**United States District Court**
**District of Columbia**

| | |
|---|---|
| **Citizens United**, | |
| *Plaintiff*, | Case No. _____ |
| *v.* | |
| **Federal Election Commission**, | THREE-JUDGE COURT |
| *Defendant.* | |

# Motion for Preliminary Injunction

Citizens United moves for a preliminary injunction as set out below and for the reasons set out in the accompanying *Memorandum* and *Verified Complaint for Declaratory and Injunctive Relief*. Fed. R. Civ. P. 65(a).

As set out more fully in the *Memorandum* and *Complaint* Citizens United challenges the constitutionality of **(a) § 201** (the "**Reporting Requirement**") of the Bipartisan Campaign Reform Act of 2002 ("BCRA") and **(b)** BCRA **§ 311** (the "**Disclaimer Requirement**") as applied to communications that meet the statutory definition of electioneering communications, 2 U.S.C. § 434(f)(3), but are not properly considered electioneering communications for any purpose, including disclosure, because the "ads may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate, . . . are not the functional equivalent of express advocacy, and therefore fall outside the scope of *McConnell*'s holding," *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652, 2670 (2007) ("*WRTL II*"), and, specifically, Citizens United's planned advertising (the "Ad") promoting a new documentary shortly to be released in theaters and in DVD format.

Citizens United submits that it meets the standards for a preliminary injunction, i.e., it has probable success on the merits, it will be irreparably harmed, others will not be substantially harmed, the public interest will be served, and there is no adequate remedy at law.

Pursuant to Local Rule of Civil Procedure 7(m), Citizens United has conferred with legal counsel for the FEC regarding this motion. The FEC objects to this motion.

Because a preliminary injunction presents no monetary risks to the FEC, Citizens United requests that bond be set at $1. Fed. R. Civ. P. 65(c).

For the reasons stated in the accompanying *Memorandum* and *Complaint*, Citizens United prays that the Court grant this motion and preliminarily enjoin the FEC from enforcing the challenged provisions as applied until a final hearing on the merits.

Oral argument is requested on this motion because of the complex legal arguments involved in this case.

Respectfully submitted,

_____

James Bopp, Jr., D.C. Bar #CO0041
Richard E. Coleson*
Jeffrey P. Gallant*
Clayton J. Callen*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/234-3685 facsimile
  * pro hac vice motion pending
*Counsel for Plaintiff*

**PI Motion**                                          2

**United States District Court**
**District of Columbia**

| | | |
|---|---|---|
| **Citizens United**, | | |
| | *Plaintiff*, | Case No. _____ |
| *v.* | | |
| **Federal Election Commission**, | | THREE-JUDGE COURT |
| | *Defendant.* | |

# Memorandum in Support of
# Preliminary Injunction Motion

———————

James Bopp, Jr., D.C. Bar #CO0041
Richard E. Coleson*
Jeffrey P. Gallant*
Clayton J. Callen*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN  47807-3510
812/232-2434 telephone
812/234-3685 facsimile
    *pro hac vice motion pending
*Counsel for Plaintiff*

**PI Memorandum**

# Table of Contents

Table of Authorities........................................................ i

Introduction............................................................... 1

Facts..................................................................... 2

Argument.................................................................. 9

    I.      Plaintiff Has a Substantial Likelihood of Success on the Merits........... 12

          A.      Campaign Restrictions Must Be "Unambiguously Campaign Related" and Properly Tailored to a Sufficient Interest............ 12

          B.      As-Applied Challenges Must Be Workable and Protect Core Political Speech....................................... 23

          C.      McConnell Did Not Decide This As-Applied Issue.............. 27

          D.      The Disclosure Requirements Are Unconstitutional As Applied to the Ads........................................... 28

    II.     Plaintiff Will Suffer Irreparable Injury Without the Injunction........... 32

    III.    The Injunction Will Not Substantially Injure Others................... 34

    IV.    The Injunction Furthers the Public Interest......................... 36

Conclusion............................................................... 36

# Table of Authorities

*Cases*

*American Civil Liberties Union of Nevada v. Heller*, 378 F.3d 979 (9th Cir. 2004).. . . . . . . 15

*Anderson v. Spear*, 356 F.3d 651 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Apotex Inc. v. U.S. Food and Drug Admin.*, – F. Supp. 2d –, WL 2695006 (D.D.C. 2007)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652 (1990). . . . . . . . . . . . . . . . . . . 22

*\*Buckley v. Valeo*, 424 U.S. 1 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 12-17, 20, 30, 31

*Center for Individual Freedom v. Carmouche*, 449 F.3d 655 (5th Cir. 2006).. . . . . . . . . . . 16

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006). . . 10, 32, 33

*Christian Civic League of Maine v. FEC*, No. 06-614, slip op. (D.D.C. Aug. 21, 2007). . . . 19

*Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981). . . . . . . . . . . . . . . . . . . 14, 31

*Delaware & H. Ry. Co. v. United Transp. Union*, 450 F. 3d 603 (D.C. Cir. 1971).. . . . . . . . 33

*Elrod v. Burns*, 427 U.S. 347 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*\*FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986). . . . . . . . . . . . . . . . . . . . 14, 20

*\*FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652 (2007).. . . . . . . . . . . . . . . . . . . . . . *passim*

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978). . . . . . . . . . . . . . . . . . . . 14, 36

*Marks v. United States*, 430 U.S. 188 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*\*McConnell v. FEC*, 540 U.S. 93 (2003).. . . . . . . . . . . . . . . . 1, 2, 12, 15-17, 20-23, 26-28, 30

*New York Times v. Sullivan*, 376 U.S. 254 (1964).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*San Jose Silicon Valley Chamber of Commerce PAC v. San Jose*, No. 06-0425) (N.D.
Cal. Sep. 20, 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Thornhill v. Alabama,* 310 U.S. 88 (1940). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Virginia v. American Bookseller's Ass'n Inc.*, 484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . 33

*Wisconsin Right to Life v. FEC*, 466 F. Supp. 2d 195 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . 34

*Wisconsin Right to Life v. FEC*, 546 U.S. 410 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Wisconsin Right to Life v. FEC*, No. 04-1260, slip op. (D.D.C. July 23, 2007) . . . . . . . . . . 18

***Statutes, Rules, and Constitutional Provisions***

11 C.F.R. § 100.29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

11 C.F.R. § 104.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

11 C.F.R. § 110.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

11 C.F.R. § 110.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11 C.F.R. § 114.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

11 C.F.R. § 114.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

11 C.F.R. § 114.15(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11 C.F.R. § 114.15(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11 C.F.R. § 114.15(b)(3)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

2 U.S.C. § 434(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2 U.S.C. § 434(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

2 U.S.C. § 441d(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

26 U.S.C. § 501(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

26 U.S.C. § 501(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Bipartisan Campaign Reform Act of 2002 ("BCRA") . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. art. I, § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Pub. L. No. 107-155 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*U.S. Const. amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Other Authorities**

*Brief of Family Research Council, Free Market Foundation, and Home School Legal Defense Association as Amici Curiae in Support of Appellee, WRTL II*, 540 U.S. 93. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

http://gullfoss2.fcc.gov/ecd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

http://www.fec.gov/info/charts_ec_dates_prez.shtml . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

http://www.fec.gov/law/law_rulemakings.shtml#ec07. . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Neil A. Lewis, *White House Got More Files Than Disclosed*, N.Y. Times, June 12, 2007. . . 8

# Introduction

Just as *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652 (2007) ("*WRTL II*"), was an as-applied challenge to a prohibition in the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81, that had been facially upheld in *McConnell v. FEC*, 540 U.S. 93 (2003), so this is an as-applied challenge to a BCRA provision facially upheld in *McConnell*. In both cases, the provisions are unconstitutional as applied.

*McConnell* facially upheld the prohibition on corporate electioneering communications, but *WRTL II* held that communications falling within the electioneering communication definition (i.e., targeted broadcast ads referencing candidates during defined preelection periods) were protected issue advocacy unless "the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 127 S. Ct. at 2667.[1] As explained in Part I.A, *infra*, this no-other-reasonable-interpretation test was the latest application of a constitutional first principle recognized in *Buckley v. Valeo*, 424 U.S. 1 (1976), namely, that to avoid unconstitutional overbreadth all campaign laws may only regulate First Amendment activity that is "unambiguously related to the campaign of a particular federal candidate." *Id.* at 80. In short, they must be "unambiguously campaign related." *Id.* at 81.

---

[1]The cited opinion is by Chief Justice Roberts, joined by Justice Alito. As the controlling *WRTL II* opinion, the principal opinion states the holding of the Court and will herein simply be referred to as *WRTL II*. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (citation omitted)).

*Buckley* expressly applied this unambiguously-campaign-related requirement to the *disclosure of expenditures*. *Id.* at 80. Therefore, it has direct application here.

*McConnell* facially upheld what shall be called herein the Disclosure Requirements.[2] 540 U.S. at 194-202. As set out below, the Disclosure Requirements are unconstitutional as applied to the activities planned by Citizens United, which activities are not unambiguously campaign related and so are beyond Congress' authority to regulate and are protected by the First Amendment.

## Facts

Plaintiff Citizens United is a nonstock, nonprofit (under 26 U.S.C. § 501(c)(4)), membership, Virginia corporation with its principal office in Washington, District of Columbia. Defendant Federal Election Commission ("FEC") is the government agency with enforcement authority over FECA.

Citizens United was founded in 1988. Its purpose is to promote the social welfare through informing and educating the public on conservative ideas and positions on issues, including national defense, the free enterprise system, belief in God, and the family as the

---

[2]This is an as-applied challenge to the constitutionality of **(a) § 201** of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81, 88-89, entitled "Disclosure of Electioneering Communications," which added a new subsection "(f)" to § 304 of the Federal Election Campaign Act ("FECA") that requires reporting of electioneering communications and **(b)** BCRA **§ 311**, 116 Stat. 105, requiring that electioneering communications contain "disclaimers." *See* 11 C.F.R. § 110.11. BCRA § 201 is called herein the "**Reporting Requirement**," BCRA § 311 is called the "**Disclaimer Requirement**," and the requirements together are called the "**Disclosure Requirements**" for ease of identification. The Reporting Requirement is codified at 2 U.S.C. § 434(f). The Disclaimer Requirement is codified at 2 U.S.C. § 441d(a).

basic unit of society. Its current annual budget is about $12 million. Citizens United has a related § 501(c)(3) entity called Citizens United Foundation ("CUF").

Citizens United is not a "qualified nonprofit corporation" because it receives corporate donations and engages in business activities. *See* 11 C.F.R. § 114.10 (exempting certain ideological, nonstock, nonprofit corporations from the electioneering communication prohibition),

One of the principal means by which Citizens United fulfills its purposes is through the production and distribution of documentary films. Its first major documentary film, in 2004, was entitled *Celsius 41.11: The Temperature at Which the Brain Begins to Die*. The film was a conservative response to Michael Moore's documentary *Fahrenheit 9/11* and was shown in over 100 theaters in 2004. It continues to be sold in DVD format. In 2005, Citizens United and CUF co-produced *Broken Promises: The United Nations at 60*, which was an exposé on the United Nations narrated by noted actor Ron Silver. This film was released in DVD format. In 2006, Citizens United and CUF co-produced two films: *Border War: The Battle Over Illegal Immigration* and *ACLU: At War With America*. *Border War* had a limited theatrical release and was sold on DVD. *ACLU* was released only in DVD format.

*Broken Promises* and *Border War* have competed for and won a number of awards from the motion picture industry. *Broken Promises* won a Special Jury Remi Award at the 2006 Houston International Film Festival. *Border War* won best feature documentary at the 2006 Liberty Film Festival, a Silver Remi Award at the 2007 Houston International Film Festival, and best feature documentary film honors from the American Film Renaissance in February 2007. *Border War* also qualified for consideration under the Academy of Motion

**PI Memorandum**                                    3

Picture Arts and Sciences demanding criteria for nomination to the 79th Academy Awards in February 2007.

In 2007, CUF produced *Rediscovering God in America*, which is narrated by Newt and Calista Gingrich. This film premiered in Washington, D.C., and New York City and is now available in DVD format only. As of December 11, 2007, the film was the top selling historical documentary on Amazon.com.

Citizens United is in the final stages of production on a feature length documentary film on Senator Hillary Clinton entitled *Hillary: The Movie*. This issue-advocacy film will be released somewhere in the December 2007 to February 2008 time-frame and is slated for both theaters and DVD sales. It includes interviews with numerous individuals and many scenes of Senator Clinton at public appearances. It is about 90 minutes in length. It does not expressly advocate Senator Clinton's election or defeat, but it discusses her Senate record, her White House record during President Bill Clinton's presidency, and her presidential bid. Some interviewees also express opinions on whether she would make a good president. A compendium book is being published by Thomas Nelson Publishers, which has purchased the book rights to the film and is paying Citizens United an advance royalty on sales. Neither of the Disclosure Requirements applies to the documentary itself.

When Citizens United produced *Celsius 41.11* in 2004, it ran national broadcast ads promoting the film. The original version of the ads had images and sound bites of President George Bush and Senator John Kerry, but those images and sound bites had to be deleted from the ads due to the electioneering communication prohibition. Prior to running the ads, Citizens United received FEC Advisory Opinion 2004-30, stating that its film ads would

**PI Memorandum**                          4

qualify as electioneering communications and would not be exempt under the Press Exemption.

Citizens United intends to fund television ads ("Ads") to promote *Hillary: The Movie* that will meet the electioneering communication definition at 2 U.S.C. § 434(f)(3), *see* ¶ ? *infra*, but will not properly be an electioneering communication for any purpose, including disclosure, because the Ads "may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate, . . . [is] not the functional equivalent of express advocacy, and therefore fall[s] outside the scope of *McConnell*'s holding." *WRTL II*, 127 S. Ct. at 2670. A true and correct transcript of the Ads is attached. *See Exhibit 1*. Citizens United has not, and will not, coordinate the production and broadcast of the Ads with any candidate, campaign committee, political committee, or political party.

The Ads that Citizens United intends to broadcast will meet the electioneering communications definition at 2 U.S.C. § 434(f)(3) and 11 C.F.R. § 100.29 because they (**a**) will be broadcast on Fox News cable and major network stations so that they (**b**) will be receivable by more than 50,000 persons, *see* http://gullfoss2.fcc.gov/ecd (Federal Communications Commission's Electioneering Communications Database), in states where caucuses, conventions, or primary elections will be selecting a party nominee, (**c**) will clearly reference Senator Clinton, a Democratic presidential candidate, and (**d**) will be made within 30 days before the following caucuses, conventions, or primaries in the identified states (with electioneering communication periods indicated) where she will be on the ballot: **Iowa** Presidential Caucus (12/04/07 - 01/03/08); **New Hampshire** Presidential Primary (12/09/07 - 01/08/08); **Michigan** Presidential Primary (12/16/07 - 01/15/08); **Nevada** Presidential

**PI Memorandum**                    5

Caucus (12/20/07 - 01/19/08); **South Carolina** Presidential Primary (D) (12/27/07 - 01/26/08); **Florida** Presidential Primary (12/30/07 - 01/29/08). *See* http://www.fec.gov/info/charts_ec_dates_prez.shtml (electioneering communication periods).

Citizens United will broadcast the 30-second, issue-advocacy ad entitled "Questions" on Fox News cable, and may broadcast it on major television network stations, too. Citizens United will broadcast the 10-second ads "Wait" and "Pants" on major television network stations, but not on Fox News. The disclaimer language mandated by FEC rule, *see* 11 C.F.R. § 110.11, takes about 4 seconds to narrate, making 10-second ads virtually impossible and 30-second ads extremely difficult to do and have any significant time left for substantive communication.

Citizens United's Ads will promote showings of *Hillary: The Movie* in theaters and sales of *Hillary* in DVD format, which may be pre-ordered while the movie is in theaters, and refer viewers to www.hillarythemovie,com for more information about the documentary and how to see or purchase it. When publicly released, the DVD form of *Hillary* will be available from major national retailers, such as Amazon.com.

Citizens United would like to begin broadcasting its Ads on Monday, December 17, 2007, and run them through the middle of January for its initial media buy. However, because it will not run the Ads absent the requested relief from this Court, Citizens United intends to begin broadcasting its ads when it gets the relief requested herein and run them through the middle of January for its initial media buy. If Senator Clinton becomes the presidential nominee of her party, Citizens United will again plan to run the Ads (and possibly materially-similar ads) on Fox News cable (and possibly other broadcast outlets) within 30 days before

the Democratic National Committee Convention (electioneering communication period is 07/29/08 - 08/28/08) and within 60 days of the November general election (electioneering communication period is 09/05/08 - 11/04/08). *See* http://www.fec.gov/in-fo/charts_ec_dates_prez.shtml. At these times, the Ads will also meet the electioneering communication definition. Citizens United believes that these are the times when the public's interest in Senator Clinton will be at its peak, which is the key to maximizing box office and DVD sales for *Hillary*.

In addition to being protected issue advocacy, the Ads meet the requirements of the recently-enacted FEC rule recognizing a commercial-transaction safe-harbor exception to the electioneering communication prohibition because each (**a**) "[p]roposes a commercial transaction, such as purchase of a book, video, or other product or service, or such as attendance (for a fee) at a film exhibition or other event," 11 C.F.R. § 114.15(b)(3)(ii); (**b**) "[d]oes not mention any election, candidacy, political party, opposing candidate, or voting by the general public," *id.* at § 114.15(b)(1); and (**c**) "[d]oes not take a position on any candidate's or officeholder's character, qualifications, or fitness for office." *Id.* at § 114.15(b)(2).

The Ads are subject to the Disclosure Requirements because the FEC recently refused requests to exclude from the Disclosure Requirements "electioneering communications" that meet the Supreme Court's issue-advocacy safe harbor, *WRTL II*, 127 S. Ct. at 2667 (no-other-reasonable-interpretation test), or the FEC's own commercial-transaction safe harbor. *See* http://www.fec.gov/law/law_rulemakings.shtml#ec07 (rulemaking documents, including requests to eliminate disclosure for ads not subject to electioneering communication prohibition).

**PI Memorandum**                                    7

One of the chief concerns with the Reporting Requirement is the disclosure of donors who may then be subject to various forms of retaliation by political opponents. On information and belief, the Clinton White House had in its possession over 1,000 FBI files on political opponents. *See*, *e.g.*, Neil A. Lewis, *White House Got More Files Than Disclosed*, N.Y. Times, June 12, 2007 (available by query at google.com).

Citizens United will have donors that it will be required to disclose (as to name and address), absent the judicial relief requested here, because it will pay for the Ads "exclusively from a segregated bank established to pay for electioneering communications permissible under 11 C.F.R. § 114.15" (rule implementing *WRTL II* by permitting corporate electioneering communications), to which donors will have "donated an amount aggregating $1,000 or more . . . since the first day of the preceding calendar year." 11 C.F.R. § 104.20.

Citizens United intends to broadcast materially-similar ads mentioning public figures who are candidates in materially-similar situations during future electioneering communication periods when public interest is at a peak. There is a strong likelihood that such similar situations will recur, given the facts that Plaintiff has engaged in similar activity in the past and that such activity is common and regularly recurring for it—as are conflicting electioneering communication periods.

Citizens United intends to broadcast its Ads without complying with the Disclosure Requirements, but it will not broadcast its Ads if it does not obtain the judicial relief presently requested. If Citizens United does not obtain the judicial relief presently requested, it will not proceed with its activities as planned. Instead, it will be forced to include the compelled speech of a disclaimer, which (**a**) requires it to mislead the public by identifying

**PI Memorandum**                                       8

its speech as electioneering speech when it is not because the U.S. Supreme Court has held

that such speech is not sufficiently related to elections to be regulated as electioneering and

(**b**) deprives Citizens United of valuable time in its short and expensive broadcast Ads, which

deprivation and burden is not justified by any constitutional or congressional authority.

Adding the disclaimer will preclude Citizens United from running its 10-second ads and will

require it to revise its 30-second ad so as to be much less effective—both as the issue

advocacy that it is and as a vehicle for promoting *Hillary: The Movie*. And Citizens United

will be compelled to file reports of its activity, which (**1**) requires it to mislead the public by

reporting its speech as electioneering speech when it is not because the U.S. Supreme Court

has held that such speech is not sufficiently related to elections to be regulated; (**2**) deprives

Citizens United of valuable time and resources in complying with reporting requirements,

which deprivation and burden is not justified by any constitutional or congressional authority;

and (**3**) will, in Citizens United's belief based on long experience, substantially reduce the

number of donors and amount of donations to Citizens United because many potential donors

do not wish to be publicly so identified for a variety of legitimate reasons. In such an event, it

will be deprived of its constitutional rights under the First Amendment to the United State

Constitution by these substantial burdens on its highly-protected, core "political speech,"

*WRTL II*, 127 S. Ct. at 2659 (twice), 2660, 2664, 2665 (thrice), 2666 (twice), 2669, 2671-74,

and will suffer irreparable harm. There is no adequate remedy at law.

## Argument

Four factors govern temporary restraining orders and preliminary injunctions:

> To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. [*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted) (preliminary injunction standards). *See also Apotex Inc. v. U.S. Food and Drug Admin.*, – F. Supp. 2d –, WL 2695006, at *3 (D.D.C. 2007) (applying same standards for temporary restraining order).]

"A district court must 'balance the strengths of the requesting party's arguments in each of the four required areas," and "[i]f the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *England*, 454 F.3d at 297.[3]

The current motion should be considered in light of *WRTL II,* in which WRTL was denied a preliminary injunction allowing it to run its 2004 anti-filibuster grassroots lobbying ads. *See WRTL II*, 127 S. Ct. at 2661. Yet the four-Justice *WRTL II* dissent argued that a preliminary injunction was the proper remedy in lieu of the no-other-reasonable-interpretation test and application rules that *WRTL II* created:

> Although WRTL contends that the as-applied remedy has proven to be "[i]nadequate" because such challenges cannot be litigated quickly enough to avoid being mooted, Brief for Appellee 65-66, nothing prevents an advertiser

---

[3]*England* cited a U.S. Supreme Court case for the proposition that "'[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," *id.* (citation omitted), but neither *England* nor the case it cited involved First Amendment expression and association rights in the core area of political speech. So the status quo argument has no applicability to the present case, which is rather governed by the holding of *Elrod v. Burns*, 427 U.S. 347, 373 (1976), that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See England*, 454 F.3d at 299 ("*Elrod* involved political speech and freedom of expression"). Where loss of First Amendment freedoms is occurring, maintaining the status quo is unjust and unjustified. Nor does a presumption of the constitutionality of a statute apply in the face of the First Amendment's strict and intermediate standards of review, which presume unconstitutionality by requiring the government to specially justify burdens on expression and association.

**PI Memorandum**                    10

> from obtaining a preliminary injunction if it can qualify for one, and WRTL
> does not point to any evidence that district courts have been unable to rule on
> any such matters in a timely way. [127 S. Ct. at 2704 (Souter, J., joined by
> Stevens, Ginsburg & Breyer, JJ.).]

The necessary implications of this argument is that there should have been a *real* possibility of obtaining a preliminary injunction in the situation that WRTL faced then and that there should be such a possibility in the situation that Plaintiff now faces. That means that all four required elements must be *capable* of being met in this situation. So, for example, the FEC must not be permitted to trump a preliminary injunction by merely asserting that it is always injured if it is unable to enforce a statute, no matter how questionable its constitutionality.

In light of *WRTL II*, it is clear that WRTL's ads *were* fully constitutionally protected issue advocacy and WRTL *should* have been allowed to run them in 2004 when it sought judicial relief to do so. It is now clear that WRTL was irreparably harmed, the FEC (and others) would not have been harmed, and the public interest would have been served if WRTL's ads had been run. While determining the likelihood of success on the merits is necessarily predictive—so that actual success does not necessarily establish that there was an ascertainable likelihood of success at the time the preliminary injunction motion was decided—WRTL succeeded on arguments grounded in the same constitutional analysis applied in the present case. So the likelihood of success is now easy to ascertain in the present case. Plaintiff's irreparable harm is also clear in light of *WRTL II. See infra* Part II. In view of the high likelihood of success on the merits and the clear and serious irreparable harm, Plaintiff would only need to make a more modest showing as to concerns about harm to the FEC or others and about promoting the public interest. However, in light of the high likelihood of success on the merits, harm to the FEC or others is highly unlikely and a benefit

**PI Memorandum**                                11

to the public is very likely if a preliminary injunction is granted. And *WRTL II* made clear

that any doubts about protecting issue advocacy should be resolved in favor of speech, not

censorship. 127 S. Ct. at 2659, 2667, 2669 n.7, 2674.

## I. Plaintiff Has a Substantial Likelihood of Success on the Merits.

### A.    Campaign Restrictions Must Be "Unambiguously Campaign Related" and Properly Tailored to a Sufficient Interest.

The Constitution mandates that "Congress shall make no law . . . abridging the

freedom of speech." U.S. Const. amend. I. This "'guarantee has its fullest and most urgent

application precisely to the conduct of campaigns for political office.'" *Buckley*, 424 U.S. at

15 (citation omitted). If "Congress shall make no law," then how may government regulate

First Amendment activities related to election campaigns? *Buckley* provided the answer:

"The constitutional power of Congress to *regulate federal elections* is well established and is

not questioned by any of the parties in this case." *Id.* at 13 (footnote omitted) (emphasis

added). *Buckley* noted that "Article I, § 4, of the Constitution grants Congress the power to

regulate elections of members of the Senate and House of Representatives." *Id.* at 13 n.16

(also citing decisional authorities extending this power to elections for President and Vice

President and to primary elections).

This authority to regulate elections is self-limiting. If the government tries to regulate

First Amendment activity that is not closely and clearly related to election campaigns, it goes

beyond its authority to regulate elections.[4]  The key to the *Buckley* analysis (as stated in its

---

[4]This is a different issue than the one raised in *McConnell* where the argument raised
was that BCRA "impair[ed] the authority of the States to regulate their own elections." 540
U.S. at 186. The Court rejected this argument, based on the facts that BCRA only regulated
(continued...)

**PI Memorandum**                    12

discussion of a *disclosure* requirement) is the clearly articulated constitutional question of whether "the *relation* of the information sought to the purpose of the Act [regulating elections] *may be too remote*," and, therefore, "*impermissibly broad*." *Id.* at 80 (emphasis added). The Court requires that government restrict its election-related laws to reach only First Amendment activities that are "*unambiguously related* to the campaign of a particular federal candidate," *id.* at 80 (emphasis added), in short, "unambiguously campaign related." *Id.* at 81.

Buckley applied this unambiguously-campaign-related requirement to (1) expenditure limitations, *id.* at 42-44; (2) PAC status and disclosure, *id.* at 79; (3) non-PAC *disclosure* of contributions and independent expenditures,[5] *id.* at 79-81; and (4) contributions. *Id.* at 23 n.24, 78 ("So defined, 'contributions' have a sufficiently close relationship to the goals of the Act [regulating elections], for they are connected with a candidate or his campaign."). Because *Buckley* expressly applied this unambiguously-campaign-related requirement to the *disclosure of expenditures*, *id.* at 80, it has direct application here.

Buckley employed two tests to implement this unambiguously-campaign-related requirement. First, to implement the requirement for PAC status, the Court created the major purpose test for "political committees": "To fulfill the purposes of the Act [regulating

---

[4](...continued)
private parties, not states, and that the government has "a fully legitimate interest in maintaining the integrity of federal officeholders and preventing corruption" in federal elections. 540 U.S. at 187.

[5]"Independent expenditure" is a term of art referring to an express-advocacy communication that is not coordinated with a candidate so as to become a contribution. *See* 2 U.S.C. § 431(17).

elections] they need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. *Buckley*, 424 U.S. at 79. "Expenditures of candidates and of 'political committees' so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, *campaign related*." *Id.* at 79 (emphasis added). This test assures that expenditures are "unambiguously related to the campaign of a particular federal candidate." *Buckley*, 424, U.S. at 80. Second, to implement the unambiguously-campaign-related requirement as to expenditures, the Court created the express advocacy test, i.e., whether a communication contains explicit words expressly advocating the election or defeat of a clearly identified candidate. *Buckley*, 424 U.S. at 44, 80.

In *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986) ("*MCFL*"), the Court again recognized the unambiguously-campaign-related requirement in two areas. First, it applied the express advocacy test to implement the unambiguously-campaign-related requirement as applied to the prohibition on corporate and union independent expenditures at 2 U.S.C. § 441b. *MCFL*, 479 U.S. at 249. Second, *MCFL* reiterated the major purpose test, which implements the unambiguously-campaign-related requirement as to PAC status. *Id.* at 253, 262 (major purpose test determined by express-advocacy "independent spending").[6]

_____

[6]The unambiguously-campaign-related requirement was also affirmed in *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978), which held that corporations could not be precluded from making either contributions or expenditures for or against ballot initiatives because "[r]eferenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *Id.* at 790 (citations omitted). And the requirement was affirmed again in *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981) ("CARC"), which applied "exacting scrutiny," *id.* at 294 ("Placing limits on contributions which in turn
(continued...)

**PI Memorandum**                    14

While *McConnell*, 540 U.S. 93, declared "the express advocacy restriction . . . an

endpoint of statutory interpretation, not a first principle of constitutional law," the express

advocacy test was created to implement the unambiguously-campaign-related requirement,

which *is* a first principle of constitutional law. *McConnell* expressly recognized this by

quoting *Buckley*'s explanation that the express advocacy construction was done "'[t]o insure

that the reach' of the disclosure requirement was 'not impermissibly broad.'" *Id.* at 191

(*quoting Buckley*, 424 U.S. at 80). *McConnell* also implicitly endorsed the unambiguously-

campaign-related requirement when it stated that "[i]n narrowly reading the FECA provisions

in *Buckley* to avoid problems of vagueness and overbreadth, we nowhere suggested that a

statute that was neither vague nor overbroad would be required to toe the same express

advocacy line." *Id.* at 192. Implicitly then, where a restriction on First Amendment liberties *is*

vague or overbroad (for reaching beyond things unambiguously campaign related) it must toe

the express advocacy line,[7] or its "functional equivalent." *Id.* at 206. *McConnell*'s facial

---

[6](...continued)
limit expenditures plainly impairs freedom of expression"), to a limit on contributions to a
California ballot initiative committee and held it unconstitutional because it d[id] not advance
a legitimate governmental interest significant enough to justify its infringement of First
Amendment rights." *Id.* at 298.

   [7]Since *McConnell*, several courts have embraced the express advocacy construction as
an indispensable tool in dealing with vague or overbroad provisions. For example, the Ninth
Circuit in *American Civil Liberties Union of Nevada v. Heller*, 378 F.3d 979, 985 (9th Cir.
2004), followed the Sixth Circuit in endorsing the express advocacy test as the appropriate
tool where a provision is vague and overbroad:

   Nevertheless, as stated recently by the Sixth Circuit, *McConnell* "left intact the
   ability of courts to make distinctions between express advocacy and issue
   advocacy, where such distinctions are necessary to cure vagueness and over-
   breadth in statutes which regulate more speech than that for which the legisla-
   ture has established a significant governmental interest." *Anderson v. Spear*,

                                                                          (continued...)

**PI Memorandum**              15

upholding of the prohibition on electioneering communications only "to the extent that [they] . . . are the functional equivalent of express advocacy," *id.*, is another reaffirmation of the unambiguously-campaign-related requirement.[8]

WRTL II applied the unambiguously-campaign-related requirement to eliminate overbreadth in the regulation of BCRA's new "electioneering communications" when it stated its test for functional equivalence: "[A]n ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 127 S. Ct. at 2667. *WRTL II* reiterated the requirement when it said that the corporate-form corruption interest does not "extend[] beyond *campaign speech.*" *Id.* at 2672 (emphasis added). So *WRTL II*'s no-other-reasonable-interpretation test is the application of the unambiguously-campaign-related requirement to electioneering communications, just as the express advocacy test was the Court's application of the unambiguously-campaign-related requirement to independent expenditures. In light of *WRTL II*, there is no longer a "functional equivalent of express advocacy" test, *McConnell*, 540 U.S. at 206, because that test has been superseded by the no-other-reasonable-interpretation test.

---

[7](...continued)
356 F.3d 651, 664-65 (6th Cir. 2004).

*See also Center for Individual Freedom v. Carmouche*, 449 F.3d 655 (5th Cir. 2006); *San Jose Silicon Valley Chamber of Commerce PAC v. San Jose*, No. 06-0425) (N.D. Cal. Sep. 20, 2006) (Order Granting Plaintiff's Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment).

[8]*McConnell* also expressly recognized the existence of "issue advocacy," which it described as "'discussion of political policy generally or advocacy of the passage or defeat of legislation,'" *id.* at 205 (*quoting Buckley,* 424 U.S. at 48), and of "genuine issue ads" that it recognized likely lay beyond Congress' ability to regulate. *Id.* at 206 n.88. Issue advocacy is not unambiguously campaign related, as *WRTL II* recognized. *See infra.*

*WRTL II* also reaffirmed that the purpose of the unambiguously-campaign-related requirement—and its no-other-reasonable-interpretation test applying it—is twofold. Negatively, it confines government within the pale of its constitutional authority to regulate elections. *See supra*. Positively, it protects what the Court calls "'genuine issue ads,'" 127 S. Ct. at 2659 (*quoting McConnell*, 540 U.S. at 206 & n.88), 2668 (same), 2673 (same), or "issue advocacy." *Id.* at 2667.[9] *WRTL II* explained that "[i]ssue advocacy conveys information and educates," *id.* at 2667, and reaffirmed *Buckley*'s statement that, because issue advocacy and candidate advocacy often look alike, bright-line tests are required to protect issue advocacy from being chilled, and any doubt must be resolved in favor of free speech:

> [W]e have acknowledged at least since *Buckley* . . . that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." 424 U.S., at 42. Under the test set forth above, that is not enough to establish that the ads can only reasonably be viewed as advocating or opposing a candidate in a federal election. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama,* 310 U.S. 88, 102 (1940). Discussion of issues cannot be suppressed simply because the issues may also be pertinent in an election. Where the First Amendment is implicated, the tie goes to the speaker, not the censor. [*Id.* at 2669.]

Lest there be any doubt as to the necessity of speech-protective lines, *WRTL II* reiterated that "the benefit of any doubt [goes] to protecting rather than stifling speech," *id.* at 2667 (*citing New York Times v. Sullivan*, 376 U.S. 254, 269-70 (1964)), "in a debatable case, the tie is resolved in favor of protecting speech," *id.* at 2669 n.7, and "the benefit of the doubt [goes to] speech, not censorship." *Id.* at 2674. In other words, free speech about public issues,

---

[9]*See also id.* at 2672-73 (listing prior concurrences by Justices Brennan and Stevens distinguishing issue advocacy from campaign advocacy).

especially political ones, is so central and essential to our system of government that it is better to allow some theoretically-regulable speech to go unrestricted than to chill public debate. This approach is akin to our criminal jurisprudence, which says that it is better to let a guilty person go free than to convict an innocent person, except that chilling free speech affects not only the lone speaker, but also her hearers and our very system of government. *WRTL II* reaffirmed what the Court held in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002): "The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." *Id.* at 2670 (*quoting Ashcroft*, 535 U.S. 234 at 255). To do otherwise would "'turn[] the First Amendment upside down.'" *Id.* (citation omitted).

Two post-*WRTL II* cases further develop the scope of protection for issue advocacy in the context of electioneering communications—showing applications of the *WRTL II* no-other-reasonable-interpretation test and the underlying unambiguously-campaign-related requirement. In both of these cases, the FEC and the intervenors (BCRA prime sponsors Sen. McCain et al.) agreed to a stipulated judgment conceding that the ads at issue were protected issue advocacy under *WRTL II*'s test. One of these cases is *WRTL III*, which held the election-eering communication prohibition unconstitutional as applied to WRTL's 2006 Child Custody Protection Act ("CCPA") advertisement. *Wisconsin Right to Life v. FEC*, No. 04-1260, slip op. at 1 (D.D.C. July 23, 2007) ("*WRTL III*").[10] The CCPA ad stated the positions of Senators

---

[10]WRTL sought a preliminary injunction during the 2006 prohibition period, as part of its ongoing *WRTL* litigation, to permit it to run this **CCPA ad** (preliminary injunction was denied and a decision on the ad was held in abeyance until after *WRTL II*):

    Listen up, parents. Wisconsin requires parental consent before your minor

                        (continued...)

**PI Memorandum**                    18

Feingold and Kohl (the candidate), based on their prior votes, and characterized their positions. The other case involved a "Crossroads" advertisement that the Christian Civic League of Maine ("CCLM") sought to run.[11] This ad stated the candidates' position on the issue and characterized that position. The district court held the electioneering prohibition unconstitutional as applied to the Crossroads ad." *Christian Civic League of Maine v. FEC*, No. 06-614, slip op. at 1-2 (D.D.C. Aug. 21, 2007) ("*CCLM*"). Consequently, there is now no question that ads stating a candidate's position and characterizing that position may be fully protected issue advocacy and excluded from the electioneering communication definition.

---

[10](...continued)
daughter can have an abortion. But, she can be taken to Illinois for an abortion that is kept secret from you. Imagine, your daughter can be taken across state lines for a major surgical procedure without your knowledge or consent. The U.S. Senate recently passed a bill to protect parents from secret abortions. Fortunately, Senator Kohl voted for the rights of parents. But, sadly, Senator Feingold did not. Your help is urgently needed because some Senators are holding up further action on the bill. Please call Senators Kohl and Feingold at 202-224-3121 and urge them to stop efforts by the Senate Democratic leadership to hold up a bill which will prevent secret abortions. That's 202-224-3121.

[11]CCLM sought judicial protection to run this **Crossroads ad** (preliminary injunction was denied and the case dismissed for mootness, which decision the Supreme Court reversed):

Our country stands at the crossroads—at the intersection of how marriage will be defined for future generations. Marriage between a man and a woman has been challenged across this country and could be declared unconstitutional at any time by rogue judges. We must safeguard the traditional definition of marriage by putting it beyond the reach of all judges—by writing it into the U.S. Constitution. Unfortunately, your senators voted against the Marriage Protection Amendment two years ago. Please call Sens. Snowe and Collins immediately and urge them to support the Marriage Protection Amendment when it comes to a vote in early June. Call the Capitol switchboard at 202-224-3121 and ask for your senators. Again, that's 202-224-3121. Thank you for making your voice heard.

**PI Memorandum**                    19

The unambiguously-campaign-related requirement is the unifying constitutional

principle and analysis of the governing precedents here—*Buckley*, *MCFL*, *McConnell*, and

*WRTL II*. It has been applied by the Supreme Court as a threshold test—regardless of the level

of scrutiny[12]—to assure that restrictions based on government-asserted interests in regulating

elections under Article I, § 4 of the Constitution are closely and clearly related to that

authority. *See*, *e.g.*, *Buckley*, 424 U.S. at 80-81. It has been applied to determine whether the

Government has a sufficient interest. *See WRTL II*, 127 S. Ct. at 2667 ("This Court has never

recognized a compelling interest in regulating ads, like WRTL's, that are neither express

advocacy nor its functional equivalent."), 2672 (corporate-form corruption interest does not

"extend[] beyond campaign speech"), *see also McConnell*, 540 U.S. at 167, 170 (First

Amendment activity must "benefit directly federal candidates" for corruption interest to exist

under intermediate scrutiny). And any tailoring analysis as to the relation of a restriction to the

governmental interest in regulating corruption relating to *elections* must logically establish

that the restriction has a close and clear nexus to *elections*. *Cf. Buckley*, 424 U.S. at 80 ("too

remote" statement may be viewed as either a threshold test or as a tailoring analysis).

The unambiguously-campaign-related requirement mandates that the Disclosure

Requirements not be applied to what the Supreme Court calls "'genuine issue ads,'" *WRTL II*,

127 S. Ct. at 2659 (*quoting McConnell*, 540 U.S. at 206 & n.88), i.e., "issue advocacy," *id.* at

2667, because issue advocacy is not unambiguously campaign related. *WRTL II* requires that

issue advocacy—or any ad (regardless of its nature) that is not the functional equivalent of

---

[12]As noted, *supra*, *Buckley* applied the unambiguously-campaign-related requirement
to the definitions of contributions, expenditures, and political committees in both restriction
and *reporting* contexts, which are subject to differing standards of scrutiny.

express advocacy as determined by the no-other-reasonable-interpretation test—must be free

from all electioneering communication "*regulation*," not just the electioneering communica-

tion *prohibition*.[13]

From the way that *WRTL II* was decided, it is clear that Court was deciding the case

based on the nature of the communication, not the nature of WRTL. Thus, issue ads passing

the no-other-reasonable-interpretation test are not unambiguously campaign related and must

re exempted from all regulation. *WRTL II*'s analysis goes to the *definition* of "electioneering

communication" itself, which then necessarily mandates that all regulations based on that

definition may only be applied to communications that fail the no-other-reasonable-interpreta-

_____

[13]The controlling opinion made this clear by repeatedly stating that ads that are not the functional equivalent of express advocacy under the no-other-reasonable interpretation test are to be free from "regulation," not just prohibition. *See WRTL II*, 127 S. Ct. at 2671 ("we reject the contention that issue advocacy may be **regulated** because express election advocacy may be"); *id.* ("A corporate ad expressing support for the local football team could not be **regulated** on the ground that such speech is less "core" than corporate speech about an election"); *id.* ("This Court has never recognized a compelling interest in **regulating** ads, like WRTL's, that are neither express advocacy nor its functional equivalent. The District Court below considered interests that might justify **regulating** WRTL's ads here, and found none sufficiently compelling. We reach the same conclusion"); *id.* at 2664 ("BCRA survives strict scrutiny to the extent it **regulates** express advocacy or its functional equivalent"); *id.* at 2672 ("Issue ads like WRTL's are by no means equivalent to contributions, and the *quid-pro-quo* corruption interest cannot justify **regulating** them"); *id.* ("such a prophylaxis-upon-prophy-laxis approach to **regulating** expression is not consistent with strict scrutiny"); *id.* at 2673 ("the interest recognized in *Austin* as justifying **regulation** of corporate campaign speech and extended in *McConnell* to the functional equivalent of such speech has no application to issue advocacy of the sort engaged in by WRTL"); *id.* at 2672 ("to justify **regulation** of WRTL's ads, this interest must be stretched yet another step to ads that are *not* the functional equiva-lent of express advocacy. Enough is enough"); *id.* at 2659 ("We further conclude that the interests held to justify **restricting** corporate campaign speech or its functional equivalent do not justify **restricting** issue advocacy"); *id.* ("we have recognized that the interests held to justify the **regulation** of campaign speech and its "functional equivalent" might not apply to the **regulation** of issue advocacy") (citations and quotations omitted); *id.* at 2671 ("That a compelling interest justifies **restrictions** on express advocacy tells us little about whether a compelling interest justifies **restrictions** on issue advocacy").

**PI Memorandum**                    21

tion test and so are truly the functional equivalent of express advocacy. The Court could have ruled for WRTL based on (1) the nature of WRTL, (2) the nature of the funds used, or (3) the nature of the ads. The Court chose to decide on the basis of the nature of the ads, although all three options were argued.[14] A decision based on the nature of WRTL or of its funds would necessarily have addressed the applicability of the corporate-form interest, i.e., whether there could be a *prohibition*.[15] A decision based on the nature of the ads, which *WRTL II* chose, addresses the proper scope of the electioneering communication *definition*, i.e., are these ads the functional equivalent of express advocacy, which is unambiguously campaign related? WRTL argued that its ads were not the functional equivalent of express advocacy. The Court agreed. Even when *WRTL II* addressed the corporate-form interest, it did so based on the nature of WRTL's ads, not the nature of WRTL: "We hold that the interest recognized in *Austin* [*v. Mich. State Chamber of Commerce*, 494 U.S. 652 (1990),] as justifying regulation of corporate campaign speech and extended in *McConnell* to the functional equivalent of such speech *has no application to issue advocacy* of the sort engaged in by WRTL." *WRTL II*, 127 S. Ct. at 2673 (emphasis added).

---

[14]The nature of WRTL was argued in the *Brief of Family Research Council, Free Market Foundation, and Home School Legal Defense Association as Amici Curiae in Support of Appellee*, *WRTL II*, 540 U.S. 93, prepared by the Stanford Constitutional Law Center, which argued that all nonprofits should be exempted from the electioneering communication prohibition because the government had no corporate-form interest as applied to nonprofits. The nature of the funds that WRTL proposed to use for its ads, if necessary to obtain judicial relief, was raised in Count II of WRTL's complaint, which offered to use funds from a separate bank account containing only funds raised for the purpose from individuals, which option would have eliminated the corporate-form interest.

[15]Only corporations (and unions for parity) are *prohibited* from making electioneering communications, based on the corporate-form interest. *See McConnell*, 540 U.S. at 205.

In sum, *WRTL II*'s no-other-reasonable-interpretation test addresses the electioneering communication *definition* because the government may not regulate issue advocacy, which is not unambiguously campaign related. Since *WRTL II* was expressly decided on the basis of what properly fits in the electioneering communication *definition*, and not on what justifies a *prohibition*, *WRTL II* modified the electioneering communication definition and the Disclosure Requirements may only be applied to communications that both meet the statutory electioneering communication definition and are the functional equivalent of express advocacy: "[A]n ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 2667.

**B.     As-Applied Challenges Must Be Workable and Protect Core Political Speech.**

In BCRA, Congress mandated that this Court "advance on the docket and . . . expedite to the greatest possible extent the disposition of th[is] action," 116 Stat. 114, and *WRTL II* mandated that as-applied challenges must be workable and highly protective of First Amendment rights in order to make them an adequate remedy—to avoid the necessity of overturning *McConnell*'s facial upholding of the prohibition at issue. 127 S. Ct. at 2666-67. The principles underlying that mandate apply to the present case, which should therefore receive the same treatment required by *WRTL II* for future as-applied challenges.

WRTL expressly asked the Supreme Court in *WRTL II* to overrule its facial upholding of the electioneering communication restrictions in *McConnell*, 540 U.S. 93, unless the Court provided the relief of both (a) stating a generally-applicable test to reduce the need for litigation and (b) making as-applied challenges an adequate remedy for protecting the First

Amendment liberties of groups seeking to broadcast genuine issue ads by limiting the burdens of litigation. Brief for Appellee at i, 62, 65-70, *WRTL II*, 127 S. Ct. 2652.

WRTL described to the Supreme Court how the as-applied remedy had been wholly inadequate in vindicating its First Amendment rights due to the heavy burdens of expensive, burdensome, and intrusive discovery and litigation, with relief coming only long after the effective opportunity to run WRTL's ads had passed. *Id.* WRTL described the numerous depositions to which it was subjected and the fact that it "was required to produce a substantial volume of documents about its inner workings, plans, and finances—all information that an ideological group would otherwise keep private." *Id.* at 10 n.19. And WRTL summarized the future inadequacy of the as-applied remedy—unless the Supreme Court's holding made it adequate by limiting how future litigation should be conducted—as follows:

> So any citizen group having the temerity to want to run future ads must (1) plan well in advance to allow ample litigation time (problematic because the need for grassroots lobbying frequently arises on short notice), (2) retain a lawyer, (3) endure the invasion of its privacy by a discovery investigation at the hands of the FEC and Intervenors (which often will include their political opponents), and (4) pay the legal expenses and costs to endure the scorched-earth litigation practices of the federally-funded FEC and the statutorily-permitted Intervenors in order to get prior permission from a court to run a constitutionally-protected communication at the core of our system of self-governance by the people. [*Id.* at 66.]

*WRTL II* took explicit notice of the "chill" resulting from "'costly, fact-dependent litigation,'" 127 S. Ct. at 2665-66 (*quoting* Brief for Appellee [FEC] at 39, *Wisconsin Right to Life v. FEC*, 546 U.S. 410 (2006) ("*WRTL I*")), and set out the example of the burden of litigation imposed on WRTL in attempting to vindicate its First Amendment liberties:

> Consider what happened in these cases. The District Court permitted extensive discovery on the assumption that WRTL's intent was relevant. As a result, the defendants deposed WRTL's executive director, its legislative director, its

**PI Memorandum**                    24

political action committee director, its lead communications consultant, and one of its fundraisers. WRTL also had to turn over many documents related to its operations, plans, and finance. Such litigation constitutes a severe burden on political speech. [*Id.* at 2666 n.5.]

In response to these identified problems, *WRTL II* (a) stated a First Amendment-protective test, *id.* at 2667, and (b) prescribed how as-applied challenges must be conducted to assure adequate protection for vital First Amendment liberties. *Id.* at 2666-67. *WRTL II* said that "the proper standard . . . must be objective, focusing on the substance of the communication." 127 S. Ct. at 2666. There must be "minimal if any discovery, to allow parties to resolve disputes quickly without chilling speech through the threat of burdensome litigation." *Id.*[16] There must not be "open-ended . . . factors" that result in "'complex argument in a trial court and a virtually inevitable appeal.'" *Id.* (citation omitted). The litigation "must give the benefit of any doubt to protecting rather than stifling speech." *Id.* at 2667 (citation omitted). *See also id.* at 2669 n.7 (restating test and limitations on conduct of as-applied litigation). Because the stated goal for as-applied challenges is "to resolve disputes quickly without chilling speech through the threat of burdensome litigation," *id.* at 2666, whatever threatens burdensome litigation must be eliminated, which should include intervention by BCRA's prime sponsors, supported by the campaign finance "reform" lobby.[17]

_____

[16]*WRTL II* said that courts may take judicial notice of "basic background information . . . to put an ad in context—such as whether an ad [is about a current legislative issue]—but the need to consider such background should not be an excuse for discovery or a broader inquiry of the sort we have just noted raises First Amendment concerns." *Id.* at 2669.

[17]Plaintiff would oppose such intervention for the reasons set out by WRTL in this Court after the *WRTL II* decision. *See* Motion to Reconsider and Deny Motion to Intervene (Docket #148), *WRTL v. FEC*, 466 F. Supp. 2d 195 (D.D.C. 2006) (No. 04-1260) (explaining that added burdens caused by intervention and intervenors is contrary to *WRTL II*'s mandate

(continued...)

These as-applied litigation mandates apply with special force to the present situation, which presents purely legal questions. There is no justification for any discovery. Plaintiff has not yet run *any* of the ads that it has verified its intent to broadcast, if permitted. Under *WRTL II*, Citizens United's Ads must be examined as to their substance, without discovery into intent and effect or any other "complex" theory that might be conjured up. The issues are simple legal questions of whether there is constitutional authority for the Disclosure Requirements as applied to communications that are not the functional equivalent of express advocacy. The government simply needs to meet its burden, if it is able, of proving that the Prohibition meets the unambiguously-campaign-related requirement as applied to the Plaintiff's Ads, in order to justify its serious burdens on First Amendment rights of free expression and association. And in light of *WRTL II*, the Court should entertain no novel arguments about an as-applied challenge being precluded, *WRTL II*, 127 S. Ct. at 2659, or about *McConnell*'s facial uphold-ing of the Disclosure Requirements somehow shifting burdens from the FEC to Plaintiff, *id.* at 2663-64, or some other novel arguments based on bits of *McConnell*, 540 U.S. 93, plucked from their context and twisted in their meaning without regard to the underlying First Amendment-protective analysis. *See WRTL I*, 546 U.S. at 411 (rejecting FEC's reading of footnote out of context and without regard to its plain meaning). This case should be expedi-tiously decided as a matter of law, based on the simple legal issues presented.

---

[17](...continued)
for how as-applied challenges must be conducted, *see WRTL II*, 127 S. Ct. at 2666-67).

**C.    *McConnell* Did Not Decide This As-Applied Issue.**

*McConnell* did not preclude the present challenge. Its analysis of the Disclosure Requirements did not even address the distinction between ads that are the functional equivalent of express advocacy and genuine issue ads, let alone decide whether Congress could require disclosure as to communications that are not truly electioneering. But from the discussion in Part I.A, it is clear that, after *WRTL II*'s narrowing of the "electioneering communication" definition by imposing the no-other-reasonable-interpretation gloss, *McConnell*'s upholding of the Disclosure Requirements for electioneering communications now applies only to ads that are truly the functional equivalent of express advocacy, i.e., they are unambiguously campaign related. Moreover, it is doubtful that Congress ever intended that disclosure be required beyond whatever definition the Supreme Court might impose on BCRA's statutory definitions of electioneering communication in order to save it from overbreadth.

In *WRTL I*, the Supreme Court unanimously held that, by facially upholding BCRA's electioneering communication prohibition, the Court "did not purport to resolve future as-applied challenges." 546 U.S. at 412. The Court did so in the face of (a) the FEC's argument that the logic of the electioneering communications prohibition precluded exceptions and (b) broadly-worded facial-analysis language in *McConnell* to the effect that the Court had "uph[eld] stringent restrictions on *all* election-time advertising that refers to a candidate because such advertising will *often* convey [a] message of support or opposition." 540 U.S. at 239 (emphasis in original). Such broad language about "*all*" electioneering communications being subject to prohibition because *some* were unambiguously campaign

related did not mean that the Court would not protect issue advocacy in an as-applied challenges.

WRTL II reiterated the Court's rejection of the notion that "McConnell left 'no room' for as applied challenges," 127 S. Ct. at 2659 (citation omitted), and protected issue advocacy by applying the no-other-reasonable-interpretation test to implement the unambiguously-campaign-related requirement as applied to the electioneering communication prohibition. Id. at 2667. Therefore, any broadly-worded facial-analysis language in McConnell's discussion of the Disclosure Requirements means neither that the present as-applied claim is precluded nor that it has already been decided by the logic of McConnell. Moreover, McConnell itself warned against an overbroad reading of the language of a particular case: "We have long rigidly adhered to the tenet never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied for the nature of judicial review constrains us to consider the case that is actually before us," 540 U.S. at 192 (citation and quotation indicators omitted).

**D.    The Disclosure Requirements Are Unconstitutional As Applied to the Ads.**

It is readily apparent from a comparison of Plaintiff's planned Ads to the unambiguously-campaign-related requirement that the Disclosure Requirements are unconsti-tutional as applied to each. It should be noted preliminarily that the Hillary documentary itself is not subject to the Disclosure Requirements because it contains no express advocacy and will not be broadcast (so as to fall within an electioneering communication definition). So it requires neither a disclaimer nor any report disclosing donors. It is simply irrational to say that taking three clips (as with the "Questions" Ad) from the fully-protected, issue-advocacy movie

and broadcasting them in an ad to promote the movie must then be subject to both of the Disclosure Requirements.

The "**Wait**" and "**Pants**" ads are 10-second ads that fit both the criteria of issue advocacy and proposals for a commercial transaction. They are issue advocacy because they promote an issue-advocacy documentary that the ads promise will let you know "everything else" about Senator Clinton. Specific public issues are not addressed in these two ads, but they let the viewer know that there are other issues about this very public figure to be known, and that they may be learned by watching the documentary. These ads are clearly the sort of highly-protected, non-electioneering, core "political speech" that *WRTL II* said could not constitutionally be permitted to fall within the definition of "electioneering communication." *WRTL II*, 127 S. Ct. at 2659 ("political speech" used twice of issue advocacy), 2660, 2664, 2665 (thrice), 2666 (twice), 2669, 2671-74.

These 10-second ads also fit within the FEC's own exemption of commercial transactions from the electioneering communication prohibition (although the FEC refused to exempt such ads from disclosure). Each ad (**a**) "[p]roposes a commercial transaction, such as purchase of a book, video, or other product or service, or such as attendance (for a fee) at a film exhibition or other event," 11 C.F.R. § 114.15(b)(3)(ii); (**b**) "[d]oes not mention any election, candidacy, political party, opposing candidate, or voting by the general public," *id.* at § 114.15(b)(1); and (**c**) "[d]oes not take a position on any candidate's or officeholder's character, qualifications, or fitness for office." *Id.* at § 114.15(b)(2). That the FEC would continue to require disclosure as to such ads is simply irrational, and it is clearly inconsistent with how *WRTL II* redefined electioneering communications.

The 30-second **"Questions"** ad is plainly issue advocacy because, as *WRTL II* put it, "[i]ssue advocacy conveys information and educates." 127 S. Ct. at 2667. "Questions" has the issue-advocacy attributes of the 10-second ads and also says that "Hillary's got an agenda," which includes being "the closest thing we have in America to a European socialist." And it, too, (a) proposes a commercial transaction, (b) mentions no election, candidacy, and so on, and (c) takes no position on Senator Clinton's character, qualifications, or fitness for office.

Most importantly, none of the proposed public communications are "unambiguously related to the campaign of a particular federal candidate." *Buckley*, 424 U.S. at 80. This is clear by looking at the proposed ads and comparing them to *WRTL II*'s application of the unambiguously-campaign-related requirement to WRTL's ads through its no-other-reasonable-interpretation test.[18]

*WRTL II* held that Congress could only "regulate," 127 S. Ct. at 2671-72, "electioneering communications" meeting the statutory electioneering communication definition "if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 127 S. Ct. at 2667. "Under this test," *WRTL II* continued,

> WRTL's three ads are plainly not the functional equivalent of express advocacy.  First, their content is consistent with that of a genuine issue ad:  The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter.  Second, their content lacks indicia of express advocacy:  The ads do not mention an election, candidacy, political party, or challenger;  and

---

[18]It should be recalled that *Buckley* employed the express advocacy construction, to which *McConnell* likened some electioneering communications, 540 U.S. at 206 ("functional equivalent of express advocacy"), precisely to fulfill the unambiguously-campaign-related requirement. *Buckley*, 424 U.S. at 39-44, 80-81. Thus, the *WRTL II* analysis is a transferable illustration of how the unambiguously-campaign-related requirement must be applied in other First Amendment contexts, whether or not they involve express advocacy.

they do not take a position on a candidate's character, qualifications, or fitness
for office. [*Id.* ]

Employing a parallel analysis to Citizens United's Ads reveals that they are likewise
not "unambiguously related to the campaign of a particular federal candidate." *Buckley*, 424
U.S. at 80. Applying the no-other-reasonable-interpretation test, reveals that the Ads are
"susceptible of [a] reasonable interpretation other than as an appeal to vote for or against a
specific candidate." 127 S. Ct. at 2667. That analysis "must be objective, focusing on the
substance of the communication rather than amorphous considerations of intent and effect,"
*id.* at 2666, and "must give the benefit of any doubt to protecting rather than stifling speech."
*Id.* at 2667. Under this test and its required application limitations, the Ads have nothing to do
with "an appeal to vote for or against" Senator Clinton. They have to do with issues and sales.
In short, the Ads are protected genuine issue advocacy. After *WRTL II*, it is clear that the
unambiguously-campaign-related requirement mandates that communications such as the Ads
must not be regulated as electioneering communications unless they, too, are "susceptible of
no reasonable interpretation other than as an appeal to vote for or against a specific candi-
date." *Id.*[19]

Therefore, the Disclosure Requirements "do[] not advance a legitimate governmental
interest significant enough to justify its infringement of First Amendment rights." *CARC*, 454

---

[19]Any consideration of contextual matters such as Citizens United's intent or the
actual effect of the Ads on an election may not be considered. *Id.* at 2664-66. Nor may this
court consider Plaintiff's opposition to Senator Clinton in other contexts, *id.* at 2668, nor the
timing of the Ads, *id.* at 2668, nor whether anything in the Ads has become a campaign issue,
*id.* at 2669, nor whether there is a federal funds alternative, *id.* at 2671 n.9, nor whether
Plaintiff could change its Ads to avoid mentioning a candidate. *Id.* Where there is any doubt,
"we give the benefit of the doubt to speech, not censorship." *Id.* at 2674.

**PI Memorandum**                                        31

U.S. at 298. The Disclosure Requirements are unconstitutional as applied to these Ads and any

ads that meet the statutory electioneering communication definition but are "susceptible of [a]

reasonable interpretation other than as an appeal to vote for or against a specific candidate."

*WRTL II*, 127 S. Ct. at 2667.[20]

## II. Plaintiff Will Suffer Irreparable Injury Without the Injunction.

In addition to having a high likelihood of success on the merits, Plaintiff will suffer

irreparable harm unless they receive the requested injunctive relief. As noted in the initial

discussion of the implications of *WRTL II* for the present motion, *supra* Part I, WRTL forever

lost the opportunity to broadcast its fully protected issue ads because it did not receive a

preliminary injunction. It was plainly irreparably harmed.

Here, too, Plaintiff wishes to engage in First Amendment activities that are "'both

certain and great . . . actual not theoretical,'" *England*, 454 U.S. at 297 (citation omitted), are

"of such imminence that there is a 'clear and present' need for equitable relief to prevent

irreparable harm," *id.* (citation and emphasis omitted), and in which "the injury [is] beyond

remediation." *Id.* Plaintiff is barred by criminal penalties from engaging in First Amendment

expression and association activities it wishes to do, which "loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

*Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiff has decided that it will not do its intended

First Amendment activities as planned unless it receives judicial protection, and such self-

---

[20]While it is not necessary to decide the present case, the court should note that in the
context of commercial transactions there are particular problems with reporting donors
because both sales and investments may generate income to the sponsoring corporation that
would be reportable as contributions, although those buying products or making investments
have no connection whatever to elections.

censorship "[i]s a harm that can be realized even without actual prosecution." *Virginia v. American Bookseller's Ass'n Inc.*, 484 U.S. 383, 393 (1988). It has "establish[ed] that [it is] or will be engaging in constitutionally protected behavior," which demonstrate[s] that the allegedly impermissible government action would chill allowable individual conduct." *England*, 454 F.3d at 301. "[Plaintiff's] 'First Amendment interests are either threatened or in fact being impaired at the time relief is sought.'" *Id.* (citation omitted). This constitutes irreparable harm.[21]

WRTL II expressly rejected a number of arguments by the FEC and Intervenors in that case that the FEC might resurrect here in arguing that Plaintiff will suffer no irreparable harm. *WRTL II* rejected the notion that, because WRTL had the option of doing its issue advocacy through a political committee ("PAC") with federal funds, it was not harmed. 127 S. Ct. at 2671 n.9. This means that neither the availability of a federal-funds option nor of an alleged alter-ego option (which alter-ego notion is erroneous as to PACs and their connected corporations because they are legally separate entities) removed the harm to WRTL in its own

---

[21]The D.C. Circuit has advised looking to the merits in constitutional-rights cases:

[I]n cases involving a claim by movant of interference with protected freedoms or other constitutional rights, the finding of irreparable injury cannot meaningfully be rested on a mere contention of a litigant, but depends on an appraisal of the validity, or at least the probable validity, of the legal premise underlying the claim of right in jeopardy of impairment. It often happens that when the parties present conflicting claims of rights and conflicting fears of threatened injury, one from the impact of the activity sought to be restrained, the other from the impact of any injunctive order, the situation realistically facing the court is this, that one party or the other will be injured whichever course is taken. A sound disposition in the interest of justice from the process of discerning and weighing of pertinent interests must depend on a reflective and attentive appraisal as to the outcome on the merits. [*Delaware & H. Ry. Co. v. United Transp. Union*, 450 F. 3d 603, 619-20 (D.C. Cir. 1971).]

capacity, using state funds. And *WRTL II* rejected the notion that a speaker could just change the message, e.g., by not mentioning a federal candidate, *id.*, because "'the rule of protection under the First Amendment [is] that a speaker has the autonomy to choose the content of his own message.'" *Id.* (citation omitted).[22]

Plaintiff's harms are irreparable and irremediable by monetary damages at law. Its rights can only be protected by declaratory and injunctive relief.

### III. The Injunction Will Not Substantially Injure Others.

As noted in the preliminary discussion of the implications of *WRTL II* for the present preliminary injunction motion, *supra* Part I, WRTL's broadcast of its fully-constitutionally-protected issue advocacy would not, and did not, harm anyone. The questions of harm to others and serving the public interest are, of course, inversely proportional to the likelihood of success on the merits. As the District of Columbia Circuit said in *United Transportation Union*, 450 F.3d at 620, in cases where harms are claimed on both sides, the Court should look

---

[22]In the *WRTL II* litigation, the FEC actually opposed the preliminary injunction on the novel theory that this Court's preliminary injunction would not provide WRTL any effective protection because in the event WRTL ultimately lost the FEC, or the Attorney General (if a violation were knowing and willful), could still bring an enforcement action. *See* Defendant Federal Election Commission's Opposition to Plaintiff's Motion for a Preliminary Injunction at 40-43, *WRTL v. FEC*, 466 F. Supp. 2d 195 (D.D.C. 2006) (No. 04-1260). If the FEC's novel theory were correct, this Court's preliminary injunctions would be meaningless, which the present Plaintiff does not believe is true. And there is no reason to believe that the Attorney General would not abide by any injunction issued by this Court. Moreover, the FEC's novel position is contrary to the position of the four dissenting Justices in *WRTL II* who believed that this Court's preliminary injunction would provide an adequate remedy to protect a plaintiff's rights. *See WRTL II*, 127 S. Ct. at 2704 (Souter, J., joined by Stevens, Ginsburg & Breyer, JJ.) It is likely that the other Justices would agree that a federal court's preliminary injunction is efficacious.

to the merits. *See supra* n.20. Given the high likelihood of success on the merits, the likelihood of harm to the FEC or anyone else is proportionally diminished.

Nonetheless, the FEC will doubtless argue that it is harmed if it is denied the opportunity to enforce a statute, as is it did in its successful effort to deny WRTL's First Amendment right to timely broadcast its 2004 anti-filibuster ads. But that generalized "harm" cannot control or it would ban all preliminary injunctions in all cases where the constitutionality of a statute (or a regulation) is challenged, making Federal Rule of Civil Procedure 65 (and its authorizing statute) a meaningless rule as applied to the government. Such a generalized "harm" will always be present for any agency or other enforcement entity—even in the context of litigation over highly-protected First Amendment activities. The First Amendment is antithetical to any such strong presumption of the constitutionality of a federal statute that would underpin the notion that the FEC is automatically harmed by inability to enforce a statute that has been credibly challenged as to its compliance with First Amendment mandates.

Finally, there is no harm to anyone else. Until BCRA, no one ever thought that Congress could require disclosure as to First Amendment activity that is not unambiguously related to the campaign of a candidate for federal office, and post-*WRTL II* the position has both been reaffirmed and the type of speech at issue in this case has been excluded from the electioneering category. To be sure, there may be those who would prefer that the Ads not be run, but there is no cognizable interest to be considered here where Congress' ability to regulate *campaign* speech is the foundation for regulation. So any possible perceived "harm" is not cognizable here—especially given the high likelihood of success on the merits of the count related to that letter.

**PI Memorandum**                    35

## IV. The Injunction Furthers the Public Interest.

As with harm to others, the question of the public interest follows the likelihood of success on the merits. Clearly, "[t]he First Amendment, in particular, serves significant societal interests." *Bellotti*, 435 U.S. at 766. It is clearly in the public interest for Americans to be able to associate and express themselves freely where there is no cognizable governmental interest justifying restriction. And it is in the public interest to receive the information that Plaintiff will offer in its Ads. Therefore, the requested injunctive relief serves the public interest.

## Conclusion

The Disclosure Requirements are unconstitutional as-applied to Citizens United's intended First Amendment activities. All the required elements for a temporary restraining order and a preliminary injunctive relief are met. This Court should expeditiously grant the requested injunctive relief.

Respectfully submitted,

/s/ James Bopp, Jr.
James Bopp, Jr., D.C. Bar #CO0041
Richard E. Coleson*
Jeffrey P. Gallant*
Clayton J. Callen*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/234-3685 facsimile
  * pro hac vice motion pending
*Counsel for Plaintiff*

**United States District Court**
**District of Columbia**

| | |
|---|---|
| **Citizens United**,<br> 1006 Pennsylvania Ave., SE<br> Washington, D.C. 20003,<br><br>           ***Plaintiff***,<br><br>   *v.*<br><br> **Federal Election Commission**,<br> 999 E Street, NW<br> Washington, DC 20463**,**<br><br>           ***Defendant***. | **Case No.** _____<br><br> THREE-JUDGE COURT |

**Order**

  This action is before the Court on Plaintiff's *Preliminary Injunction Motion*. Because we previously granted Plaintiff's *Motion to Consolidate Hearings on the Preliminary Injunction with the Merits*, we now consider the merits of this cause. We hold that the Disclosure Requirements of § 201 and § 311 of the Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81, 88-89, 105, codified at 2 U.S.C. §§ 434(f), 441d(a), are unconstitutional as-applied to Citizens United's Advertisements, and other communications that may not be prohibited as electioneering communications, because such communications are not unambiguously campaign related.

  It is ORDERED that the Defendant FEC is permanently enjoined from enforcing the Disclosure Requirements against Plaintiff's Advertisements "Wait," "Pants," and "Questions."

  SO ORDERED this _____ day of _____2007.

**Order**

_____
United States Circuit Judge


_____
United States District Judge


_____
United States District Judge

**Order**                                        2

Distribution:

James Bopp, Jr.
jboppjr@aol.com
Richard E. Coleson
rcoleson@bopplaw.com
Jeffrey P. Gallant
jgallant@bopplaw.com
Clayton J. Callen
ccallen@bopplaw.com
Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, IN 47807-3510


Thomasenia P. Duncan
Federal Election Commission
999 E Street, NW
Washington, D.C.  20436
tduncan@fec.gov

**Order**                                    3