**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
CITIZENS UNITED,                    )
                                    )
              Plaintiff,            )
                                    )
       v.                           )       Civ. No. 07-2240 (ARR, RCL, RWR)
                                    )
FEDERAL ELECTION COMMISSION,        )       OPPOSITION TO
                                    )       PRELIMINARY INJUNCTION
              Defendant.            )
                                    )
_____)


**DEFENDANT FEDERAL ELECTION COMMISSION'S MEMORANDUM IN**
**OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR PRELIMINARY**
**INJUNCTION**


Thomasenia P. Duncan (D.C. Bar No. 424222)
General Counsel

David Kolker (D.C. Bar No. 394558)
Associate General Counsel

Kevin Deeley
Assistant General Counsel

Adav Noti (D.C. Bar No. 490714)
Attorney

COUNSEL FOR DEFENDANT
January 8, 2008                    FEDERAL ELECTION COMMISSION

## TABLE OF CONTENTS

I.      FACTUAL BACKGROUND ............................................................................1

II.     STATUTORY AND REGULATORY PROVISIONS .......................................2

ARGUMENT.......................................................................................................................4

III.    PLAINTIFF CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF
        SUCCESS ON THE MERITS ........................................................................4

        A.      The Funding Restriction Is Constitutional On Its Face .........................4

                1.      *McConnell* Upheld The Funding Restriction On Its Face ...........5

                2.      *WRTL* Did Not Overrule *McConnell* ........................................6

                3.      This Court Should Not Overrule *McConnell* ...............................9

        B.      The Funding Restriction Is Constitutional As Applied To *Hillary: The Movie* ....13

        C.      The Disclosure Requirements Are Constitutional As Applied To *Hillary:
                The Movie*.............................................................................................16

        D.      Plaintiff's Motion For A Preliminary Injunction Regarding
                The "Questions" Ad Is Moot ..................................................................17

IV.     PLAINTIFF FAILS TO DEMONSTRATE IRREPARABLE INJURY...........17

        A.      Plaintiff's Delay In Moving For A Preliminary Injunction Indicates An
                Absence of Irreparable Harm.................................................................18

        B.      Plaintiff Fails To Show Irreparable Harm Regarding The Application Of
                The EC Financing Restrictions To *Hillary* ...........................................19

        C.      Plaintiff's Bare Allegations Of Chill Regarding Its Facial Challenge To The
                EC Financing Provisions Are Insufficient To Demonstrate Irreparable Harm......21

        D.      Plaintiff Fails To Demonstrate That Disclosure Related To *Hillary* Would
                Lead To Irreparable Harm .....................................................................22

V.      THE RELIEF PLAINTIFF REQUESTS WOULD NOT BE IN THE PUBLIC
        INTEREST AND WOULD HARM THE COMMISSION...............................23

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

## *Cases*

*Agostini v. Felton*, 521 U.S. 203 (1997) ........................................................................9

*Aviation Consumer Action Proj. v. Washburn*, 535 F.2d 101 (D.C. Cir. 1976) ...........21

*Buckley v. Valeo*, 424 U.S. 1 (1976) .....................................................................16, 23

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ........... 17-19, 23

*Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985) ...............................................19

*City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117 (D.D.C. 2006) .........................18

*FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238 (1986) ................................................6

*FEC v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652 (2007) ............................... passim

*Herschaft v. New York City Campaign Fin. Bd.*, 139 F. Supp. 2d 282 (E.D.N.Y. 2001) ..............23

*Hohn v. United States*, 524 U.S. 236 (1998) ...................................................................9

*Hutto v. Davis*, 454 U.S. 370 (1982) ...........................................................................9

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ...........................................................18, 22

*McConnell v. FEC*, 540 U.S. 93 (2003) ......................................................... passim

*Neb. Health & Human Servs. v. HHS*, 435 F.3d 326 (D.C. Cir. 2006) ...........................21

*NTEU v. United States*, 927 F.2d 1253 (D.C. Cir. 1991) .................................................20

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) ...........................9

*Scott-Blanton v. Universal City Studios Prods. LLLP*, 495 F. Supp. 2d 74 (D.D.C. 2007) ..........19

*Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533 (1983) ....................................9

*United States v. Webb*, 255 F.3d 890 (D.C. Cir. 2001) ....................................................9

*Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379 (4th Cir. 2001) .........................................21

*Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987) ....................................................19, 22

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ...................................17, 23

*Wisconsin Right to Life, Inc. v. FEC*, 542 U.S. 1305 (2004) ....................................21, 24

*Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410 (2006) ........................................................7

**Statutes and Regulations**

2 U.S.C. § 434(f)(3)(A)(i) ................................................................................................2

2 U.S.C. § 434(f)(3)(B)(i) ................................................................................................4

2 U.S.C. § 434f(a)(i) ......................................................................................................10

2 U.S.C. § 441b ..........................................................................................................5-6

2 U.S.C. § 441b(a) ....................................................................................................3, 17

2 U.S.C. § 441b(b)(2) ...............................................................................................3, 17

11 C.F.R. § 100.29(b)(1) ................................................................................................2

11 C.F.R. § 100.29(b)(3) ................................................................................................2

11 C.F.R. § 100.29(b)(7)(i)(G) .......................................................................................2

11 C.F.R. § 100.29(e)(1) ................................................................................................4

11 C.F.R. § 114.15 ...................................................................................................3, 15

11 C.F.R. § 114.15(a) .....................................................................................................3

11 C.F.R. § 114.15(b) ..............................................................................................3, 17

11 C.F.R. § 114.15(c) ..............................................................................................4, 17

Bipartisan Campaign Reform Act, Pub. L. No. 107-155 .................................... *passim*

Federal Election Campaign Act, 2 U.S.C. §§ 431-55 ........................................ *passim*

**Miscellaneous**

11A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 ..............19

18 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4416 .......................6

Electioneering Communications, 72 Fed. Reg. 72899 (Dec. 26, 2007) ....................................3, 15

FEC Advisory Opinion 2004-30 ......................................................................................4

LCvR 65.1(d) ................................................................................................................10

Defendant Federal Election Commission ("Commission") files this memorandum of law in opposition to Plaintiff's Second Motion for Preliminary Injunction. Plaintiff's motion should be denied because Citizens United's challenge to the facial validity of the prohibition on corporate and union funding of electioneering communications is foreclosed by *McConnell v. FEC*, 540 U.S. 93 (2003), and plaintiff's as-applied challenge to that same statute fails under the constitutional test established in *FEC v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652 (2007) ("*WRTL*"). Thus, plaintiff cannot meet its burden to demonstrate a likelihood of success on the merits of its case. Plaintiff also cannot demonstrate any irreparable harm that would arise in the absence of an injunction, and the interests of the Commission and the public weigh strongly in favor of the Commission's continued enforcement of the challenged statutory provisions.

## I.    FACTUAL BACKGROUND[1]

Plaintiff Citizens United, a corporation headquartered in Washington, D.C., has planned since at least January 2007 to distribute a movie about presidential candidate Senator Hillary Clinton in the states holding early presidential primaries. (*See* Def.'s Opp. to Pl.'s Mot. for Prelim. Inj. ("Def.'s First P.I. Opp.") at Part I.C.) The film, entitled *Hillary: The Movie*, "discusses her Senate record, her White House record during President Bill Clinton's presidency, and her presidential bid," and includes statements regarding "whether she would make a good president." (Am. Compl. ¶ 14; s*ee also id*. Exh. 2 (script of movie); *infra* Part III.B (discussing film's opposition to Senator Clinton's candidacy).)[2] Plaintiff plans to release the movie "somewhere in the December 2007 to February 2008 time-frame" (Am Compl. ¶ 14), contending

---

[1]    Factual background regarding the parties to this action and plaintiff's planned advertising campaign is provided at Parts I.A-B and I.D of the Commission's opposition to plaintiff's first preliminary injunction motion.

[2]    Because the Commission did not receive the DVD of the film until 3:00 p.m. on January 7, 2008, this memorandum refers to the script that plaintiff had earlier filed as an exhibit to the Amended Complaint.

that the time periods leading up to both the presidential primary and general elections will be "times when the public's interest in Senator Clinton will be at its peak, which is the key to maximizing box office and DVD sales for *Hillary*." (*Id.* ¶ 20.)

In its Amended Complaint, plaintiff alleges that, in addition to theatrical and DVD release, the movie "is slated for . . . cable on-demand broadcast." (*Id.* ¶ 14.) Specifically, Plaintiff alleges that it has received an "offer" to have the movie included in the programming available on a video-on-demand cable "channel" entitled "Elections '08," in exchange for "a fee" to be paid by plaintiff. (*See id.* ¶ 28.)

## II.     STATUTORY AND REGULATORY PROVISIONS

The Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431-55, as amended by the Bipartisan Campaign Reform Act ("BCRA"), Pub. L. No. 107-155, defines an "electioneering communication" ("EC") as a "broadcast, cable, or satellite communication" that refers to a clearly identified federal candidate and is made within sixty days before a general election or thirty days before a primary election in which that candidate is running. *See* 2 U.S.C. § 434(f)(3)(A)(i).[3] ECs are subject to reporting and disclaimer requirements (collectively, "disclosure provisions"), as discussed at Part II of the Commission's opposition to plaintiff's first preliminary injunction motion.

---

[3]     The Commission's regulations, in relevant part, define a "cable communication" as a communication that is "aired, broadcast, cablecast or otherwise disseminated through the facilities of a . . . cable television system" and that "[c]an be received by 50,000 or more persons in a State where a primary election . . . is being held within 30 days." 11 C.F.R. § 100.29(b)(1),(3). The term "'[c]an be received by 50,000 or more persons' means . . . [i]n the case of a communication appearing exclusively on a cable . . . system, but not on a broadcast station or network, that the viewership of the cable system or satellite system lying within a . . . State is 50,000 or more." 11 C.F.R. § 100.29(b)(7)(i)(G). Although Plaintiff does not specify the cable systems on which its film will be available, more than 50,000 people in each of Iowa, New Hampshire, Michigan, Nevada, South Carolina, and Florida (Am. Compl. ¶ 17) have access to cable-based video-on-demand channels. *See* Federal Communications Commission, Elections Communication Database, at http://gullfoss2.fcc.gov/ecd/.

2

In addition, BCRA provides that ECs may not be financed with the general treasury funds of corporations or labor unions.  *See* 2 U.S.C. § 441b(a),(b)(2).  In *WRTL*, however, the Supreme Court held that this funding restriction may constitutionally be applied only to an EC that is the "functional equivalent of express advocacy," 127 S. Ct. at 2667, which the Court's controlling opinion defined as a communication that is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  *Id.*; *see infra* Part III.B (discussing application of *WRTL* to *Hillary: The Movie*).

In light of *WRTL*, the Commission recently promulgated regulations exempting ECs that are not the functional equivalent of express advocacy (hereinafter "*WRTL* ads") from the EC funding restriction.  *See* Electioneering Communications, 72 Fed. Reg. 72,899, 72,914-15 (Dec. 26, 2007) (to be codified at 11 C.F.R. § 114.15).  The new regulations first provide that an EC qualifies as a *WRTL* ad unless the EC is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a clearly identified Federal candidate."  11 C.F.R. § 114.15(a). The regulations then set forth how the Commission will determine whether this test is met.  In relevant part, the regulations create "safe harbors" for any communications (like those at issue in *WRTL*) that do not "mention any election [or] candidacy" or "take a position on any candidate's or officeholder's character, qualifications, or fitness for office"; such an EC will qualify as a *WRTL* ad as long as it either (1) asks the named candidate or the public to take action as to the governmental issue on which the ad focuses, or (2) promotes a commercial transaction.  *See* 11 C.F.R. § 114.15(b).

For an EC falling outside the safe harbors, the regulations provide that the Commission "will consider whether the communication includes any indicia of express advocacy and whether the communication has an interpretation other than as an appeal to vote for or against a clearly

3

identified Federal candidate in order to determine whether, on balance, the communication is [a *WRTL* ad]." 11 C.F.R. § 114.15(c). The factors considered in making this determination include factors substantially identical to those listed in *WRTL*'s controlling opinion, 127 S. Ct. at 2667 — *i.e.*, whether the EC "[m]entions any election [or] candidacy," "[t]akes a position on any candidate's or officeholder's character, qualifications, or fitness for office," "[f]ocuses on a public policy issue," or "[i]ncludes a call to action or other appeal that interpreted in conjunction with the rest of the communication urges an action other than voting for or against . . . a clearly identified Federal candidate." 11 C.F.R. § 114.15(c).[4]

## ARGUMENT

The factors to be weighed in considering a motion for a preliminary injunction — and the heavy burden that a plaintiff must meet to succeed under those factors — are discussed at Part III of the Commission's opposition to plaintiff's first preliminary injunction motion.

## III.    PLAINTIFF CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    The Funding Restriction Is Constitutional On Its Face

Plaintiff's facial challenge to the EC funding restriction is merely an attempt to relitigate an issue that the Supreme Court conclusively decided in *McConnell*. As discussed below,

---

[4]    Predating the decision in *WRTL*, a "media exemption" in BCRA and the Commission's regulations provides that the EC requirements and restrictions do not apply to communications that meet the statutory definition of an EC but "appear[ ] in a news story, commentary, or editorial distributed through the facilities of any broadcasting station." 2 U.S.C. § 434(f)(3)(B)(i); 11 C.F.R. § 100.29(c)(1). Citizens United has not asked the Commission to opine on whether *Hillary: The Movie* would qualify for the media exemption, but it appears that the film would not qualify under the Commission's prior analysis, which has found that a group's paying to air an EC tends to indicate that the media exemption does not apply to that EC. *See*, *e.g.*, FEC Advisory Opinion 2004-30, http://saos.nictusa.com/aodocs/2004-30.pdf, at 7 (Sept. 10, 2004) ("[T]he very act of paying a broadcaster to air a documentary on television, rather than receiving compensation from a broadcaster, is one of the considerations . . . that can help to distinguish an electioneering communication from exempted media activity.") (internal quotation marks omitted).

*McConnell* upheld the facial constitutionality of the exact statutory provision that Citizens United now challenges, and nothing in *WRTL* can be construed to overrule this holding.

###### 1.     *McConnell* Upheld The Funding Restriction On Its Face

It is "firmly embedded" in the Supreme Court's First Amendment jurisprudence that corporations and labor unions may constitutionally be prohibited from using their general treasuries to fund communications that expressly advocate for or against the election of a candidate. *McConnell*, 540 U.S. at 203. In BCRA, Congress broadened this prohibition to encompass not just corporate and union express advocacy expenditures (which were already prohibited under FECA), but also corporate and union expenditures for communications that meet the statutory definition of an EC. *See* BCRA § 203 (codified as part of 2 U.S.C. § 441b).

Immediately after BCRA was enacted, Citizens United and other organizations filed a facial challenge to the constitutionality of the EC funding restriction, arguing that the statute was overbroad to the extent that it prohibited corporations from financing non-campaign issue speech immediately before an election. The Supreme Court rejected this challenge in *McConnell*, which upheld BCRA § 203 on its face. *McConnell*, 540 U.S. at 203-09. The Court agreed with the plaintiffs that the corporate funding restriction encompassed both campaign advocacy and some "issue ads," but the Court held that the government's long-recognized and compelling interests in regulating corporate-funded express advocacy apply with equal force to the interests in regulating corporate-funded speech that is "the functional equivalent of express advocacy." *Id.* at 205-06. The Court reasoned that, because the EC definition only encompasses communications that refer to a specific candidate shortly before an election, the fact that a communication meets the statutory criteria "strongly supports" a finding that any given EC is the functional equivalent of express advocacy, and, therefore, that the funding restriction's potential

"application to pure issue ads" is insubstantial.[5]  *See id*. at 207.  Indeed, the Court noted, "[e]ven

if we assumed that BCRA will inhibit some constitutionally protected corporate and union

speech, that assumption would not justify prohibiting all enforcement of the law."  *Id*. at 207

(internal quotation marks omitted).  Thus, *McConnell* held that the EC provision was "amply

justifie[d]," *id.* at 208, and the plaintiffs had not "carried their heavy burden" to show the

funding restriction to be unconstitutional on its face.  *Id*.

### 2.     *WRTL* Did Not Overrule *McConnell*

Despite the Supreme Court's holding — just four years ago — that the EC funding

restriction in 2 U.S.C. § 441b is constitutional on its face, Citizens United now argues that it is

likely to prevail on the merits of its current challenge to the facial constitutionality of the exact

same provision.  Plaintiff's argument (Pl.'s Mem. in Support of Second Mot. for Prelim. Inj.

("Pl.'s Second P.I. Mem.") at 8-11) appears to be based entirely on one Justice's concurrence in

*WRTL*, which is the only Supreme Court case since *McConnell* to have addressed the EC funding

restriction.  In effect, plaintiff claims that *WRTL* called *McConnell* into question to such an

extent that this Court may now overrule it.[6]

Two aspects of *WRTL*, however, make clear that it did not overrule *McConnell*'s holding

as to the facial constitutionality of the EC funding restriction.  First, the *WRTL* lawsuit was not

even a facial challenge to the statute — it was an as-applied challenge regarding three ECs that

---

[5]     *McConnell* also held that the application of the funding restriction to nonprofit corporations "is plainly valid," provided that BCRA § 203 is construed not to apply to so-called *MCFL* corporations.  *McConnell*, 540 U.S. at 209-11 (citing *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238 (1986)).  Citizens United is not an *MCFL* corporation.  (Am. Compl. ¶ 8.)

[6]     Citizens United was one of the plaintiffs whose facial challenge to the EC funding restriction was rejected in *McConnell*; thus, plaintiff's current facial challenge asking this Court to overrule *McConnell* is *res judicata*.  *See generally* 18 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4416 nn. 7-14 (describing issue preclusion as applying when issue was actually litigated in prior action between same parties and actually decided by final and binding disposition on merits).

shared certain specific "characteristics" (*e.g.*, they did not "take a position on a candidate's character, qualifications, and fitness for office"). *WRTL*, 127 S. Ct. at 2667. Indeed, the Supreme Court had explicitly held in an earlier decision that the action would proceed as an as-applied challenge. *Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410, 411-412 (2006) (reversing lower court's initial dismissal of case, noting that "[*McConnell*] found BCRA's primary definition of 'electioneering communication' facially valid when used with regard to BCRA's disclosure and funding requirements" but that "[i]n upholding § 203 against a facial challenge, we did not purport to resolve future as-applied challenges"); *see also id.* at 410 ("Appellant . . . brought this action . . . seeking a judgment declaring BCRA unconstitutional *as applied to several broadcast advertisements* that it intended to run during the 2004 election.") (emphasis added); *FEC v. Wisconsin Right to Life, Inc.*, S. Ct. No. 06-969, Questions Presented, http://www.supremecourtus.gov/qp/06-00969qp.pdf ("Whether the three-judge district court erred in holding that the federal statutory prohibition on a corporation's use of general treasury funds to finance 'electioneering communications' is unconstitutional *as applied to three broadcast advertisements* that appellee proposed to run in 2004.") (emphasis added). Thus, no facial challenge to the EC funding restriction was properly before the *WRTL* Court.

 Furthermore, the Chief Justice's controlling opinion expressly stated that it was not overruling *McConnell*. *See WRTL*, 127 S. Ct. at 2670 n.8 ("[I]n deciding this as-applied challenge, we have no occasion to revisit *McConnell's* conclusion that the statute is not facially overbroad."); *id.* at 2674 ("*McConnell* held that express advocacy of a candidate or his opponent by a corporation shortly before an election may be prohibited, along with the functional equivalent of such express advocacy. We have no occasion to revisit that determination today."); *see also id.* at 2674 (Alito, J., concurring) ("[I]t is unnecessary to . . . decide whether § 203 is

unconstitutional on its face."); *id.* at 2686-87 (opinion of Scalia, J.) (concurring only in judgment because Court's opinion should have gone further and overruled *McConnell*). Far from overruling *McConnell*, the Chief Justice's opinion relied upon *McConnell*'s reasoning when it analyzed "whether the speech at issue [*i.e.*, WRTL's advertising] is the 'functional equivalent' of speech expressly advocating the election or defeat of a candidate for federal office." *WRTL*, 127 S. Ct. at 2659 (quoting *McConnell*, 540 U.S. at 206). The Court then construed *McConnell*'s "functional equivalent of express advocacy" test to encompass ECs that are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 2667. This holding does not overrule *McConnell* — it applies it.[7]

The only support that plaintiff can muster for its reading of *WRTL* is a single reference from Justice Alito's concurrence, which no other Justice joined. (Pl.'s Second P.I. Mem. at 10.) Justice Alito wrote: "If it turns out that the implementation of the as-applied standard set out in the principal opinion impermissibly chills political speech, we will presumably be asked in a future case to reconsider the holding in *McConnell* that § 203 is facially constitutional." *WRTL*, 127 S. Ct. at 2674 (Alito, J. concurring); *see also infra* Part III.A.3 (noting evidence that *WRTL* standard has not "chill[ed] political speech"). But this statement only makes clearer that the Court's opinion did not itself "reconsider the holding in *McConnell*."

In sum, the *WRTL* Court did not decide any question regarding the facial validity of the EC funding restriction. On that point, *McConnell* remains directly controlling authority.

---

[7]     Citizens United itself correctly notes that the holding of *WRTL* "prescribed how *as-applied* challenges must be conducted" in the future. (Pl.'s Second P.I. Mem. at 10 (emphasis added) (citing *WRTL*, 127 S. Ct. at 2666-67).)

### 3.    This Court Should Not Overrule *McConnell*

Although *McConnell* is controlling here, plaintiff nonetheless asks this Court to strike down the EC funding restriction on its face, apparently on the basis that neither *McConnell* nor *WRTL* have provided plaintiff with the precise protection to which it believes it is entitled.  (*See* Pl.'s Second P.I. Mem. at 8-11.)  There are two primary flaws in this argument.

First, this Court does not have the authority to overrule a Supreme Court holding. *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983) ("Needless to say, only this Court may overrule one of its precedents."); *Hutto v. Davis*, 454 U.S. 370, 375 (1982) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.").  The *WRTL* Court's as-applied narrowing of *McConnell* does not affect this analysis, for no lower court may ignore binding precedent on the theory that a subsequent Supreme Court decision has indicated reservations about the controlling holding. *Hohn v. United States*, 524 U.S. 236, 252-53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [the lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *United States v. Webb*, 255 F.3d 890, 897-98 (D.C. Cir. 2001) ("[Defendant] asks us to disregard the earlier [Supreme Court] case because he counts five Justices as no longer supporting its holding.  That, of course, we may not do.") (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1997)).

This alone should end the inquiry into the merits of plaintiff's facial challenge, but, in addition to being legally precluded, plaintiff's argument is also factually untenable. Plaintiff claims that the as-applied test of *WRTL* has proven unworkable because "[a]s-applied remedies, even when expedited, still are too slow." (Pl.'s Second P.I. Mem. at 11.) The only possible basis for this statement is Citizens United's current lawsuit, which is the sole matter to date involving the application of *WRTL* to be brought either in the courts or before the Commission. And the only reason that plaintiff could possibly allege that this action is "too slow" — despite plaintiff's having been granted a hearing within twenty days under LCvR 65.1(d) — is because it was not decided before the Iowa caucuses and may not be decided before certain other presidential primaries. (*See* Am. Compl. ¶ 17.) But plaintiff's argument ignores the fact that plaintiff itself created the current situation by waiting until two weeks *after* the EC window opened in Iowa to file this action, despite having intended for approximately one year to release its film now. (*See* Def.'s First P.I. Opp. at Part I.C.) Indeed, plaintiff could have asked the Commission at any time after *WRTL* was decided (on June 25, 2007) whether the EC funding restriction would apply to plaintiff's ads or movie, and the Commission, by law, would have been required to provide an answer in sixty days or less. 2 U.S.C. § 437f(a)(1).[8] Plaintiff certainly did not need to wait six months and then conduct its challenge through highly expedited preliminary injunction motions, but, having chosen to do so, plaintiff cannot now seriously argue

---

[8]    When necessary, the Commission expedites its response to an urgent request for an advisory opinion, providing an answer in well under sixty days. *See, e.g.,* FEC Advisory Opinion 2006-16, http://saos.nictusa.com/aodocs/2006-16.pdf (May 10, 2006) (issued in 16 days); FEC Advisory Opinion 2006-19, http://saos.nictusa.com/aodocs/2004-30.pdf (June 5, 2006) (issued in 31 days); FEC Advisory Opinion 2007-3, http://saos.nictusa.com/aodocs/2007-03.pdf (Mar. 1, 2007) (issued in 28 days); *see also* FEC, *FEC Releases Draft Advisory Opinion Under Expedited Process*, http://www.fec.gov/press/press2006/20060504detertao.html (May 4, 2006) (explaining expedited process for issuance of an advisory opinion).

that the statute must be declared unconstitutional on its face because the court system is "too slow."

Plaintiff also argues that the unworkability of as-applied challenges is demonstrated by the Commission's statement in a prior brief that it had not yet analyzed the application of *WRTL* to the "Questions" ad.  (Pl.'s Second P.I. Mem. at 11.)  Although the Commission now agrees that "Questions" is a *WRTL* ad, *see infra* Part III.D, there was no reason for the Commission to address this issue in the context of plaintiff's first preliminary injunction motion.  The only question presented in the first motion was whether BCRA's EC *disclosure* provisions could constitutionally be applied to *WRTL* ads in general, and that question was already properly before the Court on the basis of plaintiff's "Wait" and "Pants" ads alone.  (*See* Def.'s Opp. to Pl.'s Mot. to Consol. at 9; *see also* Def.'s First P.I. Opp. at 17 n.7).)  In other words, plaintiff's first preliminary injunction motion purported to encompass *all WRTL* ads, and there were two such ads plainly presented by the Complaint, so whether "Questions" also met the *WRTL* definition had no bearing on the motion.  Because (1) this determination was immaterial to the then-pending motion, (2) the appropriate application of the Commission's new regulations was less immediately obvious as to "Questions" than it was as to the other ads alleged in the original Complaint, *see infra* Part III.D, and (3) the FEC's Commissioners had begun to disperse for the holidays (as noted in the Commission's motion for an extension of time to respond to the current motion), the Commission's brief — filed five business days after plaintiff's first motion — simply did not take a position about whether "Questions" qualifies as a *WRTL* ad.  Thus, plaintiff's suggestion that the Commission's initial response as to "Questions" undermines the constitutionality of BCRA itself (Pl.'s Second P.I. Mem. at 7-8, 11) is a manifest distortion of both the Commission's statement and the context in which that statement arose.  In no way does

11

the Commission's declining to opine on an issue that did not need to be addressed demonstrate any unworkability in the regulatory system of which plaintiff chose not to avail itself.[9]

At its core, plaintiff's argument regarding the "unworkability" of *WRTL* appears to rely on a misunderstanding of what the term "workable" means for First Amendment purposes. While plaintiff believes the "expense and burden of hiring a lawyer" (Pl.'s Second P.I. Mem. at 11) demonstrates constitutional unworkability, the relevant question as framed by Justice Alito is whether "the implementation of the as-applied standard . . . impermissibly chills political speech." *WRTL*, 127 S. Ct. at 2674 (Alito, J. concurring). The available evidence demonstrates no impermissible chilling effect arising from *WRTL*, for every group running ECs in the 2008 election — except Citizens United — has done so without needing to resort to litigation. For example, in December 2007 alone (when the 30-day EC window was open in six states), entities reported over $6,000,000 in EC disbursements, with no accompanying litigation or regulatory challenges. *See* Electioneering Communications Reports, http://www.fec.gov/finance/disclosure/ec_table.shtml (last visited Jan. 4, 2008). The Commission's promulgation at the end of December of detailed regulations defining *WRTL* ads — including safe harbor provisions for those who choose to take advantage of them — has provided even more speech-enabling guidance, as demonstrated by the quantity of EC disbursements reported immediately after the regulations became effective. *See id.*[10] And press

---

[9]    As noted previously, if plaintiff had wanted an answer from the Commission on this question, it could have directly asked the Commission months ago instead of waiting to file this last-minute action.

[10]    One such report, filed the day after the Commission's *WRTL* regulations went in effect, disclosed a $2,025,000 EC expenditure to fund a *WRTL* ad from the general treasury of a nonprofit corporation. *See* The ONE Campaign, FEC Form 9, http://images.nictusa.com/cgi-bin/fecimg/?F27039580113 (Dec. 27, 2007); Ed O'Keefe, *One Campaign Hits Airwaves*, washingtonpost.com (Dec. 12, 2007) http://blog.washingtonpost.com/channel-08/2007/12/one_campaign_hits_airwaves.html

reports indicate that substantial additional EC purchases will be made throughout the presidential primary campaign.[11]  Yet, despite all of the ECs that have been and will be made, Citizens United claims that EC speech *as a whole* has been so chilled that the EC funding restriction must be struck down on its face.  (Pl.'s Second P.I. Mem. at 10-11.)  Citizens United's bootstrapped argument must fail, for plaintiff's decision to file this lawsuit — again, the only one of its kind since *WRTL* was decided — does not demonstrate that the *WRTL* standard has impermissibly chilled political speech.

**B.      The Funding Restriction Is Constitutional As Applied To *Hillary: The Movie***

As the foregoing demonstrates, the EC funding restriction is constitutional under *McConnell* and *WRTL* as applied to all ECs that are the functional equivalent of express advocacy.  *Hillary: The Movie* is such an EC.

The controlling opinion in *WRTL* held that a communication is the functional equivalent of express advocacy if it is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  *WRTL*, 127 S. Ct. at 2667.  The opinion immediately then listed criteria relevant to the application of this standard and explained why the ads at issue in *WRTL* could be so interpreted:

> Under this test, WRTL's three ads are plainly not the functional equivalent of express advocacy.  First, their content is consistent with that of a genuine issue ad:  The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to

(containing description and video of ad that encouraged viewers to ask presidential candidates about poverty issues and showed campaign buttons of all Democratic and Republican candidates).

[11]      *See*, *e.g.*, Leslie Wayne, *Outside Groups Spend Heavily and Visibly to Sway '08 Races*, N.Y. Times, Jan. 1, 2008, http://www.nytimes.com/2008/01/01/us/politics/01donate.html (noting groups taking advantage of *WRTL* exemption); Sarah Liebowitz, *Edwards, Clinton Bankrolled from Afar*, Concord Monitor, Jan. 4, 2008, http://www.concordmonitor.com/apps/pbcs.dll/article?AID=/20080104/NEWS03/801040355/10 43/NEWS01 (discussing spending on, *inter alia*, radio broadcasts in New Hampshire).

> contact public officials with respect to the matter. Second, their content
> lacks indicia of express advocacy: The ads do not mention an election,
> candidacy, political party, or challenger; and they do not take a position on
> a candidate's character, qualifications, or fitness for office.

*Id*.; *see also* Pl.'s Second P.I. Mem. at 7 (acknowledging that Court "mentioned such matters in *applying* its no-other-reasonable-interpretation test"). The Commission included these criteria, effectively verbatim, in its regulations implementing *WRTL*. *See supra* Part II.

In light of the Supreme Court's criteria, plaintiff's as-applied challenge to the EC funding restriction must fail. As plaintiff concedes, its movie "(a) mentions election-related topics (election, candidacy, party, voting) and (b) takes a position on a candidate's character, qualifications, and fitness for office." (Pl.'s Second P.I. Mem. at 7.)[12] In fact, plaintiff's acknowledgement that the film "takes a position" on Senator Clinton's candidacy significantly understates the extent to which *Hillary: The Movie* both opposes that candidacy and attacks her "character, qualifications, and fitness for office." The film contains at least twenty-four explicit references to Senator Clinton's campaign for president, many of which state unequivocally that she should not be elected. For example, the movie declares "beyond a shadow of a doubt" that Senator Clinton "is not equipped, not qualified to be our commander in chief" (Am. Compl. Exh. 2 at 71); it asks, rhetorically, "what is there that she has accomplished in her life — that would lead you to believe that she should become the most powerful person in the country?" (*id*. at 69); and it says that she lacks "the legislative gravitas and qualifications enough to elect her [P]resident of the [U]nited [S]tates." (*Id*. at 36.) Each of these statements, and many others throughout the film, constitute "tak[ing] a position on a candidate's character, qualifications, or

---

12    Although Plaintiff appears to argue (Pl.'s Second P.I. Mem. at 7) that only "by the FEC" are these characteristics considered "indicia of express advocacy," the phrase "indicia of express advocacy" is taken directly from the very sentence in *WRTL* in which the characteristics are listed. *WRTL*, 127 S. Ct. at 2667.

fitness for office," and plaintiff's movie therefore fails the "indicia of express advocacy" portion

of the *WRTL* test.

Furthermore, *Hillary: The Movie* fails the remainder of the test because the film does not

"focus on a legislative issue," much less "take a position on the issue, exhort the public to adopt

that position, and urge the public to contact public officials with respect to the matter." The only

focuses of the film are Senator Clinton's fitness for office and her actions in relation to certain

controversies during Bill Clinton's presidency. (*See*, *e.g.*, Am. Compl. Exh. 2 at 9-17

(discussing "travelgate" controversy); *id*. at 18-22 (discussing use of private investigators).)

Contrary to plaintiff's conclusory assertion (Pl.'s Second P.I. Mem. at 5), these criticisms are not

"issue advocacy" as *WRTL* used that term. *See WRTL*, 127 S. Ct. at 2667 (describing "genuine

issue ad[s]"). In fact, despite labeling the movie as issue advocacy, plaintiff neglects to explain

what issues are discussed, other than admitting that the movie discusses Senator Clinton's

candidacy and takes a position on her fitness for office. The only advocacy in plaintiff's film is

its opposition to the election of Senator Clinton to the presidency.[13]

Thus, because *Hillary: The Movie* is nothing but an extensive critique of Senator

Clinton's "character, qualifications, and fitness for office," the film is, in the words and analysis

---

[13]      Plaintiff's film is in many ways more clearly the functional equivalent of express
advocacy than even the "Yellowtail ad," which the *McConnell* Court described as a "striking
example" of purported issue speech that was "clearly intended to influence the election."
*McConnell*, 540 U.S. at 193-94 & n.78. The Yellowtail ad consisted of a series of statements
accusing candidate Bill Yellowtail of physically abusing his wife, being a convicted felon, and
refusing to make child support payments; the ad then concluded by asking viewers to call Bill
Yellowtail and "[t]ell him to support family values." *Id.* As the Court noted, "[t]he notion that
this advertisement was designed purely to discuss the issue of family values strains credulity."
*Id.*; *see also* 72 Fed. Reg. at 72,909 (listing Yellowtail ad as example of EC not meeting criteria
in 11 C.F.R. § 114.15). Yet the Yellowtail ad, in its final sentence, actually contains
comparatively *more* issue advocacy than does *Hillary: The Movie*, which barely mentions any
legislative issues despite its feature length and urges viewers to take no action other than
effectively calling for a vote against Senator Clinton.

of *WRTL* itself, susceptible of no reasonable interpretation other than as an appeal to vote against her.  It is, in short, the functional equivalent of express advocacy, to which the EC funding restrictions may constitutionally be applied.

### C.    The Disclosure Requirements Are Constitutional As Applied To *Hillary: The Movie*

Plaintiff's arguments regarding the constitutionality of the EC disclosure provisions as applied to *Hillary: The Movie* are effectively identical to the arguments plaintiff raised in its first preliminary injunction motion.  In short, plaintiff misreads *Buckley v. Valeo*, 424 U.S. 1 (1976), and *WRTL* as holding that any "regulation" of speech that is not "unambiguously campaign related" is unconstitutional.  (*See* Pl.'s Second P.I. Mot. at 3-5.)  As discussed at length in the Commission's first opposition memorandum, however, plaintiff's argument both lacks any basis in *Buckley* itself and is contrary to a host of Supreme Court precedent upholding disclosure requirements in the context of non-campaign-related, "pure" issue speech.  (Def.'s First P.I. Opp. at Part IV.B.)  Under this precedent, BCRA's disclosure requirements are constitutional as to all ECs because the requirements substantially relate to the government's important interests in (1) providing information to the general public regarding those who are expending funds to influence government activity, and (2) gathering the information necessary to enforce BCRA's funding restrictions.  (*Id*. at Part IV.C.)  The disclosure requirements also impose minimal, if any, constitutional burden on plaintiff, who is neither prohibited from speaking nor subject to "threats, harassment, and reprisals."  (*Id*. at Part IV.D.)  For all of these reasons, even assuming that the speech to be regulated were, as plaintiff claims, "issue advocacy" (Pl.'s Second Mot. at 5), the EC disclosure requirements would be constitutional.  And because plaintiff's movie is not actually "issue advocacy," but rather, as noted previously, the functional equivalent of

express advocacy, *see supra* Part III.B, the disclosure requirements are all the more constitutionally permissible as applied here.

### D.     Plaintiff's Motion For A Preliminary Injunction Regarding The "Questions" Ad Is Moot

Plaintiff argues that its thirty-second ad entitled "Questions" is exempt from the corporate EC funding restriction under *WRTL*, and plaintiff accordingly seeks a preliminary injunction against enforcement of the restriction as to this ad.  The Commission agrees with plaintiff that "Questions" is a *WRTL* ad exempt from the funding restriction pursuant to 11 C.F.R. § 114.15(c). This analysis was slightly more complicated than it was for plaintiff's "Wait" and "Pants" ads because, while the ten-second ads qualify for the safe-harbor of 11 C.F.R. § 114.15(b) by omitting any indicia of express advocacy and promoting a commercial transaction, "Questions" arguably addresses a candidate's "character, qualifications, [and] fitness for office."  11 C.F.R. § 114.15(b).  Thus, the safe harbor provision may not apply to "Questions," but it is, "on balance," susceptible of a reasonable interpretation as a commercial advertisement for *Hillary: The Movie*, rather than solely as an appeal to vote against Senator Clinton.  11 C.F.R. § 114.15(c).  Accordingly, "Questions" is exempt from the funding restriction of 2 U.S.C. § 441b(a),(b)(2), and plaintiff's motion for a preliminary injunction against enforcement of the corporate funding restriction as to the ad is therefore moot.

## IV.     PLAINTIFF FAILS TO DEMONSTRATE IRREPARABLE INJURY

As with Citizens United's first preliminary injunction motion, plaintiff fails to meet its burden of demonstrating that it will suffer irreparable harm without the requested temporary relief.  As we explained (Def.'s First P.I. Opp. at 31-32), plaintiff must show that its alleged injury is "both certain and great," "actual and not theoretical," imminent, *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), and "beyond remediation," *Chaplaincy of Full*

*Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In addition, where the effect of the injunction would be to alter the status quo rather than maintain the relative positions of the parties, courts require "the movant to meet an even higher standard." *City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 127 (D.D.C. 2006). With respect to its new claims, plaintiff fails to meet its burden for the reasons pointed out in the Commission's earlier opposition, and the Commission incorporates those arguments herein. Plaintiff's new claims also fail in additional ways to establish irreparable harm.

### A.    Plaintiff's Delay in Moving for a Preliminary Injunction Indicates an Absence of Irreparable Harm

Despite plaintiff's planning for at least one year to distribute its movie during the presidential primary season, plaintiff waited until now to bring its new claims regarding its movie and a facial challenge to the EC financing provisions. As we have shown (Def.'s First P.I. Opp. at 37), such delay indicates an absence of the irreparable harm required to support the issuance of a preliminary injunction. *See also City of Moundridge*, 429 F. Supp. 2d at 128. Video-on-demand distribution of movies has been a common practice since well before the last year and is apparently just one of the many ways that plaintiff "intends to market *Hillary* in theaters, broadcasts, [and] on DVDs" (Pl.'s Second P.I. Mem. at 5). Accordingly, Plaintiff's purportedly new opportunity to broadcast its movie through video-on-demand (*see* Am. Compl. ¶ 28) was clearly foreseeable as part of its general distribution plans and does not support the "drastic" remedy of a preliminary injunction. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Similarly, with respect to plaintiff's new facial challenge, *WRTL* was issued approximately six months before plaintiff sought a preliminary injunction. Had plaintiff indeed been somehow chilled by the language of the Court's decision, it could have filed its case months ago and had its claim adjudicated by this Court in advance of the election without having

to invoke the extraordinary preliminary injunction procedures.  Plaintiff's "undue delay" demonstrates that the alleged harm is not of "such *imminence* that there is a clear and present need for equitable relief."  *Scott-Blanton v. Universal City Studios Prods. LLLP*, 495 F. Supp. 2d 74, 80 (D.D.C. 2007) (internal quotations omitted); *see also id.* ("[D]elay . . . tends to indicate at least a reduced need for such drastic, speedy action.") (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)); 11A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1, 156 & n.12 (2007) ("A long delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").

### B.    Plaintiff Fails to Show Irreparable Harm Regarding the Application of the EC Financing Restrictions to *Hillary*

To obtain a preliminary injunction, "[a] litigant must do more than merely *allege* the violation of First Amendment rights" because "the finding of irreparable injury cannot meaningfully be rested on a mere contention of a litigant."  *Wagner v. Taylor*, 836 F.2d 566, 576 (D.C. Cir. 1987).  Instead, "in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights."  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (internal quotation omitted).  Here, plaintiff's allegation that the application of the EC financing restriction to the purchase of on-demand video access for its campaign advocacy would cause irreparable injury is unsupported.

In its verified complaint — the only testimony plaintiff has provided — plaintiff alleges without elaboration that "it will not proceed with its activities as planned" absent an injunction and "will suffer irreparable harm."  (Am. Compl. ¶ 31.)  That bare allegation is insufficient to

establish that plaintiff cannot avoid being harmed irreparably while the litigation proceeds.

Plaintiff submits no evidence, for example, explaining how the harm will be irreparable if it

distributes the identical motion picture in theaters and through DVD sales — *i.e.*, through the

non-broadcast media that purportedly were the only methods of distributions it had intended to

use until recently.  (Pl.'s Second P.I. Mem. at 5.)

Setting aside these nonbroadcast means of distribution, plaintiff also presents no facts

detailing why it could not temporarily finance the cable dissemination of *Hillary* through its

separate segregated fund or political committee ("PAC").  As of November 30, plaintiff had

raised almost $2 million last year for its PAC and retained a little over $1 million in cash on hand

in that account.  Citizens United Political Victory Fund, Report of Receipts and Disbursements,

at 2 (Dec. 20, 2007), http://images.nictusa.com/cgi-bin/fecgifpdf/?_27658+27991053362.pdf.

Plaintiff submits no evidence about how much it plans to pay for on-demand distribution of

*Hillary*, but appears to be able to finance that portion of its distribution through the corporation's

PAC.  Plaintiff offers no reason why it could not do so during the pendency of this action; should

its constitutional challenge succeed, it could then seek permission to reimburse its PAC with

general treasury funds at the conclusion of the litigation.  The D.C. Circuit noted the possibility

of a similar option in denying an application for preliminary injunction in *NTEU v. United

States*, 927 F.2d 1253, 1256 (D.C. Cir. 1991).  In that case, federal employees sought to

preliminarily enjoin the operation of a statute prohibiting their receipt of honoraria, citing their

"First Amendment rights to make appearances, deliver speeches, and write articles for

compensation."  *Id.* at 1253.  Part of the reason there was no irreparable harm, the D.C. Circuit

found, was that the employees could have put their speaking fees into escrow during the

pendency of the litigation.  *Id.* at 1256.  Plaintiff could create a similar arrangement here by

using PAC funds only temporarily. That option indicates that plaintiff has failed to establish that it will be irreparably harmed absent preliminary relief.[14]

### C.  Plaintiff's Bare Allegations of Chill Regarding Its Facial Challenge to the EC Financing Provisions Are Insufficient to Demonstrate Irreparable Harm

As explained *supra* Part III.A, *McConnell* has already upheld the EC financing restriction on its face, and *WRTL* did not disturb that holding. Nevertheless, plaintiff now asks for the extraordinary remedy of a preliminary injunction prohibiting all applications of this financing provision. Although this request should be denied because plaintiff is unlikely to prevail on the merits of this claim, the request should equally be denied because such relief would far exceed anything necessary to provide any interim relief to which plaintiff could conceivably be entitled. All injunctions "must be narrowly tailored to remedy the specific harm shown." *Neb. Health & Human Servs. v. HHS*, 435 F.3d 326, 330 (D.C. Cir. 2006) (quoting *Aviation Consumer Action Proj. v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976)). Thus, even if the Court were to conclude that plaintiff had clearly established irreparable harm as to some of plaintiff's particular conduct, any injunction must be circumscribed to address that particular harm and should not completely prohibit operation of the EC financing provision. *See Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) (finding nationwide injunction broader than necessary and an abuse of discretion).

---

[14]    Plaintiff contends (Pl.'s Second P.I. Mem. at 13) that the Court need not consider the PAC alternative because the Supreme Court in *WRTL* did not find the PAC alternative a constitutionally sufficient outlet for corporate speech. The portion of *WRTL* to which plaintiff refers, however, did not refer to the preliminary injunction context and explicitly did not apply to express advocacy and its functional equivalent. 127 S. Ct. at 2671 n.9; *see also Wisconsin Right to Life, Inc. v. FEC*, 542 U.S. 1305, 1306 (2004) (Rehnquist, C.J., in chambers) (denying injunction barring enforcement of BCRA's EC financing restrictions pending appeal). As we have shown, *see supra* Part III.B, *Hillary* is the functional equivalent of express advocacy.

Moreover, plaintiff's facial challenge to the EC financing provision also relies exclusively on bare allegations of First Amendment chill.  Plaintiff's only attempt at submitting evidence of chill is the contention in the complaint — verified by plaintiff's president — that a statement in a Commission preliminary injunction brief declining to take an unnecessary position on one of plaintiff's ads has prevented plaintiff from airing that ad.  (Am. Compl. ¶ 32.) Plaintiff's other contention — made by plaintiff's counsel in a brief and unsupported by any evidence — is that the incorporation of the language of the *WRTL* decision into the Commission's regulations has somehow created confusion about whether *Hillary* is the functional equivalent of express advocacy.  (*See* Pl.'s Second P.I. Mem. at 7.)  As we have shown, plaintiff is not likely to succeed on the basis of either of these contentions.  *See supra* Part III.A.3.  Plaintiff's bare allegations of its own confusion over implementation of the *WRTL* opinion are also woefully inadequate to establish irreparable harm to itself, let alone to all entities who may be regulated by the EC financing restriction.  Plaintiff must establish both the "existence" and the "imminence of a First Amendment violation."  *Wagner*, 836 F.2d at 576 n.76.  Plaintiff must carry its burden of persuasion "*by a clear showing*."  *Mazurek*, 520 U.S. at 972 (internal quotation marks omitted).  Plaintiff's allegations fall far short of demonstrating that *all* applications of the EC financing restrictions must be enjoined to avert irreparable harm that plaintiff alone has allegedly suffered.

**D.**    **Plaintiff Fails to Demonstrate That Disclosure Related to *Hillary* Would Lead to Irreparable Harm**

Plaintiff fails to demonstrate irreparable injury regarding the EC disclosure provisions as applied to *Hillary: The Movie* for the same reasons that it failed to demonstrate irreparable injury from disclosure related to its ads.  (*See* Def.'s First P.I. Opp. at Part V.)  Plaintiff once again presents no evidence of a "reasonable probability" of "threats, harassment, and reprisals" as a

22

result of disclosure, *Buckley*, 424 U.S. at 69-74, 82 n.109, let alone the certain, immediate, and irremediable injury required to support a preliminary injunction, *Wisconsin Gas*, 758 F.2d at 674. In fact, one of the organizational donors to plaintiff for the *Hillary* project has not only boasted to the press of its involvement in funding the movie, it is receiving screen credit on the movie as an executive producer. *See* Rick Reiff, *Lincoln Club Aims for Hillary*, Orange County Bus. J., Aug. 13, 2007, at 3, 2007 WLNR 17661739 (Lincoln Club pledged to pay "a low-six figure amount" to fund *Hillary* and is "getting a screen credit"); Credits, *Hillary: The Movie*, http://www.hillarythemovie.com/credits.html (crediting Lincoln Club of Orange County as "Executive Producer"). So at the same time that plaintiff is arguing to this Court that to reveal publicly the donors who have chosen to help finance *Hillary: The Movie* would be unconstitutionally injurious, plaintiff is publicizing one of those donors itself in the very broadcast at issue. Thus, the "injury" that plaintiff alleges would result from association with the movie is actually seen as a *benefit* to at least one organization who has publicized its connection with Citizens United and *Hillary*. Plaintiff's alleged injury from disclosure is therefore "highly speculative" and unlikely. *Herschaft v. New York City Campaign Fin. Bd.*, 139 F. Supp. 2d 282, 285 (E.D.N.Y. 2001). The D.C. Circuit "has set a high standard for irreparable injury" and plaintiff plainly fails to meet it. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

## V.    THE RELIEF PLAINTIFF REQUESTS WOULD NOT BE IN THE PUBLIC INTEREST AND WOULD HARM THE COMMISSION

As we have explained, there is a strong public interest in enforcement of Acts of Congress such as BCRA, and an injunction proscribing its enforcement would harm both the public and the Commission. (*See* Def.'s First P.I. Opp. at Part VI.) Plaintiff's new proposed injunction would not just deprive viewers of information about who is airing and paying to finance advertisements that Congress mandated be disclosed, it would permit widespread

corporate and union financing of television ads and 'infomercials' that are the functional equivalent of express advocacy, including *Hillary: The Movie*. Such a result would return the nation to the condition that Congress sought to change when it "found that corporations and union used soft money to finance a virtual torrent of televised election-related ads during the periods immediately preceding federal elections." *McConnell*, 540 U.S. at 207. As the Supreme Court stated in the similar context of a requested injunction pending appeal during Wisconsin Right to Life's as-applied challenge to BCRA's EC financing restrictions, "barring the enforcement of an Act of Congress would be an extraordinary remedy, particularly when this Court recently held [that Act] facially constitutional." *Wisconsin Right to Life, Inc.*, 542 U.S. at 1306 (citing *McConnell*, 540 U.S. at 189-210). Plaintiff has not met its burden of clearly establishing that its proposed preliminary injunction would serve the public interest and not cause harm to the Commission.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court deny plaintiff's second motion for preliminary injunction.

Respectfully submitted,

Thomasenia P. Duncan (D.C. Bar No. 424222)
General Counsel

David Kolker (D.C. Bar No. 394558)
Associate General Counsel

Kevin Deeley
Assistant General Counsel

\_\_\_\_\_/s/ Adav Noti_____
Adav Noti (D.C. Bar No. 490714)
Attorney

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street NW
Washington, DC 20463
Dated:  January 8, 2008                    (202) 694-1650

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS UNITED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Civ. No. 07-2240 (ARR, RCL, RWR)

**ORDER**

This matter having come before the Court upon plaintiff Citizen United's Second Motion for Preliminary Injunction (Docket No. 23) and Defendant Federal Election Commission's opposition thereto, and the Court having held oral argument and read and considered the positions of all parties therein, it is hereby ORDERED that:

(1)     Plaintiff's motion is DENIED AS MOOT as to the "Questions" advertisement (Am. Compl. Exh. 1 ¶ 3); and

(2)     In all other respects, plaintiff's motion is DENIED.

SO ORDERED.

_____, 2008

_____
United States Circuit Judge A. Raymond Randolph


_____
United States District Judge Royce C. Lamberth


_____
United States District Judge Richard W. Roberts