UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **CITIZENS UNITED,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-2240 (ARR, RCL, RWR) |
| | ) | (Three-Judge Court) |
| **FEDERAL ELECTION COMMISSION,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

For the reasons that follow we deny Citizens United's ("Citizens") motions for a preliminary injunction to enjoin the Federal Election Commission ("FEC") from enforcing provisions of the Bipartisan Campaign Reform Act of 2002 ("BCRA"),[1] with respect to Citizens' advertisements for a movie—*Hillary: The Movie*—and its distribution of *The Movie* through cable TV video on-demand.

I.

Citizens United is a nonprofit membership corporation, tax-exempt under Internal Revenue Code § 501(c)(4). (Am. Compl. ¶ 5.) Citizens produced a movie titled *Hillary: The Movie*. (*Id*. Ex. 2; Notice [30] Regarding Joint Stip.) *The Movie* focuses on Senator Hillary Rodham Clinton's "Senate record, her White House record during President Bill Clinton's presidency, . . . her presidential bid," and includes "express opinions on whether she would make a good president." (Am. Compl. ¶ 14.) Citizens plans to distribute *The Movie* in January or

---

[1] Pub. L. No. 107–155, 116 Stat. 81 (2002), codified at 2 U.S.C. § 431 *et seq.*

February 2008 through theaters, video on-demand ("VOD") broadcasts, and DVD sales. (*Id.*) Citizens notified the court on January 7, 2008, that it had released *The Movie* for "public sale and exhibition." (Notice [30] Regarding Joint Stip.); *see* http://www.hillarythemovie.com (last visited Jan. 11, 2008) (offering *The Movie* on DVD for $23.95 and promoting screenings of the film in seven movie theaters across the country). *The Movie*'s release date coincides with the dates when many states will hold primary elections or party caucuses. Senator Clinton is a presidential candidate in those states. (Am. Compl. ¶ 17.) Citizens intends to fund at least three television advertisements—two 10-second advertisements, "Wait"[2] and "Pants,"[3] and one 30-second advertisement, "Questions"[4]—to coincide with the release of its movie. (*Id.* Ex. 1.) The

---

[2] The script for the television advertisement, "Wait" reads as follows:
[Image(s) of Senator Clinton on screen]
"If you thought you knew everything about Hillary Clinton . . . wait 'til you see the movie."
[Film Title Card]
[Visual Only] Hillary: The Movie.
[Visual Only] www.hillarythemovie.com

[3] The script for the television advertisement, "Pants" reads as follows:
[Image(s) of Senator Clinton on screen]
"First, a kind word about Hillary Clinton: [Ann Coulter Speaking & Visual] She looks good in a pant suit."
"Now, a movie about the everything else."
[Film Title Card]
[Visual Only] Hillary: The Movie.
[Visual Only] www.hillarythemovie.com

[4] The script for the television advertisement, "Questions" reads as follows:
[Image(s) of Senator Clinton on screen]
"Who is Hillary Clinton?"
[Jeff Gerth Speaking & Visual] "[S]he's continually trying to redefine herself and figure out who she is . . ."
[Ann Coulter Speaking & Visual] "[A]t least with Bill Clinton he was just good time Charlie. Hillary's got an agenda . . ."
[Dick Morris Speaking & Visual] "Hillary is the closest thing we have in America to a European socialist . . ."

advertisements promote *The Movie* and direct viewers to *The Movie*'s website for more information about the film and how to see or purchase it.  (*Id.* ¶ 19.)  If Senator Clinton becomes the Democratic presidential nominee, Citizens plans to broadcast the three advertisements and possibly other advertisements within 30 days before the Democratic National Committee Convention and within 60 days before the November general election—both periods are within BCRA's definition of an electioneering communication.  (*Id.* ¶ 20); 2 U.S.C. § 434(f)(3)(A)(i)(II)(bb).  Citizens has elected not to broadcast its advertisements pending resolution of this litigation.  (Am. Compl. ¶ 26.)  It has entered into negotiations to broadcast *The Movie* through the "Political Movies" component of a new nationwide VOD channel, "Elections '08," but has decided to forego the opportunity pending resolution of the current litigation because, according to Citizens, the broadcast would be banned under BCRA and, even if this were not so, the broadcast would require Citizens to disclose certain information and make certain statements as described below.  (*Id.* ¶ 28–30.)

BCRA amended the Federal Election Campaign Act of 1971 ("FECA").[5]  BCRA, Pub. L. No. 107–155, 116 Stat. 81 (2002) (codified at 2 U.S.C. § 431 *et seq.*).  Passed in 2002, it represented "the most recent federal enactment designed to purge national politics of what was conceived to be the pernicious influence of 'big money' campaign contributions." *McConnell v. FEC*, 540 U.S. 93, 115 (2003) (internal citation omitted).  BCRA introduced a new system for

---

"If you thought you knew everything about Hillary Clinton . . . wait 'til you see the movie.
  [Film Title Card]
  [Visual Only]  Hillary: The Movie.  In theaters [on DVD] January 2007.
  [Visual Only]  www.hillarythemovie.com

[5] Pub. L. No. 92-225, 86 Stat. 3 (1972) (codified at 2 USC § 431 *et seq.*).

regulating what it termed "electioneering communications." Under BCRA § 201, an "electioneering communication" is:

> any broadcast, cable, or satellite communication which—
>
> (I) refers to a clearly identified candidate for Federal office;
>
> (II) is made within—
>
> > (aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or
> >
> > (bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate
>
> . . .

2 U.S.C. § 434(f)(3)(A). For presidential candidates, the communication must also be capable of being received by 50,000 or more persons. *See* 11 C.F.R. § 100.29(b)(3)(ii). Citizens recognizes that under this statutory definition, both its advertisements and a VOD[6] broadcast of *The Movie* would be electioneering communications. (Am. Compl. ¶¶ 17, 29.) Electioneering communications are subject to a host of restrictions imposed by BCRA. Three are relevant here: § 203, § 201, and § 311. Section 203 prevents corporations and labor unions from funding electioneering communications out of their general treasury funds, unless the communication is made to its stockholders or members, to get out the vote, or to solicit donations for a segregated corporate fund for political purposes. 2 U.S.C. § 441b(b)(2). This provision does not bar

---

[6] The parties did not raise the issue of whether VOD was within the definition of "electioneering communication." However, a broadly worded FEC regulation defining "electioneering communications" indicates that VOD would be a "broadcast, cable, or satellite communication" because it is "disseminated through the facilities of a . . . cable television system." *See* 11 C.F.R. §§ 100.29(b)(1), (b)(3)(i) (indicating that "broadcast, cable, or satellite communications" include communications "aired, broadcast cablecast or otherwise disseminated through the facilities of a television station, radio station, cable television system, or satellite system").

electioneering communications paid for out of a segregated fund that receives donations only from stockholders, executives and their families.  2 U.S.C. §§ 441b(b)(2)(C), (b)(4)(A).[7]  Any electioneering communication that is not prohibited is subject to the disclosure requirements of § 201 and the disclaimer requirements of § 311, which are set out in part II.B.

Citizens' complaint, filed on December 13, 2007,[8] contains two major claims: (1) that § 203's prohibition of corporate disbursements for electioneering communications violates the First Amendment on its face and as applied to *The Movie* and to the 30-second advertisement "Questions"[9]; and (2) that BCRA § 201 requiring disclosure and § 311 requiring disclaimers are unconstitutional as applied to Citizens' three advertisements (and to *The Movie*, if Citizens broadcasts it in a manner that does not violate § 203).

II.

The court will not issue a preliminary injunction unless the movant shows that it has "1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction."  *Omar v. Harvey*, 479 F.3d 1, 18 (D.C. Cir. 2007) (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58

---

[7] Corporations and labor unions may also contribute to Political Action Committees, which are permitted to make electioneering communications.  *See McConnell*, 540 U.S. at 204 (citing *FEC v. Beaumont*, 539 U.S. 146, 162–63 (2003)).

[8] On December 14, 2007, Citizens' motion for a three-judge district court was granted [14] pursuant to BCRA § 403 and 28 U.S.C. § 2284.  On January 10, 2008, the three-judge court held an expedited hearing on the motions for preliminary injunctions.

[9] Plaintiff's challenge regarding the prohibition of "Questions" will be denied as moot. The FEC, in its filings and at oral argument, conceded that the advertisement is exempt from the Prohibition.  (Opp'n to 2d Mot. for Prelim. Inj. at 17.)

F.3d 738, 746 (D.C. Cir. 1995)). Granting injunctive relief is an "extraordinary and drastic remedy," and it is the movant's obligation to justify, *"by a clear showing*," the court's use of such a measure. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

A.

We will analyze first Citizens' likelihood of prevailing on the merits of its claims regarding *The Movie*. In *McConnell*, the Supreme Court upheld § 203 on its face, rejecting claims that the financing of "electioneering communications" constituting express advocacy or its functional equivalent were within the protection of the First Amendment. 540 U.S. at 203–09. *McConnell* did not, however, "purport to resolve future as-applied challenges." *FEC v. Wis. Right to Life, Inc.*, 127 S. Ct. 2652, 2661 (2007) (citation omitted) ("*WRTL*"). The Chief Justice's opinion in *WRTL* stated that an advertisement could not be considered the functional equivalent of express advocacy unless it "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."[10] *Id.* at 2667. To promote the objectivity of this analysis, courts are to disregard contextual evidence of the corporation's intent in running an advertisement.[11] *See id.* at 2668.

Citizens wants us to enjoin the operation of BCRA § 203 as a facially unconstitutional

---

[10] The parties agree, as do we, that the Chief Justice's formulation is now the governing test for the functional equivalent of express advocacy. Although the Court's opinion in *WRTL* was fragmented, the Chief Justice's opinion approved the judgment of the district court on the narrowest grounds. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted).

[11] *WRTL* discounted evidence that included the corporation's other candidate-related advocacy, the timing of the advertisements, and the advertisement's reference to an Internet address that directed viewers to a website containing express advocacy against the election of candidates for federal office. 127 S. Ct. at 2668–69 (Opinion of Roberts, C.J.).

burden on the First Amendment right to freedom of speech. The theory is that with respect to § 203, *WRTL* narrowed *McConnell* to such an extent that it "left the door open to facial invalidation based on the sort of circumstances that have now arisen." (2d Mot. for Prelim. Inj. Mem. at 2). For Citizens to prevail on this claim, we would have to overrule *McConnell*, which is to say that Citizens has no chance of prevailing. Only the Supreme Court may overrule its decisions. The lower courts are bound to follow them. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983); *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam).

With respect to Citizens's as-applied claims regarding *The Movie*, the first question under Chief Justice Roberts' *WRTL* opinion—and as it turns out, the last question—is whether the film is express advocacy or its functional equivalent. If it is, *McConnell* makes it likely that Citizens would not win on the merits of its claim that the First Amendment permits it to broadcast the movie within the electioneering communications period as currently funded. Citizens contends that *The Movie* is issue speech and, as it stated in oral argument, that issue speech is any speech that does not expressly say how a viewer should vote. The trouble is that the controlling opinion in *WRTL* stands for no such thing. Instead, if the speech cannot be interpreted as anything other than an appeal to vote for or against a candidate, it will not be considered genuine issue speech even if it does not expressly advocate the candidate's election or defeat. *WRTL*, 127 S. Ct. at 2667.

*The Movie* does not focus on legislative issues. *See id.*; 11 C.F.R. § 114.15(b). *The Movie* references the election and Senator Clinton's candidacy, and it takes a position on her character, qualifications, and fitness for office. *See id.*; 11 C.F.R. § 114.15(b). Dick Morris, one

7

political commentator featured in *The Movie*, has described the film as really "giv[ing] people the flavor and an understanding of why she should not be President." Dick Morris, Hillary's Threat, Address (Mar. 2007) (available at www.citizensunited.org/blog/?entryid=4563815). After viewing *The Movie* and examining the 73-page script at length, the court finds Mr. Morris's description to be accurate. *The Movie* is susceptible of no other interpretation than to inform the electorate that Senator Clinton is unfit for office, that the United States would be a dangerous place in a President Hillary Clinton world, and that viewers should vote against her.[12]

---

[12] A selection of excerpts from the movie are indicative of the film's message as a whole and serve to demonstrate the difficulty that this court had in its ultimately unsuccessful attempt to find a reasonable interpretation of *The Movie* that would take it out of the *WRTL* "functional equivalent to express advocacy" classification.

Excerpts include statements by the film's narrator, one of several political commentators or another interviewee stating:

"She's driven by the power. She's driven to get the power. That is the driving force in her life." (Am. Compl. Ex. 2 at 1.)

"She is the expert at not saying what she believes—she will run on attacking Republicans, and being the first woman president—oh isn't that amazing, she's a woman she can walk and talk." (*Id.*)

"She is steeped in controversy, steeped in sleaze, that's why they don't want us to look at her record." (*Id.* at 1–2.)

"Over the past 16 years Hillary Clinton has undoubtedly become one of the most divisive figures in America. How this makes her suited to unite the country as the next president is troubling to many." (*Id.* at 6.)

"I mean think of what it says about Hillary Clinton that she was willing to put up with his open philandering, with anything in a skirt who wanders before his eyesight—all for the power—at least with Bill Clinton he was just good time Charlie. Hillary's got an agenda and she's willing to put up with that to be [P]resident of the [U]nited [S]tates, she's got a to do list when she gets to the White House." (*Id.* at 21–22.)

"I think the American people have a right to as much of a public record as possible about Hillary Clinton. Those records should be released before the 2008 elections so that we can learn

*The Movie* is thus the functional equivalent of express advocacy. *See WRTL*, 127 S. Ct. at 2667 (setting out the "functional equivalent" standard). As such, it falls within the holding of *McConnell* sustaining, as against the First Amendment, § 203 insofar as it bars corporations from funding electioneering communications that constitute the functional equivalent of express advocacy. There is no substantial likelihood that Citizens will prevail on its as-applied challenge with respect to *The Movie*.

---

a lot more about exactly how much influence she had in the White House, what her positions were in the White House, and how she acted in the White House." (*Id.* at 60.)

"Finally, before America decides on our next president, voters should need no reminders of [] what's at stake—the well being and prosperity of our nation." (*Id.* at 68–69.)

"It[']s been said and I agree with it that this is the most personal political choice that Americans make. They want, they—their personality traits, their—will they consider a person that they could trust, that they would like, that they were comfortable with, and that's [where] I think Hillary Clinton as a candidate has great defects." (*Id.* at 69.)

"If she reverts to form, Hillary Clinton will likely be in the future what she has been in the past, which is a person, a woman, a politician of the left, and I don't think that's going to [be] good for the security of the United States." (*Id.* at 70.)

"I think we are at a very critical time in this country. I can tell you beyond a shadow of a doubt that uh, the Hillary Clinton that I know is not equipped, not qualified to be our commander in chief." (*Id.* at 71.)

"[T]his vote comes down to one thing: liberty. Do you believe in liberty or don't you? Economic liberty, free speech, protecting our borders, protecting our country from terrorism—the issue is liberty." (*Id.*)

"[W]e must not ever underestimate this woman. We must not ever understate her chances of winning. We mustn't be lolled into a state of security and complacency by the new found moderation that she likes to talk about. And we must never forget the fundamental danger that this woman [poses] to every value that we hold dear." (*Id.* at 72).

In sum, plaintiff's counsel's representation at oral argument that the movie did not exhort viewers to vote against Senator Clinton, is simply untrue.

B.

Citizens' proposed advertisements present a different picture. The FEC agrees that Citizens may broadcast the advertisements because they fall within the safe harbor of the FEC's prohibition regulations implementing *WRTL*. They did not advocate Senator Clinton's election or defeat; instead, they proposed a commercial transaction—buy the DVD of *The Movie*. *See WRTL*, 127 S. Ct. at 2667; 11 C.F.R. § 114.15(b). Although Citizens may therefore run the advertisements, it complains that requirements of § 201 and § 311 of BCRA, 2 U.S.C. §§ 434(f)(2), 441d, impose on it burdens that violate the First Amendment.

Section 201 is a disclosure provision requiring that any corporation spending more than $10,000 in a calendar year to produce or air electioneering communications must file a report with the FEC that includes—among other things—the names and addresses of anyone who contributed $1,000 or more in aggregate to the corporation for the purpose of furthering electioneering communications. §§ 434(f)(1), (2)(F); 11 C.F.R. § 104.20(c)(9). Section 311 is a disclaimer provision. 2 U.S.C. § 441d. For advertisements not authorized by a candidate or her political committee, the statement "____ is responsible for the content of this advertising" must be spoken during the advertisement and must appear in text on-screen for at least four seconds during the advertisement. § 441d(d)(2). In addition, such advertisements are required to include the name, address, and phone number or web address of the organization behind the advertisement. § 441d(a)(3).

Citizens thinks that § 201 and § 311 are unconstitutional because its advertisements do not constitute express advocacy or the functional equivalent of express advocacy. The argument is that the Supreme Court's *WRTL* decision narrowed the constitutionally permissible scope of what could be considered an electioneering communication. Under Citizens' reading of *WRTL*,

10

anything that is not express advocacy or not "susceptible of [a] reasonable interpretation other than as an appeal to vote for or against a specific candidate" cannot be constitutionally regulated by Congress under BCRA.  *See* 127 S. Ct. at 2667.

We do not believe *WRTL* went so far.  The only issue in the case was whether speech that did not constitute the functional equivalent of express advocacy could be banned during the relevant pre-election period.  Although *McConnell* upheld the § 203 prohibition on its face, the Court left open the issue that was presented in *WRTL*, reserving it for decision on an as-applied basis.  In contrast, when the *McConnell* Court sustained the disclosure provision of § 201 and the disclaimer provision of § 311, it did so for the "entire range of electioneering communications" set forth in the statute.  *McConnell*, 540 U.S. at 196; *see also id.* at 230–31 (discussing § 311).  Citizens's advertisements obviously are within that range.

Although Citizens styles its argument as an as-applied challenge, it offers only one distinction between its advertisements and the mine-run of speech that constitutes electioneering communication under BCRA.  The distinction, so goes the argument, is that Citizens' speech is constitutionally protected, as *WRTL* holds.  Whether the Supreme Court will ultimately adopt that line as a ground for holding the disclosure and disclaimer provisions unconstitutional is not for us to say.[13]  We know that the Supreme Court has not adopted that line as a ground for holding the disclosure and disclaimer provisions unconstitutional, and it is not for us to do so today.  And we know as well that in the past the Supreme Court has written approvingly of disclosure provisions triggered by political speech even though the speech itself was constitutionally protected under the First Amendment.  *See FEC v. Mass. Citizens for Life*, 479

---

[13]*See Majors v. Abell*, 361 F.3d 349, 356–57 (7th Cir. 2004) (Easterbrook, J., dubitante).

U.S. 238, 259–62 (1986) (striking down a prohibition, and noting that the disclosure provisions will apply to the newly permitted speech); *Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley*, 454 U.S. 290, 297–98 (1981) (same); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 791–92 & n.32 (1978) (discussing how disclosure provisions can help offset the coercive aspects of corporate speech).

The *McConnell* Court did suggest one circumstance in which the requirement to disclose donors might be unconstitutional as-applied—if disclosure would lead to reprisals and thus "impose an unconstitutional burden on the freedom to associate in support of a particular cause." 540 U.S. at 198. To this, the Court added that the plaintiff must show a "reasonable probability that the compelled disclosure of . . . contributors' names will subject them to threats, harassment, or reprisals." *Id.* (quoting *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 100 (1982)). Citizens' memorandum in support of its motion states that there may be reprisals, but it has presented no evidence to back up this bald assertion. In that respect, Citizens is thus in a similar position as the parties in *McConnell* who made the same assertion but presented no specific evidentiary support. *See* 540 U.S. at 199.

We therefore hold that Citizens has not established the requisite probability of prevailing on the merits of its arguments against the disclosure and disclaimer provisions—§ 201 and § 311, respectively.

C.

Citizens tells us that without a preliminary injunction it will not be able to broadcast *The Movie*, that it will have to disclose the identity of its contributors to the FEC if it runs the advertisements, and that some portion of the time it purchased for the advertisements would be consumed by the disclaimers BCRA requires. If Citizens had made more of a showing that it

had a chance of prevailing in this court on the merits, these kinds of harms might have warranted preliminary relief.  But in the face of *McConnell*'s ruling that the disclosure and disclaimer provisions are constitutional and that the restriction on corporate speech advocating the defeat of a candidate does not violate the First Amendment, Citizens is unable to raise "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."  *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953); *see also FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714–15 (D.C. Cir. 2001), *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986), *Washington Metro. Area Transit Comm. v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).

As to the remaining factors governing preliminary relief, we cannot say that enjoining enforcement of the BCRA provisions at issue would serve the public interest in view of the Supreme Court's determination that the provisions assist the public in making informed decisions, limit the coercive effect of corporate speech, and assist the FEC in enforcing contribution limits.  *See McConnell*, 540 U.S. at 196, 205, 231.

\* \* \*

Citizens' motion for preliminary injunction with respect to the § 203 Prohibition as applied to "Questions" shall be DENIED as moot as set forth in footnote 9 and shall be DENIED with respect to all other claims.  A separate order shall issue this date.

Signed by United States Circuit Judge A. Raymond Randolph, and United States District Judges Royce C. Lamberth and Richard W. Roberts, on January 15, 2008.