UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS UNITED, | ) |
| Plaintiff, | ) |
| v. | ) Civ. No. 07-2240 (ARR, RCL, RWR) |
| FEDERAL ELECTION COMMISSION, | ) MOTION TO DISMISS |
| Defendant. | ) |

**DEFENDANT FEDERAL ELECTION COMMISSION'S MOTION
TO DISMISS COUNTS 3 AND 4 OF THE AMENDED COMPLAINT**

The Federal Election Commission respectfully moves this Court for an order dismissing Count 3 of the Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and dismissing Count 4 as moot pursuant to Rule 12(b)(1). A memorandum of law in support of this motion and a proposed order are attached.

Respectfully submitted,

Thomasenia P. Duncan (D.C. Bar No. 424222)
General Counsel

David B. Kolker (D.C. Bar No. 394558)
Associate General Counsel

Kevin Deeley
Assistant General Counsel

　/s/ Adav Noti
Adav Noti (D.C. Bar No. 490714)
Attorney

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street NW
Washington, DC 20463
Dated: February 11, 2008                          (202) 694-1650

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS UNITED, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>FEDERAL ELECTION COMMISSION, )<br>)<br>Defendant. )<br>) | Civ. No. 07-2240 (ARR, RCL, RWR)<br><br>MEMORANDUM OF LAW IN SUPPORT<br>OF MOTION TO DISMISS |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
TO DISMISS COUNTS 3 AND 4 OF THE AMENDED COMPLAINT**

Defendant Federal Election Commission ("Commission") submits this memorandum in support of its Motion to Dismiss Counts 3 and 4 of the Amended Complaint. Count 3 should be dismissed because Plaintiff's film is susceptible of no reasonable interpretation other than as an appeal to vote against Senator Clinton as a candidate for President, and therefore Plaintiff may constitutionally be prohibited from using its corporate treasury funds to broadcast it. Count 4 should be dismissed as moot because there is no case or controversy regarding whether the proposed "Questions" ad may be financed with Plaintiff's corporate funds.

**I.  LEGAL BACKGROUND**

The Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431-55, as amended by the Bipartisan Campaign Reform Act ("BCRA"), Pub. L. No. 107-155, defines an "electioneering communication" ("EC") in the context of a presidential candidate as a "broadcast, cable, or satellite communication" that refers to a clearly identified candidate and is made within sixty days before a general election or thirty days before a primary election in which that candidate is running. *See* 2 U.S.C. § 434(f)(3)(A)(i). Section 203 of BCRA provides that neither

corporations nor labor unions may use their general treasury funds to produce or broadcast ECs. *See* 2 U.S.C. § 441b(a),(b)(2). However, in *FEC v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652 (2007) ("*WRTL*"), the Supreme Court held that this funding restriction may constitutionally be applied only to ECs that are the "functional equivalent of express advocacy," *id*. at 2667, which the Court's controlling opinion defined as communications that are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id*.; *see infra* Part III.A.3 (discussing application of *WRTL* to *Hillary: The Movie*).

## II.   FACTUAL BACKGROUND

According to the allegations in the Amended Complaint, which are assumed to be true for purposes of this motion only, *see infra* Part III.A.1, Plaintiff Citizens United is a Virginia corporation holding tax-exempt status under 26 U.S.C. § 501(c)(4). (Am. Compl. ¶ 5.) Plaintiff has produced a film, entitled *Hillary: The Movie*, which "discusses [Senator Hillary Clinton's] Senate record, her White House record during President Bill Clinton's Presidency, and her presidential bid." (*Id*. ¶ 14.) Some of the individuals featured in the film "also express opinions on whether she would make a good president." (*Id*.) A script of the film is appended to and incorporated by reference in the Amended Complaint. (*Id*. ¶ 28 & Exh. 2.)

Plaintiff has received an offer from "a company that markets nationwide Video on Demand ('VOD') broadcasting of programs on cable television . . . to broadcast *Hillary: The Movie*, for a fee to be paid by Citizens United, to cable viewers nationwide." (*Id*. ¶ 28.) Plaintiff "intends to accept this offer . . . but will not do so" absent injunctive relief because using corporate funds to distribute the film nationwide through cable television systems within thirty days of a presidential primary would violate the EC funding restriction in 2 U.S.C. § 441b. (*See* Am. Compl. ¶¶ 29-30.)

Plaintiff also "intends to fund television ads . . . to promote *Hillary: The Movie*." (*Id.* ¶ 16.) One of these ads, entitled "Questions," is a thirty-second advertisement consisting primarily of three clips from the film. (*See* Am. Compl. Exh. 1.) Plaintiff intends to broadcast this ad "on Fox News cable, and may broadcast it on major television network stations" (Am. Compl. ¶ 18) within thirty days of a presidential primary (*id.* ¶ 17), thereby rendering it an electioneering communication. (*Id.* ¶¶ 17, 20.)

## III.   ARGUMENT

### A.   Count 3 Fails to State a Claim on Which Relief Can Be Granted

#### 1.   *Standard of Review Under Rule 12(b)(6)*

Dismissal of a complaint is appropriate when, accepting the complaint as true and drawing all reasonable inferences in the plaintiff's favor, the complaint fails as a matter of law to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1966 (2007) (holding dismissal appropriate "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief"); *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006); *Hicks v. Ass'n of Am. Med. Coll.*, 503 F. Supp. 2d 48, 50-51 (D.D.C. 2007). Documents or exhibits attached to a complaint may properly be considered on a motion to dismiss. *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) ("In determining whether to dismiss, courts treat documents attached to a complaint as if they are part of the complaint."); *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (noting that court may consider on motion to dismiss documents "attached as exhibits or incorporated by reference in the complaint") (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997)).

> 2. *The EC Funding Restriction Is Constitutional As Applied to ECs That Are the Functional Equivalent of Express Advocacy*

It is "firmly embedded" in the Supreme Court's First Amendment jurisprudence that corporations and labor unions may constitutionally be prohibited from using their general treasuries to fund communications that expressly advocate for or against the election of a candidate. *McConnell v. FEC*, 540 U.S. 93, 203 (2003). In BCRA, Congress broadened this prohibition to encompass not just corporate and union express advocacy expenditures (which were already prohibited under FECA), but also corporate and union expenditures for communications that meet the statutory definition of an EC. *See* BCRA § 203 (codified as part of 2 U.S.C. § 441b).

Immediately after BCRA was enacted, Citizens United and other organizations filed a facial challenge to the constitutionality of the EC funding restriction, arguing that the statute was overbroad to the extent that it prohibited corporations from financing non-campaign issue speech immediately before an election. The Supreme Court rejected this challenge in *McConnell*, which upheld BCRA § 203 on its face. *McConnell*, 540 U.S. at 203-09. The Court agreed with the plaintiffs that the corporate funding restriction encompassed both campaign advocacy and some "issue ads," but the Court held that the government's long-recognized and compelling interests in regulating corporate-funded express advocacy apply with equal force to the interests in regulating corporate-funded speech that is "the functional equivalent of express advocacy." *Id.* at 205-06. The Court reasoned that, because the EC definition only encompasses communications that refer to a specific candidate shortly before an election, the fact that a communication meets the statutory criteria "strongly supports" a finding that any given EC is the functional equivalent of express advocacy, and, therefore, that the funding restriction's potential "application to pure issue ads" is insubstantial. *See id*. at 207. Indeed, the Court noted, "[e]ven

4

if we assumed that BCRA will inhibit some constitutionally protected corporate and union speech, that assumption would not justify prohibiting all enforcement of the law." *Id.* at 207 (internal quotation marks omitted). Thus, *McConnell* held that the EC provision was "amply justifie[d]," *id.* at 208, and the plaintiffs had not "carried their heavy burden" to show the funding restriction to be unconstitutional on its face. *Id.*

Four years later, in the context of an as-applied challenge to the EC funding restriction, the Supreme Court held that the restriction could constitutionally be applied only to ECs that are the functional equivalent of express advocacy. *See WRTL*, 127 S. Ct. at 2664 ("This Court has already ruled that BCRA survives strict scrutiny to the extent it regulates express advocacy or its functional equivalent. So to the extent the ads in these cases fit this description, the FEC's burden is not onerous; all it need do is point to *McConnell* and explain why it applies here.") (citing *McConnell*, 540 U.S. at 206). The controlling opinion in *WRTL* defined "the functional equivalent of express advocacy" as speech that is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *WRTL*, 127 S. Ct. at 2667. The opinion immediately then listed criteria relevant to the application of this standard and explained why the ads at issue in *WRTL* could be so interpreted:

> Under this test, WRTL's three ads are plainly not the functional equivalent of express advocacy. First, their content is consistent with that of a genuine issue ad: The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter. Second, their content lacks indicia of express advocacy: The ads do not mention an election, candidacy, political party, or challenger; and they do not take a position on a candidate's character, qualifications, or fitness for office.

*Id*. The Commission included these criteria, effectively verbatim, in its regulations implementing *WRTL*. *See* Electioneering Communications, 72 Fed. Reg. 72,899, 72,914-15 (Dec. 26, 2007) (to be codified at 11 C.F.R. § 114.15).

5

In sum, the EC funding restriction is unconstitutional as applied to ECs that are susceptible of a reasonable interpretation other than as an appeal to vote for or against a candidate, but the restriction is constitutional as applied to ECs that are the functional equivalent of express advocacy.

*3. Plaintiff's Film Is the Functional Equivalent of Express Advocacy*

Count 3 of the Amended Complaint alleges that the EC funding restriction is unconstitutional as applied to *Hillary: The Movie* because "the movie 'may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate.'" (Am. Compl. ¶ 44 (quoting *WRTL*, 127 S. Ct. at 2670).)  However, as this Court has already noted, *Hillary: The Movie* is the functional equivalent of express advocacy.  *Citizens United v. FEC*, Civ. No. 07-2240, slip op. at 7-9 (D.D.C. Jan. 15, 2008).

Plaintiff's film fails the *WRTL* standard.  *See WRTL*, 127 S. Ct. at 2667; *Citizens United*, slip op. at 7.[1]  First, it "mention[s] an election [or] candidacy":

- "[S]he will run on attacking republicans, and being the first woman president — oh isn't that amazing, she's a woman she can walk and talk." (Am. Compl. Exh. 2 at 1.)

- "Hillary Rodham Clinton.  Could she become the first female President in the history of the United States?" (*Id*. at 5.)

- "Hillary Clinton points to her time in the White House as a large part of her qualification for the job as President." (*Id*.)

- "Over the past 16 years Hillary Clinton has undoubtedly become one of the most divisive figures in America.  How this makes her suited to unite the country as the next president is troubling to many." (*Id.* at 6.)

- "There are any number of things in the Clinton's political history worth recalling before you go in to potentially vote for a Clinton, in this case a Hillary Clinton." (*Id*. at 9.)

---

[1] Plaintiff appears to have conceded this point during briefing on its motion for a preliminary injunction.  (Pl.'s Mem. in Support of Second Mot. for Prelim. Inj. at 7 ("[T]he movie (a) mentions election-related topics (election, candidacy, party, voting) and (b) takes a position on a candidate's character, qualifications, and fitness for office . . . .").)

- "Hillary's got an agenda and she's willing to put up with that to be [P]resident of the [U]nited [S]tates, she's got a to do list when she gets to the White House." (*Id.* at 21-22.)

- "I'm asking people to look at the record that is undisputed and to come to their own conclusions regarding the suitability of Hillary Clinton to acquire the highest office in this country." (*Id*. at 32.)

- "As a presidential candidate, Hillary has made other promises that may also prove difficult to keep." (*Id*. at 39.)

- "Both Clintons are well aware the war on terror could be [a] key issue in Hillary's run for the presidency." (*Id*. at 51-52.)

- "Sandy Berger was fined, lost his security clearance for 3 years, and disgraced, especially in Washington. But he has resurfaced. Reportedly, Berger is now an adviser to the presidential campaign of . . . Hillary Rodham Clinton." (*Id*. at 57 (alterations omitted; ellipsis in original).)

- "I think the American people have a right to as much of a public record as possible about Hillary Clinton. Those records should be released before the 2008 elections so that we can learn a lot more about exactly how much influence she had in the White House, what her positions were in the White House, and how she acted in the White House." (*Id.* at 60.)

- "Candidate Clinton claims she is the most experienced." (*Id.* at 67.)

- "It's worth remembering that a vote for Hillary is a vote to continue 20 years of a Bush or a Clinton in the White House." (*Id.* at 68.)

- "Finally, before America decides on our next president, voters should need no reminders of . . . what's at stake — the well being and prosperity of our nation." (*Id.* at 68–69.)

Second, *Hillary: The Movie* "take[s] a position on a candidate's character, qualifications, or fitness for office":[2]

- "[S]he is steeped in controversy, steeped in sleaze, that's why they don't want us to look at her record." (*Id.* at 1-2.)

- "After announcing her bid for the presidency, fellow Democrats including former Clinton confidant and Hollywood mogul David Geffen publicly questioned Hillary's integrity and truthfulness." (*Id.* at 7.)

---

[2] Many of the following excerpts also "mention an election [or] candidacy."

- "So, who is the real Hillary Clinton?  Is she a [ ] brilliant trailblazer, poised to make history as the first female president, or is she ruthless, cunning, dishonest — willing to do anything for power?"  (*Id.* at 8.)

- "Is Hillary really the most qualified to hit the ground running if elected President? After all, she was First Lady for 8 years and now a Senator from New York. Referring to her opponents she's said, quote, 'there is one job we can't afford on-the-job training for:  that is the job of our next President.'"  (*Id.* at 35-36.)

- "Hillary says we should elect her president because of her tremendous accomplishments in the United States Senate. . . .  But is that the legislative gravitas and qualifications enough to elect her [P]resident of the [U]nited [S]tates?  Is she kidding?"  (*Id.* at 36.)

- "There's one Hillary who says, 'I'm gonna bring the troops home right away when I'm elected President' and another Hillary who says, 'I'm gonna keep troops in Iraq indefinitely.'  One of these two women is lying."  (*Id.* at 47.)

- "As much as those pardons reveal about Bill, an earlier pardon may have revealed even more about Hillary's character — and her willingness to do *anything* to get elected."  (*Id*. at 60.)

- "It[']s been said and I agree with it that this is the most personal political choice that Americans make. They want, they — their personality traits, their — will they consider a person that they could trust, that they would like, that they were comfortable with, and that's [where] I think Hillary Clinton as a candidate has great defects."  (*Id.* at 69.)

- "[I]f she weren't married to Bill Clinton, what is there that she has accomplished in her life-that would lead you to believe that she should become the most powerful person in the country?"  (*Id.*)

- "If she reverts to form, Hillary Clinton will likely be in the future what she has been in the past, which is a person, a woman, a politician of the left, and I don't think that's going to [be] good for the security of the United States."  (*Id.* at 70.)

- "I can tell you beyond a shadow of a doubt that uh, the Hillary Clinton that I know is not equipped, not qualified to be our commander in chief."  (*Id.* at 71.)

- "[W]e must not ever underestimate this woman. We must not ever understate her chances of winning. We mustn't be lolled [sic] into a state of security and complacency by the new found moderation that she likes to talk about. And we must never forget the fundamental danger that this woman [poses] to every value that we hold dear."  (*Id.* at 71-72.)

8

- In addition to these oral statements, the film contains multiple visual attacks on Senator Clinton's character — generally in the form of abridged newspaper headlines — that are not reflected in the written script. For example, thirty-seven seconds into the movie, after a montage of headlines containing the phrase "Mrs. Clinton," the visual zooms in and lingers on the word "perjury" (omitting the remainder of the headline). Four seconds later, after a montage of headlines referring to the "First Lady," the visual zooms in and lingers on the word "lies" (again omitting the remainder of the headline).

Finally, *Hillary: The Movie* fails to qualify for an exemption under *WRTL* because the film "does not focus on legislative issues" or otherwise constitute issue advocacy. *Citizens United*, slip op. at 7-9. The film does not "take a position on [an] issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter," *WRTL*, 127 S. Ct. at 2667, as Plaintiff has already conceded. (*See* Pl.'s Mem. in Support of Second Mot. for Prelim. Inj. at 7 (acknowledging that movie is not "grassroots lobbying activity" and includes no call to action other than voting).) The only focuses of the film are Senator Clinton's character and fitness for office and her actions in relation to certain controversies during Bill Clinton's presidency. (*See*, *e.g.*, Am. Compl. Exh. 2 at 10-35 (discussing, *inter alia*, "travelgate"), 50-67 (discussing, *inter alia*, Bill Clinton's presidential pardons).) In the few short portions of the film that touch on legislative issues, the film consistently and explicitly ties these issues to further critiques of Senator Clinton's character and fitness for the presidency. (*See*, *e.g.*, *id.* at 46-47 (discussing immigration debate and concluding that "it raised the question can you withstand the criticism . . . and if [you're] gonna whine about people complaining about you, that doesn't suggest presidential stature or character"); *id.* at 47-49 (discussing Iraq war and concluding that Senator Clinton is "not flipping and flopping. [S]he's lying.").) The inclusion of such issue-based criticisms does not mean that Plaintiff's movie is genuine issue advocacy. *See WRTL*, 127 S. Ct. at 2667 n.6 (contrasting issue ads in that case with hypothetical ad that "condemned [the candidate]'s record on a particular issue" in the *McConnell* decision).

9

Moreover, the overwhelming majority of the movie's advocacy criticizes the character of Senator Clinton without reference to any issues at all. Plaintiff's complaint is thus incorrect as a matter of law that *Hillary: The Movie* is an "issue-advocacy film" (Am. Compl. ¶ 14), as the criticisms in the movie are not "issue advocacy" as *WRTL* used that term. *See WRTL*, 127 S. Ct. at 2667 (describing "genuine issue ad[s]"). The only advocacy in Plaintiff's film is its opposition to the election of Senator Clinton to the presidency.

Thus, because *Hillary: The Movie* is nothing but an extensive critique of Senator Clinton's "character, qualifications, and fitness for office" and lacks indicia of genuine issue advocacy, the film is, in the words and analysis of *WRTL* itself, susceptible of no reasonable interpretation other than as an appeal to vote against her. *Citizens United*, slip op. at 8. It is, in short, the functional equivalent of express advocacy, to which the EC funding restrictions may constitutionally be applied. *Id*. at 9 (citing *McConnell*). Accordingly, Count 3 of the Amended Complaint fails as a matter of law.

      **B.**     **The Court Lacks Subject Matter Jurisdiction Over Count 4**

           *1.*     *Standard of Review Under Rule 12(b)(1)*

"Article III of the Constitution limits federal courts to the adjudication of actual, ongoing controversies between litigants." *Deakins v. Monaghan*, 484 U.S. 193, 199 (1988). An "'actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (quoting *Preiser v. Newkirk,* 422 U.S. 395, 401 (1975)). If a claim becomes moot, no actual controversy exists for Article III purposes. *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 70 (1983) ("Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies."); *Spirit of the Sage Council v. Norton*, 411 F.3d 225, 230 (D.C. Cir.

2005); *Matthews v. District of Columbia*, 521 F. Supp. 2d 79, 81-82 (D.D.C. 2007) (quoting *Iron Arrow*); *Ctr. for Biological Diversity v. Kempthorne*, 498 F. Supp. 2d 293, 296 (D.D.C. 2007) ("The court will lack subject matter jurisdiction if the defendant demonstrates that the plaintiff's claim is moot.") (citing *DeFunis v. Odegaard,* 416 U.S. 312, 316 (1974)).

A claim challenging actual or planned government action becomes moot when the government indicates that it will not take the action regarding which the plaintiff complains. *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 512 (1989) (holding that private plaintiffs' constitutional challenge to anti-abortion statute was moot where government stated it would enforce statute only as to government employees, not private parties); *Frank v. Minn. Newspaper Ass'n, Inc.*, 490 U.S. 225, 227 (1989) (holding that challenge to application of statute was moot where government conceded that statute did not reach challenged application); *DeFunis,* 416 U.S. at 316-17 (holding that plaintiff's suit seeking admission to state law school was moot where plaintiff had been admitted and government promised not to revoke admission regardless of outcome of case); *see also Comm. in Solidarity with People of El Salvador v. Sessions*, 929 F.2d 742, 745 (D.C. Cir. 1991) (finding dismissal as moot proper where government took action that plaintiff sought to compel while case was pending); *Ctr. for Biological Diversity*, 498 F. Supp. 2d at 297 (same); *Pennington v. U.S. Dept. of Justice*, Civ. No. 06-1808, 2007 WL 2492745, at *1 (D.D.C. Aug. 30, 2007) (same).

    2.  *Count 4 Is Moot*

Count 4 of the Amended Complaint alleges that the EC funding restriction is unconstitutional as applied to "Questions" because "the ad 'may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate.'" (Am. Compl. ¶ 44 (quoting *WRTL*, 127 S. Ct. at 2670).) The Commission agrees that "Questions" is

11

susceptible of a reasonable interpretation as an advertisement that promotes a commercial transaction. Therefore, under *WRTL*, the Commission may not constitutionally enforce — and will not attempt to enforce — the EC funding restriction as to "Questions." This disposes of the entire as-applied challenge presented in Count 4; no issues therein remain to be adjudicated. Accordingly, there is no actual case or controversy before this Court regarding the financing of "Questions," and the Court lacks jurisdiction over the subject matter of Count 4. *See Citizens United*, slip op. at 5 n.9 (denying Plaintiff's motion for preliminary injunction regarding "Questions" as moot).

## IV. CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court dismiss Counts 3 and 4 of the Amended Complaint.

                                               Respectfully submitted,

                                               Thomasenia P. Duncan (D.C. Bar No. 424222)
                                               General Counsel

                                               David Kolker (D.C. Bar No. 394558)
                                               Associate General Counsel

                                               Kevin Deeley
                                               Assistant General Counsel

                                                  /s/ Adav Noti
                                               Adav Noti (D.C. Bar No. 490714)
                                               Attorney

                                               COUNSEL FOR DEFENDANT
                                               FEDERAL ELECTION COMMISSION
                                               999 E Street NW
                                               Washington, DC 20463
Dated: February 11, 2008                    (202) 694-1650

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS UNITED, | ) |
| Plaintiff, | ) |
| v. | ) Civ. No. 07-2240 (ARR, RCL, RWR) |
| FEDERAL ELECTION COMMISSION, | ) |
| Defendant. | ) |

**[PROPOSED] ORDER**

This matter having come before the Court upon Defendant Federal Election Commission's Motion to Dismiss Counts 3 and 4 of the Amended Complaint, it is hereby ORDERED that:

(1) Defendant's motion is GRANTED;

(2) Count 3 of the Amended Complaint is DISMISSED with prejudice for failure to state a claim on which relief can be granted; and

(3) Count 4 of the Amended Complaint is DISMISSED as moot.

SO ORDERED.

_____, 2008

_____
United States Circuit Judge A. Raymond Randolph

_____
United States District Judge Royce C. Lamberth

_____
United States District Judge Richard W. Roberts