United States District Court
District of Columbia

| | |
|---|---|
| **Citizens United**,<br><br>            *Plaintiff*,<br><br>v.<br><br>**Federal Election Commission**,<br><br>            *Defendant.* | Case No. 07-2240 (ARR, RCL, RWR)<br><br>THREE-JUDGE COURT |

**Plaintiff's Memorandum of Law Responding to
FEC's Motion to Dismiss Counts 3 & 4**

Citizens United ("CU") responds to *Defendant Federal Election Commission's Motion to Dismiss Counts 3 and 4 of the Amended Complaint* (#43) and the FEC's accompanying *Memorandum* ("Mem."). As set out below, (I) CU agrees to dismissal of Count 4 without prejudice because it presently appears to be moot, but (II) Count 3 should not be dismissed because:

- *Hillary: The Movie* contains no *words* constituting an "*appeal to vote* for or against a specific candidate," as required by *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652, 2667 (2007) ("*WRTL II*") (emphasis added);

- *Hillary* "may reasonably be interpreted as *something other* than as an appeal to vote for or against a specific candidate," *WRTL II*, 127 S. Ct. at 2670 (emphasis added), i.e., it is a full-length documentary *movie* (shown in theaters and sold on DVD) that is the functional equivalent of a book, not of the "*ads*" that were the target of the Bipartisan Campaign Reform Act of 2002 ("BCRA") and constituted the evidence considered in *McConnell v. FEC*, 251 F. Supp. 2d 176 (D.D.C. 2003) (three-judge court) and *McConnell v. FEC*, 540 U.S. 93 (2003);

- the electioneering communication prohibition, 2 U.S.C. § 441b, is unconstitutional as applied to a movie that is the functional equivalent of a book, not an "ad"; and

**Response to Motion to Dismiss**          1

- the FEC is presently doing discovery as to whether CU is a media entity, leaving an open issue as to whether the FEC will assert that CU now has a status that could permit *all* broadcasts (as opposed to the FEC's contrary finding earlier in an advisory opinion).

**I. CU Agrees to Dismissal of Count 4 Without Prejudice.**

CU did not challenge the electioneering communication prohibition, codified at 2 U.S.C. § 441b, as applied to the "Questions" ad, *see* Am. Compl. Ex. 1 (ad transcript), when it filed its initial complaint. CU made no such claim because it seemed clear to CU that "Questions" could not be prohibited under the rule set out by Chief Justice Roberts in the controlling opinion in *WRTL II*, 127 S. Ct. at 2667, and the FEC's new rule implementing *WRTL II*, *see* 72 Fed. Reg. 72899, as to the proper scope of "electioneering communication" in BCRA.

CU added Count 4 to the *Amended Verified Complaint for Declaratory and Injunctive Relief* (#22), when FEC counsel declared that they were unable to determine whether "Questions" was prohibited under *WRTL II* and the FEC's own rule, as set out in the *Amended Verified Complaint* ("AVC"):

> 32. On the evening of December 20, 2007, the FEC filed its memorandum opposing preliminary injunction (Doc. #18), in which it stated that "the Commission has not had a sufficient opportunity to consider whether plaintiff's third ad (titled 'Questions') qualifies as a *WRTL* ad under the Commission's new regulations. Although plaintiff's first two proposed ads appear to come within the *WRTL* exemption — thus placing Citizens's United's constitutional claim squarely before the Court as applied to those two ads — 'Questions' poses a closer question that the Commission has not had an adequate opportunity to address." Doc. #18 at 8-9. If the FEC can't tell by looking at an ad whether it meets the FEC's own exception to the Prohibition, then Citizens United can't know whether it may even broadcast the ad without being subject to FEC investigation, enforcement, and penalties. Therefore, CU will not broadcast this ad unless it receives the judicial relief sought herein and will be irreparably harmed by violation of its constitutional rights to free speech and association.

**Response to Motion to Dismiss** 2

So Count 4 challenged the electioneering communications prohibition as applied to "Questions":

> 44. As applied to the broadcasting of the ad entitled "Questions," the Prohibition is unconstitutional because the ad is not "unambiguously related to the campaign of a particular federal candidate," *Buckley*, 424 U.S. at 80, and because the ad "may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate." *WRTL II*, 127 S. Ct. at 2670. Failing this threshold requirement, the Prohibition does not come within congressional authority to regulate elections and is overbroad for sweeping in First Amendment activity without authority.
> 45. As applied to the ad entitled "Questions," the Prohibition is unconstitutional under the First Amendment guarantees of free expression and association.

Nineteen days later, on January 8, 2008, FEC counsel finally conceded that "on balance," "Questions" was protected by 11 C.F.R. § 114.15(c), the rule supposedly implementing *WRTL II* as to the proper scope of a regulated "electioneering communication." Doc. 33 at 17. However, FEC counsel continued to insist that "the safe harbor provision" of the FEC rule "may not apply to 'Questions.'" *Id.* As may be seen, it is only with great difficulty that FEC counsel was able to bring itself to decide that "Question" could not be prohibited as an electioneering communication. It should be noted that the FEC Commissioners are presently unable to give an official advisory opinion as to whether "Questions" is an electioneering communication under its rule or *WRTL II* because the FEC continues to lack a quorum of Commissioners for such official acts.

However, on the assumption that FEC counsel are able to provide an official FEC position that "Questions" is not an electioneering communication for purposes of the prohibition, and so long as the FEC does not alter this position, CU agrees that Count 4 is now moot. Consequently, CU agrees that Count 4 should be dismissed without prejudice (only to be revived if the FEC should alter its position that "Questions" is not an electioneering communication for purposes of the prohibition). Count 4 should not be dismissed *with* prejudice, given the equivocation of FEC counsel, the present peculiar circumstances of the FEC Commissioners as outlined

**Response to Motion to Dismiss**　　　　　　　3

above, and the fact that it is being dismissed for mootness, which in no way addresses the merits of the claim, only the lack of jurisdiction.

## II. Count 3 Should Not Be Dismissed.

CU did not challenge the electioneering communication prohibition, codified at 2 U.S.C. § 441b, as applied to *Hillary: The Movie*, when it filed its initial complaint because there were no plans to broadcast the documentary. However, as set out in the *Amended Verified Complaint*, CU got an offer to broadcast the documentary:

> 28. On December 20, 2007, a company that markets nation-wide Video on Demand ("VOD") broadcasting of programs on cable television made an offer to Citizens United to broadcast *Hillary: The Movie*, for a fee to be paid by Citizens United, to cable viewers nationwide (or to such markets as remain appropriate when the judicial relief requested herein is provided). *Hillary* would be broadcast under a "Political Movies" component of "Elections '08, a new channel sponsored by the cable industry. The contract offered would be for 4 weeks. A true and correct copy of the current (not finalized) script of *Hillary* is filed separately under seal. *See Exhibit 2* (under seal). Citizens United expects further opportunities to put *Hillary* on television in the near future by other means.
> 29. This broadcasting would bring *Hillary* within the electioneering communication definition because the movie (**a**) will be broadcast on cable stations so that it (**b**) will be receivable by more than 50,000 persons, in states where caucuses, conventions, or primary elections will be selecting a Democratic party nominee, (**c**) will clearly reference Senator Clinton, a presidential candidate, and (**d**) will be made within 30 days before the caucuses, conventions, or primaries in the states identified in ¶ 17 where she will be on the ballot.
> 30. Citizens United intends to accept this offer to broadcast its documentary, but will not do so unless it receives the judicial relief requested herein because (**a**) it will have donors who would have to be disclosed and it does not wish to comply with the Disclosure Requirements as to the movie for the reasons stated in ¶¶ 23 & 27 and (**b**) the communication would be a prohibited "electioneering communication" under BCRA because it is not exempt from the "electioneering communication" prohibition under the FEC's regulation at 11 C.F.R. § 114.15 (creating an exception to the electioneering communication prohibition).

So CU added Count 3:

> 41. As applied to the broadcasting of *Hillary*, the Prohibition is unconstitutional because the documentary is not "unambiguously related to the campaign of a particular federal candidate," *Buckley*, 424 U.S. at 80, and because the movie "may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate." *WRTL II*, 127 S. Ct. at 2670. Failing this threshold requirement, the Prohibition does not come within congressional authority to regulate elections and is overbroad for sweeping in First Amendment activity without authority.
> 42. As applied to *Hillary*, the Prohibition is unconstitutional under the First Amendment guarantees of free expression and association.

**A.    *Hillary* Contains No "Appeal to Vote," as *WRTL II* Requires for Prohibition, and the Prohibition Is Unconstitutional as Applied to Movies.**

FEC counsel argue that this Court "noted" that *Hillary* "is the functional equivalent of express advocacy," Mem. 6 (citation omitted), although, of course, that was for preliminary injunction purposes. The FEC acknowledges, as it must, that *WRTL II*'s appeal-to-vote test, 127 S. Ct. at 2667 ("an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate"), governs whether *Hillary* may be prohibited as an electioneering communication, Mem. 6, 10, but proceeds to misinterpret and misapply *WRTL II*'s test.

First, the *WRTL II* test specifically required that there be an unambiguous "*appeal to vote*": "[A] court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an *appeal to vote* for or against a specific candidate." 127 S. Ct. at 2667. *See also id.* at 2670 ("Because WRTL's ads may reasonably be interpreted as something other than as an *appeal to vote* for or against a specific candidate, we hold they are not the functional equivalent of express advocacy." (emphasis added)).

**Response to Motion to Dismiss**                     5

Second, *WRTL II* expressly required that the search for this unambiguous "appeal to vote" must focus on the *language of the communication* itself, i.e., the test "must be objective, focusing on the *substance of the communication* rather than amorphous considerations of intent and effect." *Id.* at 2666 (emphasis added). This focus on the actual words of the communication is also required by *WRTL II*'s rejection of reliance on "contextual factors." *Id.* at 2669.

Third, *WRTL II* repeatedly required that where there is *any doubt* as to whether the necessary unambiguous "appeal to vote" is present in the words of the communication then there is *not* an "appeal to vote" because all doubts and debatable words are to be resolved in favor of the speaker. *See id.* at 2667, 2669 & n.7, 2674.

Fourth, *WRTL II* demanded both that there be unambiguous words containing an "appeal to vote" and that all doubts be resolved in favor of unrestricted speech precisely because of the *dissolving-distinction problem* that the Court had earlier identified, in *Buckley v. Valeo*, 424 U.S. 1 (1976), as requiring the express-advocacy test in the independent expenditure context. *WRTL II* mentioned this dissolving-distinction *twice*, emphasizing its vital importance to the Court's First Amendment jurisprudence in this area. 127 S. Ct. at 2659, 2669. The dissolving distinction that required a bright, speech-protective line was the distinction between (1) "discussion of issues and candidates," which is present in *Hillary*, and (2) "advocacy of election or defeat of candidates," which is absent from *Hillary*:

> [T]he *distinction* between *discussion of issues and candidates* and *advocacy of election or defeat of candidates* may often *dissolve* in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest. [*Buckley*, 424 U.S. at 42 (emphasis added).]

**Response to Motion to Dismiss**                            6

The Court elaborated further on the necessity of a bright line—between (1) "discussion, laudation, [and] general advocacy" (present in *Hillary*) and (2) and "solicitation" (absent from *Hillary*)—to protect issue advocacy:

> (W)hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between *discussion, laudation, general advocacy*, and *solicitation* puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning. [¶] Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim. [*Id.* at 43 (emphasis added).]

*WRTL II* expressly held that this dissolving-distinction problem may not be used to quash the very intermingled discussion of issues and candidates that is at issue herein: "Discussion of issues cannot be suppressed simply because the issues may also be pertinent in an election." 127 S. Ct. at 2669. And it elaborated the point that the dissolving-distinction is a reason to protect, not restrict, free speech: "'The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse.'" *Id.* at 2670 (citation omitted).

     *WRTL II*'s test, then, requires examination of the words of the communication itself to see if they make an unambiguous "*appeal to vote* for or against a specific candidate." This inquiry must be made without resort to external context or any effort to discern intent and effect. The inquiry must be made subject to the governing principle that the intermingled "*discussion of issues and candidates*" is constitutionally protected, as is "*discussion, laudation,* [and] *general advocacy.*" See supra. The *WRTL II* test does *not* include any elements of the *application* of that test to grassroots lobbying that *WRTL II* did after establishing the actual test. *See* 127 S. Ct. at

**Response to Motion to Dismiss**       7

2667. This is not a grassroots lobbying case about a legislative issue, so it is not at all surprising that there is no such single, central issue throughout the documentary as would be expected with grassroots lobbying. But, the documentary does contain the type of issue advocacy that intermingles "*discussion of issues and candidates*," *see supra*, which is equally protected by the *WRTL II* test.

So the issue that must be decided in considering the FEC's Rule 12(b)(6) motion is whether there are actual words in *Hillary* that contain *WRTL II*'s required unambiguous "appeal to vote," also known as "advocacy of election or defeat of candidates" or "solicitation," which may not be confused with protected "discussion of issues and candidates" or "discussion, laudation, [and] general advocacy." *See supra*.

FEC counsel set out a laundry list of quotations from *Hillary*, Mem. 6-9, that they believe all *add up* to the conclusion that *Hillary* is "susceptible of no reasonable interpretation other than as an appeal to vote against her." Mem.10. But they point to no quotation that actually *has* words containing an unambiguous "appeal to vote." This is unsurprising because none contains "an appeal to vote." The test is not whether a series of statements that contain no "appeal to vote" is perceived by FEC counsel to add up to "an appeal to vote"—based apparently on forbidden considerations—but whether there are words that contain an unambiguous "appeal to vote." Under the proper test, a series of statements that contain no "appeal to vote" may not be added up to achieve a cumulative result that they individually lack. A series of zeroes adds up to nothing, not something.

Of course, *Hillary* "may reasonably be interpreted as something other than as an *appeal to vote* for or against a specific candidate," *WRTL II*, 127 S. Ct. at 2670. A reasonable interpretation

is that it is a full-length, documentary movie about Senator Clinton, and such a movie enjoys all the protection historically afforded to any book about a public figure.

*Hillary* is the functional equivalent of a book, not of the 30- or 60-second ads that were the target of Congress in BCRA and at issue in *McConnell*. The fact that it is in the modern medium of a documentary film that can be viewed in a theater, brought home on a DVD, or watched on television does not vitiate the historical protection afforded to books and their modern equivalents. If the difference in medium matters when it comes to First Amendment protection for the functional equivalent of a book, then the government could freely engage in high-tech "book burnings" without restriction.

Examination of the *McConnell* record indicates that full-length documentary films were nowhere in the sights of the campaign finance reform lobby or Congress in promoting and passing BCRA, nor were they in the consideration of the district court or the Supreme Court in *McConnell*. *McConnell* specifically identified the focus of BCRA as being "advertisements," "ads," and "commercials" *see McConnell*, 540 U.S. at 126-28, and the opinion nowhere mentioned a book or a movie as the focus of the case. *McConnell* specifically identified the sort of communication that it perceived to be the problem that BCRA addressed, i.e., the Bill Yellowtail "ad," which was a brief commercial. *Id.* at 193 n.78.

In the *McConnell* three-judge district court, the court's per curiam memorandum opinion plainly identified "ads" as being the communications at issue in that facial challenge, actually equating "electioneering communication" and "so-called 'issue *ads*'": "Section 201 of BCRA sets forth a primary, and a 'backup' definition, of an 'electioneering communication' (*i.e.*, so-called 'issue *ads*'). *McConnell*, 251 F. Supp. 2d at 184 (emphasis added). In its finding of fact regarding BCRA's disclosure provisions (including findings concerning the FEC's expert

**Response to Motion to Dismiss**               9

testimony), the court consistently spoke of "ads" and "advertisements," never movies. *See id.* at 229-33. Similarly, the three separate opinions are replete with references to "ads" and "advertisements," but not discussions of movies. For example, Judge Leon specifically identified sham issue ads as the BCRA target: "In an attempt to prevent actual and apparent corruption arising from the funding of such sham issue *advertisements*, Congress enacted a sweeping set of reforms . . . ." *Id.* at 757 (opinion of Leon, J.) (emphasis added). And he cited the studies on which the government relied to defend the electioneering communications prohibition, which studies only examined *advertisements* (both "genuine" and "sham"). *Id.* at 796-97. In fact, Judge Henderson's findings of fact specifically pointed to a 30-minute NRA "infomercial" and two 30-minute "news magazine[s]" that would have been captured by the "electioneering communication" definition, but which the studies on which the government relied failed to include, and which she said would have altered the percentage of genuine issue ads captured (for she considered them genuine issue advocacy) as compared to sham issue ads captured (for substantial overbreadth analysis). *Id.* at 305-06, 316-17 (opinion of Henderson, J.). Judge Kollar-Kotelly's opinion likewise confirmed that the studies offered to justify BCRA's electioneering communications restrictions were based on "advertisements." *See, e.g., id.* at 719-24 (opinion of Kollar-Kotelly, J.).

A full-length documentary movie shown in theaters, sold on DVD, and with a compendium book on which CU has received an advance royalty on sales from Thomas Nelson Publishers, *AVC* ¶ 14 is simply not the same as an "ad," or even an "infomercial" or a "news magazine" (which are generally not also shown in theaters and sold as movies on DVDs), even if the movie is broadcast. Given *McConnell*'s focus and record, there is no justification for treating a full-length documentary movie—especially one with neither express advocacy nor "an appeal to vote"—as in any way being "the functional equivalent of express advocacy." *WRTL II*, 127 S.

**Response to Motion to Dismiss**                        10

Ct. at 2667. The problem that *McConnell* identified as being a compelling justification for the electioneering communication prohibition had to do with ads, not movies. 540 U.S. at 126-28. There was no record evidence that *movies* were a problem, so neither *McConnell* nor the studies (of ads) on which it relied provide any support for applying the prohibition to a full-length movie.

The fact that this documentary is unflattering to Senator Clinton does not convert it from a protected movie into an unprotected "sham issue ad," any more than Michael Moore's criticisms of President George W. Bush in *Fahrenheit 9/11* make his movie a "sham issue ad." Movies were simply not at issue in *McConnell* and they may "reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate"—i.e., they are about the traditional First Amendment goals of communicating ideas and viewpoints, discussing public figures and issues, and (usually, it is hoped) making money by sales—so they "are not the functional equivalent of express advocacy, and therefore fall outside the scope of *McConnell*'s holding." *Id.* at 2670.

The fact that CU was to pay a fee in connection with the broadcasting of *Hillary* does not change the fact that *Hillary* is the functional equivalent of a book, not an ad. As explained in the *Amended Verified Complaint*, CU would pay a fee:

> 28. On December 20, 2007, a company that markets nationwide Video on Demand ("VOD") broadcasting of programs on cable television made an offer to Citizens United to broadcast *Hillary: The Movie*, for a fee to be paid by Citizens United, to cable viewers nationwide (or to such markets as remain appropriate when the judicial relief requested herein is provided). *Hillary* would be broadcast under a "Political Movies" component of "Elections '08, a new channel sponsored by the cable industry. The contract offered would be for 4 weeks. A true and correct copy of the current (not finalized) script of *Hillary* is filed separately under seal. *See Exhibit 2* (under seal). Citizens United expects further opportunities to put *Hillary* on television in the near future by other means.

**Response to Motion to Dismiss**                    11

As a matter of law, the presence or absence of a fee has nothing to do with whether a communication is or is not an "electioneering communication." Initially, the FEC promulgated a rule, former 11 C.F.R. § 100.29(b)(3)(i), that only communications broadcast "for a fee" were within the "electioneering communication" definition. This was overturned in *Shays v. FEC*, 337 F. Supp. 2d 28 (D.D.C. 2004), *aff'd* 414 F.3d (D.C. Cir. 2005), *reh'g en banc denied*, No. 04-5352 (D.C. Cir. Oct. 21, 2005), and the FEC issued a new rule indicating that the payment of a fee was irrelevant. *See* 70 Fed. Reg. 75713. And the historically-recognized constitutional protection afforded to books under freedoms of speech and press has also never turned on whether the book was published for a fee or whether an author was fortunate enough to get a publisher to foot the bill. In book publishing there are a variety of arrangements for publication—ranging from books that are entirely self-published, to books where an author shares the expense and risk with a publisher, to arrangements where a publisher pays all of the costs—and there is a wide range of agreements as to the payment of royalties. For constitutional purposes, a self-published book has every bit of the First Amendment protection that is afforded to a book entirely funded by a publisher. These same principles apply to *Hillary*, which is the functional equivalent of a book.

Ignoring *WRTL II*'s actual "appeal to vote" test, the clear distinction between "ads" and movies, the broad scope that *WRTL II* established for issue advocacy, the reasonable interpretation that *Hillary* has other than as "an appeal to vote," and the clear constitutional protection for books and movies, the FEC attempts to substitute elements of *WRTL II*'s application of its "appeal to vote" test to grassroots lobbying, which is not at issue here. As the FEC notes, Mem. 6 n.1, CU has already acknowledged that *Hillary* discusses elections and candidacy and that it is critical of Senator Clinton in several ways. The FEC lists some examples. Mem. 6-9. But of course, the *WRTL II* test does not require that there be no discussion of elections or candidacy in

order to avoid the prohibition, nor even that a communication not criticize a candidate, but only that there be an unambiguous "appeal to vote," which is the one thing the FEC is unable to demonstrate. The FEC here makes the error of attempting to substitute a particular application of the *WRTL II* test to a particular set of facts in the particular context of grassroots lobbying for the test itself.

As to the presence or absence of criticism, the FEC has specifically settled two cases in which there was criticism of a candidate but where the FEC agreed that, under *WRTL II*, these electioneering communications could not be prohibited. In both of these cases, the FEC and the intervenors (BCRA prime sponsors Sen. McCain et al.) agreed to a stipulated judgment conceding that the ads at issue were protected issue advocacy under *WRTL II*'s test. One of these cases is *WRTL III*, which held the electioneering communication prohibition unconstitutional as applied to WRTL's 2006 Child Custody Protection Act ("CCPA") advertisement. *Wisconsin Right to Life v. FEC*, No. 04-1260, slip op. at 1 (D.D.C. July 23, 2007) ("*WRTL III*").[1] The CCPA ad stated the positions of Senators Feingold and Kohl (the candidate), based on their prior votes, and characterized their positions in a way that praised the candidate and criticized the non-candidate. The other case involved a "Crossroads" advertisement that the Christian Civic

---

[1] WRTL sought a preliminary injunction during the 2006 prohibition period, as part of its ongoing *WRTL* litigation, to permit it to run this **CCPA ad** (preliminary injunction was denied and a decision on the ad was held in abeyance until after *WRTL II*):

> Listen up, parents. Wisconsin requires parental consent before your minor daughter can have an abortion. But, she can be taken to Illinois for an abortion that is kept secret from you. Imagine, your daughter can be taken across state lines for a major surgical procedure without your knowledge or consent. The U.S. Senate recently passed a bill to protect parents from secret abortions. Fortunately, Senator Kohl voted for the rights of parents. But, sadly, Senator Feingold did not. Your help is urgently needed because some Senators are holding up further action on the bill. Please call Senators Kohl and Feingold at 202-224-3121 and urge them to stop efforts by the Senate Democratic leadership to hold up a bill which will prevent secret abortions. That's 202-224-3121.

**Response to Motion to Dismiss**     13

League of Maine ("CCLM") sought to run.[2] This ad stated the candidate's and non-candidate's position on the issue and characterized that position in a way that criticized both. The district court held the electioneering prohibition unconstitutional as applied to the Crossroads ad." *Christian Civic League of Maine v. FEC*, No. 06-614, slip op. at 1-2 (D.D.C. Aug. 21, 2007) ("*CCLM*"). Consequently, there is now no question that ads stating a candidate's position and characterizing that position in a way that praises or criticizes the candidate may be fully protected issue advocacy and excluded from the electioneering communication definition.

Moreover, the FEC has now conceded that the "Questions" ad is not subject to the prohibition, although it did not concede that it fell within the FEC's safe harbor provision,[3] and that ad describes Senator Clinton in several ways that the FEC must surely think are critical of her "character, qualifications, or fitness for office." 11 C.F.R. § 114.15(b)(2). So the FEC has already conceded that whether or not there is an unambiguous "appeal to vote" does not turn on whether or not there is criticism of the candidate. And when the FEC conceded that "Questions" met *WRTL II*'s "appeal to vote" test, Doc. #33 at 17, it also conceded that a communication could

---

[2]CCLM sought judicial protection to run this **Crossroads ad** (preliminary injunction was denied and the case dismissed for mootness, which decision the Supreme Court reversed):

> Our country stands at the crossroads—at the intersection of how marriage will be defined for future generations. Marriage between a man and a woman has been challenged across this country and could be declared unconstitutional at any time by rogue judges. We must safeguard the traditional definition of marriage by putting it beyond the reach of all judges—by writing it into the U.S. Constitution. Unfortunately, your senators voted against the Marriage Protection Amendment two years ago. Please call Sens. Snowe and Collins immediately and urge them to support the Marriage Protection Amendment when it comes to a vote in early June. Call the Capitol switchboard at 202-224-3121 and ask for your senators. Again, that's 202-224-3121. Thank you for making your voice heard.

[3]The safe harbor provision is set out at 11 C.F.R. § 114.15(b), also available at 72 Fed. Reg. 72914. It provides much of the language on which the FEC relies in its briefing concerning whether *Hillary* is prohibited.

**Response to Motion to Dismiss**                    14

meet the "appeal to vote" test without meeting the factors set out in the FEC's safe harbor, which is inconsistent with the FEC's present argument that continues to use the safe-harbor language as the basis of its argument for why *Hillary* fails the "appeal to vote" test.

And the FEC's argument that *Hillary* "'does not focus on legislative issues,'" Mem. 9 (citation omitted), is a meaningless argument beyond the grassroots lobbying context. *WRTL II* in fact defined "issue advocacy" without resort to a focus on a legislative issue: "Issue advocacy conveys information and educates. An issue ad's impact on an election, if it exists at all, will come only after the voters hear the information and choose—uninvited by the ad—to factor it into their voting decisions." 127 S. Ct. at 2667. *Hillary* in fact, discusses a wide range of issues, as the FEC notes, Mem. 9, doing so in the approved context of the intermingled "'discussion of issues and candidates.'" *WRTL II*, 127 S. Ct. at 2669 (*quoting Buckley*, 424 U.S. at 42). In a book or a documentary movie about a public figure, a central issue will be that public figure—What is she like? What does she think? What has she done?— but that focus has never warranted government suppression of a book since the passage of the First Amendment, just as it may not justify suppression of a documentary movie. Talking about public officials, even criticizing them, is the essence of core First Amendment protection.

In fact, *WRTL II* was decided in response to the FEC's and Intervenors' argument that criticism was the real indicator of the wrong intent that made an electioneering communication subject to prohibition and to WRTL's extended argumentation that criticism of public officials is at the core, not the periphery, of First Amendment protection, *see Brief for Appellee* at 1-5, *WRTL II*, 127 S. Ct. 2652, which included the following quote:

> This struggle of the government to silence the people continues here as BCRA sponsors, Intervenors herein, defend the "electioneering communication" prohibition by declaring that quashing criticism is the true intent behind the provision and thus argue that broadcast ads

**Response to Motion to Dismiss**                                15

> are sham, not genuine, if the ads (a) "took a *critical* stance regarding a candidate's position on an issue" and (b) "referred to the candidate by name." Intervenors' Br. at 22 (emphasis added). Intervenors' Brief is replete with complaints about Senators being criticized for their positions on a current legislative matter. *See id.* at 3, 10, 11, 15, 16, 22, 23 n.11, 24, 25 n.14, 27, 28, 36. So is the FEC's Brief. *See* FEC Br. at 10, 11, 19, 20, 33, 44, 48. [*Brief for Appellee* at 5, *WRTL II*, 127 S. Ct. 2652.]

*WRTL II* clearly rejected the FEC's notion then, as this Court must do now, that if citizens criticize public officials then the government may restrict their speech. Such pre-Revolutionary British and European thought was rejected in this Republic with the First Amendment.

In sum, *Hillary* is not subject to the electioneering communication prohibition, both because it contains no language expressing the requisite unambiguous "appeal to vote" and because the evidence on which *McConnell* relied, as well as that opinion itself, had solely to do with ads, not full-length movies. The prohibition is unconstitutional as applied to *Hillary* for both of these reasons.

**B.  Dismissal Would Be Improper Because the FEC Is Doing Discovery as to Whether CU Is a Media Entity, Leaving an Open Issue That Could Permit *All* Broadcasts.**

As stated in the *Verified Amended Complaint*, CU earlier sought recognition as a media entity, so that it could broadcast its ads and movies without being subject to the electioneering prohibition, but was told by the FEC that it did not fit within the press exception:

> 15. When Citizens United produced *Celsius 41.11* in 2004, it ran national broadcast ads promoting the film. The original version of the ads had images and sound bites of President George Bush and Senator John Kerry, but those images and sound bites had to be deleted from the ads due to the electioneering communication prohibition. Prior to running the ads, Citizens United received FEC Advisory Opinion 2004-30, stating that its film and film ads would qualify as electioneering communications and would not be exempt under the Press Exemption.

**Response to Motion to Dismiss**              16

Presently, the FEC lacks a quorum of Commissioners to issue any such official determinations, so obtaining a possibly different advisory opinion is impossible.

Yet the FEC legal counsel have stated in conference with CU counsel that they are doing discovery, including in a currently outstanding set of interrogatories, as to whether CU is a media entity so as to fall within the press exception. If the FEC were to take the position that CU is, in fact, a media entity and that all of its broadcasts are protected from the electioneering communication prohibition by the press exception, then CU could freely broadcast *Hillary* without violating the prohibition.

Since the FEC has made this an open question, it cannot consistently seek at this point to dismiss Count 3, and this Court should deny the motion to dismiss Count 3 on that ground alone. At a minimum, if this Court were to decide to dismiss Count 3, it should only do so without prejudice, so that CU could revive Count 3 if the FEC actually asserts that CU is a media entity and its broadcasts are protected by the media exception.

**Conclusion**

For the reasons stated, Count 4 (re "Questons") should be dismissed without prejudice, but Count 3 (re *Hillary*) should not be dismissed. In the alternative, if this Court decides to dismiss Count 3, it should do so without prejudice.

Dated: March 24, 2008                                Respectfully Submitted,

/s/ James Bopp, Jr.
James Bopp, Jr., D.C. Bar #CO0041
Richard E. Coleson*
Jeffrey P. Gallant*
Clayton J. Callen*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/234-3685 facsimile
* *Pro Hac Vice Motion granted*
Counsel for Plaintiff

**United States District Court**
**District of Columbia**

| | |
|---|---|
| **Citizens United**, <br> *Plaintiff,* <br> v. <br> **Federal Election Commission**, <br> *Defendant.* | **Case No.** 07-2240 (ARR, RCL, RWR) <br><br> THREE-JUDGE COURT |

**[Proposed] Order**

It is hereby ORDERED that Count 4 of Plaintiff's Amended Complaint is dismissed without prejudice as moot. It is further ORDERED that Defendant's motion to dismiss Count 3 of Plaintiff's Amended Complaint is DENIED.

SO ORDERED this _____ day of _____ 2008.

_____
United States Circuit Judge

_____
United States District Judge

_____
United States District Judge

**Order**