UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS UNITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-2240 (ARR, RCL, RWR) |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | REPLY IN SUPPORT OF |
| | ) | MOTION TO DISMISS |
| Defendant. | ) | |
| | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS COUNTS 3 AND 4 OF THE AMENDED COMPLAINT**

Defendant Federal Election Commission ("Commission") submits this reply memorandum in further support of its Motion to Dismiss Counts 3 and 4 of the Amended Complaint. The Commission agrees with Plaintiff that Count 4 should be dismissed without prejudice as moot. Count 3, however, should be dismissed with prejudice because Plaintiff's film is the functional equivalent of express advocacy, and therefore Plaintiff has no constitutional right under *FEC v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652 (2007) ("*WRTL*"), to use its corporate treasury funds to broadcast *Hillary: The Movie* on cable television.

**I.    PLAINTIFF'S FILM IS THE FUNCTIONAL EQUIVALENT OF EXPRESS
ADVOCACY**

The main thrust of Plaintiff's response (*see* Pl.'s Mem. of L. Resp. to FEC's Mot. to Dismiss Counts 3 & 4 at 5-8, 12-16 ("Pl.'s Mem.")) is that *Hillary: The Movie* is constitutionally exempt from the electioneering communication ("EC") corporate funding restriction because the film purportedly contains "no *words* constituting" an appeal to vote against Senator Clinton. (*Id.* at 1.) This argument fails as a matter of law, for it seeks to reintroduce a test akin to the "magic words" requirement that the Supreme Court rejected in *McConnell v. FEC*, 540 U.S. 93 (2003),

and *WRTL*.  Although the *WRTL* test requires a broadcast to be the "*functional equivalent* of expressadvocacy," 127 S. Ct. at 2667 (emphasis added), that analysis is necessarily broader than a wooden, "magic words" interpretation of express advocacy or any other standard that relies upon the presence of particular words, phrases, or grammatical constructs.

The history of the Supreme Court's express advocacy jurisprudence demonstrates the shortcomings of Plaintiff's argument.  In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Court examined the provision of the Federal Election Campaign Act ("FECA") that limited expenditures made by certain persons "relative to a clearly identified candidate."  *See id.* at 39-51.  The Court held that this provision was unconstitutionally vague and, accordingly, construed it narrowly to encompass only expenditures for communications that expressly advocate the election or defeat of a candidate.  *Id.* at 44; *see also id. at* 79-80 (employing same narrowing construction for certain disclosure requirements); *McConnell*, 540 U.S. at 190-93 (discussing *Buckley*).  *Buckley* characterized express advocacy communications as those "containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'"  *Buckley*, 424 U.S. at 44 n.52; *see also McConnell*, 540 U.S. at 191.

In part because the express advocacy requirement proved easy to evade, *see McConnell*, 540 U.S. at 193, Congress enacted the Bipartisan Campaign Reform Act ("BCRA"), Pub. L. No. 107-155, which expanded the application of FECA's corporate and union financing restriction. In relevant part, BCRA extended the restriction to all electioneering communications, which BCRA defined as television or radio broadcasts that refer to a federal candidate within a certain time window in advance of an election.  *See* 2 U.S.C. § 434(f)(3)(A)(i).  Other than a reference to a candidate, there is no content requirement in the EC definition.  *See id.*

After BCRA was passed, the *McConnell* plaintiffs challenged the constitutionality of the EC definition because, *inter alia*, it restricted corporate and union funding of communications that did not contain express advocacy.  *McConnell*, 540 U.S. at 205-06 ("[P]laintiffs argue that the justifications that adequately support the regulation of express advocacy do not apply to significant quantities of speech encompassed by the definition of electioneering communications.").  The Supreme Court rejected this argument, finding that the "vast majority" of communications mentioning candidates within the EC windows are "the functional equivalent of express advocacy," and therefore ECs may constitutionally be subject to the corporate funding restriction.  *Id*. at 206.  The Court further emphasized that its prior "express advocacy limitation [in *Buckley*], in both the expenditure and the disclosure contexts, was the product of statutory interpretation rather than a constitutional command."  *Id.* at 191-92.  The Court accordingly upheld BCRA's corporate funding restriction on its face.  *Id*. at 209.

In *WRTL*, the Court held that BCRA's funding restriction for ECs could be applied constitutionally to broadcasts meeting the statutory EC definition only if they are the "functional equivalent" of express advocacy, *i.e.*, are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  *WRTL*, 127 S. Ct. at 2667.  This test, like *McConnell*, imposes no magic-words requirement; instead, *WRTL* explicitly states that the analysis must "focus[ ] on the substance of the communication."  *Id*. at 2666.  *WRTL* overruled neither *McConnell's* facial upholding of the EC provision nor its explanation that *Buckley's* express advocacy interpretation is not a constitutional requirement.

Nonetheless, Plaintiff now attempts to import a narrow interpretation of express advocacy into the *WRTL* test.  (*See*, *e.g.*, Pl.'s Mem. at 8 ("[T]he issue that must be decided . . . is whether there are actual words in *Hillary* that contain *WRTL II*'s required unambiguous 'appeal to

vote . . . .'").)[1]  In support of its claim, Plaintiff selectively quotes *WRTL*'s language regarding

an "appeal to vote."  (*See id*. at 5-8.)  Plaintiff fails to note, however, that the test from which this

language is taken does not ask whether the communication contains specific words constituting

an appeal to vote (as Plaintiff repeatedly suggests), but instead whether the communication "is

susceptible of no reasonable interpretation other than *as* an appeal to vote."  *WRTL*, 127 S. Ct. at

2667 (emphasis added).  *WRTL*'s application of the test further demonstrates that the inquiry is

holistic, examining the "focus" of the communication, any "position" it manifests, and whether

the "content is consistent" with "genuine" issue advocacy.  *Id*.  Indeed, when the Court analyzed

whether the content of WRTL's ads contained "indicia of express advocacy," it reviewed

whether the ads "mention an election, candidacy, political party, or challenger," and whether

they "take a position on a candidate's character, qualifications, or fitness for office," not whether

the ads contain specific words exhorting viewers to vote for or against a candidate.  *Id*.  Thus,

*WRTL* does not support Plaintiff's argument that the presence or absence of specific words of

electoral advocacy is the determining factor in whether a communication is the *functional*

*equivalent* of express advocacy.

        As set forth in the Commission's motion to dismiss, Plaintiff's film is overwhelmingly

focused on Senator Clinton's candidacy for president and devoted to attacking her character and

her fitness for that office, such that it is susceptible of no reasonable interpretation other than as

---

[1]        Although Plaintiff has studiously avoided using the phrase "magic words," Plaintiff has
acknowledged that this is the import of its argument.  *See* Tr. of Prelim. Inj. Hr'g at 14-16 (Jan.
10, 2008) (attached as Exhibit 1):

                JUDGE LAMBERTH:  Do you have to use the magic words "vote" for it to be
                express advocacy; is that your position? . . .
                MR. BOPP:  Yes.
                . . .
                MR. BOPP:  [The film] does not say vote against her.
                JUDGE LAMBERTH:  Because it did not use the magic words[?]
                MR. BOPP:  Exactly right.

an appeal to vote against her.  (*See* Def.'s Mem. of L. in Support of Its Mot. to Dismiss Counts 3 and 4 of the Am. Compl. at 6-10 ("Def.'s Mem.").)  *See also Citizens United v. FEC*, 530 F. Supp. 2d 274, 279-80 (D.D.C. 2008) ("*The Movie* is susceptible of no other interpretation than to inform the electorate that Senator Clinton is unfit for office, that the United States would be a dangerous place in a President Hillary Clinton world, and that viewers should vote against her."). Under the *WRTL* test, *Hillary: The Movie* "is thus the functional equivalent of express advocacy."  *Citizens United*, 530 F. Supp. 2d at 280.

Plaintiff's related argument (Pl.'s Mem. at 12-15) that the film is issue advocacy — because of what Plaintiff calls the "dissolving-distinction problem" (Pl.'s Mem. at 6-7) — is similarly untenable.  As the Chief Justice wrote in *WRTL*, the relevant constitutional question for communications that purport to be issue speech is not whether the communications *contain* issue speech, but whether they "*focus* on a legislative issue . . . and urge the public to contact public officials with respect to the matter."  *WRTL*, 127 S. Ct. at 2667 (emphasis added).  Merely including references to an "issue" within a communication that focuses on a candidate's fitness for office neither immunizes the communication from regulation nor renders it issue speech.  *See McConnell*, 540 U.S. at 193 & n.78 (noting that, despite ad's references to family values issues, "[t]he notion that [the Bill Yellowtail ad] was designed purely to discuss the issue of family values strains credulity").[2]  Thus, as *WRTL* confirmed, the relevant question is whether "the substance of the communication" as a whole is the functional equivalent of express advocacy. *See WRTL*, 127 S. Ct. at 2666; *see also MCFL,* 479 U.S. at 249-50 (holding that newsletter's

---

[2]     As the Court has noted in the context of express advocacy, when a communication goes "beyond issue discussion" to campaign speech, the communication "falls squarely within" the corporate financing restriction.  *See FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 249-50 (1986) ("*MCFL*") (holding that corporation's newsletter was express advocacy, despite inclusion of issue speech as part of the communication).

combination of exhortation to vote pro-life, plus separate list of pro-life candidates, constituted express advocacy, even though newsletter did not explicitly appeal for votes for named candidates).

Plaintiff also claims that its film is akin to the issue ads in *WRTL III*, Civ. No. 04-1260 (D.D.C.), and *Christian Civic League of Maine v. FEC*, Civ. No. 06-614 (D.D.C.).  Those ads, however, contained only brief references to candidates, while focusing on legislative issues and urging the public to take positions on those issues.  (*See* Pl.'s Mem. at 13 n.1, 14 n.2.)  *Hillary: The Movie* inverts this formula:  It contains only brief references to legislative issues, while focusing on Senator Clinton's character and fitness for office and omitting any appeal for public action (other than voting against Senator Clinton).  (*See* Def.'s Mem. at 7-9.)  In fact, even the fleeting instances of issue-related discussion within *Hillary: The Movie* are not genuine issue speech, for each issue is discussed only as a further means of attacking Senator Clinton's character and fitness for higher office.  (*See*, *e.g.*, Am. Compl. Exh. 2 at 46-47 (discussing immigration debate and concluding that Senator Clinton's response "doesn't suggest presidential stature or character"); *id*. at 47-49 (discussing Iraq war and concluding that "the potential future commander-in-chief" is "not flipping and flopping.  [S]he's lying.").)  In addition to contemporaneously tying its brief issue discussions to her character, the film concludes emphatically that these are reasons that she should not be elected to the presidency.  (*See id*. at 68-72 (concluding, *inter alia*, that Senator Clinton "has great defects" as potential president, lacks experience to "become the most powerful person in the country," is not "going to [be] good for the security of the United States," and poses "fundamental danger . . . to every value that we hold dear").)  Plaintiff does not and cannot identify a single issue that is raised in the film without being connected to Senator Clinton's candidacy.  Thus, under the plain language of the

*WRTL* test, *Hillary: The Movie* does not "focus on a legislative issue," and it therefore cannot be a "genuine issue ad."[3]  Because the film has no reasonable interpretation other than as an appeal to vote against Senator Clinton, Count 3 of the Amended Complaint must fail as a matter of law.

## II.    PLAINTIFF'S REMAINING ARGUMENTS ARE ALSO WITHOUT MERIT

Plaintiff makes four additional arguments in opposition to the Commission's motion to dismiss, and each one lacks merit.  First, Plaintiff claims that the EC financing restriction should be construed to apply only to "ads," not to "a full-length documentary movie shown in theaters, sold on DVD, and with a compendium book."  (Pl.'s Mem. at 10-11.)  But none of these cited methods of distributing *Hillary: The Movie* is subject to any EC regulations whatsoever; only the cable television distribution of the film falls within the statutory definition of an EC, and that definition draws no distinction between advertisements or movies.  *See* 2 U.S.C. § 434(f)(3)(A)(i) (defining EC as "broadcast, cable, or satellite communication").  Furthermore, although *McConnell* upheld BCRA's corporate financing restriction on its face, 540 U.S. at 209, Plaintiff attempts to limit this holding to advertisements, stating that "there was no record evidence [in *McConnell*] that *movies* were a problem."  (Pl.'s Mem. at 11.)  This assertion, however, is belied by the thirty-minute broadcasts that, as Plaintiff notes, were not only in the *McConnell* record, but were actually discussed by the district court in that case.  *See* Pl.'s Mem. at 10 (*citing McConnell*, 251 F. Supp. 2d at 305-06, 316-17); *see also McConnell*, 251 F. Supp. 2d at 547-48 (opinion of Kollar-Kotelly, J.), 906 (opinion of Leon, J.).  Thus, the *McConnell*

---

[3]      Plaintiff's claim (Pl.'s Mem. at 15) that its film is a "biography" fails for the same reason: Senator Clinton's actions and experiences are discussed solely in the context of criticizing her character and fitness for office.  (*See* Def.'s Mem. at 6-9.)  *Hillary: The Movie*, therefore, is as much a biography of Senator Clinton as the Bill Yellowtail ad was a biography of Bill Yellowtail.

Court undeniably was aware of the existence of ECs longer than thirty- or sixty-second ads when it upheld the EC definition.[4]

Second, Plaintiff argues (Pl.'s Mem. at 8-12) that *Hillary: The Movie* is "the functional equivalent of a book," and therefore it is entitled to greater First Amendment protections than is a standard television advertisement.  Under FECA, however, this is an irrelevant comparison, for a book (such as the companion book to Plaintiff's film) could never be an EC.  Plaintiff's choice to broadcast the film on cable television falls squarely within the EC provision, and neither this provision nor the Supreme Court's opinions provide a basis for exempting certain broadcasts simply because they differ in form from standard television advertisements, much less because they might *theoretically* have been distributed in some other medium subject to different regulation.[5]  *Cf. McConnell*, 540 U.S. at 207 (rejecting argument that EC provision is "underinclusive because it does not apply to advertising in the print media").

Third, as it has done several times during this litigation (*see*, *e.g.*, Tr. of Prelim. Inj. Hr'g at 19, 48-49 (Jan. 10, 2008) (attached as Exh. 1)), Plaintiff again attempts to draw a parallel between *Hillary: The Movie* and the film *Fahrenheit 9/11*.  (Pl.'s Mem. at 11.)  The apparent implication of Plaintiff's argument is that, if Michael Moore's film criticizing President Bush was not subject to regulation as an EC, then neither should Plaintiff's film criticizing Senator

---

[4]    Plaintiff also repeatedly quotes isolated words from *McConnell* in an attempt to argue that the Court never *specifically* found movies to be constitutionally regulable.  (*See* Pl.'s Mem. at 9-10.)  This argument, however, is baseless, for *McConnell*'s facial upholding of the EC corporate funding restriction included film-length broadcasts by definition.  *See* 2 U.S.C. § 434(f)(3)(A)-(B) (defining ECs by method of broadcast and providing no exemption based on length of broadcast).

[5]    Plaintiff's argument also fails as a factual matter.  For example, as the Commission noted in its motion to dismiss, Plaintiff's film contains multiple visual attacks on Senator Clinton's character that are not reflected in the written script.  (Def.'s Mem. at 9.)  Because these attacks consist primarily of carefully edited video montages that could not be duplicated on the pages of a book, *Hillary: The Movie* cannot reasonably be considered "the functional equivalent of a book."

Clinton.  But this comparison is meaningless, for *Fahrenheit 9/11* was never shown on television during an electioneering communication window, and thus it was never an EC or otherwise subject to the Commission's jurisdiction.

Finally, Plaintiff argues (Pl.'s Mem. at 16-17) that Count 3 of the Amended Complaint should not be dismissed because the Commission has sought discovery regarding the "press exception" to the EC regulations.  However, the Commission is seeking this discovery primarily to prepare for the possibility that Plaintiff, having failed in its constitutional claims, may raise a press exemption argument (*see* Exh. 1 at 19 (comparing film to "Frontline or Nova or 48 Hours or 60 Minutes")) in the context of Plaintiff's challenges to the EC *disclosure* provisions — challenges that are not at issue in this motion to dismiss.  The Commission has every right under the Federal Rules of Civil Procedure to protect itself through discovery against an argument — no matter how weak that argument would be.[6]  Plaintiff cites no authority for the proposition that the Commission's inquiry about its other claims somehow rescues Plaintiff's *financing* challenge from its legal insufficiency.  There is no such authority:  Count 3 fails as a matter of law, and the Commission's unrelated discovery request cannot redeem that failure.

III.    **CONCLUSION**

For the foregoing reasons, the Commission respectfully requests that the Court dismiss Count 3 of the Amended Complaint with prejudice, and dismiss Count 4 of the Amended Complaint without prejudice as moot.

---

[6]     The argument would lack merit because, *inter alia*, Plaintiff intends to pay a cable provider to air the film.  Am. Compl. ¶ 28; FEC Advisory Opinion 2004-30 at 7 (Sept. 10, 2004), http://saos.nictusa.com/aodocs/2004-30.pdf (denying media exemption to Citizens United).  In any event, Plaintiff does not actually attempt to claim the press exemption in its opposition to the Commission's motion to dismiss (*see* Pl.'s Mem. at 16-17; *see also* Am. Compl. ¶ 15 (citing Advisory Opinion 2004-30)), and no facts about the exemption are relevant to the constitutional issue now before the Court.

Respectfully submitted,

Thomasenia P. Duncan (D.C. Bar No. 424222)
General Counsel

David Kolker (D.C. Bar No. 394558)
Associate General Counsel

Kevin Deeley
Assistant General Counsel

_____/s/ Adav Noti_____
Adav Noti (D.C. Bar No. 490714)
Attorney

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street NW
Washington, DC 20463
Dated:  April 3, 2008                    (202) 694-1650

# EXHIBIT 1

```
 1                      UNITED STATES DISTRICT COURT

 2                         DISTRICT OF COLUMBIA

 3   CITIZENS UNITED                     CIVIL ACTION NO. 07-2240

 4                                       WASHINGTON,D.C.

 5   VERSUS                              THURSDAY, JANUARY 10,2008

 6

 7   FEDERAL ELECTION COMMISSION        10:00 A.M.

 8

 9                   PRELIMINARY INJUNCTIONS HEARING

10   BEFORE THE HONORABLE A. RAYMOND RANDOLPH, CIRCUIT JUDGE,

11   AND THE HONORABLE ROYCE C. LAMBERTH AND RICHARD W. ROBERTS,

12             UNITED STATES DISTRICT COURT JUDGES

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF,           JAMES BOPP, JR., ESQ.
     CITIZENS UNITED              BOPP,COLESON & BOSTROM
15                                1 South 6th Street
                                  Terre Haute, IN  47807-3510
16                                812-232-2434

17   FOR THE DEFENDANT,           KEVIN DEELEY, ESQ.
                                  DAVID KOLKER, ESQ.
18   FEDERAL ELECTION COMMISSION  ADAV NOTI, ESQ.
                                  999 E Street, NW
19                                Washington, D.C.  20463
                                  (202)694-1556
20
     REPORTED BY:                 WENDY C. RICARD, CCR, RPR
21                                OFFICIAL COURT REPORTER
                                  333 Constitution Street, NW
22                                Washington, D.C.  20001
                                  (202)354-3111

23   Proceedings recorded by mechanical stenography.

24   Transcript produced by computer-aided transcription.

25
```

1    prohibitions and disclaimers on the basis that it's too broad

2    and encompasses speech that is not campaign related.  So I

3    just don't know what case they're referring to.

4            And the principle just creates a bright line.  In

5    other words because the principle separates what Congress can

6    regulate under campaign finance laws and what Congress cannot

7    regulate under campaign finance laws because it is only

8    unambiguously campaign related activity that gives rise to

9    any of the interests that would justify congressional

10   regulation, including the disclosure interest.

11           Now, moving to the prohibition and the movie, we've

12   alleged and they do not contest that there is no express

13   advocacy in this movie.  There is considerable issue advocacy

14   --

15           JUDGE LAMBERTH:  Do you have to use the magic words

16   "vote" for it to be express advocacy; is that your position?

17   As long as you don't say "vote", then you can say anything.

18   You can say she's a terrible person.

19           MR. BOPP:  Yes.

20           JUDGE LAMBERTH:  She's -- well, I'll give you a

21   couple of direct votes.

22           JUDGE ROBERTS:  -- got to do it on the record.

23           JUDGE LAMBERTH:  Well, I guess -- tell me why this

24   is all sealed.  Why is the transcript sealed?

25           MR. BOPP:  Well, at the time the transcript was

15

1    sealed --

2            JUDGE LAMBERTH:  So you can sell it; that's why we

3    have it sealed?

4            MR. BOPP:  Yes.  Because it was not completed.  The

5    movie was not completed.

6            JUDGE LAMBERTH:  Is there a reason it is sealed

7    today?

8            MR. BOPP:  There would be no need to have it sealed

9    today.  When we filed it, yes; but now --

10           JUDGE LAMBERTH:  We can unseal it today.

11           MR. BOPP:  We could do that, yes.  And, in fact, we

12   have filed with the Court an unsealed version of the final

13   movie and the final ads.

14           JUDGE LAMBERTH:  Okay.

15           MR. BOPP:  So that you can see them in DVD in

16   addition to the fact that you have the transcript.

17           JUDGE LAMBERTH:  I have not received that.

18           MR. BOPP:  That was filed on Monday.  I had the --

19   I was notified electronically that it was filed.

20           JUDGE ROBERTS:  In any event, there's no problem

21   with it --

22           JUDGE LAMBERTH:  -- file it.  It didn't get to me.

23   But in any event --

24           JUDGE ROBERTS:  There's no problem with us citing

25   passages from the --

1            JUDGE LAMBERTH:  -- what you just said we can
2    unseal -- I can tell you beyond a shadow of doubt that
3    Hillary Clinton that I know is not equipped, not qualified to
4    be our commander-in-chief.  That doesn't say vote against
5    her?
6            MR. BOPP:  That does not say vote against her.
7            JUDGE LAMBERTH:  Because it did not use the magic
8    words.
9            MR. BOPP:  Exactly right.
10           JUDGE LAMBERTH:  And unless you use the magic words
11   --
12           MR. BOPP:  It said explicit words of advocacy.
13           JUDGE LAMBERTH:  What could be more explicit
14   advocacy than to say she's not equipped to be
15   commander-in-chief?
16           MR. BOPP:  Explicit words of advocacy to vote for
17   or against?
18           JUDGE ROBERTS:  How is that different from
19   Billy Yellowtail(Phonetic), then?
20           MR. BOPP:  How it is it?
21           JUDGE ROBERTS:  Yeah.
22           MR. BOPP:  Well, the movie involves numerous issues
23   that are related to either conduct in office, when she was in
24   the White House, or her policy positions.  Not what she is
25   doing with her husband behind closed doors -- Yellowtail,

1    remember, he hit his wife and said he didn't hit her hard.

2    That has nothing to do with public policy or conduct in

3    office, issues that are legitimate about discussing in the

4    public square about politicians.

5              She was in the White House for eight years as First

6    Lady.  It talks about the travel -- office firing of White

7    House personnel.  It talks about the White House giving

8    pardons to which President Clinton did, but she had a --

9    arguably hand in.  It talked about responsibility of the

10   Clinton administration for 911.  It talked about her policy

11   positions on health care, immigration, the war on terror and

12   Iraq.

13             JUDGE ROBERTS:  And over and over, it returns to a

14   refrain such as the one on Page 32:  I'm not asking anybody

15   to believe me, I'm asking people to look at that record, it's

16   undisputed, and to come to their on conclusions regarding the

17   suitability of Hillary Clinton to acquire the highest office

18   in this country.

19             MR. BOPP:  It doesn't advocate the election of a --

20   they haven't claimed it.

21             JUDGE LAMBERTH:  Oh, that's really --

22             MR. BOPP:  They haven't even claimed it.  These are

23   the experts over here.

24             JUDGE ROBERTS:  And you really think that's

25   different from the conclusion the Supreme Court reached with

18

1    respect to the Billy Yellowtail ad?

2              MR. BOPP:  Yes, I think it is different.

3              JUDGE ROBERTS:  All right.

4              MR. BOPP:  You can talk about -- and this kind of

5    gets down to the critical distinction in position.  They are

6    claiming that they have authority to prohibit communications

7    because it discusses the character of the individual.  That's

8    their position.

9              Now, there's no question that this movie discusses

10   the character in certain places of Hillary Clinton.

11             JUDGE ROBERTS:  Many places; you would concede

12   that?

13             MR. BOPP:  I haven't counted many.  You could say

14   many; many places.  It's a 90-minute documentary.  It

15   discusses a wide range of issues, and it does discuss her

16   character as it relates to her conduct in office and her

17   policy position.  It does do that, no question.

18             Well, Buckley said that there is a distinction

19   between urging somebody to vote for/or against a candidate on

20   the one hand and discussing issues and candidates -- and,

21   look, what people do in office, what it demonstrates in terms

22   of their character, is a legitimate issue.

23             JUDGE ROBERTS:  And issue ads often exert listeners

24   to do something at the end of those ads.  What does this ad

25   or movie exert listeners to end up doing?

    1              MR. BOPP:  Nothing.  Nothing.  Because it doesn't
    2    urge them to vote for/or against a candidate.  It urges them
    3    to do nothing.  It's just like what you see on Frontline.
    4              JUDGE ROBERTS:  On what?
    5              MR. BOPP:  Frontline; on the PBS documentary series
    6    called Frontline or Nova or 48 Hours or 60 Minutes.  They
    7    talk about issues, and you --
    8              JUDGE LAMBERTH:  You can't compare this to 60
    9    Minutes.
   10              MR. BOPP:  Huh?
   11              JUDGE LAMBERTH:  You can't compare this to 60
   12    Minutes.  If you read those transcripts --
   13              MR. BOPP:  Well, I beg to differ.  I feel that it
   14    is comparable.  I mean it's a political documentary, no
   15    question.  It's about politics.  It's about issues and
   16    character, but it does not call for a vote for/or against a
   17    candidate as other documentaries such as -- how about
   18    Farenheit 9/11, Michael Moore's documentary; a hard-hitting,
   19    political documentary that called into question every aspect
   20    of the incumbent president who was up for re-election?
   21              I mean this used to be the American way.  This is
   22    the American way.  You can talk about politicians.  You can
   23    talk about candidates, of what they're doing to us and for us
   24    in office.  And the FEC in order to -- because they --
   25              JUDGE LAMBERTH:  You still can here, the only thing

48

1   Wisconsin case.  I think it is a whole new world with the
2   Roberts' opinion.  I mean the whole idea of circumventions
3   out the door; deference is out the door.  He says enough is
4   enough.  The tie goes to the speaker.

5          You read the McConnell opinion and you wonder
6   whether any of those makes sense.  Well, we have a new day, a
7   new court, that is giving meaning to what McConnell said were
8   genuine issue ads; dealt with whether or not they can be
9   prohibited; adopted a test for function equivalent, and now
10  the question is can you apply disclosures or disclaimers to
11  it, and we urge you to grant the preliminary injunction.

12          JUDGE RANDOLPH:  I just want to be clear:  There's
13  nothing in particular about your organization that makes you
14  unique from countless other organizations?

15          MR. BOPP:  I agree with that.

16          JUDGE RANDOLPH:  And there's nothing in particular
17  about the content of these ads other than the fact that
18  they're exempt or they have a safe harbor that makes them
19  unique from any of the countless other kinds of ads that
20  could be considered to have satisfied -- not satisfied the
21  Roberts' test?

22          MR. BOPP:  That is true.  I think there are others
23  that would be protected by Roberts' opinion, and if they --
24  people have to make a choice, though, right now as Michael
25  Moore did.  He didn't bring a lawsuit.  He took Bush's name

49

```
 1    out of his ads.  Well, I don't know how in the world Citizens

 2    United can advertise a movie that's called "Hillary The

 3    Movie" without mentioning Hillary Clinton.  So they have a

 4    dilemma that they hope that this Court will resolve for them.

 5    Thank you.

 6            JUDGE RANDOLPH: Okay.  The case is submitted.

 7    Thank you very much.

 8            THE DEPUTY CLERK:  All rise.   This Honorable Court

 9    stands adjourned.

10                  [End of proceedings]

11

12

13

14

15                                    ,

16

17

18

19

20

21

22

23

24

25
```