**United States District Court**
**District of Columbia**

| | |
|---|---|
| Citizens United, *Plaintiff*, *v.* Federal Election Commission, *Defendant*. | **Civ. No. 07-2240** (ARR, RCL, RWR) |

# Plaintiff's Summary Judgment Motion

Citizens United ("Citizens" moves for summary judgment in its favor on **Count 1** (Disclosure Requirements[1] as applied to its Ads and all communications not the "functional equivalent of express advocacy" under the appeal-to-vote test of *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652, 2667 (2007) ("*WRTL II*"), **Count 2** (Disclosure Requirements as applied to *Hillary: The Movie*), and **Count 3** (Prohibition as applied to *Hillary*).[2] Fed. R. Civ. P. 56.

As to **Count 4** (Prohibition as applied to "Questions" ad), Citizens "agree[d] to dismissal of Count 4 without prejudice because it presently appears to be moot." Doc. 46 at 1 (Pl.'s Mem. Law Responding to FEC's Mot. Dismiss Counts 3 & 4), to which the FEC agreed. Doc. 49 at 1.

As to **Count 5** (Prohibition facially), the addition of this count was based on the FEC's initial inability to determine whether the "Questions" ad was prohibited. Now that the FEC has determined the ad not to be prohibited Citizens considers Count 5 moot. If this jurisdiction permitted the

---

[1]"**Disclosure Requirements**" refers to both § 201 ("Reporting Requirement") and BCRA § 311 ("Disclaimer Requirement") of the Bipartisan Campaign Reform Act of 2002 ("BCRA"). The Reporting Requirement is codified at 2 U.S.C. § 434(f). The Disclaimer Requirement is codified at 2 U.S.C. § 441d(a). *See also* 11 C.F.R. § 110.11. "**Ads**" refers to the three adds for which Citizens United has sought judicial relief herein. "**Prohibition**" refers to BCRA § 203's prohibition on corporate electioneering communications, 2 U.S.C. § 441b, as limited by *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652 (2007) ("*WRTL II*").

[2]As to **Count 3**, the FEC has filed *[FEC]'s Motion to Dismiss Counts 3 & 4 of the Amended Complaint* (Doc. 43), which has received no ruling.

dismissal of individual counts, Citizens would dismiss Count 5 without prejudice. As this is impossible, Citizens hereby advises the Court of its intent to abandon the count and asks the Court to consider the count moot and not rule on it.

In support of this motion, Citizens United files contemporaneously its *Memorandum in Support of Plaintiff's Summary Judgment Motion*, *Plaintiff's Statement of Undisputed Material Facts* ("SUMF"), and *Affidavit of David N. Bossie,* LCvR 7(h). A draft order is provided. LCvR 7(c). Oral argument on this motion is requested. LCvR 7(f).

Respectfully submitted,

/s/ James Bopp, Jr.
James Bopp, Jr., D.C. Bar #CO0041
Richard E. Coleson*
Jeffrey P. Gallant*
Clayton J. Callen*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/235-3685 facsimile
   * pro hac vice motion granted

May 16, 2008                    *Counsel for Plaintiff*

**United States District Court**
**District of Columbia**

| | |
|---|---|
| **Citizens United**, *Plaintiff,* | **Civ. No. 07-2240** (ARR, RCL, RWR) |
| *v.* | |
| **Federal Election Commission**, *Defendant.* | |

# Memorandum in Support of
## *Plaintiff's Summary Judgment Motion*

———————

James Bopp, Jr., D.C. Bar #CO0041
Richard E. Coleson*
Jeffrey P. Gallant*
Clayton J. Callen*
Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/235-3685 facsimile
    *pro hac vice motion granted
*Counsel for Plaintiff*

May 16, 2008

**SJ Memo**

# Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.    All Campaign Restrictions Must Be "Unambiguously Campaign Related"
        and Disclosure Provisions and Prohibitions Require Strict Scrutiny. . . . . . . . . . . . . . . 8

    II.   *McConnell* Did Not Preclude As-Applied Challenges. . . . . . . . . . . . . . . . . . . . . . . . . . 23

    III.  Disclosure Imposes Substantial Burdens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    IV.  The Disclosure Requirements and Prohibition Are Unconstitutional as Applied. . . . . 33

           A. The Ads Are Not Unambiguously Campaign Related . . . . . . . . . . . . . . . . . . . . . . . 33

           B. *Hillary* Is Not Unambiguously Campaign Related. . . . . . . . . . . . . . . . . . . . . . . . . 33

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Plaintiff's Statement of Undisputed Material Facts

# Table of Authorities

*Cases*

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*AFL-CIO v. FEC*, 333 F.3d 168 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*American Civil Liberties Union of Nevada v. Heller*, 378 F.3d 979 (9th Cir. 2004) . . . . . . . . . 13

*Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652 (1990) . . . . . . . . . . . . . . . . . . . 18, 19

*\*Buckley v. Valeo*, 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*California Pro-Life Council v. Getman*, 328 F.3d 1088 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . 38

*Center for Individual Freedom v. Carmouche*, 449 F.3d 655 (5th Cir. 2006) . . . . . . . . . . . . . . 13

*Christian Civic League of Maine v. FEC*, No. 06-614, slip op. (D.D.C. Aug. 21, 2007) . . . . . . 17

*Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981) . . . . . . . . . . . . . . . . . . . 11-12, 33

*Crawford v. Marion County Election Board*, 128 S. Ct. 1610 (2008) . . . . . . . . . . . . . . . . . . . . . 24

*FEC v. Furgatch*, 807 F.2d 857 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37-38

*FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986) . . . . . . . . . . . . . . . . . . 10, 11, 17

*\*FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) . . . . . . . . . . . . . . . . . . . 11-12, 22

*Gonzales v. Carhart*, 127 S. Ct. 1610 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Marks v. United States*, 430 U.S. 188 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*\*McConnell v. FEC*, 251 F. Supp. 2d 176 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 28, 34, 40

*\*McConnell v. FEC*, 540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) . . . . . . . . . . . . . . . . . . . 22, 27, 29

*New York Times v. Sullivan*, 376 U.S. 254 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*North Carolina Right to Life v. Leake*, ___ F.3d ___, No. 07-1438, 2008 WL 1903462 (4th
    Cir. May 1, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-22

*San Jose Silicon Valley Chamber of Commerce PAC v. San Jose*, No. 06-0425) (N.D. Cal.
Sep. 20, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Shays v. FEC*, 337 F. Supp. 2d 28 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184 (2008) . . . . 24

*Wisconsin Right to Life v. FEC*, 546 U.S. 410 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Wisconsin Right to Life v. FEC*, No. 04-1260, slip op. (D.D.C. July 23, 2007) . . . . . . . . . . . . 16

**Statutes, Rules, and Constitutional Provisions**
2 U.S.C. § 431(17) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

2 U.S.C. § 434(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

2 U.S.C. § 441b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

11 C.F.R. § 100.29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

11 C.F.R. § 100.29(b)(3)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

11 C.F.R. § 110.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

11 C.F.R. § 114.15(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

11 C.F.R. § 114.15(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

11 C.F.R. § 114.15(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

11 C.F.R. § 114.15(b)(3)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81   *passim*

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. Const. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. art. I, § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Other Authorities**
70 Fed. Reg. 75713 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Brian Dougherty, *Disclosure Flaw*, reasononline, Mar. 1996 . . . . . . . . . . . . . . . . . . . . . . . . . 31

Brian Dougherty, *How campaign finance law hurts participation in politics*, reasononline,
Apr. 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Club for Growth PAC, *FEC Advisory Opin. Req.*, AO 2007-33 . . . . . . . . . . . . . . . . . . . . . . . . 5

Dick M. Carpenter II, *Disclosure Costs: Unintended Consequences of Campaign Finance
Reform* (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

William McGeveran, *Mrs. McIntyre's Checkbook: Privacy Costs of Political Contribution
Disclosure*, 6 U. Pa. J. Const. L. 1 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-30

Bradley A. Smith, *A Moderate, Modern Campaign Reform Agenda*, 12 NEXUS 3 (2007) . . . . 30

# Introduction

As *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652 (2007) ("*WRTL II*"),[3] was an as-applied challenge to a provision of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81, facially upheld in *McConnell v. FEC*, 540 U.S. 93 (2003), this case also challenges, as applied, a BCRA provision facially upheld in *McConnell*. While *McConnell* facially upheld the corporate electioneering communications Prohibition, *WRTL II* limited the scope of regulable electioneering communications to those meeting both the statutory definition (2 U.S.C. § 434(f)(3)) and *WRTL II*'s appeal-to-vote test. 127 S. Ct. at 2667 ("susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate"). Those not the "functional equivalent of express advocacy" under *WRTL II*'s test are protected "political speech" or "issue advocacy." *Id.* at 2659.[4]

*WRTL II*'s appeal-to-vote test is the latest application of the constitutional first principle recognized in *Buckley v. Valeo*, 424 U.S. 1 (1976), that campaign finance laws may only regulate communications that are "unambiguously related to the campaign of a particular federal candidate," *id.* at 80, i.e., "unambiguously campaign related." *Id.* at 81. *Buckley* expressly applied this unambiguously-campaign-related requirement to the *disclosure of expenditures*. *Id.* at 80. So it has direct application here. *McConnell* facially upheld the "Disclosure Requirements" (*see Motion* at 1 n.1), 540 U.S. at 194-202, but they are unconstitutional as applied to communications that are not unambiguously campaign related under *WRTL II*'s test.

---

[3]This principal opinion ("*WRTL II*") is by Chief Justice Roberts (Justice Alito joining). This opinion states the holding. *Marks v. United States*, 430 U.S. 188, 193 (1977) (Absent majority opinion, holding is position taken by those concurring on narrowest grounds.)

[4]*WRTL II* uses "political speech" to indicate the protected speech numerous times. *Id.* at 2659 (twice), 2660, 2664, 2665 (thrice), 2666 (twice), 2669, 2671-74.

**SJ Memo**                                        1

So Citizens United ("Citizens") seeks declaratory and permanent injunctive relief from the Disclosure Requirements as applied to (a) communications that are not unambiguously campaign related under *WRTL II*'s appeal-to-vote test, (b) Citizens' Ads,[5] and (c) *Hillary: The Movie*. And Citizens seeks declaratory and injunctive relief from the electioneering communication Prohibition as applied to *Hillary: The Movie*, which the FEC insists is not protected under *WRTL II*.

## Facts

The facts summarized here are set out in *Plaintiff's Statement of Undisputed Material Facts* ("SUMF"). Citizens is a nonprofit, ideological corporation. A principal means by which Citizens fulfills its purposes is through the production and distribution of documentary films. *See* SUMF ¶¶ 5-9 (information about other films). In January 2008, Citizens released a feature-length documentary film on Senator Hillary Clinton, entitled *Hillary: The Movie*, that is being shown in theaters and sold on DVDs. It includes numerous interviews and scenes of Senator Clinton at public appearances. It is about 90 minutes in length. It does not expressly advocate Senator Clinton's election or defeat, but it discusses her Senate record, her White House record during President Bill Clinton's presidency, and her presidential bid. Some interviewees opine on whether she would make a good president. A compendium book has been published.

When Citizens produced *Celsius 41.11: The Temperature at Which the Brain Begins to Die* (responding to Michael Moore's documentary *Fahrenheit 9/11*) in 2004, it ran national broadcast ads promoting the film. The original version of the ads had images and sound bites of President George Bush and Senator John Kerry, but those images and sound bites were deleted due to the electioneering communication Prohibition. Prior to running the ads, Citizens received FEC

---

[5]Scripts for the Ads ("Wait," "Pants," and "Questions") are in *Plaintiff's Statement of Undisputed Material Facts*. SUMF ¶¶ 26-28.

Advisory Opinion 2004-30, stating that its film ads would qualify as electioneering communications and would not be exempt under the Press Exemption.

Citizens intends to fund three television Ads to promote *Hillary* that will be "electioneering communications" and burdened by the Disclosure Requirements. *See* 2 U.S.C. § 434(f)(3); 11 C.F.R. § 100.29. Citizens intends to broadcast the 30-second ad "Questions" on Fox News cable, and may broadcast it on major television network stations. Citizens intends to broadcast the 10-second ads "Wait" and "Pants" on major television network stations, but not on Fox News. The disclaimer language mandated by FEC rule, *see* 11 C.F.R. § 110.11, takes about 4 seconds to narrate, making 10-second ads virtually impossible and 30-second ads difficult to do with significant time for substantive communication.[6] The Ads reference www.hillarythemovie.com, which promotes showings of *Hillary* in theaters and sales of *Hillary* on DVD.

Citizens intends to begin broadcasting its ads during electioneering communication periods when it gets the relief requested herein. If Senator Clinton becomes the presidential nominee of her party, Citizens plans to run the Ads on Fox News cable (and possibly other outlets) within 30 days before the Democratic National Committee Convention (the electioneering communication period is July 29 to August 28, 2008) and within 60 days of the November general election (the electioneering communication period is September 5 to November 4, 2008). At these times, the Ads will also meet the electioneering communication definition. Citizens believes that these are the times when the public's interest in Senator Clinton will be at its peak, which is the key to

---

[6]The Disclaimer Requirement mandates (**1**) a spoken statement that "Citizens United is responsible for the content of this advertising" and (**2**) a written statement appearing on screen stating (**a**) "the name and permanent street address, telephone number or . . . Web address of the person who paid for the communication," (**b**) a statement that the communication is "not authorized by any candidate or candidates committee," and (**c**) a "clearly readable" statement that "Citizens United is responsible for the content of this advertising." 11 C.F.R. § 110.11(a)-(c).

**SJ Memo**                                     3

maximizing box office and DVD sales for *Hillary*. Citizens is in the process of making a

documentary film about presidential candidate Senator Barack Obama, which it intends to have

ready for release by June 2008. Citizens will have ads that are substantially similar to the Ads for

*Hillary* to promote its Senator Obama documentary, but it cannot offer its ads for judicial review

in advance because they are not prepared.[7]

The Ads may not be prohibited. The FEC concedes that the two 10-second ads fit its

regulatory commercial transaction exception, but says that "Questions" falls outside the safe

harbor. Doc 33 at 17 (Opp'n to 2d Mot. for Prelim. Inj.).[8] But the FEC concedes that "on

balance" "Questions" is protected from prohibition under *WRTL II*'s appeal-to-vote test. *Id.*[9] The

Ads remain subject to the Disclosure Requirements because the FEC refused to exclude

electioneering communications that are not unambiguously campaign related under *WRTL II*'s

appeal-to-vote test. *See* http://www.fec.gov/law/law_rulemakings.shtml#ec07 (rulemaking

documents including requests to eliminate disclosure for ads protected by *WRTL II*).

---

[7]They will not be prepared until the movie is completed because they will be based on scenes from the documentary. Nor can Citizens seek an advisory opinion on these ads because they are neither begun nor completed and because the FEC is, for the foreseeable future, unable to issue advisory opinions due to an insufficient number of commissioners. These ads will also be run during electioneering communication periods and subject to the Disclosure Requirements.

[8]Citizens believes that all of the ads meet the requirements of the recently-enacted FEC rule recognizing a commercial-transaction, safe-harbor exception to the electioneering communication prohibition because each (**a**) "[p]roposes a commercial transaction, such as purchase of a book, video, or other product or service, or such as attendance (for a fee) at a film exhibition or other event," 11 C.F.R. § 114.15(b) (3)(ii); (**b**) "[d]oes not mention any election, candidacy, political party, opposing candidate, or voting by the general public," *id.* at § 114.15(b)(1); and (**c**) "[d]oes not take a position on any candidate's or officeholder's character, qualifications, or fitness for office." *Id.* at § 114.15(b)(2).

[9]Seven days after this suit was filed, the FEC was unsure whether the "Questions" was a protected ad—under its regulatory test or *WRTL II*'s appeal-to-vote test—and declared that it needed more time to make up its mind. Doc. 19 at 8 (Opp'n to Mot. for Consol'n). Seventeen days later, the FEC finally concluded that the 30-second ad was protected under *WRTL II*. Doc. 33 at 17 (Opp'n to 2d Mot. for Prelim. Inj.).

Citizens does not believe that the Disclosure Requirements are constitutional as applied to communications that are not unambiguously campaign related under *WRTL II*'s appeal-to-vote test, including its Ads and *Hillary*. It will neither assume the disclosure burdens nor broadcast its communications absent the requested judicial relief. If it were to comply with the Disclaimer Requirement, it would be (**a**) required to mislead the public by identifying its speech as "electioneering" (by compliance with the "electioneering communication" Disclosure Requirements), which the speech is not under *WRTL II*, and (**b**) deprived of valuable time in its short and expensive broadcast Ads without constitutional or congressional authority.[10] Adding the disclaimer would preclude Citizens from running its 10-second ads[11] and would require it to revise its 30-second ad so as to be much less effective for the constitutionally-protected purposes that it serves. If Citizens were to comply with the Reporting Requirement it would be (**1**) required to mislead the public by reporting its speech as "electioneering"; (**2**) deprived of valuable time and resources in complying with reporting requirements without constitutional or congressional authority; and (**3**) in Citizens' belief based on long experience, subjected to a

---

[10]While Citizens relies primarily on constitutional arguments, there is no evidence that Congress intended to apply the Disclosure Requirements to communications meeting the electioneering communication definition but precluded from the scope of regulable communications because they are not unambiguously campaign related under *WRTL II.*

[11]On November 15, 2007, Club for Growth PAC ("CFG- PAC") requested an FEC advisory opinion granting an exemption from disclaimer requirements for 10- and 15-second televised independent expenditure ads. CFG-PAC stated that the disclaimers "severely curtail[]" its speech as 31.6% to 36.9% of 10-second ads would be consumed by the spoken disclaimer. CFG- PAC also noted how such short "TV spots are important in the current media landscape with multiplication of viewing choices, increased competition from the Internet, and ever increasing costs." CFG-PAC, *Advisory Opin. Req.*, AO 2007-33, *available at* www. fec.gov (Pending Advisory Opinion Requests). The request was placed on the agenda for the Commission's January 24, 2008 meeting. The draft advisory opinion submitted by the FEC Office of General Counsel argued against the exemption. *See* FEC Office of General Counsel, *Draft AO*, Agenda Doc. No. 08-03, *available at* www. fec.gov (Pending Advisory Opinion Requests). Of course, the FEC lacks sufficient commissioners to issue a formal advisory opinion.

substantially reduced number of donors and amount of donations because many potential donors do not wish to be publicly identified for legitimate reasons. Citizens also believes that *Hillary* is not unambiguously campaign related, but Citizens is chilled from broadcasting the movie because the FEC insists that it fails *WRTL II*'s appeal-to-vote test.

## Argument

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The undisputed fact pattern is simple—Citizens is chilled from doing communications that would subject it to the Disclosure Requirements. On the purely legal issues, Citizens is entitled to judgment.

In denying a preliminary injunction, this Court indicated that it did not believe that Citizens had likely success on the merits. The Court did not accept that, as this Court put it, *WRTL II* had "narrowed the permissible scope of what could be considered an electioneering communication" so that communications that are not the functional equivalent of express advocacy under *WRTL II*'s appeal-to-vote test could not be regulated. Doc. 38 at 11. The points on which the Court relied are set out next with indications of where the points are addressed. Citizens respectfully invites the Court to consider these points in light of the responses.

First, this Court said that "the only issue in [*WRTL II*] was whether speech that did not constitute the functional equivalent of express advocacy could be banned . . . ." *Id.* In Part I, Citizens responds that *WRTL II* protected speech that is not "the functional equivalent of express advocacy," 127 S. Ct. at 2667—which *WRTL II* called "political speech" or "issue advocacy," as

distinguished from "campaign speech" or "express advocacy"[12]—employing an analysis that it expressly applied to *disclosure* in *Buckley*, 424 U.S. 1, and that logically extends beyond the Prohibition at issue in *WRTL II* to the Disclosure Requirements presently at issue.

Second, this Court said that *McConnell* precludes as-applied challenges, i.e., while *McConnell* "left open the issue that was presented in *WRTL*, reserving it for decision on an as-applied basis," the Disclosure Requirements were "sustained" as to "the 'entire range of electioneering communications.'" Doc. 38 at 11 (citation omitted). In Part II, Citizens responds that the Supreme Court unanimously rejected just such an argument in *Wisconsin Right to Life v. FEC*, 546 U.S. 410 (2006) ("*WRTL I*") (per curiam), and that the "entire range of electioneering communications" does not rightly include those held not to be the functional equivalent of express advocacy under *WRTL II*'s appeal-to-vote test. *WRTL II*, 127 S. Ct. at 2667.

Third, this Court said that "in the past the Supreme Court has written approvingly of disclosure provisions triggered by political speech even though the speech itself was constitutionally protected under the First Amendment." Doc. 38 at 11. As may be seen in Part I, no cited case approves disclosure as to speech that is not unambiguously campaign related.

Fourth, this Court said that Citizens had not provided evidence that there would be "reprisals," so that it was not within the class of socially disfavored groups that are free from *any* disclosure as to contributors. Doc. 38 at 12. In Part III, Citizens explains that this statement indicates a misunderstanding of Citizens' argument and that binding precedent recognizes disclosure costs and requires that they always be considered in strictly scrutinizing disclosure burdens.

---

[12]*Political speech* is used in *WRTL II* as a synonym for *issue advocacy*, *see supra*, n.4, and as an antonym to *campaign speech* or *express advocacy*. *See*, *e.g.*, 127 S. Ct. at 2659.

### I. All Campaign Restrictions Must Be "Unambiguously Campaign Related" and Disclosure Provisions and Prohibitions Require Strict Scrutiny.

This Court denied a preliminary injunction in part on the basis that only the Prohibition was at issue in *WRTL II*. But *WRTL II* reaffirmed the Court's unambiguously-campaign-related requirement, which the Supreme Court expressly applied to *disclosure of expenditures* in *Buckley*, 424 U.S. at 80. As discussed at the end of this Part, the unambiguously-campaign-related requirement was just employed by the Fourth Circuit as the foundation for deciding an election-law case. That *Buckley-WRTL II* constitutional analysis must be applied here.

Constitutional analysis should begin with the Constitution, which mandates that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This "'guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" *Buckley*, 424 U.S. at 15 (citation omitted). If "Congress shall make no law," how may government regulate election-related First Amendment activities? *Buckley* identified the answer as "[t]he constitutional power of Congress to *regulate federal elections*." *Id.* at 13 (footnote omitted) (emphasis added) (citing U.S. Const. art. I, § 4).

This authority is self-limiting. If the government tries to regulate speech and association not clearly related to election campaigns, it goes beyond its authority. Key to *Buckley*'s analysis is its question of whether "the *relation* of the information sought to the purpose of the Act [regulating elections] *may be too remote*," and, therefore, "*impermissibly broad*." *Id.* at 80 (emphasis added). The Court requires that government restrict its election-related laws to reach only First Amendment activities that are "*unambiguously related* to the campaign of a particular federal candidate," *id.* at 80 (emphasis added), in short, "unambiguously campaign related." *Id.* at 81.

This unambiguously-campaign-related requirement reaffirms and clarifies an earlier

**SJ Memo**                                       8

formulation of the requirement where the Court established the standard of review as requiring both "exacting scrutiny" (i.e., strict scrutiny) and "*also . . .* that there be a 'relevant correlation' [footnote omitted] or 'substantial relation' [footnote omitted] between the governmental interest and the information required to be disclosed." *Id.* at 64 (emphasis added). This "relevant correlation" or "substantial relation" was applied by the Court to require that regulated activity must be "unambiguously related to the campaign of a particular federal candidate." *Id.* at 80.

*Buckley* applied this requirement to (1) expenditure limitations, *id.* at 42-44; (2) PAC status and disclosure, *id.* at 79; (3) non-PAC *disclosure* of contributions and independent expenditures,[13] *id.* at 79-81; and (4) contributions. *Id.* at 23 n.24, 78 ("So defined, 'contributions' have a sufficiently close relationship to the goals of the Act, for they are connected with a candidate or his campaign."). Because *Buckley* expressly applied this requirement to *disclosure of expenditures*, *id.* at 80, it has direct application here.

*Buckley* employed two tests to implement the unambiguously-campaign-related requirement. First, to implement the requirement for PAC status, the Court created the major purpose test for "political committees": "To fulfill the purposes of the Act [i.e., regulating elections] they need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. *Id.* at 79. "Expenditures of candidates and of 'political committees' so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, *campaign related*." *Id.* at 79 (emphasis added). This test assures that expenditures are "unambiguously related to the campaign of a particular federal candidate." *Id.* at 80. Second, to implement the requirement as to expenditures, the Court

---

[13]An "independent expenditure" is an express-advocacy communication that is not coordinated with a candidate so as to become a contribution. *See* 2 U.S.C. § 431(17).

created the express-advocacy test, i.e., whether a communication contains explicit words

expressly advocating the election or defeat of a clearly identified candidate. *Id.* at 44, 80.

The reason for the requirement and these two derivative tests is twofold. First, they limit

congressional power to the constitutional authority to regulate elections. *See id.* at 13. Second,

they protect the people's core political speech in their sovereign, self-government role, which

must not be burdened. The Court noted a dissolving-distinction problem as requiring a bright,

speech-protective line between (1) "discussion of issues and candidates" and (2) "advocacy of

election or defeat of candidates":

> [T]he *distinction* between *discussion of issues and candidates* and *advocacy of election or defeat of candidates* may often *dissolve* in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest. [*Id.* at 42 (emphasis added).]

The Court elaborated further on the necessity of the bright line—between (1) "discussion,

laudation, [and] general advocacy" and (2) "solicitation"—to protect issue advocacy:

> (W)hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between *discussion, laudation, general advocacy*, and *solicitation* puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning. [¶] Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim. [*Id.* at 43 (emphasis added).]

In *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986) ("*MCFL*"), the Court again

recognized the unambiguously-campaign-related requirement. First, it applied the express advo-

cacy test to implement the requirement as applied to the prohibition on corporate and union inde-

pendent expenditures at 2 U.S.C. § 441b. *MCFL*, 479 U.S. at 249. Second, *MCFL* reiterated the

SJ Memo                                          10

major purpose test, which implements the requirement as to PAC status. *Id.* at 253, 262 (major purpose test determined by express-advocacy "independent spending").

The requirement was affirmed in *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978), which held that corporations could not be precluded from making either contributions or expenditures for or against ballot initiatives because "[r]eferenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *Id.* at 790 (citations omitted). The requirement was affirmed again in *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981) ("*CARC*"), which applied "exacting scrutiny," *id.* at 294 ("Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression"), to a limit on contributions to a ballot initiative committee and held it unconstitutional because it d[id] not advance a legitimate governmental interest significant enough to justify its infringement of First Amendment rights." *Id.* at 298.

In denying preliminary injunction, the present Court relied on *MCFL*, *CARC*, and *Bellotti* for the proposition that "the Supreme Court has written approvingly of disclosure provisions triggered by political speech even though the speech itself was constitutionally protected under the First Amendment." Doc. 38 at 11-12. But no case authorizes disclosure of communications that are not "unambiguously campaign related," *Buckley*, 424 U.S. at 81, i.e., not the "functional equivalent of express advocacy" under *WRTL II*'s appeal-to-vote test. 127 S. Ct. at 2667. *MCFL* spoke approvingly of disclosure of *independent expenditures*, which are unambiguously-campaign-related. *See* 479 U.S. at 252-53 ("person that during a year makes *independent expenditures*"; "unincorporated organizations whose major purpose is not campaign advocacy, but who occasionally make *independent expenditures*" (emphasis added)). An "independent ex-

penditure" is an expenditure "expressly advocating the election or defeat of a clearly identified candidate . . . ." 2 U.S.C. § 431(17). This definition is consistent with the express advocacy construction that *Buckley* imposed on *disclosure* restrictions in the process of implementing the unambiguously-campaign-related requirement. 424 U.S. at 80.

Nor does *CARC* support the idea that the government may regulate transactions that are not unambiguously campaign related. *CARC* dealt with *contributions* to a campaign committee, which are unambiguously-campaign-related: "The issue on appeal is whether a limitation of $250 on contributions to committees formed to support or oppose ballot measures violates the First Amendment." 454 U.S. at 291. *Buckley*, construed "contributions" to meet the unambiguously-campaign-related requirement. *See* 424 U.S. at 23 n.24, 78.

*Bellotti* provides no support for regulation beyond the unambiguously-campaign-related requirement because it dealt with a statute that barred "associations and . . . corporations . . . from making contributions or expenditures 'for the purpose of . . . influencing or affecting the vote,'" 435 U.S. at 767-78 (citation omitted), and *Buckley* construed "'contributions' and 'expenditures' . . . 'for the purpose of influencing'" to meet the unambiguously-campaign-related requirement, 424 U.S. at 77-81, so that the scope of "contributions" was narrowly limited and "expenditures" were limited to express advocacy. *See supra* at 9-10. These cases support Citizens' argument and provide no authority for regulating core political speech that is neither a contribution nor express advocacy (nor the functional equivalent of express advocacy under *WRTL II*'s test).

While *McConnell*, 540 U.S. 93, declared "the express advocacy restriction . . . an endpoint of statutory interpretation, not a first principle of constitutional law," the express advocacy test was created to implement the unambiguously-campaign-related requirement, which *is* a first principle of constitutional law. *McConnell* expressly recognized this by quoting *Buckley*'s expla-

nation that the express advocacy construction was done "'[t]o insure that the reach' of the disclo-

sure requirement was 'not impermissibly broad.'" *Id.* at 191 (*quoting Buckley*, 424 U.S. at 80).

*McConnell* also implicitly endorsed the unambiguously-campaign-related requirement when it

stated that "[i]n narrowly reading the FECA provisions in *Buckley* to avoid problems of vague-

ness and overbreadth, we nowhere suggested that a statute that was neither vague nor overbroad

would be required to toe the same express advocacy line." *Id.* at 192. So where a restriction on

First Amendment liberties *is* vague or overbroad (for reaching beyond things unambiguously

campaign related) it must toe the express advocacy line,[14] or its "functional equivalent." *Id.* at

206. *McConnell*'s facial upholding of the prohibition on electioneering communications only "to

the extent that [they] . . . are the functional equivalent of express advocacy," *id.*, is another

reaffirmation of the unambiguously-campaign-related requirement.[15]

    *WRTL II* applied the unambiguously-campaign-related requirement to eliminate overbreadth

in the regulation of BCRA's new "electioneering communications" when it stated its test for

---

[14]Since *McConnell*, several courts have embraced the express advocacy construction as an indispensable tool in dealing with vague or overbroad provisions. For example, the Ninth Circuit in *American Civil Liberties Union of Nevada v. Heller*, 378 F.3d 979, 985 (9th Cir. 2004), followed the Sixth Circuit in endorsing the express advocacy test as the appropriate tool where a provision is vague and overbroad:

    Nevertheless, as stated recently by the Sixth Circuit, *McConnell* "left intact the ability of courts to make distinctions between express advocacy and issue advocacy, where such distinctions are necessary to cure vagueness and over-breadth in statutes which regulate more speech than that for which the legislature has established a significant governmental interest." *Anderson v. Spear*, 356 F.3d 651, 664-65 (6th Cir. 2004).

*See also Center for Individual Freedom v. Carmouche*, 449 F.3d 655 (5th Cir. 2006); *San Jose Silicon Valley Chamber of Commerce PAC v. San Jose*, No. 06-0425) (N.D. Cal. Sep. 20, 2006) (Order Granting Pl.'s Mot. for Summ. J. and Den. Defs.' Mot. for Summ. J.).

[15]*McConnell* also expressly recognized the existence of "issue advocacy," which it described as "'discussion of political policy generally or advocacy of the passage or defeat of legislation,'" *id.* at 205 (*quoting Buckley*, 424 U.S. at 48), and of "genuine issue ads" that it recognized likely lay beyond Congress' ability to regulate. *Id.* at 206 n.88. Issue advocacy, i.e., ordinary political speech, is not unambiguously campaign related, as *WRTL II* recognized. *See infra.*

functional equivalence: "[A]n ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 127 S. Ct. at 2667. *WRTL II* reiterated the requirement when it said that the corporate-form corruption interest does not "extend[] beyond *campaign* speech." *Id.* at 2672 (emphasis added). *WRTL II*'s appeal-to-vote test is the application of the unambiguously-campaign-related requirement to electioneering communications, just as the express advocacy test was the Court's application of the requirement to independent expenditures. In light of *WRTL II*, there is no longer a free-standing "functional equivalent of express advocacy" test, *McConnell*, 540 U.S. at 206, because functional equivalence is now determined by *WRTL II*'s test.

 *WRTL II* also reaffirmed that the purpose of the unambiguously-campaign-related require-ment—and its appeal-to-vote test applying it—is twofold. Negatively, it confines government within the pale of its constitutional authority to regulate elections. *See supra* at 10. Positively, it protects what the Court calls "political speech" or "issue advocacy." 127 S. Ct. at 2659. *WRTL II* explained that "[i]ssue advocacy conveys information and educates," *id.* at 2667, and reaffirmed *Buckley*'s statement that the dissolving-distinction problem, *see supra* at 10, requires a speech-protective, bright-line test that resolves all doubts in favor of free speech:

> [W]e have acknowledged at least since *Buckley* . . . that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." 424 U.S., at 42. Under the test set forth above, that is not enough to establish that the ads can only reasonably be viewed as advocating or opposing a candidate in a federal election. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama,* 310 U.S. 88, 102 (1940). Discussion of issues cannot be suppressed simply be-cause the issues may also be pertinent in an election. Where the First Amendment is implicated, the tie goes to the speaker, not the censor. [*Id.* at 2669.]

 Note that what *WRTL II* referred to as constitutionally-protected "political speech" or "issue

advocacy," *see, e.g.*, 127 S. Ct. at 2659, does not require "focus on legislative issues," as the present Court seemed to believe in its preliminary injunction analysis. Doc. 38 at 7. Nowhere in *WRTL II*'s appeal-to-vote test is there any requirement that the communication focus on legislative issues in order to be protected "political speech" or "issue advocacy." *WRTL II* did observe, in *applying* its appeal-to-vote test to grassroots lobbying, that WRTL's communications focused on legislative issues. 127 S. Ct. at 2667. But to make that a requirement for the appeal-to-vote test or for qualifying as protected "political speech" or "issue advocacy" is to confuse a constitutional *test* with the fact-bound *application* of the test in a particular case. To qualify as protected "political speech," a communication needs only to be "speech about public issues more generally, or 'issue advocacy,' that mentions a candidate for federal office," *id.* at 2659, or to "convey[] information and educate[]," *id.* at 2667, or to be a "discussion of issues and candidates" that falls short of express "advocacy of election or defeat of candidates." *Id.* at 2669 (*quoting Buckley*, 424 U.S. at 42). Since *WRTL II* reaffirmed "'the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message,'" *id.* at 2671 (citation omitted), no restriction may be imposed on what constitutes "political speech" or "issue advocacy." The speaker is free to engage in its speech without government restriction *unless* there is a constitutionally-cognizable reason and means to restrict it, which there is not if the speech is not unambiguously campaign related under the Supreme Court's tests applying that requirement. In effect, then, "political speech" or "issue advocacy" is defined by the *absence* of either express advocacy or *WRTL II*'s "appeal to vote," not the *presence* of some topic.

Lest there be any doubt as to the necessity of speech-protective lines, *WRTL II* reiterated that "the benefit of any doubt [goes] to protecting rather than stifling speech," *id.* at 2667 (*citing New York Times v. Sullivan*, 376 U.S. 254, 269-70 (1964)), "in a debatable case, the tie is resolved in

favor of protecting speech," *id.* at 2669 n.7, and "the benefit of the doubt [goes to] speech, not censorship." *Id.* at 2674. In other words, free speech about public issues, especially political ones, is so essential to our system of government that it is better to allow some theoretically-regulable speech to go unrestricted than to chill public debate. This approach is akin to criminal jurisprudence, which finds it better to let some guilty persons go free than to convict innocents, except that chilling free speech affects not only the lone speaker, but also her hearers and our very system of government. *WRTL II* reaffirmed the statement in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), that "'[t]he Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse.'" *Id.* at 2670 (*quoting Ashcroft*, 535 U.S. 234 at 255). To do otherwise would "'turn[] the First Amendment upside down.'" *Id.* (citation omitted).

Two post-*WRTL II* cases further develop the scope of protection for ordinary political speech in the context of electioneering communications—showing applications of the *WRTL II* appeal-to-vote test and the underlying unambiguously-campaign-related requirement. In both of these cases, the FEC and the intervenors (BCRA prime sponsors Sen. McCain et al.) agreed to a stipulated judgment conceding that the ads at issue were protected political speech under *WRTL II*'s test. *WRTL III* held the electioneering communication Prohibition unconstitutional as applied to WRTL's 2006 Child Custody Protection Act ("CCPA") advertisement. *Wisconsin Right to Life v. FEC*, No. 04-1260, slip op. at 1 (D.D.C. July 23, 2007) ("*WRTL III*").[16] The CCPA ad stated the

---

[16]The ad stated:

> Listen up, parents. Wisconsin requires parental consent before your minor daughter can have an abortion. But, she can be taken to Illinois for an abortion that is kept secret from you. Imagine, your daughter can be taken across state lines for a major surgical procedure without your knowledge or consent. The U.S. Senate recently passed a bill to protect parents from secret abortions. Fortunately, Senator Kohl voted for the rights of parents. But, sadly, Senator Feingold did not. Your help is urgently needed because some Senators are

positions of Senators Feingold and Kohl (the candidate), based on their prior votes, and character-

ized their positions. The other case involved an ad that the Christian Civic League of Maine

sought to run.[17] This ad stated the candidates' position on the issue and characterized that position.

The district court held the electioneering prohibition unconstitutional as applied to the ad.

*Christian Civic League of Maine v. FEC*, No. 06-614, slip op. at 1-2 (D.D.C. Aug. 21, 2007)

("*CCLM*"). Consequently, there is now no question that ads stating a candidate's position and

criticizing or praising that position may be fully protected political speech.

    The unambiguously-campaign-related requirement is the unifying constitutional principle and

analysis of the governing precedents here—*Buckley*, *MCFL*, *McConnell*, and *WRTL II*. It has been

applied by the Supreme Court as a threshold test—regardless of the level of scrutiny[18]—to assure

that restrictions based on government-asserted interests in regulating elections under Article I, § 4

of the Constitution are closely and clearly related to that authority. *See*, *e.g.*, *Buckley*, 424 U.S. at

80-81. It has been applied to determine whether the Government has a sufficient interest. *See*

*WRTL II*, 127 S. Ct. at 2667 ("This Court has never recognized a compelling interest in regulating

---

holding up further action on the bill. Please call Senators Kohl and Feingold at 202-224-3121 and urge them to stop efforts by the Senate Democratic leadership to hold up a bill which will prevent secret abortions. That's 202-224-3121.

[17]The ad stated:

Our country stands at the crossroads—at the intersection of how marriage will be defined for future generations. Marriage between a man and a woman has been challenged across this country and could be declared unconstitutional at any time by rogue judges. We must safeguard the traditional definition of marriage by putting it beyond the reach of all judges—by writing it into the U.S. Constitution. Unfortunately, your senators voted against the Marriage Protection Amendment two years ago. Please call Sens. Snowe and Collins immediately and urge them to support the Marriage Protection Amendment when it comes to a vote in early June. Call the Capitol switchboard at 202-224-3121 and ask for your senators. Again, that's 202-224-3121. Thank you for making your voice heard.

[18]As noted, *supra* at 9, *Buckley* applied the unambiguously-campaign-related requirement to the definitions of contributions, expenditures, and political committees in both prohibition and *disclosure* contexts.

ads, like WRTL's, that are neither express advocacy nor its functional equivalent."), 2672 (corporate-form corruption interest does not "extend[] beyond campaign speech"), *see also McConnell*, 540 U.S. at 167, 170 (First Amendment activity must "benefit directly federal candidates" for corruption interest to exist under intermediate scrutiny). And any tailoring analysis as to the relation of a restriction to the governmental interest in regulating corruption relating to *elections* must logically establish that the restriction has a close and clear nexus to *elections*. *Cf. Buckley*, 424 U.S. at 80 ("too remote" statement may be viewed as either a threshold test or as a tailoring analysis).

The unambiguously-campaign-related requirement mandates that the Disclosure Requirements not be applied to ordinary "political speech," *WRTL II*, 127 at 2659, because such speech is not unambiguously campaign related. *WRTL II* requires that ordinary political speech—communications that are neither express advocacy nor its functional equivalent under the appeal-to-vote test—must be free from all electioneering communication "*regulation*," not just the electioneering communication *prohibition*.[19] From the way that *WRTL II* was decided, it is clear that the Court

---

[19]While it is true that only the Prohibition was at issue in *WRTL II*, the opinion consistently employed broader terminology consistent with the application of the unambiguously-campaign-related requirement that was occurring, repeatedly stating that ads that are not the functional equivalent of express advocacy under the appeal-to-vote test are to be free from both "restriction" and "regulation." *See WRTL II*, 127 S. Ct. at 2671 ("we reject the contention that issue advocacy may be **regulated** because express election advocacy may be"); *id.* ("A corporate ad expressing support for the local football team could not be **regulated** on the ground that such speech is less "core" than corporate speech about an election"); *id.* ("This Court has never recognized a compelling interest in **regulating** ads, like WRTL's, that are neither express advocacy nor its functional equivalent. The District Court below considered interests that might justify **regulating** WRTL's ads here, and found none sufficiently compelling. We reach the same conclusion"); *id.* at 2664 ("BCRA survives strict scrutiny to the extent it **regulates** express advocacy or its functional equivalent"); *id.* at 2672 ("Issue ads like WRTL's are by no means equivalent to contributions, and the *quid-pro-quo* corruption interest cannot justify **regulating** them"); *id.* ("such a prophylaxis-upon-prophylaxis approach to **regulating** expression is not consistent with strict scrutiny"); *id.* at 2673 ("the interest recognized in *Austin* as justifying **regulation** of corporate campaign speech and extended in *McConnell* to the functional equivalent of such speech has no application to issue advocacy of the sort engaged in by WRTL"); *id.* at 2672 ("to justify **regulation** of WRTL's ads, this interest must be stretched yet another step to ads that are

was deciding the case based on the nature of the communication (which has broad ramifications), not the nature of WRTL (which would apply only in the Prohibition context). The Court could have ruled for WRTL based on (1) the nature of WRTL, (2) the nature of the funds used, or (3) the nature of the ads. The Court chose to decide on the basis of the nature of the ads, although all three options were argued.[20] A decision based on the nature of WRTL or of its funds would necessarily have addressed the applicability of the corporate-form interest, i.e., whether there could be a *prohibition*.[21] *WRTL II*'s decision based on the nature of the ads addresses the proper *scope* of the electioneering communication, i.e., are these ads the functional equivalent of express advocacy, which is unambiguously campaign related? WRTL argued that its ads were not the functional equivalent of express advocacy. The Court agreed. Even when *WRTL II* addressed the corporate-form interest, it did so based on the nature of WRTL's ads, not the nature of WRTL: "We hold that the interest recognized in *Austin* [*v. Mich. State Chamber of Commerce*, 494 U.S. 652 (1990),] as justifying regulation of corporate campaign speech and extended in *McConnell* to

---

*not* the functional equivalent of express advocacy."); *id.* at 2659 ("We further conclude that the interests held to justify **restricting** corporate campaign speech or its functional equivalent do not justify **restricting** issue advocacy"); *id.* ("we have recognized that the interests held to justify the **regulation** of campaign speech and its "functional equivalent" might not apply to the **regulation** of issue advocacy") (citations and quotations omitted); *id.* at 2671 ("That a compelling interest justifies **restrictions** on express advocacy tells us little about whether a compelling interest justifies **restrictions** on issue advocacy").

[20]The nature of WRTL was argued in the *Brief of Family Research Council, Free Market Foundation, and Home School Legal Defense Association as Amici Curiae in Support of Appellee*, *WRTL II*, 540 U.S. 93, prepared by the Stanford Constitutional Law Center, which argued that all nonprofits should be exempted from the electioneering communication prohibition because the government had no corporate-form interest as applied to nonprofits. The nature of the funds that WRTL proposed to use for its ads, if necessary to obtain judicial relief, was raised in Count II of WRTL's complaint, which offered to use funds from a separate bank account containing only funds raised for the purpose from individuals, which option would have eliminated the corporate-form interest.

[21]Only corporations (and unions for parity) are *prohibited* from making electioneering communications, based on the corporate-form interest. *See McConnell*, 540 U.S. at 205.

**SJ Memo**                              19

the functional equivalent of such speech *has no application to issue advocacy* of the sort engaged in by WRTL." *WRTL II*, 127 S. Ct. at 2673 (emphasis added). So although *WRTL II* never formally construed the actual statutory *definition* of "electioneering communication" at 2 U.S.C. § 434(f)(3),[22] its analysis went to the permissible *scope* of "electioneering communication," employing the unambiguously-campaign-related requirement that *Buckley* employed in the expenditure disclosure context. Since the unambiguously-campaign-related requirement is not limited to the Prohibition context, and arose in the disclosure context, there is no reason to limit *WRTL II*'s appeal-to-vote construction of the scope of "electioneering communication" to the Prohibition context. So all statutes concerning "electioneering communications" should be limited to the permissible scope established by *WRTL II*, i.e, to communications that are the functional equivalent of express advocacy under *WRTL II*'s appeal-to-vote test. Ordinary political speech is not unambiguously campaign related and must be exempted from all regulation.

In *North Carolina Right to Life v. Leake*, ___ F.3d ___, No. 07-1438, 2008 WL 1903462 (4th Cir. May 1, 2008), a federal appellate court has recently applied the unambiguously-campaign-related requirement in a cogent, extended analysis that provides guidance for the present application of it. *Leake* dealt with both the express advocacy test and the major purpose test, as governing applications of the unambiguously-campaign-related requirement. *Leake* expressly anchored its analysis in *Buckley*'s requirement that "campaign finance laws may constitutionally regulate only those actions that are 'unambiguously related to the campaign of a particular . . . candidate.'" 2008

---

[22]*WRTL II* would not be expected to construe phrases of the "electioneering communication" definition *II* because *McConnell* decided that the "definition of 'electioneering communication' raises none of the vagueness concerns that drove our analysis in Buckley," 540 U.S. at 194, and upheld the provisions facially. *Id.* at 201-02, 207. There were no vague phrases such as "relative to" and "purpose of influencing" that *Buckley* construed to require express advocacy, as *McConnell* noted. *Id.* at 191 (citations omitted).

WL 1903462, at *5 (*quoting Buckley*, 424 U.S. at 80). The Fourth Circuit first applied this requirement to the question of "whether North Carolina's method for determining if a communication 'supports or opposes the nomination or election of one or more clearly identified candidates' unconstitutionally regulates issue advocacy." *Id.* at *3. The court noted that the Supreme Court has only recognized two categories of communications meeting the unambiguously-campaign-related requirement, namely, express advocacy and the functional equivalent of express advocacy as determined under *WRTL II*'s appeal-to-vote test. *Id.* at *5-7. Noting that the support/oppose test at issue fit neither category, the court held it unconstitutional for "stray[ing] too far from the regulation of elections into the regulation of ordinary political speech," which is "democracy's lifeblood." *Id.* at *8. The court wrote that only the Supreme Court's two carefully defined categories (express advocacy and its functional equivalent) "struck [the proper] balance" and "ensured that potential speakers would have clear notice as to what communications could be regulated, ensuring that political expression would not be chilled." *Id.* Deciding that the support/oppose test was not amenable to the saving "express advocacy" construction, *id.* at *8-9, the Fourth Circuit held that the support/oppose provision "'unquestionably chill[s] a substantial amount of political speech' and declar[ed] the statute unconstitutionally overbroad and vague" on its face. *Id.* at *9 (*quoting WRTL II*, 127 S. Ct. at 2666).

*Leake* next considered North Carolina's PAC definition, which in relevant part imposed PAC burdens on groups making or receiving "'contributions'" or making "'expenditures'" and having "'a major purpose to support or oppose the nomination or election of one or more clearly identified candidates.'" *Id.* at *10 (citation omitted). The Fourth Circuit's "analysis . . . beg[an] at precisely the same point," i.e., *Buckley*'s unambiguously-campaign-related requirement, *id.* at *11, which it held requires that the test for PAC status be "*the* major purpose," not "*a* major purpose,"

of the organization. *Id.* This test "is best understood as an empirical judgment as to whether an organization primarily engages in regulable, election-related speech," which "ensure[s] that the burdens facing a political committee largely f[a]ll on election-related speech, rather than on protected political speech." *Id.* The *Leake* decision also contains a helpful discussion of the constitutional first-principles underlying the unambiguously-campaign-related requirement.

In addition to the unambiguously-campaign-related requirement, strict scrutiny governs the constitutional analysis in the present case. *Buckley* required "exacting scrutiny" of disclosure provisions, 424 U.S. at 64, which it referred to as the "strict test," *id.* at 66, and by which it meant "strict scrutiny." *See WRTL II*, 127 S. Ct. at 2669 n.7 (*Buckley*'s use of "exacting scrutiny," 424 U.S. at 44, was "strict scrutiny."); *see also McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) (disclaimer case) ("When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest. See, *e.g.*, [*First National Bank of Boston v.* ]*Bellotti,* 435 U.S. [765], 786 [(1978)]."); *Bellotti*, 435 U.S. at 786, 795 ("exacting scrutiny" is strict scrutiny).[23]

In sum, this case is governed by the *Buckley-WRTL II* analysis, which requires that campaign finance laws reach only communications that are unambiguously campaign related. In the electioneering communication context, this requirement is only met by communications that both fit the statutory definition and are the functional equivalent of express advocacy under *WRTL II*'s appeal-to-vote test. The burden is on the government to justify the Disclosure Requirements by proving both that Congress has a compelling interest in regulating speech that is not unambiguously campaign related and that the Disclosure Requirements are narrowly tailored to such an

---

[23]*McConnell*'s use of " important state interests" in its facial analysis of the Disclosure Provisions, 540 U.S. at 196, is not to the contrary because it was simply using a synonym for what were necessarily "compelling state interests" since *Buckley* employed strict scrutiny.

interest—all as applied to the communications at issue here. And the FEC has the burden of proving that *Hillary* is unambiguously campaign related under *WRTL II*'s appeal-to-vote test so that it may be prohibited.

## II. *McConnell* Did Not Preclude As-Applied Challenges.

In its memorandum denying preliminary injunction, this Court said that *McConnell* precluded as-applied challenges to the Disclosure Requirements, i.e., while *McConnell* "left open the issue that was presented in *WRTL*, reserving it for decision on an as-applied basis," the Disclosure Requirements were "sustained" as to "the 'entire range of electioneering communications.' Citizens's advertisements obviously are within that range." Doc. 38 at 11 (citation omitted).

The Supreme Court unanimously rejected just such an argument in *WRTL I*, 546 U.S. 410. In that case, the FEC had also urged that certain language in *McConnell* precluded all as-applied challenges to the electioneering communication Prohibition. The Court, within a week of oral argument, reversed:

> We agree with WRTL that the District Court misinterpreted the relevance of our "uphold[ing] all applications of the primary definition" of electioneering communications. [540 U.S.] at 190, n. 73. Contrary to the understanding of the District Court, that footnote merely notes that because we found BCRA's primary definition of "electioneering communication" facially valid when used with regard to BCRA's disclosure and funding requirements, it was unnecessary to consider the constitutionality of the backup definition Congress provided. *Ibid.* In upholding § 203 against a facial challenge, we did not purport to resolve future as-applied challenges. [546 U.S. at 411-12.]

The Court did so in the face of (a) the FEC's argument that the logic of the electioneering communications prohibition precluded exceptions and (b) broadly-worded facial-analysis language in *McConnell* to the effect that the Court had "uph[eld] stringent restrictions on *all* election-time advertising that refers to a candidate because such advertising will *often* convey [a] message of support or opposition." 540 U.S. at 239 (emphasis in original). Such broad language

about "*all*" electioneering communications being subject to prohibition because *some* were unambiguously campaign related did not mean that the Court would not protect ordinary political speech, or issue advocacy, in an as-applied challenges.

*WRTL I* may, in fact, be viewed in the context of the Roberts Court's encouragement of as-applied challenges. *See*, *e.g.*, *Gonzales v. Carhart*, 127 S. Ct. 1610 (2007) (upholding federal partial-birth abortion ban; "In these circumstances the proper means to consider exceptions is by as-applied challenge."); *Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184 (2008) (upholding Washington's open primary system against facial challenge but leaving open "as applied challenge[s]"); *Crawford v. Marion County Election Board*, 128 S. Ct. 1610 (2008) (insufficient evidence to sustain facial challenge to Indiana's voter identification law). The Supreme Court has, of course, allowed greater flexibility in bringing facial challenges, such as *McConnell*, in the First Amendment context, but this special solicitude for First Amendment cases heightens the ability to bring as-applied challenges rather than reducing the possibility.

*WRTL II* reiterated the Court's rejection of the notion that "*McConnell* left 'no room' for as applied challenges," 127 S. Ct. at 2659 (citation omitted), and protected issue advocacy by applying the appeal-to-vote test to implement the unambiguously-campaign-related requirement as applied to the electioneering communication Prohibition. *Id.* at 2667. Therefore, any broadly-worded facial-analysis language in *McConnell*'s discussion of the Disclosure Requirements means neither that the present as-applied claim is precluded nor that it has already been decided by the logic of *McConnell*. Moreover, *McConnell* itself warned against an overbroad reading of the language of a particular case: "We have long rigidly adhered to the tenet never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied for the nature of judicial review constrains us to consider the case that is actually before us," 540 U.S.

at 192 (citation and quotation indicators omitted).

*McConnell* did not "purport to resolve future as-applied challenges" with regard to the present challenge, which is based on the proper scope of the same "electioneering communication" definition in the disclosure context. *McConnell*'s facial upholding of the Disclosure Requirements as to the "entire range of electioneering communications" does not rightly include those held not to be the functional equivalent of express advocacy under *WRTL II*'s appeal-to-vote test. *WRTL II*, 127 S. Ct. at 2667. *McConnell*'s analysis of the Disclosure Requirements did not even address the distinction between ads that are the functional equivalent of express advocacy and "political speech" or "issue advocacy," let alone decide whether Congress could require disclosure as to communications that are not truly electioneering. But from the discussion in Part I, it is clear that, after *WRTL II*'s narrowing of the scope of regulable "electioneering communications," *McConnell*'s upholding of the Disclosure Requirements for electioneering communications should now apply only to ads that are truly the functional equivalent of express advocacy under *WRTL II*'s appeal-to-vote test. Finally, it is doubtful that Congress ever intended that disclosure be required beyond whatever scope the Supreme Court might impose on "electioneering communication" to save it from overbreadth.

### III. Disclosure Imposes Substantial Burdens.

As noted in the Introduction, this Court said that Citizens had not provided evidence that there would be "reprisals," so that it was not within the class of socially disfavored groups that are free from *any* disclosure as to contributors. Doc. 38 at 12. As the FEC was urging this interpretation of what Citizens was asserting, it is not surprising that the Court might think that this was Citizens' argument, but it is not. Citizens only challenges here disclosure as to communications that are not unambiguously campaign related, not as to those that are. Citizens believes that it and

its donors must be free of any burden for choosing to associate for the purpose of amplified, collective speech that is not unambiguously campaign related under *WRTL II*'s appeal-to-vote test.

Citizens asserts that disclosure imposes its own unique burdens that are real and recognized in precedent as always essential to the constitutional analysis of any disclosure provision. Among these are fear of reprisal and a reduction in donors and donations. So no court should apply cursory review because only "mere" disclosure is at issue. In fact, *Buckley* rejected any notion that "mere" disclosure imposes no substantial First Amendment burden by subjecting the expenditure disclosure provision at issue in that case to strict scrutiny. *See supra* at 22.

And *Buckley* plainly recognized the inherent burdens of compelled disclosure on freedom of speech and association: "We have long recognized that *significant encroachments* on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest." *Buckley*, 424 U.S. at 64 (emphasis added). "The Court's decisions involving associational freedoms establish that the right of association is a 'basic constitutional freedom' (citation omitted) that is 'closely allied to freedom of speech and a right which, like free speech lies at the foundation of a free society.'" *Id.* at 25. *Buckley* recognized this concern as inherent in compelled disclosure (whether or not it rises to the level of harassment proven by certain historically unpopular groups to wholly exempt them from disclosure) because "compelled disclosure, *in itself*, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Id.* at 64 (emphasis added). *Buckley* recognized an inherent risk of a "deterrent effect," *id.* at 65, and the fact that disclosure is inherently an "invasion of privacy." *Id.* at 66. And *Buckley* concluded its strict scrutiny of the disclosure provisions at issue by expressly repeating these inherent burdens and stating that they must be considered in the constitutional analysis when considering disclosure:

It is undoubtedly true that public disclosure of contributions to candidates and political parties *will deter* some individuals who otherwise might contribute. In some instances, disclosure may even expose contributors to harassment or retaliation. These are not insignificant burdens on individual rights, and they must be weighed carefully against the interests which Congress has sought to promote by this legislation. [*Id.* at 68 (emphasis added).]

And Chief Justice Burger responded to this statement of the majority with examples:

Examples come readily to mind. Rank-and-file union members or rising junior executives may now think twice before making even modest contributions to a candidate who is disfavored by the union or management hierarchy. Similarly, potential contributors may well decline to take the obvious risks entailed in making a reportable contribution to the opponent of a well-entrenched incumbent. This fact of political life did not go unnoticed by the Congress:
"The disclosure provisions really have in fact made it difficult for challengers to challenge incumbents." 120 Cong. Rec. 34392 (1974) (remarks of Sen. Long). [*Buckley*, 424 U.S. at 237 (Burger, C.J., concurring in part and dissenting in part).]

In *McIntyre*, 514 U.S. 334, the Supreme Court again recognized the reality of disclosure burdens: "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *Id.* at 342-43. "On occasion, quite apart from any threat of persecution, an advocate may believe her ideas will be more persuasive if her readers are unaware of her identity." *Id.* at 343.

In 2003, the D.C. Circuit accepted affidavits from labor organizations stating "that releasing the names of hundreds of volunteers, members, and employees will make it more difficult for the organization to recruit future personnel" against the FEC assertion that this was "specula-tive," *AFL-CIO v. FEC*, 333 F.3d 168, 176 (D.C. Cir. 2003), applied strict scrutiny, *id.*, and stopped release of this (and other) information by striking down an FEC rule requiring public release of all investigation materials upon conclusion of an investigation. *Id.* at 179.

So Citizens does not have to prove disclosure burdens because they are already recognized

as a matter of law in binding precedent. However, Citizens has provided an illustration of the disclosure costs already recognized and affirmed its reasonable belief that it will be subject to similar loss of donors and donations and that retaliation is a concern—in addition to the inherent "invasion of privacy." In the *Amended Verified Complaint*, Citizens illustrated the concern that donors may be subject to various forms of retaliation by political opponents with a news account particularly relating to President and Senator Clinton. Doc. 22 at ¶ 23 (SUMF ¶ 35). Citizens' President also verified that the Disclosure Requirements "will, in Citizens United's belief based on long experience, substantially reduce the number of donors and amount of donations to Citizens United because many potential donors do not wish to be publicly so identified for a variety of legitimate reasons." *Id.* at ¶ 27 (SUMF ¶ 39).

Evidence of such burdens was put in the *McConnell* record by the National Rifle Association, the Associated Builders and Contractors, the Associated General Contractors of America, the U.S. Chamber, and the ACLU. *McConnell v. FEC*, 251 F. Supp. 2d 176, 227-29 (D.D.C. 2003) (per curiam). The evidence ranged from large numbers of contributions at just below the disclosure trigger amount, to vandalism after disclosure, to non-contribution because of concerns about a group's ability to retain confidentiality, to concerns about employers, neighbors, other business entities, and others knowing of support for causes that are not popular everywhere and the results of such disclosure. *Id.*

A 2003 law review article provides many helpful insights into the privacy costs of disclosure, including autonomy and dignity costs and a chilling effect. William McGeveran, *Mrs. McIntyre's Checkbook: Privacy Costs of Political Contribution Disclosure*, 6 U. Pa. J. Const. L. 1 (2003). The author noted the popularity of disclosure provisions "despite two countervailing trends." *Id.* at 2. "First, is the rising concern in nearly every other area of the law about informa-

tion privacy." *Id.* Second, are "recent Supreme Court decisions about anonymous political

activity." *Id.* at 3 (*citing*, inter alia, *McIntyre*, 514 U.S. 334). The article concluded that

"excessive disclosure is an unwise policy," *id.* at 7, noting that everything has changed with the

glut of readily-searchable, digitized information:

> Because of combined cultural and technological forces, we now live in an age when
> everyone from prospective employers to prospective dates conducts do-it-yourself back-
> ground checks with Internet search engines. Dramatically increased computerization has
> created digitized archives of personal data that are larger, more publicly accessible, and
> more easily searched and analyzed than ever before. In the last five years, campaign
> contribution disclosure suddenly joined the trend of online compilation and availability.
> this change in technology qualitatively transformed the nature of disclosure laws. No
> longer can a contributor assume that disclosed information is unlikely to be seen by
> anyone. The law remains the same, but its effect is entirely different. [*Id.* at 11-12.]

The same article identified "two intertwined privacy costs" of disclosure. *Id.* at 16. "The

concrete costs occur when disclosure leads to specific negative results for the contributor." *Id.*

"Individuals also have a direct but abstract interest in shaping their identity in the world, rooted

in rights of dignity and autonomy." *Id.* Among the concrete costs, the author notes that disclo-

sure could "bear negative consequences on many professions. Those who rely on trust and

identification with others to do their work—such as ministers, psychotherapists, or school-

teachers—may find their roles undermined if congregants, patients, or parents know and judge

their personal political activity." *Id.* Journalists, judges, and gays in the military are others who

are mentioned in the article as persons for whom "professional penalties [resulting from

disclosure] are a significant deterrent against contributing for persons with few other options for

political expression." *Id.* at 17-18. "The conversion of political information to unwanted

commercial purposes" is another problem detailed. *Id.* at 18. The author cites Charles Fried for

the argument "that the formation of relationships, an essential aspect of autonomy, requires that

an individual control the selective revelation of personal information to others." *Id.* at 19

**SJ Memo**                                                    29

(citation omitted). And the article notes that "the fragmentary information derived from disclosure reports could be quite misleading," citing examples of giving to a conservative religious group to support one, but not all, of its agenda items or giving "to a liberal Democrat because your brother went to school with him." *Id.* (citation omitted).

The same 2003 article notes that "[t]here is very little empirical evidence to determine how often or how much the prospect of disclosure discourages would-be campaign contributors," but goes on to note that "the Supreme Court's anonymity cases require virtually no empirical showing." *Id.* at 21 (citations omitted). And the author notes that the chilling would fall disproportionately on "unpopular or unconventional" causes, *id.* at 22, and that "[r]obust public debate costs money," *id.* at 23, so that such causes would be shut out of the debate.

In a 2007 article, Bradley Smith, former FEC Chairman, argued for raising the level at which contributor disclosure is required, because of the "invasion of privacy," the risk of "retaliations by vengeful politicians," and because "mandatory disclosure at low levels may actually decrease whatever utility disclosure generally has." Bradley A. Smith, *A Moderate, Modern Campaign Reform Agenda*, 12 NEXUS 3 (2007).

Also in 2007, the Institute for Justice commissioned a public opinion survey that fills the empirical evidence gap noted above and provides valuable illustrations of the burdens of disclosure in the context of ballot initiatives. *See* Dick M. Carpenter II, *Disclosure Costs: Unintended Consequences of Campaign Finance Reform* (2007) (available at http://www.ij.org/ publications/other/disclosurecosts.html). A central finding was that disclosure is popular "for thee, but not for me." *Id.* at 7. Fifty-six percent of respondents objected to having their name and address posted on the Internet as a contributor, and seventy-one percent objected to having their employer's name listed. *Id.* Sixty percent said they would think twice about contributing if their

name and address would be disclosed, and forty-nine percent said the same if their employer were reported. *Id.* Numerous individual comments are included in the report, such as "I would never want my employer to know who I give money to" and "Because that would jeopardize my job." *Id.* at 9.

Brian Dougherty has written two articles on disclosure costs that were published online at www.reason.com. In the first he wrote of the unintended consequences of California's post-Watergate Political Reform Act, which mandated severe disclosure burdens. Brian Dougherty, *Disclosure Flaw*, reasononline, Mar. 1996 (available at http://www.reason.com/news/printer/ 29856.html). "Twenty years later," he wrote, "the same law is being used to strike at private citizens who attempted to discipline a powerful politician they considered arrogant and corrupt." *Id.* at 1. According to the article, California had just imposed an $808,000 fine (the largest ever) on Russell Howard and Steve Cicero (president and treasurer) of Californians Against Corruption, a small grassroots organization that only spent $103,091 in an unsuccessful effort to, inter alia, oust by recall a powerful state senator whom they considered to be corrupt. In the flurry of activity and with few resources, CAC had trouble keeping up with the reporting of the name, address, occupation, and employer of anyone contributing over $100. The information was always requested, but contributors did not always follow up with the needed information. California's Fair Political Practices Commission levied the maximum $2,000 per violation for each failure to provide a piece of the required information, even though the total was about eight times the total amount spent and most of the contributors' addresses were provided on copies of the checks given to the FPPC. The FPPC seemed unfazed by the fact that the second and third largest fines before ($772,000 and $447,500) involved money laundering, not a nonpartisan recall campaign. These two citizens lacked the funds to even come close to paying the outra-

geous fine, and one of them was quoted as saying that the "prerequisites for the exercise of First Amendment rights [were] extremely complicated" and burdensome.

In another article, Dougherty returned to the same subject after the passage of BCRA, recounting the CAC's travails. Brian Dougherty, *How campaign finance law hurts participation in politics*, reasononline, Apr. 2001 (available at http://www.reason.com/news/printer/ 32341.html). He added the information that "[t]he FPPC explicitly stated as an aggravating factor that Howard told a newspaper reporter that 'the little guy can't participate [in politics] without running afoul of technical violations.'" *Id.* at 2. Dougherty put these disclosure costs in perspective: "Anyone who believe there is too much political influence by wealthy interests and not enough by citizens should think about the fate of Howard and Cicero and ask themselves: Can there be anything good about laws that take away everything a citizen has merely because he didn't file paperwork on time with the government?" *Id.* at 3. The author added that "Howard and Cicero thought that in America if you wanted to get involved in politics, you were free to get involved. They didn't realize that you would have to satisfy a complicated and picayune set of government paperwork requirements at risk of your entire future to do so." *Id.*

So there is no "mere" disclosure. The costs are real and recognized and must be considered in the strict scrutiny of the Disclosure Requirements. While some reasonable level of disclosure, with reasonable enforcement penalties, may be constitutionally permissible as to First Amendment activity that is unambiguously campaign related, there is no constitutional warrant to impose these real burdens on citizens engaging in communications that are clearly not unambiguously campaign related under *WRTL II*'s appeal-to-vote test. Citizens must be free to participate robustly, without limit, and without a second thought in ordinary political speech.

**IV. The Disclosure Requirements and Prohibition Are Unconstitutional as Applied.**

For the reasons stated below, neither Citizens' Ads nor *Hillary: The Movie* are unambiguously campaign related under *WRTL II*'s appeal-to-vote test. So they are ordinary political speech that may not be regulated or restricted.

**A. The Ads Are Not Unambiguously Campaign Related.**

As noted above, *supra* at 4, the FEC has already acknowledged that none of the Ads contains an appeal to vote under *WRTL II*'s test. Necessarily then, they are not unambiguously campaign related. So Congress lacks authority to regulate them by imposing the Disclosure Requirements. The Disclosure Requirements "do[] not advance a legitimate governmental interest significant enough to justify [their] infringement of First Amendment rights." *CARC*, 454 U.S. at 298. The Disclosure Requirements are unconstitutional as applied to these Ads and any communications that meet the statutory electioneering communication definition but are "susceptible of [a] reasonable interpretation other than as an appeal to vote for or against a specific candidate." *WRTL II*, 127 S. Ct. at 2667.[24]

**B. *Hillary* Is Not Unambiguously Campaign Related.**

As set out in briefing opposing *[FEC]'s Motion to Dismiss Counts 3 & 4 of the Amended Complaint* (Doc. 43), Citizens documentary movie is also not unambiguously campaign related. Therefore it may neither be prohibited (Count 3) nor subjected to the Disclosure Requirements (Count 2). Both the Prohibition and Disclosure Requirements are unconstitutional as applied to the documentary because:

---

[24]While it is not necessary to decide the present case, the court should note that in the context of commercial transactions there are particular problems with reporting donors because both sales and investments may generate income to the sponsoring corporation that would be reportable as contributions, although those buying products or making investments have no connection whatever to elections.

- *Hillary: The Movie* contains no *words* constituting an "*appeal to vote* for or against a specific candidate," as required by *WRTL II*, 127 S. Ct. at 2667 (emphasis added);

- *Hillary* "may reasonably be interpreted as *something other* than as an appeal to vote for or against a specific candidate," *id.* at 2670 (emphasis added), i.e., it is a full-length documentary *movie* (shown in theaters and sold on DVD) that is the functional equivalent of a book, not of the "*ads*" that were the target of BCRA and constituted the evidence considered in *McConnell*, 251 F. Supp. 2d 176, and *McConnell*, 540 U.S. 93;

- the challenged provisions are unconstitutional as applied to a full-length movie that is the functional equivalent of a book, not an "ad."

In their argument for dismissing Count 3, FEC counsel argued that this Court "noted" that *Hillary* "is the functional equivalent of express advocacy," Doc. 43 at 6 (citation omitted), although, of course, that was for preliminary injunction purposes. The FEC acknowledges that *WRTL II*'s appeal-to-vote test, 127 S. Ct. at 2667, governs whether *Hillary* may be prohibited as an electioneering communication, Doc. 43 at 6, 10, but proceeded to misinterpret and misapply *WRTL II*'s test by missing the following points.

First, the *WRTL II* test specifically required that there be an unambiguous "*appeal to vote*": "[A] court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an *appeal to vote* for or against a specific candidate." 127 S. Ct. at 2667 (emphasis added). *See also id.* at 2670 ("Because WRTL's ads may reasonably be interpreted as something other than as an *appeal to vote* for or against a specific candidate, we hold they are not the functional equivalent of express advocacy." (emphasis added)). *See infra* at 37-38 (nature of "appeal to vote").

Second, *WRTL II* expressly required that the search for this unambiguous "appeal to vote"

must focus on the *language of the communication* itself, i.e., the test "must be objective, focusing on the *substance of the communication* rather than amorphous considerations of intent and effect." *Id.* at 2666 (emphasis added). This focus on the actual words of the communication is also required by *WRTL II*'s rejection of reliance on "contextual factors." *Id.* at 2669.

Third, *WRTL II* repeatedly required that where there is *any doubt* as to whether the necessary unambiguous "appeal to vote" is present in the words of the communication then there is *not* an "appeal to vote" because all doubts and debatable words are to be resolved in favor of the speaker. *See id.* at 2667, 2669 & n.7, 2674.

Fourth, *WRTL II* demanded both that there be unambiguous words containing an "appeal to vote" and that all doubts be resolved in favor of unrestricted speech precisely because of the *dissolving-distinction problem* that the Court had earlier identified, in *Buckley*, 424 U.S. 1. *See supra* at 10, 14. *WRTL II* mentioned this dissolving-distinction problem *twice*, emphasizing its vital importance to the Court's First Amendment jurisprudence in this area. 127 S. Ct. at 2659, 2669. The dissolving distinction that required a bright, speech-protective line was the distinction between (1) "discussion of issues and candidates," which is present in *Hillary*, and (2) "advocacy of election or defeat of candidates," which is absent from *Hillary. Buckley*, 424 U.S. at 42. The Court elaborated further on the necessity of a bright line—between (1) "discussion, laudation, [and] general advocacy" (present in *Hillary*) and (2) and "solicitation" (absent from *Hillary*)—to protect issue advocacy, *id.* at 43, or what *WRTL II* called "political speech."

*WRTL II* expressly held that this dissolving-distinction problem may not be used to quash the very intermingled discussion of issues and candidates that is at issue herein: "Discussion of issues cannot be suppressed simply because the issues may also be pertinent in an election." 127 S. Ct. at 2669. And it elaborated the point that the dissolving-distinction is a reason to protect,

not restrict, free speech: "'The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse.'" *Id.* at 2670 (citation omitted).

*WRTL II*'s test, then, requires examination of the words of the communication itself to see if they make an unambiguous "*appeal to vote* for or against a specific candidate." This inquiry must be made without resort to external context or any effort to discern intent and effect. The inquiry must be made subject to the governing principle that the intermingled "*discussion of issues and candidates*" is constitutionally protected, as is "*discussion, laudation,* [and] *general advocacy.*" *See supra.* The *WRTL II test* does not include any elements of the *application* of that test to grassroots lobbying that *WRTL II* did after establishing the actual test. *See* 127 S. Ct. at 2667. This is not a grassroots lobbying case, so it is unsurprising that there is no such single, central issue throughout the documentary as would be expected with grassroots lobbying. But, the documentary does contain the type of political speech that intermingles "*discussion of issues and candidates*," *see supra*, which is equally protected by the *WRTL II* test.

So the issue that must be decided is whether there are actual words in *Hillary* that contain *WRTL II*'s required unambiguous "appeal to vote," also known as "advocacy of election or defeat of candidates" or "solicitation," which may not be confused with protected "discussion of issues and candidates" or "discussion, laudation, [and] general advocacy." *See supra.* The requirement that there be actual words advocating a vote is not a conflation of the appeal-to-vote test with the express-advocacy test by requiring magic words. While it is clear in the wake of *McConnell* and *WRTL II* that the express advocacy test requires "magic words" (e.g., "vote for"), *see McConnell*, 540 U.S. at 126; *WRTL II*, 127 S. Ct. at 2669 n.7), *McConnell* and *WRTL II* approved a highly-limited extension of congressional ability to regulate communications

beyond magic words. Central to this new class of "electioneering communications" is the requirement that they contain an "appeal to vote." *WRTL II*, 127 S. Ct. at 2667. It must not be assumed that this choice of words happened haphazardly. Rather, *WRTL II*'s language was carefully chosen to go beyond "vote for" but not beyond words clearly advocating a vote.

It is instructive to compare and contrast the appeal-to-vote test with the Ninth Circuit's attempt, in *FEC v. Furgatch*, 807 F.2d 857 (9th Cir. 1987), to frame an express-advocacy test that went beyond the magic words. Of course, as noted above, *McConnell* and *WRTL II* made it clear that express advocacy requires the magic words, so no other express-advocacy test is now permissible and *Furgatch* is a dead letter. But *Furgatch* illuminates the outer limit of an effort to permit government regulation beyond magic words, a limit that *WRTL II* clearly drew back from at points and did not in any way go beyond. *Furgatch* dealt with a newspaper ad that concluded with these words concerning President and candidate Jimmy Carter: "It is an attempt to hide his own record, or lack of it. If he succeeds the country will be burdened with four more years of incoherencies, ineptness and illusion, as he leaves a legacy of low-level campaigning. DON'T LET HIM DO IT." *Id.* at 858. The Ninth Circuit adopted the following express-advocacy test:

> We conclude that speech need not include any of the words listed in *Buckley* to be express advocacy . . . , but it must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an *exhortation to vote* for or against a specific candidate. This standard can be broken into three main components. First, even if it is not presented in the clearest, most explicit language, speech is "express" for present purposes if its message is unmistakable and *unambiguous*, suggestive of only one plausible meaning. Second, speech may only be termed "advocacy" if it presents a *clear plea for action*, and thus speech that is merely informative is not covered by the Act. Finally, it must be clear what action is advocated. Speech cannot be "express advocacy of the election or defeat of a clearly identified candidate" when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action. [*Id.* at 863-64 (emphasis added.]

In its appeal-to-vote test, *WRTL II* rejected any reliance on "external events," requiring that

the objective words of the communication itself must be the focus. 127 S. Ct. at 2666. Of course, an electioneering communication by definition is broadcast near an election, identifies a candidate, and targets the candidate's constituents, so there is a built-in relevant context. Like *WRTL II*, *Furgatch* mandated that the message must be "unambiguous" and that all doubts are resolved in favor of the speaker. And just as *WRTL II* requires an unambiguous "appeal to vote," *Furgatch* mandated "an exhortation to vote," which must be a "clear plea for action" that "encourages a vote."[25] In *Furgatch*, the Ninth Circuit decided that "Don't let him do it!" was such a clear plea for action that constituted an unambiguous exhortation to vote without saying "vote against." *WRTL II* was not endorsing a test going beyond the controversial *Furgatch* decision, so the "appeal to vote" language of the *WRTL II* test must be taken at least as seriously as the Ninth Circuit took its "exhortation to vote" or "clear plea for action" requirement.

In arguing for dismissal of Count 3, FEC counsel set out a laundry list of quotations from *Hillary*, Doc. 43 at 6-9, that they believe all *add up* to the conclusion that *Hillary* is "susceptible of no reasonable interpretation other than as an appeal to vote against her." *Id.* at 10. But they pointed to no quotation that actually *has* words containing an unambiguous "appeal to vote." There is no "exhortation to vote," nor a "clear plea for action" that "encourages a vote," nor even a "Don't let her do it!" None of the FEC's cited quotations contains the requisite "appeal to vote." The test is not whether a series of statements that contain no "appeal to vote" is perceived

---

[25]Even before *McConnell* and *WRTL II* effectively overruled *Furgatch*, the Ninth Circuit made clear that some express words of advocacy were required under the *Furgatch* express advocacy test: "a close reading of *Furgatch* indicates that we presumed express advocacy must contain some explicit *words* of advocacy. *See id.* at 864 (noting that 'context cannot supply a meaning that is incompatible with, or simply unrelated to, the clear import of the words'). 'Context,' we emphasized, 'remains a consideration, but an ancillary one, peripheral to the words themselves.' *Id.* at 863." *California Pro-Life Council v. Getman*, 328 F.3d 1088, 1098 (9th Cir. 2003) (emphasis in original).

by FEC counsel to add up to "an appeal to vote"—based apparently on forbidden consider-
ations—but whether there are words that contain an unambiguous "appeal to vote." Under the
proper test, a series of statements that contain no "appeal to vote" may not be added to achieve a
cumulative result they individually lack. A series of zeroes totals nothing.

*Hillary* also "may reasonably be interpreted as *something other* than as an appeal to vote,"
*WRTL II*, 127 S. Ct. at 2670 (emphasis added). A reasonable interpretation is that it is a full-
length, documentary movie about Senator Clinton, and such a movie enjoys all the protection
historically afforded to any book about a public figure. *Hillary* is the functional equivalent of a
book, not of the 30- or 60-second ads that were the target of Congress in BCRA and at issue in
*McConnell*. The fact that it is in the medium of a documentary film that can be viewed in a
theater, brought home on a DVD, or watched on television does not vitiate the historical protec-
tion afforded to books and their modern equivalents. If the difference in medium matters when it
comes to First Amendment protection for the functional equivalent of a book, then the govern-
ment could freely engage in high-tech "book burnings" without restriction.

Examination of the *McConnell* record indicates that full-length documentary films were
nowhere in the sights of the campaign finance reform lobby or Congress in promoting and
passing BCRA, nor were they in the consideration of the district court or the Supreme Court in
*McConnell*. *McConnell* specifically identified the focus of BCRA as being "advertisements,"
"ads," and "commercials" *see McConnell*, 540 U.S. at 126-28, and the opinion nowhere
mentioned a book or a movie as the focus of the case. *McConnell* specifically identified the sort
of communication that it perceived to be the problem that BCRA addressed, i.e., the Bill
Yellowtail "ad," which was a brief commercial. *Id.* at 193 n.78.

In the *McConnell* three-judge district court, the court's per curiam memorandum opinion

plainly identified "ads" as being the communications at issue in that facial challenge, actually equating "electioneering communication" and "so-called 'issue *ads*'": "Section 201 of BCRA sets forth a primary, and a 'backup' definition, of an 'electioneering communication' (*i.e.*, so-called 'issue *ads*')." *McConnell*, 251 F. Supp. 2d at 184 (emphasis added). In its finding of fact regarding BCRA's disclosure provisions (including findings concerning the FEC's expert testimony), the court consistently spoke of "ads" and "advertisements," never movies. *See id.* at 229-33. Similarly, the three separate opinions are replete with references to "ads" and "advertisements," but not movies. Judge Leon specifically identified sham issue ads as the BCRA target: "In an attempt to prevent actual and apparent corruption arising from the funding of such sham issue *advertisements*, Congress enacted a sweeping set of reforms . . . ." *Id.* at 757 (op. of Leon, J.) (emphasis added). And he cited the studies on which the government relied to defend the electioneering communications prohibition, which studies only examined *advertisements* (both "genuine" and "sham"). *Id.* at 796-97. Judge Henderson's factual findings specifically pointed to a 30-minute NRA "infomercial" and two 30-minute "news magazine[s]" that would have been captured by the "electioneering communication" definition, but which the studies on which the government relied failed to include, and which she said would have altered the percentage of genuine issue ads captured (for she considered them genuine issue advocacy) as compared to sham issue ads captured (for substantial overbreadth analysis). *Id.* at 305-06, 316-17 (op. of Henderson, J.). Judge Kollar-Kotelly's opinion likewise confirmed that the studies offered to justify BCRA's electioneering communications restrictions were based on "advertisements." *See*, *e.g.*, *id.* at 719-24 (op. of Kollar-Kotelly, J.).

A full-length documentary movie shown in theaters, sold on DVD, with a compendium book on which Citizens has received an advance royalty on sales, SUMF ¶ 23, is not the same as

an "ad," or even an "infomercial" or a "news magazine" (which are generally not also shown in theaters and sold as movies on DVDs), even if the movie is broadcast. Given *McConnell*'s focus and record, there is no justification for treating a full-length documentary movie—especially one with neither express advocacy nor "an appeal to vote"—as in any way being "the functional equivalent of express advocacy." *WRTL II*, 127 S. Ct. at 2667. The problem that *McConnell* identified as being a compelling justification for the electioneering communication prohibition had to do with ads, not movies. 540 U.S. at 126-28. There was no record evidence that *movies* were a problem, so neither *McConnell* nor the studies (of ads) on which it relied provide any support for applying the Disclosure Requirements or Prohibition to a full-length movie.

The fact that this documentary is unflattering to Senator Clinton does not convert it into an unprotected "sham issue ad" any more than Michael Moore's criticisms of President George W. Bush in *Fahrenheit 9/11* make his movie a "sham issue ad." Movies were simply not at issue in *McConnell* and they may "reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate"—i.e., they are about the traditional First Amendment goals of communicating ideas and viewpoints, discussing public figures and issues, and (usually, it is hoped) making money by sales—so they "are not the functional equivalent of express advocacy, and therefore fall outside the scope of *McConnell*'s holding." *Id.* at 2670.

The fact that Citizens would pay a fee in connection with the broadcasting of *Hillary* does not change the fact that *Hillary* is the functional equivalent of a book, not an ad. *See* SUMF ¶ 41. As a matter of law, the presence or absence of a fee has nothing to do with whether a communication is or is not an "electioneering communication." Initially, the FEC promulgated a rule, former 11 C.F.R. § 100.29(b)(3)(i), that only communications broadcast "for a fee" were within the "electioneering communication" definition. This was overturned in *Shays v. FEC*,

337 F. Supp. 2d 28 (D.D.C. 2004), *aff'd* 414 F.3d (D.C. Cir. 2005), *reh'g en banc denied*, No. 04-5352 (D.C. Cir. Oct. 21, 2005), and the FEC issued a new rule indicating that the payment of a fee was irrelevant. *See* 70 Fed. Reg. 75713. And the historically-recognized constitutional protection afforded to books under freedoms of speech and press has also never turned on whether the book was published for a fee or whether an author was fortunate enough to get a publisher to foot the bill. In book publishing there are a variety of arrangements for publica-tion—from self-publishing, to sharing expense and risk with a publisher, to arrangements where a publisher pays all of the costs—and there is a wide range of agreements as to the payment of royalties. For constitutional purposes, self-published books have all of the First Amendment protection afforded books entirely funded by publishers. These same principles apply to *Hillary*, the functional equivalent of a book.

Ignoring *WRTL II*'s actual "appeal to vote" test, the clear distinction between "ads" and movies, the broad scope that *WRTL II* established for issue advocacy, the reasonable interpreta-tion that *Hillary* has other than as "an appeal to vote," and the clear constitutional protection for books and movies, the FEC attempted, in seeking dismissal of Count 3, to substitute elements of *WRTL II*'s application of its "appeal to vote" test to grassroots lobbying, which is not at issue here. As the FEC noted, Doc. 43 at 6 n.1, Citizens has already acknowledged that *Hillary* discusses elections and candidacy and that it is critical of Senator Clinton in several ways. The FEC lists some examples. *Id.* at 6-9. But of course, the *WRTL II* test does not require that there be no discussion of elections or candidacy in order to avoid the Prohibition, nor even that a communication not criticize a candidate, but only that there be an unambiguous "appeal to vote," which is the one thing the FEC has been unable to demonstrate. Instead, the FEC has to date made the error of attempting to substitute a particular application of the *WRTL II* test to a

particular set of facts in the particular context of grassroots lobbying for the test itself.

As to the presence or absence of criticism, the FEC has specifically settled two cases in which there was criticism of a candidate but where the FEC agreed that, under *WRTL II*, these electioneering communications could not be prohibited. *See supra* at 16-17. In both of these cases, the FEC and the intervenors (BCRA prime sponsors Sen. McCain et al.) agreed to a stipulated judgment conceding that the ads at issue were protected issue advocacy under *WRTL II*'s test. So there is now no question that communications stating a candidate's position and characterizing that position in a way that praises or criticizes the candidate may be fully protected issue advocacy and excluded from the electioneering communication definition.

Moreover, the FEC has now conceded that the "Questions" ad is not subject to the prohibition, although it did not concede that it fell within the FEC's safe harbor provision,[26] and that ad describes Senator Clinton in several ways that the FEC must surely think are critical of her "character, qualifications, or fitness for office." 11 C.F.R. § 114.15(b)(2). So the FEC has already conceded that whether or not there is an unambiguous "appeal to vote" does not turn on whether there is criticism. And when the FEC conceded that "Questions" met *WRTL II*'s appeal-to-vote test, Doc. #33 at 17, it also conceded that a communication could meet the appeal-to-vote test without meeting the safe harbor factors, which is inconsistent with the FEC's argument using the safe-harbor factors as the reason why *Hillary* fails the appeal-to-vote test.

And the FEC's argument that *Hillary* "'does not focus on legislative issues,'" Doc. 43 at 9 (citation omitted), is a meaningless argument beyond the grassroots lobbying context. *WRTL II* in fact defined "issue advocacy," i.e., "political speech," without resort to a focus on a legisla-

---

[26]The safe harbor is at 11 C.F.R. § 114.15(b). It provides much of the language on which the FEC relies in its briefing concerning whether *Hillary* is prohibited.

tive issues: "Issue advocacy conveys information and educates. An issue ad's impact on an election, if it exists at all, will come only after the voters hear the information and choose— uninvited by the ad—to factor it into their voting decisions." 127 S. Ct. at 2667. *Hillary* in fact, discusses a wide range of issues, as the FEC has noted, Doc. 43 at 9, doing so in the approved context of the intermingled "'discussion of issues and candidates.'" *WRTL II*, 127 S. Ct. at 2669 (*quoting Buckley*, 424 U.S. at 42). In a book or a documentary movie about a public figure, a central issue will be that public figure—What is she like? What does she think? What has she done?— but that has never warranted government suppression of a book since the passage of the First Amendment, just as it may not justify suppression of a documentary movie. Talking about and criticizing public officials is at the core of First Amendment protection.

In fact, *WRTL II* was decided in response to the FEC's and Intervenors' argument that criticism was the real indicator of the wrong intent that made an electioneering communication subject to prohibition and to WRTL's extended argumentation that criticism of public officials is at the core, not the periphery, of First Amendment protection, *see Brief for Appellee* at 1-5, *WRTL II*, 127 S. Ct. 2652, which included the following quote about criticism:

> This struggle of the government to silence the people continues here as BCRA sponsors, Intervenors herein, defend the "electioneering communication" prohibition by declaring that quashing criticism is the true intent behind the provision and thus argue that broadcast ads are sham, not genuine, if the ads (a) "took a *critical* stance regarding a candidate's position on an issue" and (b) "referred to the candidate by name." Intervenors' Br. at 22 (emphasis added). Intervenors' Brief is replete with complaints about Senators being criticized for their positions on a current legislative matter. *See id.* at 3, 10, 11, 15, 16, 22, 23 n.11, 24, 25 n.14, 27, 28, 36. So is the FEC's Brief. *See* FEC Br. at 10, 11, 19, 20, 33, 44, 48. [*Brief for Appellee* at 5, *WRTL II*, 127 S. Ct. 2652.]

*WRTL II* clearly rejected the FEC's notion then, as this Court must do now, that if citizens criticize public officials then the government may restrict their speech. Such pre-Revolutionary British and European thought was rejected in this Republic with the First Amendment.

In sum, *Hillary* is not subject to the electioneering communication prohibition, both because it contains no language expressing the requisite unambiguous "appeal to vote" and because the evidence on which *McConnell* relied, as well as that opinion itself, had solely to do with ads, not full-length movies, which are the functional equivalent of protected books. The Prohibition is unconstitutional as applied to *Hillary* for these reasons. And because *Hillary* is not unambiguously campaign related under *WRTL II*'s appeal-to-vote test, the Disclosure Requirements are unconstitutional as applied to it.

## Conclusion

For the reasons stated, Citizens' summary judgment motion should be granted.

Respectfully submitted,

/s/ James Bopp, Jr.
James Bopp, Jr., D.C. Bar #CO0041
Richard E. Coleson*
Jeffrey P. Gallant*
Clayton J. Callen*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/235-3685 facsimile
    * pro hac vice motion granted
*Counsel for Plaintiff*

**United States District Court**
**District of Columbia**

| | |
|---|---|
| **Citizens United**, | |
| *Plaintiff*, | |
| *v.* | **Civ. No. 07-2240** (ARR, RCL, RWR) |
| **Federal Election Commission**, | |
| *Defendant.* | |

## Plaintiff's Statement of Undisputed Material Facts

Citizens United has moved for summary judgment in its favor. Fed. R. Civ. P. 60. In support of that motion, Citizens United provides this statement of material facts with references to supporting evidence. LCvR 7(h).[27]

1. Plaintiff Citizens United is a nonstock, nonprofit (under 26 U.S.C. § 501(c)(4)), membership, Virginia corporation with its principal office in Washington, District of Columbia. AVC ¶ 5.

2. Defendant Federal Election Commission ("FEC") is the government agency with enforcement authority over FECA. AVC ¶ 6.

3. Citizens United was founded in 1988. Its purpose is to promote the social welfare through informing and educating the public on conservative ideas and positions on issues, including national defense, the free enterprise system, belief in God, and the family as the basic unit of society. Its current annual budget is about $12 million. Citizens United has a related § 501(c)(3) entity called Citizens United Foundation ("CUF"). AVC ¶ 7.

4. Citizens United is not a "qualified nonprofit corporation" because it receives corporate donations and engages in business activities. *See* 11 C.F.R. § 114.10 (exempting certain ideological,

---

[27]**Key to Evidentiary Citations:** Amended Verified Complaint (Docket #22) = AVC; Affidavit of David N. Bossie (*Attachment 1* hereto) = Bossie Aff.

**SJ Facts**                    1

nonstock, nonprofit corporations from the electioneering communication prohibition). AVC ¶ 8.

5. One of the principal means by which Citizens United fulfills its purposes is through the production and distribution of documentary films. Its first major documentary film, in 2004, was entitled *Celsius 41.11: The Temperature at Which the Brain Begins to Die*. The film was a conservative response to Michael Moore's documentary *Fahrenheit 9/11* and was shown in over 100 theaters in 2004. It continues to be sold in DVD format. AVC ¶ 9.

6. In 2005, Citizens United and CUF co-produced *Broken Promises: The United Nations at 60*, which was an exposé on the United Nations narrated by noted actor Ron Silver. This film was released in DVD format. AVC ¶ 10.

7. In 2006, Citizens United and CUF co-produced two films: *Border War: The Battle Over Illegal Immigration* and *ACLU: At War With America*. *Border War* had a limited theatrical release and was sold on DVD. *ACLU* was released only in DVD format. AVC ¶ 11.

8. *Broken Promises* and *Border War* have competed for and won a number of awards from the motion picture industry. *Broken Promises* won a Special Jury Remi Award at the 2006 Houston International Film Festival. *Border War* won best feature documentary at the 2006 Liberty Film Festival, a Silver Remi Award at the 2007 Houston International Film Festival, and best feature documentary film honors from the American Film Renaissance in February 2007. *Border War* also qualified for consideration under the Academy of Motion Picture Arts and Sciences demanding criteria for nomination to the 79th Academy Awards in February 2007. AVC ¶ 12.

9. In 2007, CUF produced *Rediscovering God in America*, which is narrated by Newt and Calista Gingrich. This film premiered in Washington, D.C., and New York City and is now available in DVD format only. As of December 11, 2007, the film was the top selling historical documentary on Amazon.com. AVC ¶ 13.

10. At the time of filing its complaint, Citizens United was in the final stages of production on a feature length documentary film on Senator Hillary Clinton entitled *Hillary: The Movie.* This issue-advocacy film was expected to be released somewhere in the December 2007 to February 2008 time-frame and was slated for theaters, cable on-demand broadcast, and DVD sales. AVC ¶ 14.

11. The documentary film *Hillary: The Movie* was completed on January 4, 2008, and was released to members of the news media in DVD format. A true and correct copy of the final transcript was filed with this Court as Document #32 (filed Jan. 7, 2008). Bossie Aff. ¶ 4.

12. *Hillary* has been shown in theaters on the following 2008 dates in the cities indicated: Jan. 14 (Washington, DC); Jan. 16 (New York, NY); Jan. 17 (Las Vegas, NV); Jan. 22 (Greenville, SC); Jan. 23 (Tampa, FL); Jan. 24 (New York, NY); Jan. 30 (Phoenix, AZ); Feb. 1 (San Diego, CA); Feb. 2 (Santa Ana, CA); Feb. 11 (Seattle, WA); March 4 (Orlando, FL); Apr. 3 (Santa Barbara, CA); Apr. 21 (Brooklyn, OH). Bossie Aff. ¶ 5.

13. *Hillary* is currently available for sale at www.hillarythemovie.com for $23.95 (plus shipping & handling) with patrons requested to allow two weeks for delivery. *Hillary* is also available at www.amazon.com for $21.99 (plus shipping & handling). Bossie Aff. ¶ 6.

14. Based on long experience with marketing Citizens United's documentaries, it is David N. Bossie's opinion that Citizens United's inability to broadcast the ads set out in the complaint (the ads are available for viewing at www.hillarythemovie.com) is decreasing sales of *Hillary* DVDs and tickets for theater screenings. In fact, it has been impossible to do the usual theatrical release in numerous theaters due to the inability to broadcast the advertisements. Bossie Aff. ¶ 7.

15. Citizens United continues to plan to broadcast its ads for *Hillary* and for a documentary concerning Barack Obama during electioneering communication periods before presidential

primaries, the Democratic Party convention, and the general election in numerous states if timely judicial relief is granted, all as set out and verified in the original and amended complaints. The time-bound details of the advertising plans that were originally set out in the complaint, AVC ¶¶ 17, 20, are no longer possible, but HLW yet intends to do what broadcasting is feasible if it obtains the requested judicial relief in a timely fashion. And Citizens United reaffirms its intention to do materially similar advertising in materially similar situations in the future. Bossie Aff. ¶ 8; AVC ¶ 25.

16. Citizens United is planning a documentary film on presidential candidate Senator Barack Obama, which it anticipates being ready for release by June 2008. It will raise similar issues as *Hillary*, and Citizens United will similarly wish to broadcast ads that name Senator Obama and will be broadcast during electioneering communication periods. The ads and movie, if broadcast, will be electioneering communications. However, it is impossible to present the movie and ads to the Court now in a request for declaratory and injunctive relief because they are not prepared for the Court to review. The ads cannot even be prepared in advance because they will be based on materials from the movie, which is not ready now. Bossie Aff. ¶ 9.

17. Citizens United could not obtain an FEC advisory opinion now, or in the near future, concerning the Senator Obama documentary because the documentary is not finished, the ads cannot yet be done, and there are not enough FEC Commissioners presently to enable the FEC to render advisory opinions. Bossie Aff. ¶ 10.

18. Citizens United does not know now whether it will be offered an opportunity to broadcast the Obama documentary on television, as it was offered for *Hillary*, and such offers are usually made when a movie is completed or nearly completed. Bossie Aff. ¶ 11.

19. Based on how the FEC has analyzed *Hillary* and its Ads, Citizens United will be chilled

as to the Obama documentary and its ads in the same manner. Bossie Aff. ¶ 12.

20. The FEC concedes that the two 10-second ads fit its regulatory commercial transaction exception to the prohibition on broadcasting electioneering communications, but it asserts that the 30-second ad, "Questions," does not fall within that safe harbor. Opp'n to 2d Mot. for Prelim. Inj. (Doc. #33) at 17. However, the FEC does concede that "on balance" the "Questions" ad is protected from prohibition under the appeal-to-vote test of *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652, 2667 (2007) ("*WRTL II*"). Seven days after the present suit was filed, the FEC was unsure whether "Questions" was a protected ad—under its regulatory test or *WRTL II*'s test—and declared that it needed more time to make up its mind. Opp'n to Mot. for Consol'n (Doc. #19) at 8. Seventeen days later, the FEC finally concluded that the 30-second ad was protected under *WRTL II*. The FEC said that (a) it was uncertain as to whether the ad fit the FEC rule's safe harbor, but (b) "on balance" it was a protected ad under *WRTL II*. *See* Doc. #33 at 17. This analysis indicates a *balancing* of unidentified factors. Bossie Aff. ¶ 13.

21. As to *Hillary*, the FEC declared it was not protected by *WRTL II* from prohibition, based on identified phrases without mentioning any balancing. *See* Doc. #33 at 14. This analysis apparently differed from the balancing used as to Questions. Bossie Aff. ¶ 14.

22. The FEC's delay and imprecision in analysis of these two communications, lack of bright lines, and apparent substitution of a balancing test for *WRTL II*'s no-other-reasonable-interpretation test makes it impossible for Citizens United to know whether the FEC will consider its Obama documentary and ads to be subject to prohibition as electioneering communications. Bossie Aff. ¶ 15.

23. *Hillary: The Movie* includes interviews with numerous individuals and many scenes of Senator Clinton at public appearances. It is about 90 minutes in length. It does not expressly

advocate Senator Clinton's election or defeat, but it discusses her Senate record, her White House record during President Bill Clinton's presidency, and her presidential bid. Some interviewees also express opinions on whether she would make a good president. A compendium book is being published by Thomas Nelson Publishers, which has purchased the book rights to the film and is paying Citizens United an advance royalty on sales. Neither of the Disclosure Requirements applies to the documentary itself (unless it is broadcast). AVC ¶ 14.

24. When Citizens United produced *Celsius 41.11* in 2004, it ran national broadcast ads promoting the film. The original version of the ads had images and sound bites of President George Bush and Senator John Kerry, but those images and sound bites had to be deleted from the ads due to the electioneering communication prohibition. Prior to running the ads, Citizens United received FEC Advisory Opinion 2004-30, stating that its film and film ads would qualify as electioneering communications and would not be exempt under the Press Exemption. AVC ¶ 15.

25. Citizens United intends to fund television ads ("Ads") to promote *Hillary: The Movie* that will meet the electioneering communication definition at 2 U.S.C. § 434(f)(3). A true and correct transcript of the Ads is attached to the *Amended Verified Complaint*. *See* AVC *Exhibit 1*. Citizens United has not, and will not, coordinate the production and broadcast of the Ads with any candidate, campaign committee, political committee, or political party. AVC ¶ 16.

26. The first of Citizens United's Ads is in the following words:

**"Wait"**
:10
[Image(s) of HRC on screen]
If you thought you knew everything about Hillary Clinton . . . wait 'til you see the movie.
[Film Title Card]
[Visual Only] Hillary: The Movie.
[Visual Only] www.hillarythemovie.com.

**SJ Facts**                                      6

AVC *Exhibit 1.*

27. The second of Citizens United's Ads is in the following words:

**"Pants"**
:10
[Image(s) of HRC on Screen]
First, a kind word about Hillary Clinton: [Ann Coulter Speaking & Visual] She looks good in a pant suit.
Now, a movie about everything else.
[Film Title Card]
[Visual Only] Hillary: The Movie
[Visual Only] www.hillarythemovie.com

AVC *Exhibit 1.*

28. The third of Citizens United's Ads is in the following words:

**"Questions"**
:30
[Image(s) of HRC on Screen]
Who is Hillary Clinton?
[JEFF GERTH Speaking & Visual] [S]he's continually trying to redefine herself and figure out who she is . . .
[ANN COULTER Speaking & Visual] [A]t least with Bill Clinton he was just good time Charlie. Hillary's got an agenda . . .
[DICK MORRIS Speaking & Visual] Hillary is the closest thing we have in America to a European socialist . . .
If you thought you knew everything about Hillary Clinton . . . wait 'til you see the movie.
[Film Title Card]
[Visual Only] Hillary: The Movie. In theaters [on DVD] January 2007.
[Visual Only] www.hillarythemovie.com.

AVC *Exhibit 1.*

29. The Ads that Citizens United intends to broadcast will meet the electioneering communica-

tions definition at 2 U.S.C. § 434(f)(3) and 11 C.F.R. § 100.29 because they (**a**) will be broadcast

on Fox News cable and major network stations so that they (**b**) will be receivable by more than 50,000 persons, *see* http://gullfoss2.fcc.gov/ecd (Federal Communications Commission's Electioneering Communications Database), in states where caucuses, conventions, or primary elections will be selecting a Democratic party nominee, (**c**) will clearly reference Senator Clinton, a presidential candidate, and (**d**) will be made within 30 days before the caucuses, conventions, or primaries in the identified states (with electioneering communication periods indicated) where she will be on the ballot. AVC ¶ 17.

30. In the amended complaint, Citizens United declared its intent to broadcast the Ads in the following: **Iowa** Presidential Caucus (12/04/07 - 01/03/08); **New Hampshire** Presidential Primary (12/09/07 - 01/08/08); **Michigan** Presidential Primary (12/16/07 - 01/15/08); **Nevada** Presidential Caucus (12/20/07 - 01/19/08); **South Carolina** Presidential Primary (D) (12/27/07 - 01/26/08); **Florida** Presidential Primary (12/30/07 - 01/29/08). *See* http://www.fec.gov/info/charts_ec_dates_prez.shtml (electioneering communication periods). AVC ¶ 17.

31. Citizens United will broadcast the 30-second, issue-advocacy ad entitled "Questions" on Fox News cable, and may broadcast it on major television network stations, too. Citizens United will broadcast the 10-second ads "Wait" and "Pants" on major television network stations, but not on Fox News. The disclaimer language mandated by FEC rule, *see* 11 C.F.R. § 110.11, takes about 4 seconds to narrate, making 10-second ads virtually impossible and 30-second ads extremely difficult to do and have any significant time left for substantive communication. AVC ¶ 18.

32. Citizens United's Ads will promote showings of *Hillary: The Movie* in theaters and sales of *Hillary* in DVD format and refer viewers to www.hillarythemovie.com for more information about the documentary and how to see or purchase it. AVC ¶ 19.

33. In the complaint, Citizens United declared its desire to begin broadcasting its Ads on Monday, December 17, 2007, and run them through the middle of January for its initial media buy. However, because it will not run the Ads absent the requested relief from this Court, Citizens United declared its intent to begin broadcasting its ads when it gets the relief requested herein and run them through the middle of January for its initial media buy. If Senator Clinton becomes the presidential nominee of her party, Citizens United will again plan to run the Ads (and possibly materially-similar ads) on Fox News cable (and possibly other broadcast outlets) within 30 days before the Democratic National Committee Convention (electioneering communication period is 07/29/08 - 08/28/08) and within 60 days of the November general election (electioneering communication period is 09/05/08 - 11/04/08). *See* http://www.fec.gov/info/charts_ec_dates_ prez.shtml. At these times, the Ads will also meet the electioneering communication definition. Citizens United believes that these are the times when the public's interest in Senator Clinton will be at its peak, which is the key to maximizing box office, cable on-demand, and DVD sales for *Hillary*. AVC ¶ 20.

34. The Ads are subject to the Disclosure Requirements because the FEC recently refused requests to exclude from the Disclosure Requirements "electioneering communications" that meet the Supreme Court's issue-advocacy safe harbor, *WRTL II*, 127 S. Ct. at 2667 (appeal-to-vote test), or the FEC's own commercial-transaction safe harbor. *See* http://www.fec.gov/law/ law_rule-makings.shtml#ec07 (rulemaking documents, including requests to eliminate disclosure for ads not subject to electioneering communication prohibition). AVC ¶ 22.

35. One of the chief concerns with the Reporting Requirement is the disclosure of donors who may then be subject to various forms of retaliation by political opponents. Citizens United noted,

on information and belief, that the Clinton White House had in its possession over 1,000 FBI files on political opponents. *See*, *e.g.*, Neil A. Lewis, *White House Got More Files Than Disclosed*, N.Y. Times, June 12, 2007 (available by query at google.com). AVC ¶ 23.

36. Citizens United recited in the amended complaint that it will have donors that it will be required to disclose (as to name and address), absent the judicial relief requested here, because it will pay for the Ads "exclusively from a segregated bank account established to pay for electioneering communications permissible under 11 C.F.R. § 114.15" (rule implementing *WRTL II* by permitting corporate electioneering communications), to which donors will have "donated an amount aggregating $1,000 or more . . . since the first day of the preceding calendar year." 11 C.F.R. § 104.20. ¶ 24. But Citizens United will not make any electioneering communications unless it obtains the requested judicial relief, under which it would have to do no disclosure as to donors, *see* AVC ¶ 26, either from its general fund or a segregated bank account.

37. Citizens United intends to broadcast materially-similar ads mentioning public figures who are candidates in materially-similar situations during future electioneering communication periods when public interest is at a peak. There is a strong likelihood that such similar situations will recur, given the facts that Plaintiff has engaged in similar activity in the past and that such activity is common and regularly recurring for it—as are conflicting electioneering communication periods. AVC ¶ 25, Bossie Aff. ¶ 7.

38. Citizens United intends to broadcast its Ads without complying with the Disclosure Requirements, but it will not broadcast its Ads if it does not obtain the judicial relief presently requested. AVC ¶ 26.

39. If Citizens United does not obtain the judicial relief presently requested and decided to

proceed with its activities as electioneering communications, it could not proceed with its activities as planned. Instead, it would be forced to include the compelled speech of a disclaimer, which (**a**) requires it to mislead the public by identifying its speech as electioneering speech and (**b**) deprives Citizens United of valuable time in its short and expensive broadcast Ads. Adding the disclaimer will preclude Citizens United from running its 10-second ads and will require it to revise its 30-second ad so as to be much less effective—both as the issue advocacy that it is and as a vehicle for promoting *Hillary: The Movie.* And Citizens United will be compelled to file reports of its activity, which (**1**) requires it to mislead the public by reporting its speech as electioneering speech; (**2**) deprives Citizens United of valuable time and resources in complying with reporting requirements; and (**3**) will, in Citizens United's belief based on long experience, substantially reduce the number of donors and amount of donations to Citizens United because many potential donors do not wish to be publicly so identified for a variety of legitimate reasons. AVC ¶ 27.

40. On December 20, 2007, a company that markets nationwide Video on Demand ("VOD") broadcasting of programs on cable television made an offer to Citizens United to broadcast *Hillary: The Movie*, for a fee to be paid by Citizens United, to cable viewers nationwide (or to such markets as remain appropriate when the judicial relief requested herein is provided). *Hillary* would be broadcast under a "Political Movies" component of "Elections '08, a new channel sponsored by the cable industry. The contract offered would be for 4 weeks. AVC ¶ 28.

41. This broadcasting would bring *Hillary* within the electioneering communication definition because the movie (**a**) will be broadcast on cable stations so that it (**b**) will be receivable by more than 50,000 persons, in states where caucuses, conventions, or primary elections will be selecting a Democratic party nominee, (**c**) will clearly reference Senator Clinton, a presidential candidate, and

(**d**) will be made within 30 days before the caucuses, conventions, or primaries in the states identified in ¶ 17 where she will be on the ballot. AVC ¶ 29.

42. Citizens United intends to accept this offer to broadcast its documentary, but will not do so unless it receives the judicial relief requested herein because (**a**) it will have donors who would have to be disclosed and it does not wish to comply with the Disclosure Requirements as to the movie for the reasons stated in [AVC] ¶¶ 23 & 27 and (**b**) the communication would be a prohibited "electioneering communication" under BCRA because it is not exempt from the "electioneering communication" prohibition under the FEC's regulation at 11 C.F.R. § 114.15 (creating an exception to the electioneering communication prohibition). AVC ¶ 30.

43. If Citizens United does not obtain the judicial relief presently requested as to *Hillary*, it will not proceed with its activities as planned. In such an event, Citizens United will be deprived of its constitutional rights and will suffer irreparable harm. AVC ¶ 32.

44. Citizens United has no adequate remedy at law. AVC ¶ 33.

Respectfully submitted,

/s/ James Bopp, Jr.
James Bopp, Jr., D.C. Bar #CO0041
Richard E. Coleson*
Jeffrey P. Gallant*
Clayton J. Callen*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/235-3685 facsimile
  * pro hac vice motion granted
*Counsel for Plaintiff*

**United States District Court**
**District of Columbia**

| | |
|---|---|
| **Citizens United**, *Plaintiff*, *v.* **Federal Election Commission**, *Defendant.* | **Civ. No. 07-2240** (ARR, RCL, RWR) |

# Affidavit of David N. Bossie

I, David N. Bossie, make this affidavit in support of Plaintiff's summary judgment motion and declare as follows:

1. I am the Chairman of the Board and President of Citizens United.

2. I have personal knowledge of Citizens United and its activities, and if called upon to testify I would competently testify as to the matters stated herein.

3. I verify again the factual statements in the *Amended Verified Complaint for Declaratory and Injunctive Relief* (Doc. #22) and provide the following supplemental information.

4. The documentary film *Hillary: The Movie* was completed on January 4, 2008, and was released to members of the news media in DVD format. A true and correct copy of the final transcript was filed with this Court as Document #32 (filed Jan. 7, 2008).

5. *Hillary* has been shown in theaters on the following 2008 dates in the cities indicated: Jan. 14 (Washington, DC); Jan. 16 (New York, NY); Jan. 17 (Las Vegas, NV); Jan. 22 (Greenville, SC); Jan. 23 (Tampa, FL); Jan. 24 (New York, NY); Jan. 30 (Phoenix,

**Bossie Affidavit**                                    1

AZ); Feb. 1 (San Diego, CA); Feb. 2 (Santa Ana, CA); Feb. 11 (Seattle, WA); March 4 (Orlando, FL); Apr. 3 (Santa Barbara, CA); Apr. 21 (Brooklyn, OH).

6. *Hillary* is currently available for sale at www.hillarythemovie.com for $23.95 (plus shipping & handling) with patrons requested to allow two weeks for delivery. *Hillary* is also available at www.amazon.com for $21.99 (plus shipping & handling).

7. Based on long experience with marketing Citizens United's documentaries, it is my opinion that Citizens United's inability to broadcast the Ads set out in the complaint (the Ads are available for viewing at www.hillarythemovie.com) is decreasing sales of *Hillary* DVDs and tickets for theater screenings. In fact, it is impossible to do the usual theatrical release in numerous theaters due to the inability to broadcast the Ads.

8. Citizens United continues to plan to broadcast its Ads for *Hillary* and for a documentary concerning Barack Obama during electioneering communication periods before presidential primaries, the Democratic Party convention, and the general election in numerous states if timely judicial relief is granted, all as set out and verified in the original and amended complaints. The time-bound details of the advertising plans that were originally set out in the complaint, AVC ¶¶ 17, 20, are no longer possible, but HLW yet intends to do what broadcasting is feasible if it obtains the requested judicial relief in a timely fashion. And Citizens United reaffirms its intention to do materially similar advertising in materially similar situations in the future.

9. Citizens United is planning a documentary film on presidential candidate Senator Barack Obama, which it anticipates being ready for release by June 2008. It will raise similar issues as *Hillary*, and Citizens United will similarly wish to broadcast ads that name Senator

**Bossie Affidavit**                                    2

Obama and will be broadcast during electioneering communication periods. The ads and movie, if broadcast, will be electioneering communications. However, it is impossible to present the movie and ads to the Court now in a request for declaratory and injunctive relief because they are not prepared for the Court to review. The ads cannot even be prepared in advance because they will be based on materials from the movie, which is not ready now.

10. Citizens United could not obtain an FEC advisory opinion now, or in the near future, concerning the Senator Obama documentary because the documentary is not finished, the ads cannot yet be done, and there are not enough FEC Commissioners presently to enable the FEC to render advisory opinions.

11. Citizens United does not know now whether it will be offered an opportunity to broadcast the Obama documentary on television, as it was offered for *Hillary*, and such offers are usually made when a movie is completed or nearly completed.

12. Citizens United will be chilled as to the Obama documentary and its ads, just as it has been chilled with respect to *Hillary* and its Ads, based on how the FEC has analyzed *Hillary* and its Ads and Citizens United's ability to broadcast them free of the Disclosure Requirements of which Citizens United complains.

13. The FEC concedes that the two 10-second ads fit its regulatory commercial transaction exception, but it asserts that the 30-second ad, "Questions," does not fall within that safe harbor. Opp'n to 2d Mot. for Prelim. Inj. (Doc. 33) at 17. However, the FEC does concede that "on balance" the "Questions" ad is protected from prohibition under the appeal-to-vote test of *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652, 2667 (2007) ("*WRTL II*"). Seven days after the present suit was filed, the FEC was unsure whether "Questions" was a

protected ad—under its regulatory test or *WRTL II*'s test—and declared that it needed more time to make up its mind. Opp'n to Mot. for Consol'n (Doc. 19) at 8. Seventeen days later, the FEC finally concluded that the 30-second ad was protected under *WRTL II*. The FEC said that (a) it was uncertain as to whether the ad fit the FEC rule's safe harbor, but (b) "on balance" it was a protected ad under *WRTL II*. *See* Doc. #33 at 17. This analysis indicates a *balancing* of unidentified factors.

14. As to *Hillary*, the FEC declared it was not protected by *WRTL II* from prohibition, based on identified phrases without mentioning any balancing. *See* Doc. #33 at 14. This analysis apparently differed from the balancing used as to Questions.

15. The FEC's delay and imprecision in analysis of these two communications, lack of bright lines, and apparent substitution of a balancing test for *WRTL II*'s appeal-to-vote test makes it impossible for Citizens United to know whether the FEC will consider its Obama documentary and ads to be subject to prohibition as electioneering communications.

16. I verify under penalty of perjury under the laws of the United States of America

that the foregoing statements are true and correct.


Executed on May 16, 2008.


/s/ David N. Bossie
David N. Bossie
Citizens United

**United States District Court**
**District of Columbia**

| | |
|---|---|
| **Citizens United**, <br><br>                                         *Plaintiff,* <br><br>    *v.* <br><br> **Federal Election Commission**, <br><br>                                        *Defendant.* | **Civ. No. 07-2240** (ARR, RCL, RWR) |

**[Proposed] Order**

Plaintiff's motion for summary judgment as to Counts 1, 2, and 3 of its amended complaint is GRANTED for the reasons stated in the motion and memorandum in support.

The Court declares sections 201 ("Reporting Requirement") and 311 ("Disclaimer Requirement") of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), codified at 2 U.S.C. §§ 434(f) and 441d(a), unconstitutional as applied to communications that are not the "functional equivalent of express advocacy" under the appeal-to-vote test of *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652, 2667 (2007) ("*WRTL II*"), which communications include Plaintiff's three proposed ads and the documentary film *Hillary: The Movie.*

The Court further declares BCRA § 203 ("Prohibition"), codified at 2 U.S.C. § 441b, unconstitutional as applied to *Hillary: The Movie* because it is not the "functional equivalent of express advocacy" under *WRTL II*'s appeal-to-vote test.

Counts 4 and 5 of Plaintiff's amended complaint are dismissed  without prejudice as moot.

Defendant Federal Election Commission is hereby permanently enjoined from enforcing the challenged provisions as applied to communications that are not the functional

equivalent of express advocacy under *WRTL II*'s appeal-to-vote test, including Plaintiff's communications at issue herein.

      SO ORDERED this _____ day of _____2008.


_____
United States Circuit Judge


_____
United States District Judge


_____
United States District Judge