## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                         )
CITIZENS UNITED,                         )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )        Civ. No. 07-2240 (ARR, RCL, RWR)
                                         )
FEDERAL ELECTION COMMISSION,             )        MOTION FOR SUMMARY JUDGMENT
                                         )
                    Defendant.           )
_____)

## DEFENDANT FEDERAL ELECTION COMMISSION'S
## MOTION FOR SUMMARY JUDGMENT

The Federal Election Commission respectfully moves this Court for summary judgment

pursuant to Federal Rule of Civil Procedure 56 on Counts 1, 2, and 3 of Plaintiff's Amended

Complaint.  A memorandum of law in support of this motion, a statement of material facts not in

dispute, a statement of genuine issues, and a proposed order are attached pursuant to LCvR 7(h)

and 56.1.

                                  Respectfully submitted,

                                  Thomasenia P. Duncan (D.C. Bar No. 424222)
                                  General Counsel

                                  David B. Kolker (D.C. Bar No. 394558)
                                  Associate General Counsel

                                  Kevin Deeley
                                  Assistant General Counsel

                                  ____/s/ Adav Noti_____
                                  Adav Noti (D.C. Bar No. 490714)
                                  Attorney

                                  COUNSEL FOR DEFENDANT
                                  FEDERAL ELECTION COMMISSION
                                  999 E Street NW
                                  Washington, DC 20463
Dated: June 6, 2008               (202) 694-1650

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                            )
CITIZENS UNITED,                            )
                                            )
                    Plaintiff,              )
                                            )
            v.                              )         Civ. No. 07-2240 (ARR, RCL, RWR)
                                            )
FEDERAL ELECTION COMMISSION,                )         MEMORANDUM OF LAW
                                            )
                    Defendant.              )
_____)


## DEFENDANT FEDERAL ELECTION COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Thomasenia P. Duncan (D.C. Bar No. 424222)
General Counsel

David Kolker (D.C. Bar No. 394558)
Associate General Counsel

Kevin Deeley
Assistant General Counsel

Adav Noti (D.C. Bar No. 490714)
Attorney

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street NW
Washington, DC 20463
(202) 694-1650

June 6, 2008

# TABLE OF CONTENTS

I.      BACKGROUND ........................................................................................ 1

     A.     Statutory and Regulatory Background.................................................. 1

     B.     Factual Background ........................................................................... 3

          1.     Citizens United and Related Entities ........................................... 3

          2.     Citizens United's Film and Advertisements ................................. 3

          3.     Funding of Citizens United's Electioneering Communications ................. 5

     C.     Procedural History ........................................................................... 5

II.     ARGUMENT .......................................................................................... 7

     A.     Standard of Review........................................................................... 7

     B.     The EC Disclosure Provisions Are Constitutional As Applied to Plaintiff's Advertisements ......................................................................... 7

          1.     The Disclosure Requirements Are Constitutional on Their Face .............. 7

          2.     Disclosure Requirements Are Subject to Intermediate Scrutiny and Have Repeatedly Been Upheld Even as to Spending that Cannot Constitutionally Be Limited........................................................... 11

          3.     Disclosure Regarding WRTL Ads Furthers Important Government Interests.............................................................................. 18

               a.     Providing Information to the Public ............................................. 19

               b.     Facilitating Enforcement of Funding Regulations........................ 22

          4.     Plaintiff Demonstrates No Constitutional Burden Arising from the Disclosure Provisions................................................................ 25

               a.     Plaintiff Presents No Evidence that Its Donors Will Suffer Reprisals.................................................................................. 25

               b.     Plaintiff Presents No Evidence that the Disclosure Requirements Will Chill Its Speech............................................. 29

               c.     The Disclaimer Requirements Impose No Constitutional Burdens ................................................................................... 30

          5.     The Important Government Interests Support the Disclosure Requirements As Applied to Plaintiff....................................... 34

C.   The EC Disclosure Provisions Are Constitutional As Applied to Plaintiff's Film ................................................................................................ 34

D.   *Hillary: The Movie* Is the Functional Equivalent of Express Advocacy .............. 34

   1.   The EC Funding Restriction Is Constitutional As Applied to ECs that Are the Functional Equivalent of Express Advocacy ............................... 35

   2.   Plaintiff's Film Is the Functional Equivalent of Express Advocacy ........ 37

   3.   Plaintiff's Counterarguments Are Without Merit ..................................... 39

III.   CONCLUSION ............................................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) .................................................... 12-13

*Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429 (4th Cir. 1999) ......... 23

*AFL-CIO v. FEC*, 333 F.3d 168 (D.C. Cir. 2003) ................................................... 28-29

*Alaska Right To Life Comm. v. Miles*, 441 F.3d 773 (9th Cir. 2006) ........................ 11-12, 24-26

*Am. Civil Liberties Union of N.J. v. N.J. Election Law Enforcement Comm'n*,
      509 F. Supp. 1123, 1129 (D.N.J. 1981) ...................................................... 21

*Am. Civil Liberties Union of Nev. v. Heller*, 378 F.3d 979 (9th Cir. 2004) ............................. 14, 30

*Am. Fed'n of Gov't Employees, Local 446 v. Nicholson*, 475 F.3d 341 (D.C. Cir. 2007) ............ 7

*Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87 (1982) ...................................... 25

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................................ *passim*

*Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999) ............... 11, 14, 16, 20, 30

*Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003) ....................................... 20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) ......... 18, 22

*Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981) ........................................... 15-17

*Citizens for Responsible Gov't State Political Action Comm. v. Davidson*,
      236 F.3d 1174 (10th Cir. 2000) ............................................................. 14, 23, 30

*Citizens United v. FEC*, 128 S. Ct. 1732 (2008) ........................................................... 6

*Citizens United v. FEC*, 530 F. Supp. 2d 274 (D.D.C. 2008) ..................... 6, 8, 26, 34, 37-39, 42

*Colo. Right To Life Comm., Inc. v. Davidson*, 395 F. Supp. 2d 1001 (D. Colo. 2005) .......... 11, 26

*Comm'n on Indep. Coll. & Univ. v. N.Y. Temp. State Comm'n on Regulation of Lobbying*,
      534 F. Supp. 489 (N.D.N.Y. 1982) ............................................................ 21

*Crawford v. Marion County Election Bd.*, 128 S. Ct. 1610 (2008) .............................................. 31

*Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655 (5th Cir. 2006) .................................. 11

*Daggett v. Comm'n on Gov't Ethics & Election Practices*, 205 F.3d 445 (1st Cir. 2000) .......... 23

*FEC v. Furgatch*, 807 F.2d 857 (9th Cir. 1987) ......................................................... 41

*FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238 (1986) ("*MCFL*") .................. 15, 17, 23-24, 43

*FEC v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652 (2007) ("*WRTL*")............................. *passim*

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)................................................ 13-17, 20

*Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457 (11th Cir. 1996) ........................... 21

*GCI Health Care Ctrs., Inc. v. Thompson*, 209 F. Supp. 2d 63 (D.D.C. 2002)............................ 7

*Herschaft v. New York City Campaign Fin. Bd.*, 127 F. Supp. 2d 164 (E.D.N.Y. 2000)........ 11-12

*In re Grand Jury Proceedings*, 776 F.2d 1099 (2d Cir. 1985) ..................................................... 26

*Jones v. Unknown Agents of FEC*, 613 F.2d 864 (D.C. Cir. 1979) ...................................... 11, 26

*Kimbell v. Hooper*, 665 A.2d 44 (Vt. 1995) ................................................................................ 21

*Majors v. Abell*, 361 F.3d 349 (7th Cir. 2004)...................................................................... 14, 30

*Mariani v. United States*, 212 F.3d 761 (3d Cir. 2000) (en banc) ............................................. 26

*McConnell v. FEC*, 540 U.S. 93 (2003)................................................................................ *passim*

*McConnell v. FEC*, 251 F. Supp. 2d 176 (D.D.C. 2003).................................................. 9, 28, 30, 44

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)........................................ 13-14, 20, 28

*Meese v. Keene*, 481 U.S. 465 (1987) ........................................................................................ 32

*Minn. State Ethical Practices Bd. v. Nat'l Rifle Ass'n of Am.*, 761 F.2d 509 (8th Cir. 1985) ...... 21

*N.C. Right to Life, Inc. v. Leake*, 524 F.3d 427 (4th Cir. 2008)............................................. 12-13

*N.C. Right to Life Comm. Fund for Indep. Political Expenditures v. Leake*,
    Nos. 07-1438, 07-1439, 2008 WL 1903473 (4th Cir. May 1, 2008) ............................... 12

*NAACP v. Alabama*, 357 U.S. 449 (1958) .................................................................................. 25

*Nat'l Ass'n of Mfrs. v. Taylor*, --- F. Supp. 2d ---, Civ. No. 08-208, 2008 WL 1776997
    (D.D.C. Apr. 18, 2008), *appeal docketed*, No. 08-5085 (D.C. Cir.)................................ 21

*Nat'l Ass'n of Mfrs. v. Taylor*, Civ. No. 08-208, 2008 WL 1390606 (D.D.C. Apr. 11, 2008),
    *appeal docketed*, No. 08-5085 (D.C. Cir.)................................................................... 26-27

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001)................................................... 33

*R.I. Affiliate Am. Civil Liberties Union, Inc. v. Begin*, 431 F. Supp. 2d 227 (D.R.I. 2006) ... 17, 20

*Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004) .................................................... 10

*United States v. Harriss*, 347 U.S. 612 (1954) ..................................................... 21, 30

*Wash. St. Grange v. Wash. St. Republican Party*, 128 S. Ct. 1184 (2008).................................... 31

*Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626 (1985) ................ 22

**Statutes and Regulations**

2 U.S.C. § 431(11) ............................................................................................................ 2

2 U.S.C. § 441d ................................................................................................................. 2

2 U.S.C. § 441d(a)(3) ....................................................................................................... 2

2 U.S.C. § 441d(d)(2) ....................................................................................................... 3

2 U.S.C. § 434(f)(1) .......................................................................................................... 2

2 U.S.C. § 434(f)(2) .......................................................................................................... 2

2 U.S.C. § 434(f)(2)(E) ..................................................................................................... 2

2 U.S.C. § 434(f)(3)(A) ................................................................................................... 44

2 U.S.C. § 434(f)(3)(A)(i) ...................................................................................... 1, 40, 44

2 U.S.C. § 434(f)(3)(B) ................................................................................................... 44

2 U.S.C. § 441b ............................................................................................................... 35

2 U.S.C. § 441b(a) .......................................................................................................... 10

2 U.S.C. § 441b(b) ......................................................................................................... 1, 8

2 U.S.C. § 441b(b)(2) ....................................................................................................... 2

11 C.F.R. § 104.20 ............................................................................................................ 2

11 C.F.R. § 104.20(c)(7) ................................................................................................ 2, 5

11 C.F.R. § 104.20(c)(9) ................................................................................................ 2, 5

11 C.F.R. § 110.11 ............................................................................................................ 2

11 C.F.R. § 110.11(b)(3) ................................................................................................... 2

11 C.F.R. § 110.11(c)(4) ................................................................................................... 3

11 C.F.R. § 110.11(c)(4)(iii)(A) ..................................................................................... 33

11 C.F.R. § 114.15 ........................................................................................................ 2, 37

Bipartisan Campaign Reform Act ("BCRA"), Pub. L. No. 107-155 ..................................... *passim*

Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431-55 ......................................... *passim*

**Other Authorities**

*Electioneering Communications*, 72 Fed. Reg. 72,899 (Dec. 26, 2007) .................................. 5, 27

FEC Advisory Opinion 1990-13 ................................................................................................ 27

FEC Advisory Opinion 1996-46 ................................................................................................ 27

FEC Advisory Opinion 2003-02 ................................................................................................ 27

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 34

Fed. R. Civ. P. 56 ........................................................................................................................ 7

Defendant Federal Election Commission ("Commission") submits this memorandum of law in support of its Motion for Summary Judgment and in opposition to Plaintiff's Summary Judgment Motion. The Commission should be granted summary judgment as to Plaintiff's claims that its paid broadcast communications involving presidential candidate Senator Hillary Clinton, and all similar communications, should be exempt from federal electioneering communication disclosure requirements. These disclosure provisions are substantially related to important government interests in providing information to the public and facilitating enforcement of electioneering communication financing restrictions. Plaintiff provides no evidence that it or its donors would be subject to any threats, harassment, or reprisals — or any other constitutional burden — if their identities were made known. Summary judgment is appropriate on Plaintiff's challenge to the electioneering communication funding restriction because Plaintiff's film, which is essentially a ninety-minute campaign 'infomercial' contending that Senator Clinton is unfit to be President, is the functional equivalent of express advocacy that she be defeated.

## I.    BACKGROUND

### A.    Statutory and Regulatory Background

The Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431-55, as amended by the Bipartisan Campaign Reform Act ("BCRA"), Pub. L. No. 107-155, defines an "electioneering communication" ("EC") in the context of a presidential candidate as a "broadcast, cable, or satellite communication" that refers to a clearly identified candidate and is made within sixty days before a general election or thirty days before a primary election or party nominating convention. *See* 2 U.S.C. § 434(f)(3)(A)(i).

Section 203 of BCRA provides that neither corporations nor labor unions may use their general treasury funds to produce or broadcast ECs. *See* 2 U.S.C. § 441b(a),(b)(2). However, in

*FEC v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652 (2007) ("*WRTL*"), the Supreme Court held that this funding restriction may constitutionally be applied only to ECs that are the "functional equivalent of express advocacy," *id*. at 2667, which the Court's controlling opinion defined as communications that are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id*. The Commission has promulgated regulations codifying the *WRTL* standard. *See* 11 C.F.R. § 114.15.

ECs are subject to reporting requirements, 2 U.S.C. § 434(f)(2); 11 C.F.R. § 104.20, and disclaimer requirements, 2 U.S.C. § 441d; 11 C.F.R. § 110.11. The reporting requirements at issue in this case provide that any "person" (defined to include any corporation, labor organization, or other group, 2 U.S.C. § 431(11)) expending over $10,000 to produce or air an EC must file a statement with the Commission. 2 U.S.C. § 434(f)(1)-(2). The statement must identify, in relevant part, the person making the EC disbursement and the amount and date of the disbursement. When a corporation finances an EC that is permissible under *WRTL*, the corporation must also report "the name and address of each person who made a donation aggregating $1,000 or more to the corporation . . . for the purpose of furthering electioneering communications." 11 C.F.R. § 104.20(c)(9). However, if the disbursement is made out of a "segregated bank account established to pay for electioneering communications," the corporation making the EC need only identify those individuals who contributed $1,000 or more to the account itself. 2 U.S.C. § 434(f)(2)(E); 11 C.F.R. § 104.20(c)(7).

The EC disclaimer provisions require that a televised EC include on the screen (1) "the name and permanent street address, telephone number, or World Wide Web address of the person who paid for the communication," and (2) a statement "that the communication is not authorized by any candidate or candidate's committee." 2 U.S.C. § 441d(a)(3); 11 C.F.R. § 110.11(b)(3). The EC must also include a statement that the entity funding the EC "is

responsible for the content of this advertising" — this statement must be (1) made orally by a representative of the person making the EC, and (2) printed "for a period of at least 4 seconds" on at least four percent of the screen.  2 U.S.C. § 441d(d)(2); 11 C.F.R. § 110.11(c)(4).

### B.    Factual Background

#### 1.    Citizens United and Related Entities

Plaintiff Citizens United is a Virginia corporation holding tax-exempt status under section 501(c)(4) of the Internal Revenue Code.  (Def.'s Statement of Material Facts as to Which There Is No Genuine Dispute ("Def.'s Facts") ¶ 1.)  In addition to this corporation, Citizens United operates Citizens United Political Victory Fund ("CU-PVF"), which is a political committee (or "separate segregated fund") and is registered with the Commission as such.  (*Id.* ¶ 19.)  As a political committee, CU-PVF files with the Commission monthly, publicly available reports identifying, *inter alia*, the name and address of each person who has donated $200 or more to CU-PVF in the calendar year of the report.  (*Id.* ¶ 20.)  Since 1994, CU-PVF has filed approximately 160 reports, identifying a total of approximately 1,214 donations.  (*Id.* ¶ 21.)

Citizens United also operates The Presidential Coalition, LLC, and 2007 Conservative Victory Committee, which are entities holding tax-exempt status under section 527 of the Internal Revenue Code.  (*Id.* ¶ 22.)  As "527" organizations, these entities file each year with the Internal Revenue Service two to six publicly available reports listing, *inter alia*, the name, address, occupation, and employer of each person who has donated $200 or more to the organization in that calendar year.  (*Id.* ¶ 23.)  Since 2005, The Presidential Coalition has filed ten reports, identifying a total of approximately 11,500 donations.  (*Id.* ¶ 24.)

#### 2.    Citizens United's Film and Advertisements

Plaintiff has produced a film, entitled *Hillary: The Movie*.  (*Id.* ¶ 3.)  This film focuses on the ongoing presidential election, specifically Senator Hillary Clinton's candidacy for President

of the United States.  (*Id.* ¶ 4.)  *Hillary: The Movie* is devoted to criticizing Senator Clinton's character and arguing that she lacks the qualifications and is not fit to be elected President.  (*Id.* ¶ 5.)  *Hillary: The Movie* does not focus on legislative issues, and it does not take a position on an issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter; instead, the only focuses of the film are Senator Clinton's character and fitness for office and her actions in relation to certain controversies during Bill Clinton's presidency.  (*Id.* ¶ 6.)  The film mentions legislative issues only in the context of critiquing Senator Clinton's character and her fitness for the presidency.  (*Id.*)  Plaintiff identifies itself as being involved with the film by including Citizens United's name and logo at the beginning of the movie.  (*Id.* ¶ 3.)

 *Hillary: The Movie* is available for purchase by the general public on DVD, and it has been exhibited in several movie theaters.  (*Id.* ¶ 7.)  On December 20, 2007, Plaintiff received a solicitation to pay to have *Hillary: The Movie* distributed for four weeks through a nationwide cable-television video-on-demand system.  (*Id.* ¶ 9.)[1]  Pursuant to this solicitation, the film would be broadcast on "Elections '08," which bills itself as a "breakthrough platform [that] allows you to speak directly to voters — 24/7 — in their own living rooms.  By crafting and controlling your own long-form campaign message, you reach voters with no media dilution or bias."  (*Id.* ¶ 10.)  Plaintiff wishes to pay to distribute its film through this medium within the thirty-day period before the Democratic national convention.  (*Id.* ¶ 11.)

 Plaintiff also wishes to promote its film through television advertisements.  (*Id.* ¶ 13.) These advertisements would mention Senator Clinton and would air on nationwide cable and network television within the thirty-day period before the Democratic national convention.  (*Id.*

---

[1] Because Plaintiff has insisted that the terms of the December 2007 offer remain confidential (*see* First Supp. to Pl.'s Resp. to FEC's First Interrogs. at 5-6 (Def.'s Exh. 1)), this offer is being filed under seal.

¶ 14.)  Plaintiff has stated that it intends to fund its advertisements from a bank account consisting solely of donations made to Plaintiff for the purpose of furthering the production or distribution of electioneering communications.  (*Id.* ¶ 16.)[2]

Four days after Senator Barack Obama won the Iowa presidential caucuses, Plaintiff announced its intent to produce and broadcast a "documentary" film about Senator Obama, as well as television advertising for that film.  (*Id.* ¶ 18.)

3.    *Funding of Citizens United's Electioneering Communications*

Since December 2006, twenty-eight individuals, two for-profit corporations, and three other entities have donated $1,000 or more to Plaintiff for the purpose of furthering the production or distribution of Plaintiff's electioneering communications.  (*Id.* ¶ 17.)  Ten of the twenty-eight individuals have been publicly identified in IRS filings as donors to one of Plaintiff's affiliated 527 organizations, The Presidential Coalition.  (*Id.* ¶ 25.)  In addition, one individual and two other entities, who have donated a total of $173,500 to Plaintiff for the purpose of furthering Plaintiff's electioneering communications, are identified in the credits of *Hillary: The Movie*.  (*Id.* ¶ 26.)

**C.    Procedural History**

Plaintiff's Amended Complaint asserts five claims, each seeking declaratory and injunctive relief.  Counts 1 and 2 allege that the EC disclosure requirements are unconstitutional as applied to Plaintiff's ads, to all other ads exempt from the EC funding restriction under *WRTL*,

---

[2]    Throughout this action, Plaintiff has asserted that it would be required to disclose all of its income, including income from the sale of its products.  (*See*, Pl.'s Mem. in Support of Summ. J. Mot. at 33 n.24.)  That assertion is incorrect; corporations disclosing ECs are not required to report income from commercial transactions or any other income besides donations earmarked for ECs.  *See Electioneering Communications*, 72 Fed. Reg. 72,899, 72,911 (Dec. 26, 2007); 11 C.F.R. § 104.20(c)(9).  Plaintiff has also asserted that it intends to utilize the "segregated bank account" option to reduce its disclosure obligations, but, because non-earmarked general treasury funds are not subject to disclosure, Plaintiff's intended use of the segregated account would likely increase Plaintiff's reporting obligations.  *See id.*

and to Plaintiff's movie. (Am. Compl. ¶¶ 34-39.) Counts 3 and 4 allege that the corporate

funding restriction is unconstitutional as applied to Plaintiff's movie and "Questions" ad,

respectively. (*Id.* ¶¶ 40-45.) Finally, Count 5 alleges that the corporate funding restriction is

unconstitutional on its face. (*Id.* ¶¶ 46-48.)

Contemporaneously with the filing of its original and amended complaints, Plaintiff

sought preliminary injunctions against the Commission's enforcement of the EC disclosure

requirements and funding restriction. This Court denied Plaintiff's motions, holding, *inter alia*,

that Plaintiff was unlikely to prevail on the merits of its claims. *See Citizens United v. FEC*,

530 F. Supp. 2d 274, 280-81 (D.D.C. 2008). Plaintiff appealed directly to the Supreme Court the

denial of a preliminary injunction as to Count 1. On March 24, 2008, the Supreme Count

dismissed the appeal for lack of jurisdiction. *Citizens United v. FEC*, 128 S. Ct. 1732 (2008).

On February 11, 2008, the Commission moved to dismiss Count 3 for failure to state a

claim on which relief can be granted and Count 4 for lack of subject-matter jurisdiction. Plaintiff

agrees that the Court lacks jurisdiction over Count 4, but Plaintiff opposes dismissal of Count 3.

The Commission's Motion to Dismiss Counts 3 and 4 remains pending before the Court.

On May 23, 2008, the Court entered an order dismissing Count 5 pursuant to a stipulation

of the parties.[3]

---

[3]    The Commission notes that it was unaware of Plaintiff's intent to abandon Count 5 until
Plaintiff filed its motion for summary judgment. (*See* Pl.'s Summ. J. Mot. at 1-2.) If the
Commission had been informed of Plaintiff's intention earlier (such as during the parties'
scheduling conference in March 2008), the Commission would have consented to significantly
shorter discovery and briefing periods and could have avoided unnecessary affirmative case
preparation regarding Plaintiff's facial challenge to the EC funding restriction. (*See* Joint Rep. of
Parties Pursuant to LCvR 16.3(d) (Docket No. 47) at ¶ 8(b) ("The Commission also requires time
to develop a factual record regarding Plaintiff's facial challenge to the electioneering
communication financing restriction and possibly to conduct some discovery regarding that
claim, potentially including third-party and/or expert discovery.").

## II.    ARGUMENT

### A.    Standard of Review

"[I]n ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed."  *GCI Health Care Ctrs., Inc. v. Thompson*, 209 F. Supp. 2d 63, 67 (D.D.C. 2002) (citations omitted); *Am. Fed'n of Gov't Employees, Local 446 v. Nicholson*, 475 F.3d 341, 342 (D.C. Cir. 2007) ("[S]ummary judgment is appropriate if there is no genuine issue as to any material fact and if either [cross-movant] is entitled to a judgment as a matter of law."); *see* Fed. R. Civ. P. 56.

### B.    The EC Disclosure Provisions Are Constitutional As Applied to Plaintiff's Advertisements

#### 1.    *The Disclosure Requirements Are Constitutional on Their Face*

In *McConnell v. FEC*, 540 U.S. 93 (2003), the Supreme Court upheld the facial constitutionality of each of the EC disclosure provisions at issue here.  *Id.* at 194-99, 230-31. Regarding the reporting requirements, the Court held that they are consistent with the First Amendment because "important state interests," namely "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions . . . amply support[ ] application of [the] disclosure requirements to the entire range of electioneering communications."  *Id.* at 196 (internal quotation marks omitted).  The Court acknowledged that there may be limited instances in which the First Amendment burdens of disclosure might outweigh these government interests as to particular organizations, and the Court explained how the lower courts should decide such cases, but left resolution of them to future as-applied challenges.  *Id.* at 197-99; *see infra* Part II.B.4 (explaining why Plaintiff does not meet

*McConnell*'s requirements for as-applied challenges).[4]  Five Justices joined this opinion, and three additional Justices agreed that the reporting requirements were constitutional because they "substantially relate" to the informational interest cited by the majority.  *Id*. at 321 (opinion of Kennedy, J.).  Regarding the disclaimer requirements, Chief Justice Rehnquist, writing for eight Justices, upheld the provisions as bearing "a sufficient relationship to the important governmental interest of 'shed[ding] the light of publicity' on campaign financing."  *Id*. at 231 (quoting *Buckley v. Valeo*, 424 U.S. 1, 81 (1976)).

Four years later, in *WRTL*, the Supreme Court again addressed BCRA's EC provisions. The subject of that case, however, was not disclosure, but funding — specifically, it was an as-applied challenge to § 441b(b)(2)'s prohibition on corporate funding of ECs, which *McConnell* had upheld on its face.  *McConnell*, 540 U.S. at 206-09.  In fact, the plaintiff in *WRTL* had explicitly disavowed any challenge to the disclosure provisions.  *Wisconsin Right to Life, Inc. v. FEC*, Civ. No. 04-1260, Verified Compl. for Declaratory and Injunctive Relief ¶ 36 (D.D.C. July 28, 2004) ("WRTL does not challenge the reporting and disclaimer requirements for electioneering communications, only the prohibition on using its corporate funds for its grass-roots lobbying advertisements.").[5]  The Court's controlling opinion (written by Chief Justice

---

[4]      Contrary to Plaintiff's assertion (Pl.'s Mem. in Support of Summ. J. Mot. at 23-25), the Commission has never argued that *McConnell*'s facial holding precludes the possibility of as-applied challenges to the disclosure statutes, nor did this Court hold that such actions are precluded.  *See Citizens United*, 530 F. Supp. 2d at 281 (noting that "[t]he *McConnell* Court did suggest one circumstance in which the requirement to disclose donors might be unconstitutional as-applied").

[5]      WRTL further informed the Court that "[b]ecause WRTL does not challenge the disclaimer and disclosure requirements, there will be no ads done under misleading names. *There will continue to be full disclosure of all electioneering communications, both as to disclaimers and public reports.  The whole system will be transparent.*  With all this information, it will then be up to the people to decide how to respond to the call for grassroots lobbying on a particular governmental issue."  Br. for Appellee, *FEC v. Wisconsin Right to Life, Inc.*, S. Ct. Nos. 06-969, 06-970, at 49 (Mar. 21, 2007), available at http://www.jamesmadisoncenter.org/WI/BriefforAppellee032207.pdf (emphasis added).

Roberts and joined by Justice Alito) held that corporations may fund an EC unless the communication is the functional equivalent of express advocacy, which the Chief Justice defined as a communication that "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *WRTL*, 127 S. Ct. at 2667. This holding thereby created two categories of communications that meet the statutory definition of an EC:  (1) ECs that are the functional equivalent of express advocacy, which are subject to the corporate funding restriction; and (2) ECs that are susceptible of an interpretation other than as an appeal to vote for or against a specific candidate (hereinafter "*WRTL* ads"), which may be financed with the general treasury funds of corporations or unions.

Contrary to Plaintiff's contention (Pl.'s Mem. in Support of Summ. J. Mot. ("Pl.'s Mem.") at 14-15), the Court did not hold that all *WRTL* ads are "issue speech":  The Chief Justice explicitly noted that the distinction between campaign and issue speech "dissolve[s] in practical application," and held that *funding* limitations act to "suppress[ ]" speech susceptible of multiple interpretations, contrary to the First Amendment.  *Id*. at 2669 (internal quotation marks omitted); *infra* Part II.D.3 (demonstrating that inclusion of purported political discussions in Plaintiff's film does not render film "issue speech").  *WRTL* did not decide — either explicitly or tacitly — the question of whether *WRTL* ads may constitutionally be subject to BCRA's EC *disclosure* provisions, which, the Court had previously held, do not suppress speech.  *See McConnell*, 540 U.S. at 197-99, 201 ("[FECA's] disclosure requirements are constitutional because they 'd[o] not prevent anyone from speaking.'") (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 241 (D.D.C. 2003)).

Although WRTL did not challenge any disclosure provisions, and although disclosure is not mentioned anywhere in the *WRTL* opinion, Plaintiff now attempts to construe the decision as having addressed the issue and decided that all *WRTL* ads are exempt from all "regulation,"

including both financing restrictions and disclosure requirements.  (Pl.'s Mem. at 1, 18-19 &

n.9.)  Plaintiff's argument must fail, for it misinterprets the meaning of the *WRTL* language on

which it relies.  The decision in that case turned, in part, on the Commission's argument that the

EC financing restriction was merely a funding *regulation*, not a speech *prohibition*.  *See* Br. for

Appellant FEC, *FEC v. Wisconsin Right to Life, Inc.*, S. Ct. Nos. 06-969, 06-970, at 7 (Feb. 23,

2007), available at http://www.usdoj.gov/osg/briefs/2006/3mer/2mer/2006-0969.mer.aa.pdf

(arguing that *McConnell* held financing restriction to be regulation rather than "complete ban").[6]

The Court rejected the Commission's distinction, using the term "regulation" to make clear that

the financing provision was unconstitutional as applied to certain ads even though it was not an

outright prohibition.  *See WRTL*, 127 S. Ct. at 2671 n.9 (rejecting distinction).  But the Court

nowhere suggested that disclosure was also unconstitutional or that its use of the word

"regulation" encompassed disclosure provisions of any kind.  Indeed, if the Court had been using

the word "regulation" as imagined by Plaintiff, it was tacitly deciding an issue that was not

presented in the case.  It defies logic to believe that the Court would issue such a momentous

ruling — striking down an act of Congress and significantly limiting *McConnell* — *sub silentio*.

*See Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 449 n.4 (2004) (noting that Court is

unlikely to overrule its own recent decisions *sub silentio*).  Thus, there is no reasonable basis for

Plaintiff's claim that the term "regulation," as used in *WRTL*, includes disclosure.[7]

---

[6]     *McConnell* had explained that "[b]ecause corporations can still fund electioneering
communications with PAC money [raised in a separate segregated fund, 2 U.S.C. § 441b(b)], it
is 'simply wrong' to view the provision as a 'complete ban' on expression rather than a
regulation."  540 U.S. at 204 (citation omitted).

[7]     To the extent that Plaintiff's motion can be read to argue that the constitutional
limitations on financing and disclosure provisions are necessarily coterminous — *i.e.*, that *WRTL*
ads must be exempt from disclosure because they are exempt from funding restrictions — such
an argument is plainly contrary to law.  *See infra* Part II.B.2 (collecting cases in which courts
have struck down financing restrictions but upheld disclosure provisions).

In sum, *McConnell* upheld the EC disclosure provisions on their face, and nothing in *WRTL* stands to the contrary.  It is true, as Plaintiff contends (Pl.'s Mem. at 24-25), that the Court's "rejection of [the] facial challenge to the requirement to disclose individual donors [did] not foreclose possible future challenges to particular applications of that requirement." *McConnell*, 540 U.S. at 199.  However, *McConnell* also reiterated the burden of proof that a plaintiff must meet to succeed in such a challenge, and noted that the plaintiffs — one of which was Citizens United — had not presented enough specific evidence to meet that burden.  *See infra* Part II.B.4.  Thus, Citizens United must show undisputed evidence sufficient to meet the as-applied burden defined in *McConnell* and earlier cases.  For the reasons discussed below, Plaintiff plainly cannot meet this burden.

2.     *Disclosure Requirements Are Subject to Intermediate Scrutiny and Have Repeatedly Been Upheld Even as to Spending that Cannot Constitutionally Be Limited*

It is well established that First Amendment challenges to disclosure statutes are analyzed under an "exacting scrutiny" standard, which requires that the compelled disclosure bear a "substantial relation" to an important government interest.  *Buckley*, 424 U.S. at 64, 66, 75; *see also McConnell*, 540 U.S. at 196, 231; *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 202 (1999) ("In [*Buckley*], we stated that 'exacting scrutiny' is necessary when compelled disclosure of campaign-related payments is at issue [and] upheld, as substantially related to important governmental interests, the recordkeeping, reporting, and disclosure provisions of [FECA] . . . ."); *Alaska Right To Life Comm. v. Miles*, 441 F.3d 773, 788 (9th Cir. 2006) (describing standard applied in *McConnell*); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 663 (5th Cir. 2006); *Jones v. Unknown Agents of FEC*, 613 F.2d 864, 875 (D.C. Cir. 1979) (citing *Buckley*); *Colo. Right To Life Comm., Inc. v. Davidson*, 395 F. Supp. 2d 1001, 1015 (D. Colo. 2005) (citing *Buckley*); *Herschaft v. New York City Campaign Fin. Bd.*, 127 F.

Supp. 2d 164, 167 (E.D.N.Y. 2000) ("[T]he government's interests must be 'sufficiently important to outweigh the possibility of infringement' and there must be a 'relevant correlation' or 'substantial relation' between the governmental interests and the information required to be disclosed.") (quoting *Buckley*).  As the Fourth Circuit recently held, in upholding the constitutionality of state judicial-election disclosure laws,

> Reporting and disclosure requirements in the campaign finance realm "must survive exacting scrutiny." *Buckley*, 424 U.S. at 64. The plaintiffs argue that "exacting scrutiny" in this context is equivalent to strict scrutiny (requiring narrow tailoring to a compelling state interest), but this argument is inconsistent with *Buckley* and subsequent cases.  In *Buckley* the Supreme Court held that there must be "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed."  424 U.S. at 64.  In applying this test, the Court upheld a FECA disclosure requirement that bore a "sufficient relationship to a substantial governmental interest."  424 U.S. at 80.  Likewise, the Court recently upheld BCRA's disclosure requirements based on its determination that the requirements advanced "important state interests."  *McConnell*, 540 U.S. at 93.

*N.C. Right to Life Comm. Fund for Indep. Political Expenditures v. Leake*, 524 F.3d 427, 439 (4th Cir. 2008).[8]  The Ninth Circuit has also made clear that *McConnell* "did not apply 'strict scrutiny' or require a 'compelling state interest.'  Rather, the Court upheld the disclosure requirements as supported merely by 'important state interests.'"  *Alaska Right To Life*, 441 F.3d at 788 (internal citations omitted).  Thus, "exacting scrutiny," as courts apply it to disclosure statutes, is identical to the constitutional standard more commonly known as intermediate scrutiny.  *See*, *e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 220 (1995) (noting that

---

[8]    Plaintiff discusses at some length (Pl.'s Mem. at 20-22) a companion case, *N.C. Right to Life, Inc. v. Leake*, Nos. 07-1438, 07-1439, 2008 WL 1903462 (4th Cir. May 1, 2008).  The provisions at issue in the case Plaintiff cites, however, implicated mandatory financing restrictions such as independent expenditure and contribution limits for groups that met the definition of "political committee."  *See id.*  In contrast, the *Leake* opinion we cite above specifically and thoroughly examined disclosure requirements for campaign spending free from any mandatory financing restrictions.

intermediate scrutiny standard requires statute to be "substantially related to the achievement of an important governmental objective") (internal quotation marks omitted).

Plaintiff nonetheless argues that disclosure provisions are subject to "'exacting scrutiny' (i.e., strict scrutiny)" (Pl.'s Mem. at 9, 22), and that, "regardless of the level of scrutiny," the first constitutional inquiry in the disclosure context must be whether the activity giving rise to the disclosure requirement is "unambiguously-campaign-related." (*Id*. at 17.) Neither of these assertions has any basis in law.

First, as discussed above, *Buckley*'s "exacting scrutiny" standard, as applied to *disclosure requirements*, was intermediate, not strict, scrutiny. *Buckley*, 424 U.S. at 64; *Leake*, 524 F.3d at 439. Plaintiff's contrary argument cites to *Buckley*'s use of the phrase "exacting scrutiny" in striking down FECA's *expenditure limits*, to which the Court applied strict scrutiny. *See Buckley*, 424 U.S. at 44-45. But *Buckley* explicitly distinguished the scrutiny applicable to such "limitations on core First Amendment rights of political expression," *id*., from infringements on the "privacy of association" at issue in *disclosure requirements*. *Id*. at 64. In the context of potential associational burdens arising from disclosure requirements, *Buckley* specifically defined exacting scrutiny as requiring only "a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed." *Id*. at 64 (quotation marks omitted). Furthermore, to the extent that *Buckley*'s internally differing uses of the phrase "exacting scrutiny" caused any confusion, *McConnell* expressly stated that the proper standard for disclosure obligations is the intermediate "important state interests" test. 540 U.S. at 196. Neither *Buckley* nor *McConnell* applied strict scrutiny to any of FECA's disclosure requirements.

Plaintiff also cites *WRTL*, 127 S. Ct. at 2669 n.7, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 786 (1978), and *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995), for the proposition that strict scrutiny applies to disclosure requirements. (Pl.'s Mem. at 22.) But the

13

footnote in *WRTL* merely cited *Buckley*'s application of strict scrutiny to expenditure limits, *WRTL*, 127 S. Ct. at 2669 n.7 (citing *Buckley*, 424 U.S. at 44), and *Bellotti* applied strict scrutiny to "a prohibition . . . directed at speech itself," *Bellotti*, 435 U.S. at 786 (striking down expenditure limit). Neither case applied strict scrutiny to any disclosure provision. *McIntyre* applied strict scrutiny to a statute requiring identification of pamphlet distributors, but the Court explicitly distinguished this type of "anonymous campaign literature" from the financial disclosures at issue in Buckley. *McIntyre*, 514 U.S. at 353; *see also id.* at 379 (Scalia, J., dissenting) (noting that Court's First Amendment cases do not "acknowledge any general right to anonymity . . . . Rather, they recognize[ ] a right to an *exemption* from otherwise valid disclosure requirements on the part of someone who could show a 'reasonable probability' that the compelled disclosure would result in 'threats, harassment, or reprisals from either Government officials or private parties'") (quoting *Buckley*; emphasis in original). Many courts have recognized this distinction between mandatory in-person identification, which may give rise to strict scrutiny, and requirements to make after-the-fact filings with a government agency, which are reviewed under the lower standard. *See Buckley v. Am. Constitutional Law Found.*, 525 U.S. at 198 (striking down statute requiring petition-circulators to wear name badges but upholding statute requiring them to file affidavits identifying themselves); *Majors v. Abell*, 361 F.3d 349, 353-54 (7th Cir. 2004) (distinguishing *McIntyre*); *Am. Civil Liberties Union of Nev. v. Heller*, 378 F.3d 979, 1002 (9th Cir. 2004); *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1199 (10th Cir. 2000). Thus, there is no support for Plaintiff's claim that strict scrutiny applies to statutes requiring the filing of disclosure statements.

Throughout its brief, Plaintiff also argues that the First Amendment always prohibits the government from mandating disclosure regarding advertising, unless the speech contains specific

words unambiguously advocating the election or defeat of candidates.  This assertion severely

misinterprets *Buckley* and its progeny.  Plaintiff distorts *Buckley* by contending that the decision

enshrined the phrase "unambiguously-campaign-related" as a stand-alone constitutional "test" or

"requirement" (Pl.'s Mem. at 17) that all disclosure statutes must pass.  On the contrary, this

phrase was merely part of the Court's explanation that its statutory construction of "expenditure"

in one part of the Act's disclosure provisions would resolve "serious problems of vagueness,"

*Buckley*, 424 U.S. at 76 — a problem that the Court has explicitly noted, and Plaintiff has

conceded (Pl.'s Mem. at 20 n.22), does not arise in the context of BCRA's bright-line EC

definition.  *McConnell*, 540 U.S. at 194 ("[W]e observe that [BCRA's] definition of

'electioneering communication' raises none of the vagueness concerns that drove our analysis in

*Buckley*.").  Indeed, to the extent that *Buckley* caused any confusion on this point, the Court put

the question to rest in *McConnell*, which, in upholding BCRA's EC provisions, noted that

*Buckley*'s "express advocacy limitation, in both the expenditure and the disclosure contexts, was

the product of statutory interpretation rather than a constitutional command."  *McConnell*, 540

U.S. at 191-92.  Thus, *Buckley*'s interpretation of the term independent "expenditure" (when

made by individuals or groups other than political committees) to mean spending that is

"unambiguously related" to the campaign of a candidate, 424 U.S. at 79-80, has no bearing on

the electioneering communication disclosure provisions; as the *McConnell* Court has explained,

the definition of that term requires no narrowing construction to avoid vagueness.

Plaintiff's misinterpretation of *Buckley* is further demonstrated by the Supreme Court's

subsequent cases addressing disclosure.  Plaintiff cites *FEC v. Mass. Citizens for Life, Inc.*, 479

U.S. 238 (1986) ("*MCFL*"), *Bellotti*, and *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290

(1981), for the proposition that "no case authorizes disclosure of communications that are not

'unambiguously campaign related'" (Pl.'s Mem. at 11) — or, as Plaintiff elaborates,

"unambiguously related to the campaign of a particular federal candidate."  (Pl.'s Mem. at 1, 8.)

This assertion is manifestly false, because *Bellotti* and *Citizens Against Rent Control* had nothing

whatsoever to do with any candidate campaign; they concerned pure issue speech regarding

citizen initiatives and referenda.  *See Bellotti*, 435 U.S. at 790 (distinguishing referendum from

candidate campaign); *Citizens Against Rent Control*, 454 U.S. at 297 (same).  Importantly, these

non-campaign cases nonetheless spoke with approval of mandatory financial disclosure.  *Bellotti*,

435 U.S. at 791-92 n.32 ("Identification of the source of advertising [for or against initiatives]

may be required as a means of disclosure, so that the people will be able to evaluate the

arguments to which they are being subjected."); *Citizens Against Rent Control*, 454 U.S. at 298-

99 ("[T]here is no risk that the Berkeley voters will be in doubt as to the identity of those whose

money supports or opposes a given ballot measure since contributors must make their identities

known under . . . the ordinance, which requires publication of lists of contributors in advance of

the voting."); *see also Buckley v. Am. Constitutional Law Found.*, 525 U.S. at 204 (upholding

mandatory disclosure of donations made to organizations to pay ballot-initiative petition

circulators).

Plaintiff similarly asserts that *Citizens Against Rent Control* and *Bellotti* must have

applied the "unambiguously campaign related" requirement because the former "dealt with

contributions to a campaign committee" and the latter "construed contributions and

expenditures," and because *Buckley* had previously construed those terms.  (*See* Pl.'s Mem. at 12

(emphasis and quotation marks omitted).)  But this is nothing more than obfuscation:  *Citizens*

*Against Rent Control* did not involve contributions that would be spent to affect *candidate*

campaigns; *Bellotti* did not involve expenditures in candidate elections; *Buckley* narrowly

construed the term "expenditure" in certain contexts due to vagueness concerns; and neither

*Citizens Against Rent Control* nor *Bellotti* even mentioned *Buckley*'s construction, much less

applied it to ballot initiative funding issues.  *See Bellotti*, 435 U.S. at 775-95 (constitutional analysis); *Citizens Against Rent Control*, 454 U.S. at 294-300 (same).[9]  Thus, there simply is no connection between *Buckley*'s narrowing of FECA and the holdings of these other cases, much less any plausible argument that *Bellotti* or *Citizens Against Rent Control* implicitly adopted an "unambiguously campaign related" test or otherwise subjected disclosure statutes to any such standard.

It is equally nonsensical for Plaintiff to assert that *MCFL* "recognized the unambiguously-campaign-related requirement" (Pl.'s Mem. at 10) as a broad principle applicable to disclosure requirements, because the issue in that case was FECA's limits on corporate independent expenditures, and the communications at issue expressly advocated for and against specific candidates.  *MCFL*, 479 U.S. at 249-50.  Indeed, in finding those funding limits unconstitutional as applied to MCFL, the Court noted the benefits of mandatory disclosure, even when the underlying expenditures to be disclosed were constitutionally exempt from limitation. *Id*. at 262 (striking down independent expenditure restrictions on certain non-profit organizations in part because "reporting obligations provide precisely the information necessary to monitor MCFL's independent spending activity"); *see also Buckley,* 424 U.S. at 44, 80 (striking expenditure limits but upholding mandatory disclosure of expenditures); *R.I. Affiliate Am. Civil Liberties Union, Inc. v. Begin*, 431 F. Supp. 2d 227, 239 (D.R.I. 2006) (citing *MCFL* and *Berkeley* as cases in which Supreme Court found funding restrictions unnecessary in light of disclosure requirements).  Accordingly, *MCFL* stands directly contrary to Plaintiff's argument that *WRTL*'s holding regarding EC funding must be extended to the EC disclosure requirements.

---

[9]     In fact, the only times the word "campaign" appears in the majority opinion in *Bellotti* are when the Court (a) distinguishes referenda from candidate campaigns, 435 U.S. at 788 n.26, and (b) notes the continued applicability of disclosure provisions.  *Id.* at 792 n.32.

Finally, in *McConnell*, the Court recognized that the statutory EC definition encompassed issue speech, 540 U.S. at 207 (discussing inclusion of some "pure issue ads" within EC definition), but the Court nonetheless facially upheld the disclosure requirements as "to the entire range of 'electioneering communications.'" *Id.* at 196. This necessarily means that disclosure is not constitutionally limited to "unambiguously campaign related" advertising, for such a limitation would be impossible to reconcile with *McConnell*'s facial upholding of the disclosure provisions as "to the entire range" of ECs.[10]

In sum, Plaintiff's proposition that the Constitution prohibits disclosure requirements that are not "unambiguously campaign related" is unsupported in the Supreme Court's disclosure jurisprudence; the proper inquiry in this action is whether the EC disclosure provisions as applied to *WRTL* ads bear a substantial relationship to an important government interest.[11]

>    3.    *Disclosure Regarding WRTL Ads Furthers Important Government Interests*

The important government interests relating to disclosure of political activity are well recognized: "[D]isclosure serves informational functions, as well as the prevention of corruption and the enforcement of the contribution limitations." *Buckley*, 424 U.S. at 83; *see also McConnell*, 540 U.S. at 196. More specifically, courts have identified disclosure-related

---

[10]    The Commission again stresses, *see supra* p. 8 n.4, that it is not arguing that *McConnell*'s facial holding precludes as-applied challenges to the disclosure provisions. But the holding does belie Plaintiff's argument that the Court has categorically excluded from disclosure requirements all ECs that are not the functional equivalent of candidate campaign ads.

[11]    Plaintiff also contends that its ads are commercial speech, *i.e.*, advertising the sale of a product. (*See, e.g.*, Plaintiff's Statement of Undisputed Material Facts ("Pl.'s Facts") ¶¶ 32 ("[The] Ads will promote showings of *Hillary: The Movie* in theaters and sales of *Hillary* in DVD format . . . ."), 33 (stating that ads will be timed "to maximiz[e] box office, cable on-demand, and DVD sales").) Even if this contention is accurate, mandatory disclosure of commercial speech is subject to even fewer constitutional restrictions than those governing disclosure of political advertising. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562-63 (1980) ("The Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression.").

government interests in (a) encouraging maximum transparency in political activity by providing financial information to the public, (b) facilitating enforcement of substantive funding regulations, and (c) deterring actual or apparent corruption.[12]  The informational and enforcement interests apply with full force to *WRTL* ads, as discussed below.

<div align="center">a.    *Providing Information to the Public*</div>

The government's interest in providing information to the public was recognized in *Buckley*, which held the interest sufficient to justify mandatory disclosure of campaign financing and express advocacy.  *Buckley*, 424 U.S. at 66-68, 81-82 ("[T]he disclosure requirement … [is] a minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view.").  *McConnell* then applied *Buckley*'s holding regarding this interest to uphold the EC disclosure provisions.  *McConnell*, 540 U.S. at 196, 200-01; *see also id*. at 237-43 (upholding broadcast station record-keeping requirements in part to "help both the regulatory agencies and the public … determine the amount of money that individuals or groups, supporters or opponents, intend to spend to help elect a particular candidate").  *McConnell* also quoted with approval the lower court's finding that the corporate plaintiffs challenging the disclosure provisions purported to seek "wide-open" speech, yet "ignore[d] the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace."  *Id*. at 196-97.  Plaintiff engages in no analysis of *Buckley* or *McConnell*'s holdings on these points, instead resting its entire argument again on the

---

[12]      Regarding communications that meet the statutory definition of ECs, the Court in *WRTL* held that the anti-corruption interest did not apply to communications other than express advocacy or its functional equivalent.  *See WRTL*, 127 S. Ct. at 2672.  Thus, because Plaintiff's planned ads are not the functional equivalent of express advocacy, the Commission is not relying upon an anti-corruption interest to justify disclosure requirements as applied to Plaintiff's *WRTL* ads.

premise that the government's only interest is in disclosure of "unambiguously campaign related" speech. Once more, however, Plaintiff's assertion is contrary to law.

The government's informational interest has repeatedly been found to justify mandatory disclosure relating to two different forms of "pure" issue advocacy. First, the informational interest has been recognized extensively in the context of issue advocacy regarding ballot initiatives. *See, e.g.*, *Buckley v. Am. Constitutional Law Found.*, 525 U.S. at 204 (upholding requirement to disclose donations made to organizations to pay ballot-initiative petition circulators); *Bellotti*, 435 U.S. at 792 n.32 ("Identification of the source of advertising may be required as a means of disclosure . . . ."); *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1107 (9th Cir. 2003) (holding that state's informational interest, where factually supported, is sufficient to justify mandatory financial disclosure regarding ballot-initiative advocacy); *R.I. Affiliate*, 431 F. Supp. 2d at 236 (citing *Cal. Pro-Life Council*). This is particularly noteworthy here because the Supreme Court has held that ballot-initiative activity is inherently issue-focused and does not have the same corruptive potential as spending to influence candidate elections. *Bellotti*, 435 U.S. at 790 ("The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue.") (internal citations omitted); *McIntyre*, 514 U.S. at 353 n.15 (quoting *Bellotti*). For this reason, the *WRTL* Court itself considered ballot-initiative advertising to be analogous to *WRTL* ads for First Amendment purposes. *See WRTL*, 127 S. Ct. at 2664-65 (citing *Bellotti*), 2671-73 (same). Thus, any claim by Plaintiff that the government has no interest in disclosure of non-campaign issue advocacy is contrary to Supreme Court precedent and must fail: The interest necessarily extends to issue speech "so that the people will be able to evaluate the arguments to which they are being subjected." *Bellotti*, 435 U.S. at 792 n.32.

20

Second, courts are nearly unanimous in upholding mandatory disclosure of lobbying expenditures on the basis of the government's interest in informing the public of who is attempting to sway the resolution of public issues and how they are attempting to do so. *See*, *e.g.*, *United States v. Harriss*, 347 U.S. 612, 625 (1954) ("[F]ull realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures."); *Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 460 (11th Cir. 1996) (upholding state lobbyist disclosure statutes in light of state interest in helping citizens "apprais[e] the integrity and performance of officeholders and candidates, in view of the pressures they face"); *Minn. State Ethical Practices Bd. v. Nat'l Rifle Ass'n of Am.*, 761 F.2d 509, 512 (8th Cir. 1985) (quoting *Harriss*); *Nat'l Ass'n of Mfrs. v. Taylor*, --- F. Supp. 2d ---, Civ. No. 08-208, 2008 WL 1776997, at *7 (D.D.C. Apr. 18, 2008), *appeal docketed*, No. 08-5085 (D.C. Cir.) (denying motion for preliminary injunction against enforcement of lobbyist disclosure statute where injunction "would prevent . . . the public from gaining access to the very information Congress sought to have revealed").[13]  Lobbying, like issue advocacy, typically does not involve candidate campaigns; it is issue-oriented political activity protected by the First Amendment, and it therefore shares most of the key characteristics of *WRTL* advertising that the Supreme Court found significant in that case.  See *WRTL*, 127 S. Ct. at 2667 ("The ads focus on a legislative issue [and] take a position on the issue . . . .  The ads do not mention an election, candidacy, political party, or challenger . . . .").  Thus, these cases make clear that the

---

[13]      *See also Comm'n on Indep. Coll. & Univ. v. N.Y. Temp. State Comm'n on Regulation of Lobbying*, 534 F. Supp. 489, 494-95 (N.D.N.Y. 1982) ("The lobby law serves to apprise the public of the sources of pressure on government officials, thus better enabling the public to access their performance."); *Am. Civil Liberties Union of N.J. v. N.J. Election Law Enforcement Comm'n*, 509 F. Supp. 1123, 1129 (D.N.J. 1981) ("The voting public should be able to evaluate the performance of their elected officials in terms of representation of the electors' interest in contradistinction to those interests represented by lobbyists.") (citation omitted); *Kimbell v. Hooper*, 665 A.2d 44, 49 (Vt. 1995) ("Vermont's lobbyist disclosure law is a reasonable means of evaluating the lobbyist's influence on the political process.").

government's interest in providing information to the public extends beyond speech about candidate elections and encompasses activity that attempts to sway public opinion on issues, just as Plaintiff claims to wish to do here.

In sum, even accepting *arguendo* the proposition that Plaintiff's *WRTL* ads are issue speech,[14] such ads still constitute attempts to sway public opinion or action on the specified issues, just as ballot-initiative advertising and lobbying activities are. In each of these areas, the government's informational interest has been uniformly recognized, and mandatory disclosure provisions have been consistently upheld.[15]

> b.    *Facilitating Enforcement of Funding Regulations*

The second important government interest courts have recognized in upholding disclosure statutes is the interest in enabling enforcement of substantive funding regulations. In the electoral context, *Buckley* upheld FECA's disclosure requirements as advancing the government's interest in "gathering the data necessary to detect violations of the contribution limitations." 424 U.S. at 68. *McConnell* similarly held that mandatory disclosure was constitutional in light of the interest in "gathering the data necessary to enforce more substantive electioneering restrictions." 540 U.S. at 196; *see also id*. at 200-01 (upholding compelled disclosure of executory contracts where to hold otherwise would "open a significant loophole" in

---

[14]    As Chief Justice Roberts noted when he reaffirmed *Buckley*'s holding that the "'distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application,'" *WRTL*, 127 S. Ct. at 2669 (quoting *Buckley*, 424 U.S. at 42), an ad may both resemble advocacy for or against candidates and advocate a position on an issue. Thus, even an ad that is exempt from BCRA's financing restriction because it is susceptible of an interpretation as non-candidate advocacy may in fact influence an election.

[15]    To the extent that Plaintiff's *WRTL* ads are commercial speech, the government's informational interest and ability to require disclosure may be even stronger. *See Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626, 651-52 (1985) (upholding disclaimer requirements in attorney advertising); *Central Hudson*, 447 U.S. at 562-63 (noting "lesser protection" accorded to commercial speech).

disclosure requirements); *id.* at 237 (upholding broadcast station record-keeping provisions to "provide an independently compiled set of data for purposes of verifying candidates' compliance with the disclosure requirements and source limitations of BCRA and [FECA]"); *cf. Daggett v. Comm'n on Gov't Ethics & Election Practices*, 205 F.3d 445, 466 (1st Cir. 2000) (upholding expenditure disclosure statutes to enable administration of public campaign financing system).

This enforcement interest is not limited to spending by candidates or those coordinating their spending with candidates. The Supreme Court has recognized Congress's "legitimate fear" that, if disclosure were limited to such spending, "efforts would be made, as they had been in the past, to avoid the disclosure requirements by routing financial support of candidates through avenues not explicitly covered by the general provisions of the Act." *Buckley*, 424 U.S. at 76 (internal quotation marks omitted). Thus, the government's interest as it relates to disclosure of independent campaign-related spending "can be as strong as it is in coordinated spending." *See Buckley*, 424 U.S. at 81; *Citizens for Responsible Gov't*, 236 F.3d at 1197 (upholding state disclosure requirements for independent expenditures); *Daggett*, 205 F.3d at 466 (same); *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 443 (4th Cir. 1999) (upholding mandatory disclosure of data regarding advertising for or against state candidates).

Nor is the enforcement interest limited to mandatory disclosure of disbursements by entities whose major purpose is campaign activity. For example, the Supreme Court in *MCFL* held that the defendant corporation must be allowed to finance independent expenditures with its corporate treasury funds because it presented no "threat at all" of corruption due to its particular lack of business activity and funding. 479 U.S. at 263. Nevertheless, the Court held that MCFL would have to report its independent expenditures so that the public would have information, the Commission could monitor its independent spending, and the Commission could review whether the corporation's major purpose has become campaign activity:

23

> Even if [the contribution limit] is inapplicable, an independent expenditure of as little as $250 by MCFL will trigger the disclosure provisions of § 434(c).  As a result, MCFL will be required to identify all contributors who annually provide . . . funds intended to influence elections, will have to specify all recipients of independent spending . . ., and will be bound to identify all persons making contributions . . . who request that the money be used for independent expenditures.  *These reporting obligations provide precisely the information necessary to monitor MCFL's independent spending activity and its receipt of contributions*. . . .
>
> Furthermore, should MCFL's independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee.  As such, it would automatically be subject to the obligations and restrictions applicable to those groups whose primary objective is to influence political campaigns.  In sum, there is no need for the sake of disclosure to treat MCFL any differently than other organizations that only occasionally engage in independent spending on behalf of candidates.

*Id*. at 262 (internal citation omitted and emphasis added).  In other words, even though *MCFL* corporations may finance independent expenditures and all electioneering communications with their general treasury funds, FECA's disclosure provisions remain applicable to such corporations so that the government can determine if and when they cross the line from exempt to regulable activity.

Analogously, even though the prohibition on corporate spending cannot constitutionally be applied when corporations run *WRTL* ads, the EC disclosure provisions remain applicable to such ads because the government has an important enforcement interest in determining which ECs are exempt under *WRTL* and which are regulable.  The Ninth Circuit recognized such an interest in *Alaska Right to Life*, in which the court analyzed a state disclosure statute similar in both the reporting and disclaimer areas to FECA's disclosure provisions regarding ECs.  *See* 441 F.3d at 788-93.  The plaintiff in that case, an *MCFL* corporation, argued that "to the degree disclosure . . . is required for 'issue advocacy' communications . . . , there is no compelling state interest that would justify such a requirement."  *Id*. at 793.  The court rejected ARTL's contention, noting that the *MCFL* Court itself had found sufficient state interests, including an

enforcement interest, to justify mandatory disclosure regarding MCFL's activities.  *Id.* at 791-93.
The Ninth Circuit therefore held that ARTL could constitutionally be compelled to make
disclosures regarding advertising that met the statutory definition of an EC but that consisted
only of issue advocacy — *i.e.*, a subset of what would now be known as *WRTL* ads.

This analysis applies with equal force to BCRA's EC disclosure provisions:  Without
disclosure, the Commission would have difficulty knowing when or where ECs are being
broadcast and would therefore be seriously harmed in its ability to ensure that communications
purporting to be *WRTL* ads meet the criteria to be financed by corporate or union general
treasury funds.  Thus, requiring all EC advertisers to disclose serves the government's important
interest in "gathering the data" necessary to ensure that the Act is properly enforced.

> 4.     *Plaintiff Demonstrates No Constitutional Burden Arising from the
>         Disclosure Provisions*

Citizens United fails, as a matter of both law and fact, to demonstrate any cognizable
First Amendment burden arising from the EC disclosure provisions.

> a.     *Plaintiff Presents No Evidence that Its Donors Will Suffer
>         Reprisals*

Both *Buckley* and *McConnell* held that as-applied challenges to disclosure requirements
might be appropriate in a single situation:  when an organization's disclosure would result in a
"reasonable probability" of "threats, harassment, and reprisals" of its members.  *McConnell*, 540
U.S. at 198-99 (citing *Buckley*, *NAACP v. Alabama*, 357 U.S. 449 (1958), and *Brown v. Socialist
Workers '74 Campaign Comm.*, 459 U.S. 87 (1982)); *see also Buckley*, 424 U.S. at 69-74, 82
n.109 (citing *NAACP*).  Proof of burdensome reprisal has been demonstrated, however, only in
cases involving organizations, such as the NAACP and the Socialist Workers Party, whose
members faced actual, documented danger at the relevant time.  *See Buckley*, 424 U.S. at 69
(noting that plaintiffs in *NAACP* faced "economic reprisal, loss of employment, physical

coercion, and other manifestations of public hostility") (citation omitted); *McConnell*, 540 U.S.

at 198-99 (noting that *Brown* Court found "reasonable probability" of "threats, harassment, and

reprisals").  The *Buckley* and *McConnell* Courts, while recognizing harassment as a *potential*

burden, specifically found no evidence of *actual* harassment in the FECA/BCRA context and

held that such evidence would be required to mount a reprisal-based, as-applied First

Amendment challenge to the Act's disclosure provisions.  *Buckley*, 424 U.S. at 69 ("No record of

harassment on a similar scale was found in this case."); *McConnell*, 540 U.S. at 199 (upholding

lower court finding that "concerns" of plaintiffs regarding harassment were unsupported due to

"lack of specific evidence"); *see also Alaska Right To Life*, 441 F.3d at 793-94 (rejecting

harassment-based, as-applied challenge to disclosure requirements); *Citizens United*, 530

F. Supp. 2d at 281; *cf. Nat'l Ass'n of Mfrs. v. Taylor*, Civ. No. 08-208, 2008 WL 1390606, at

*21-22 (D.D.C. Apr. 11, 2008), *appeal docketed*, No. 08-5085 (D.C. Cir.) (rejecting First

Amendment challenge to lobbyist disclosure statute under *NAACP* standard where plaintiff

"offer[ed] only speculation that harm may befall its members").[16]  Accordingly, in the absence

of specific evidence that a particular organization (or its members) faces a reasonable probability

---

[16]    *See also Mariani v. United States*, 212 F.3d 761, 775 (3d Cir. 2000) (en banc) (citing
*Buckley* for proposition that FECA disclosure provisions did not give rise to "reasonable
probability" of "threats, harassment, or reprisals"); *Jones*, 613 F.2d at 876-77 (rejecting minor
party's claim that FEC investigation subjected party to threats or harassment); *Colo. Right To
Life*, 395 F. Supp. 2d at 1016 n.17 (rejecting First Amendment claim because plaintiff did not
provide evidence of threats or harassment arising from disclosure); *cf. In re Grand Jury
Proceedings*, 776 F.2d 1099, 1103-04 (2d Cir. 1985) (holding that party asserting First
Amendment associational privilege to withhold organization's membership information from
grand jury "must show a reasonable probability that compelled disclosure would subject an
organization's members to threats, harassment, or reprisals from either government officials or
private parties") (citing *Buckley*).

of *NAACP*-type harassment arising from the mandated disclosures, a plaintiff alleging this kind of burden cannot prevail in an as-applied challenge to the EC disclosure provisions.[17]

Citizens United presents no admissible evidence whatsoever regarding harassment of its donors (*see* Def.'s Statement of Genuine Issues ¶ 35), much less evidence sufficient to show a reasonable probability that disclosed donors would suffer constitutionally significant repercussions. Indeed, far from fearing reprisals, Plaintiff boasts of its "consistent and open association" with powerful government officials and political candidates. (Def.'s Facts ¶ 28 (noting also that Plaintiff threatened to sue news organization for referring to Plaintiff as "fringe militia").) Furthermore, Citizens United already publicly discloses donors to its political committee and section 527 organizations: Since 1994, Citizens United has disclosed approximately 1,200 political committee donations and approximately 11,500 donations to its 527s, including the names and addresses of each donor, as well as many of their occupations and employers. (*See* Def.'s Facts ¶¶ 20-24.) In light of this extensive and ongoing record of disclosure, Citizens United's lack of any evidence regarding reprisals is particularly telling. *See Nat'l Ass'n of Mfrs.*, 2008 WL 1390606, at *22 (noting absence of evidence of harassment despite plaintiff's voluntary public disclosure of hundreds of individuals and corporations affiliated with plaintiff).

Instead of providing evidence, Plaintiff cites the district court record from *McConnell*, in which certain plaintiffs attempted to make factual showings regarding disclosure-related burdens

---

[17]    If a donor faced a real threat of reprisal, the corporation could request that the Commission exempt disclosure of that donor from the relevant disclosure requirements on constitutional grounds, as the Socialist Workers Party has done repeatedly and successfully. *See* FEC Advisory Opinions 1990-13 (granting party exemption from disclosure requirements due to substantiated threat of reprisals), 1996-46 (same), 2003-02 (same); *see also Electioneering Communications*, 72 Fed. Reg. at 72,901 ("Organizations with significant and serious threats of reprisal or harassment may seek as-applied exemptions to the disclosure requirements under *Socialist Workers* through advisory opinions and court filings."). All FEC advisory opinions are available on the Commission's website at http://saos.nictusa.com/saos/searchao.

(Pl.'s Mem. at 28), without referring to any evidence that Citizens United — which was also a plaintiff in *McConnell* — itself introduced. *See McConnell*, 251 F. Supp. 2d at 227-29 (discussing testimony of NRA, ACLU, and three trade organizations). Not only are these facts therefore irrelevant to Citizen United's pending as-applied challenge, but Plaintiff also fails to note that the Supreme Court found the evidence of burdens presented in *McConnell* insufficient to outweigh the government's interests in disclosure. *McConnell*, 540 U.S. at 199. Thus, because Plaintiff, like the other *McConnell* plaintiffs, fails to make a sufficient factual showing regarding donor harassment, Plaintiff's claim must fail for lack of evidence.

Plaintiff's claim also fails as a matter of law. Citizens United attempts to sidestep its dearth of facts with the untenable argument that disclosure is per se so constitutionally burdensome that the EC disclosure provisions must be struck down. (*See* Pl.'s Mem. at 25-32.) In support, Plaintiff cites *Buckley*, where the Court found that "encroachments" on First Amendment rights require the application of intermediate scrutiny. *See Buckley*, 424 U.S. at 64, 68. But, having established the standard of scrutiny, *Buckley* then looked to the evidence that the disclosing parties would suffer threats, harassment, or reprisals upon disclosure. *Id*. at 69-74. Where such evidence is lacking, as in *Buckley* and here, as-applied challenges fail. *Id*.; *see supra* pp. 25-27.

Plaintiff also cites *McIntyre* and *AFL-CIO v. FEC*, 333 F.3d 168 (D.C. Cir. 2003), neither of which demonstrates the existence of any constitutional burden on Citizens United. As noted previously, *McIntyre* and subsequent cases distinguish between mandatory in-person self-identification, which is not at issue in this action, and disclosure through government filings (such as in EC disclosure), which has been addressed and upheld in the line of cases from *Buckley* to *McConnell*. *See supra* Part II.B.2. *AFL-CIO* is even more removed: In that case, the Commission had subpoenaed polling data, campaign planning documents, and other strategic

28

information from organizations that had been charged with — but ultimately cleared of — wrongdoing.  *See* 333 F.3d at 171.  The D.C. Circuit held that a regulation under which the Commission intended to make the information public after the conclusion of the investigation was constitutionally invalid in light of the organizations' evidence that "disclosing detailed descriptions of training programs, member mobilization campaigns, polling data, and state-by-state strategies [would] directly frustrate the organizations' ability to pursue their political goals by revealing to their opponents activities, strategies and tactics."  *Id*. at 176-77.  This regulation accordingly posed a danger of unilateral disclosure not present in the universally applicable requirements at issue in this case, and no comparable strategic material is at issue here.

Finally, Plaintiff paraphrases several articles discussing, *inter alia*, the "privacy costs" of disclosure and penalties that have been imposed on groups that fail to make required disclosures. (Pl.'s Mem. at 28-32.)  Plaintiff offers neither any explanation of how these articles are relevant to the specific issue of Citizens United's as-applied challenge (as opposed to disclosure in general) nor any legal authority supporting their assertions.  In short, the extended narration of these articles merely highlights the absence of evidence and caselaw supporting Plaintiff's claim.

       b.       *Plaintiff Presents No Evidence that the Disclosure Requirements Will Chill Its Speech*

Plaintiff also argues that the disclosure requirements will chill its speech.  (*See* Pl.'s Mem. at 6.)  The manner in which such a chill would operate under this theory is unclear:  To the extent that Plaintiff's claim is based on speculation that the reporting requirements might cause donors not to contribute to Plaintiff because of a fear of reprisal or a preference for non-disclosure (*see* Plaintiff's Statement of Undisputed Material Facts ("Pl.'s Facts") ¶¶ 35, 39), the argument fails for the reasons stated above.  *See supra* Part II.B.4.a; *see also Buckley*, 424 U.S. at 68 (holding disclosure requirements constitutional even though "[i]t is undoubtedly true that public disclosure of contributions . . . will deter some individuals who otherwise might

29

contribute."). To the extent Plaintiff claims that the disclosure requirements will chill its speech

directly, this argument has been explicitly rejected in *McConnell* and numerous other cases

holding that financial reporting relating to speech is, as a matter of law, too removed in time and

space from the speech act to constitute an unconstitutional hindrance to speech. *See McConnell*,

540 U.S. at 197-99, 201 ("[FECA's] disclosure requirements are constitutional because they

'd[o] not prevent anyone from speaking.'") (quoting *McConnell*, 251 F. Supp. 2d at 241); *see

also Buckley v. Am. Constitutional Law Found.*, 525 U.S. at 198 (rejecting challenge to

requirement that petition circulators file affidavits); *Majors*, 361 F.3d at 354; *Citizens for

Responsible Gov't*, 236 F.3d at 1199; *ACLU v. Heller*, 378 F.3d at 1002; *cf. Harriss*, 347 U.S. at

626 (rejecting First Amendment challenge to federal lobbyist disclosure statute because "hazard"

of speech being silenced by financial disclosure was "too remote" to outweigh government's

interest in protecting legislative process).[18] In short, there is no authority for the proposition that

financial disclosure imposes an unconstitutional chill on speech outside the context of reprisals

against disclosed donors, and, even if such authority existed, Plaintiff has not demonstrated any

direct chill on its speech.

        *c.*    *The Disclaimer Requirements Impose No Constitutional Burdens*

     Although Plaintiff makes a factual allegation that the disclaimer requirements will cause

Plaintiff to "mislead the public" by "identifying its speech as electioneering speech" (Pl.'s Facts

¶ 39), Plaintiff's brief makes no argument regarding this claim. In fact, Plaintiff's brief makes

---

[18]     Indeed, such a claim would be particularly dubious here, given that there is currently an eight-week period (between now and thirty days before the Democratic convention) during which Plaintiff can advertise its films nationwide, through any medium, without these communications' being regulated as ECs. (Def.'s Facts ¶ 12.) Although Plaintiff has alleged that it is most interested in advertising the films shortly before elections, Plaintiff has, in fact, exhibited *Hillary: The Movie* in several theaters *after* state primaries. (*See id.* ¶ 8.) This casts further doubt on any allegations of chilled speech, as the thirty-day EC period closes on the day of the primary, so Plaintiff was then completely free to advertise each of these theater showings in these markets.

no argument whatsoever about the disclaimer requirements specifically.[19]  Nonetheless, because Plaintiff did raise such an argument during preliminary injunction briefing, the Commission notes that Plaintiff's allegation is completely unsupported in the factual record.  Plaintiff provides no evidence that a single person has ever been "misled" by an EC disclaimer.  *Cf. Crawford v. Marion County Election Bd.*, 128 S. Ct. 1610, 1622-23 (2008) (rejecting challenge to voter-identification law where evidence did not show any specific person had been unable to vote); *Wash. St. Grange v. Wash. St. Republican Party*, 128 S. Ct. 1184, 1193-94 (2008) (rejecting facial challenge to statute governing ballot listings where evidence did not show that any voter would be misled by listings).

Furthermore, the argument has no basis in law.  As noted *supra* Part I.A, BCRA requires the following disclosures relating to televised ECs:  (1) a financial statement filed with the Commission; (2) a written statement on the screen, with the name and contact information of the entity funding the EC, stating that this entity "is responsible for the content of this advertising" and "that the communication is not authorized by any candidate or candidate's committee"; and (3) an oral statement that the entity funding the EC "is responsible for the content of this advertising."  Contrary to Plaintiff's unexplained assertion, none of these provisions requires Citizens United to identify its ads as "electioneering speech."  In fact, the disclaimer requirements are precisely worded so that Plaintiff need only take responsibility "for the content of *this advertising*," with no additional characterization or definition.  Plaintiff does not explain how such a statement could or would "mislead" the public.  *Cf. Wash. St. Grange*, 128 S. Ct. at 1193-94 (holding that plaintiffs' "sheer speculation" regarding "mere possibility" that "voters will be confused" was "fatal flaw" in challenge to statute regarding candidate ballot listings).

---

[19]    The only specific references to the disclaimer requirement are in the "Facts" section of plaintiff's brief (Pl.'s Mem. at 2-6), which merely repeats Plaintiff's Statement of Undisputed Material Facts.

In *Meese v. Keene*, 481 U.S. 465 (1987), the Supreme Court considered and rejected an argument identical to the one now raised by Citizens United. The *Meese* plaintiff, who wished to exhibit certain films, claimed his First Amendment rights were violated by a statute that required the films to be labeled "political propaganda." *Id.* at 467-68. The Court denied this claim and held that the plaintiff's rights were not violated because: (a) the plaintiff was free to go beyond the required disclosures to explain to his audience that the films were not "propaganda" in the common understanding of the term, *id.* at 480-81; (b) the statute did not require any information to be withheld from the public, *id.* at 481-82; (c) "a zeal to protect the public from too much information" does not state a constitutional claim, *id.* at 482 (internal quotation marks omitted); (d) there was no evidence on the record that the public misunderstood the label, *id.* at 483; and (e) "no constitutional provision prohibits the Congress" from using whatever labels it wishes to use in defining terms within legislation, *id.* at 484-85. Each of these rationales applies with equal force here: Plaintiff is free to explain the meaning of the term "electioneering" as much as it wishes, the statute withholds no information from the public, there is no evidence that the public is confused by EC disclaimers, and Congress was entirely within its power to use the term "electioneering communication" instead of whatever term Plaintiff would prefer.

Plaintiff also alleges (but makes no legal argument in relation to the allegation) that the disclaimer requirements "will preclude Citizens United from running its 10-second ads." (Pl.'s Facts ¶ 39.) The Commission is not aware of any authority holding that a requirement to use a portion of a television commercial to convey important information relevant to that commercial creates a cognizable constitutional burden on the advertiser's ability to advertise. *See McConnell*, 540 U.S. at 230-31 (upholding BCRA's extension of spoken disclaimer requirement to ECs). Indeed, federal and state governments often require extensive oral and written information to be included in various communications, such as advertising for attorneys,

pharmaceuticals, securities, etc.  As the Second Circuit has stated in rejecting a First Amendment

challenge to a state labeling law:

> [W]e note the potentially wide-ranging implications of [plaintiff's] First Amendment complaint.  Innumerable federal and state regulatory programs require the disclosure of product and other commercial information. *See*, *e.g.*, 2 U.S.C. § 434 (reporting of federal election campaign contributions); 15 U.S.C. § 78l (securities disclosures); 15 U.S.C. § 1333 (tobacco labeling); 21 U.S.C. § 343(q)(1) (nutritional labeling); 33 U.S.C. § 1318 (reporting of pollutant concentrations in discharges to water); 42 U.S.C. § 11023 (reporting of releases of toxic substances); 21 C.F.R. § 202.1 (disclosures in prescription drug advertisements); 29 C.F.R. § 1910.1200 (posting notification of workplace hazards); Cal. Health & Safety Code § 25249.6 ("Proposition 65"; warning of potential exposure to certain hazardous substances); N.Y. Envtl. Conserv. Law § 33-0707 (disclosure of pesticide formulas).  To hold that the Vermont statute is insufficiently related to the state's interest in reducing mercury pollution would expose these long established programs to searching scrutiny by unelected courts.  Such a result is neither wise nor constitutionally required.

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001).  In each of these areas, the

advertiser undoubtedly would prefer to use its time and space for content other than a disclaimer,

but the disclaimer requirements do not prevent Plaintiff from advertising — they only result in

Plaintiff, like all advertisers subject to regulation, having to purchase a few seconds of additional

advertising time, which is not a burden of constitutional dimension.[20]

In sum, Plaintiff's brief provides no factual basis for, or legal argument regarding,

Plaintiff's challenge to the disclaimer requirements.  In any event, the Commission should be

granted summary judgment because Plaintiff fails to state a cognizable claim that the disclaimer

---

[20]    Although Plaintiff conflates the written and spoken disclaimer provisions into a single "Disclaimer Requirement" (Pl.'s Summ. J. Mot. at 1 n.1) that allegedly "deprives Citizens United of valuable time in its short and expensive broadcast Ads" (Pl.'s Facts ¶ 39), the written disclaimer provision has little effect on an advertiser's ability to use its time as it wishes, for the written disclaimer may be as small as four percent of vertical height of television screen.  11 C.F.R. § 110.11(c)(4)(iii)(A).

requirements unconstitutionally burden Citizens United by misleading the public or mandating a spoken message.

### 5. The Important Government Interests Support the Disclosure Requirements As Applied to Plaintiff

For the foregoing reasons, important government interests support the congressionally mandated disclosure provisions at issue here. Specifically, there are important interests in providing information to the public regarding the financing of Plaintiff's ads, and in enforcing the substantive restrictions applicable to ECs. Plaintiff has provided neither factual evidence nor legal authority for the proposition that the disclosure provisions constitute a burden on Citizens United's First Amendment rights. Thus, summary judgment should be granted to the Commission on Count 1 of the Amended Complaint.

### C. The EC Disclosure Provisions Are Constitutional As Applied to Plaintiff's Film

Count 2 of the Amended Complaint seeks an injunction against enforcement of the EC disclosure provisions as to the cable distribution of *Hillary: The Movie*. Even if the film were exempt from the corporate funding restriction under *WRTL*, the EC disclosure provisions would be constitutional as applied for the reasons stated above. *See supra* Part II.B. Moreover, *Hillary: The Movie* is the functional equivalent of express advocacy, *see Citizens United*, 530 F. Supp. 2d at 280; *infra* Part II.D, as to which there is no doubt regarding the constitutionality of disclosure under *McConnell*. *See* 540 U.S. at 194-99.

### D. *Hillary: The Movie* Is the Functional Equivalent of Express Advocacy

For the reasons stated in the Commission's Motion to Dismiss Counts 3 and 4 of the Amended Complaint, *Hillary: The Movie* is the functional equivalent of express advocacy; thus, Count 3 of the Amended Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), and Plaintiff's motion for summary judgment as to Count 3 should be denied as moot.

Alternately, for the same reasons and because no material facts are in dispute, the Commission should be granted summary judgment as to Count 3, and Plaintiff's motion for summary judgment should be denied on the merits. For the convenience of the Court, the Commission reiterates below the relevant portions of its Motion to Dismiss Counts 3 and 4 of the Amended Complaint and its reply brief in support of that motion, as modified to oppose Plaintiff's motion for summary judgment.

       1.     *The EC Funding Restriction Is Constitutional As Applied to ECs that Are the Functional Equivalent of Express Advocacy*

It is "firmly embedded" in the Supreme Court's First Amendment jurisprudence that corporations and labor unions may constitutionally be prohibited from using their general treasuries to fund communications that expressly advocate for or against the election of a candidate. *McConnell*, 540 U.S. at 203. In BCRA, Congress broadened this prohibition to encompass not just corporate and union express advocacy expenditures (which were already prohibited under FECA), but also corporate and union expenditures for communications that meet the statutory definition of an EC. *See* BCRA § 203 (codified as part of 2 U.S.C. § 441b).

The *McConnell* plaintiffs brought a facial challenge against the constitutionality of the EC funding restriction, arguing that the statute was overbroad because it prohibited corporations from financing non-campaign issue speech immediately before an election. The Supreme Court rejected this challenge and upheld BCRA § 203 on its face. *McConnell*, 540 U.S. at 203-09. The Court agreed with the plaintiffs that the corporate funding restriction encompassed both campaign advocacy and some "issue ads," but the Court held that the government's long-recognized and compelling interests in regulating corporate-funded express advocacy apply with equal force to the interests in regulating corporate-funded speech that is "the functional equivalent of express advocacy." *Id*. at 205-06. The Court reasoned that, because the EC definition only encompasses communications that refer to a specific candidate shortly before an

election, the fact that a communication meets the statutory criteria "strongly supports" a finding that any given EC is the functional equivalent of express advocacy, and, therefore, that the funding restriction's potential "application to pure issue ads" is insubstantial.  *See id*. at 207.  Indeed, the Court noted, "[e]ven if we assumed that BCRA will inhibit some constitutionally protected corporate and union speech, that assumption would not justify prohibiting all enforcement of the law."  *Id*. (internal quotation marks omitted).  Thus, *McConnell* held that the EC provision was "amply justifie[d]," *id.* at 208, and the plaintiffs had not "carried their heavy burden" to show the funding restriction to be unconstitutional on its face.  *Id*. at 207

Four years later, in the context of an as-applied challenge to the EC funding restriction, the Supreme Court held that the restriction could constitutionally be applied only to ECs that are the functional equivalent of express advocacy.  *See WRTL*, 127 S. Ct. at 2664 ("This Court has already ruled that BCRA survives strict scrutiny to the extent it regulates express advocacy or its functional equivalent.  So to the extent the ads in these cases fit this description, the FEC's burden is not onerous; all it need do is point to *McConnell* and explain why it applies here.") (citing *McConnell*, 540 U.S. at 206).  The controlling opinion in *WRTL* defined "the functional equivalent of express advocacy" as speech that is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  *WRTL*, 127 S. Ct. at 2667.  The opinion immediately then listed criteria relevant to the application of this standard and explained why the ads at issue in *WRTL* could be so interpreted:

> Under this test, WRTL's three ads are plainly not the functional equivalent of express advocacy.  First, their content is consistent with that of a genuine issue ad:  The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter.  Second, their content lacks indicia of express advocacy:  The ads do not mention an election, candidacy, political party, or challenger; and they do not take a position on a candidate's character, qualifications, or fitness for office.

*Id*.  The Commission included these criteria, effectively verbatim, in its regulations

implementing *WRTL*.  *See* 11 C.F.R. § 114.15.

In sum, the EC funding restriction is unconstitutional as applied to ECs that are

susceptible of a reasonable interpretation other than as an appeal to vote for or against a

candidate, but the restriction is constitutional as applied to ECs that are the functional equivalent

of express advocacy.

### 2.    *Plaintiff's Film Is the Functional Equivalent of Express Advocacy*

Count 3 of the Amended Complaint alleges that the EC funding restriction is

unconstitutional as applied to *Hillary: The Movie* because "the movie 'may reasonably be

interpreted as something other than as an appeal to vote for or against a specific candidate.'"

(Am. Compl. ¶ 41 (quoting *WRTL*, 127 S. Ct. at 2670).)  However, as this Court preliminarily

held, *Hillary: The Movie* is the functional equivalent of express advocacy.  *Citizens United*, 530

F. Supp. 2d at 280.

Plaintiff's film fails the *WRTL* standard.  *See WRTL*, 127 S. Ct. at 2667; *Citizens United*,

530 F. Supp. 2d at 278-80.  First, *Hillary: The Movie* mentions an election and candidacy.

(Def.'s Facts ¶ 4(a)-(n) (quoting Am. Compl. Exh. 2 at 1, 5-6, 9, 21-22, 32, 39, 51-52, 57, 60,

67-69).)  Second, it takes a position on a candidate's character, qualifications, or fitness for

office.  (Def.'s Facts ¶ 5(a)-(m) (quoting Am. Compl. Exh. 2 at 1-2, 7-8, 35-36, 47, 60, 69-72).)

For example, the movie declares "beyond a shadow of a doubt" that Senator Clinton "is not

equipped, not qualified to be our commander in chief" (Am. Compl. Exh. 2 at 71); it asks,

rhetorically, "what is there that she has accomplished in her life — that would lead you to

believe that she should become the most powerful person in the country?" (*id*. at 70); and it says

that she lacks "the legislative gravitas and qualifications enough to elect her [P]resident of the

[U]nited [S]tates." (*Id*. at 36.)

37

Moreover, the movie fails to qualify for an exemption under *WRTL* because it "does not focus on legislative issues" or otherwise constitute issue advocacy. *Citizens United*, 530 F. Supp. 2d at 279; *see also* Def.'s Facts ¶ 6. The film does not "take a position on [an] issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter," *WRTL*, 127 S. Ct. at 2667, as Plaintiff has already conceded. (*See* Pl.'s Mem. in Support of Second Mot. for Prelim. Inj. at 7 (acknowledging that movie is not "grassroots lobbying activity" and includes no call to action other than voting).) The only focuses of the film are Senator Clinton's character and fitness for office and her actions in relation to certain controversies during Bill Clinton's presidency. (*See*, *e.g.*, Am. Compl. Exh. 2 at 10-35 (discussing, *inter alia*, "travelgate"), 50-67 (discussing, *inter alia*, Bill Clinton's presidential pardons).) In the few short portions of the film that touch on legislative issues, the film consistently and explicitly ties these issues to further critiques of Senator Clinton's character and fitness for the presidency. (*See*, *e.g.*, *id.* at 46-47 (discussing immigration debate and concluding that "it raised the question can you withstand the criticism . . . and if [you're] gonna whine about people complaining about you, that doesn't suggest presidential stature or character"); *id.* at 47-49 (discussing Iraq war and concluding that Senator Clinton is "not flipping and flopping. [S]he's lying.").) The inclusion of such issue-based criticisms does not mean that Plaintiff's movie is genuine issue advocacy. *See WRTL*, 127 S. Ct. at 2667 n.6 (contrasting issue ads in that case with hypothetical ad that "condemned [the candidate]'s record on a particular issue" in the *McConnell* decision). Moreover, the overwhelming majority of the movie's advocacy criticizes the character of Senator Clinton without reference to any issues at all. Plaintiff is thus incorrect as a matter of law that *Hillary: The Movie* is an "issue-advocacy film" (Am. Compl. ¶ 14), as the criticisms in the movie are not "issue advocacy" as *WRTL* used that

term. *See WRTL*, 127 S. Ct. at 2667 (describing "genuine issue ad[s]"). The only advocacy in Plaintiff's film is its opposition to the election of Senator Clinton to the presidency.

Thus, because *Hillary: The Movie* is nothing but an extensive critique of Senator Clinton's "character, qualifications, and fitness for office" and lacks indicia of genuine issue advocacy, the film is, in the words and analysis of *WRTL* itself, susceptible of no reasonable interpretation other than as an appeal to vote against her. It is, in short, the functional equivalent of express advocacy, to which the EC funding restrictions may constitutionally be applied. *Citizens United*, 530 F. Supp. 2d at 279-80 (citing *McConnell*). Accordingly, Count 3 of the Amended Complaint fails as a matter of law.

### 3.    Plaintiff's Counterarguments Are Without Merit

The main thrust of Plaintiff's motion for summary judgment on Count 3 (*see* Pl.'s Mem. at 33-45) is that *Hillary: The Movie* is constitutionally exempt from the EC corporate funding restriction because the film purportedly contains "no *words* constituting" an appeal to vote against Senator Clinton. (*Id*. at 34.) This argument fails as a matter of law, for it seeks to reintroduce a test akin to the "magic words" requirement that the Supreme Court rejected in *McConnell* and *WRTL*. The *WRTL* test requires a broadcast to be the "*functional equivalent* of express advocacy*," 127 S. Ct. at 2667 (emphasis added) — an analysis that is necessarily broader than a wooden, "magic words" interpretation of express advocacy or any other standard that relies upon the presence of particular words, phrases, or grammatical constructs.

The history of the Supreme Court's express advocacy jurisprudence demonstrates the shortcomings of Plaintiff's argument. In *Buckley*, the Court held that FECA's statutory limitation of expenditures "relative to a clearly identified candidate" was unconstitutionally vague and, accordingly, construed it narrowly to encompass only expenditures for communications that expressly advocate the election or defeat of a candidate. *See Buckley*, 424

U.S. at 44; *McConnell*, 540 U.S. at 190-93 (discussing *Buckley*).  *Buckley* characterized express advocacy communications as those "containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'"  *Buckley*, 424 U.S. at 44 n.52; *see also McConnell*, 540 U.S. at 191.

In part because the express advocacy requirement proved easy to evade, *see McConnell*, 540 U.S. at 193, Congress enacted BCRA, which expanded the application of FECA's corporate and union financing restriction to all ECs.  Other than a reference to a candidate, there is no content requirement in the EC definition.  *See* 2 U.S.C. § 434(f)(3)(A)(i).  Accordingly, the *McConnell* plaintiffs challenged the constitutionality of the EC definition because, *inter alia*, it restricted corporate and union funding of communications that did not contain express advocacy.  *McConnell*, 540 U.S. at 205-06 ("[P]laintiffs argue that the justifications that adequately support the regulation of express advocacy do not apply to significant quantities of speech encompassed by the definition of electioneering communications.").  The Supreme Court rejected this argument, finding that the "vast majority" of communications mentioning candidates within the EC windows are "the functional equivalent of express advocacy," and therefore ECs may constitutionally be subject to the corporate funding restriction.  *Id*. at 206.  The Court further emphasized that its prior "express advocacy limitation [in *Buckley*], in both the expenditure and the disclosure contexts, was the product of statutory interpretation rather than a constitutional command."  *Id*. at 191-92.  The Court accordingly upheld BCRA's corporate funding restriction on its face.  *Id*. at 209.

In *WRTL*, the Court held that BCRA's funding restriction for ECs could be applied constitutionally to broadcasts meeting the statutory EC definition only if they are the "functional equivalent" of express advocacy, *i.e.*, are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  *WRTL*, 127 S. Ct. at 2667.  This test,

40

like *McConnell*, imposes no magic-words requirement; instead, *WRTL* explicitly states that the

analysis must "focus[ ] on the substance of the communication." *Id*. at 2666. *WRTL* overruled

neither *McConnell's* facial upholding of the EC provision nor its explanation that *Buckley's*

express advocacy interpretation is not a constitutional requirement.

Nonetheless, Plaintiff now attempts to import a narrow interpretation of express advocacy

into the *WRTL* test. (*See, e.g.*, Pl.'s Mem. at 36 ("[T]he issue that must be decided is whether

there are actual words in *Hillary* that contain *WRTL II*'s required unambiguous 'appeal to

vote . . . .'").) In support of its claim, Plaintiff selectively quotes *WRTL*'s language regarding an

"appeal to vote." (*See id*. at 36-37.) Plaintiff fails to note, however, that the test from which this

language is taken does not ask whether the communication contains specific words constituting

an appeal to vote (as Plaintiff repeatedly suggests), but instead whether the communication "is

susceptible of no reasonable interpretation other than *as* an appeal to vote." *WRTL*, 127 S. Ct. at

2667 (emphasis added). *WRTL*'s application of the test further demonstrates that the inquiry is

holistic, examining the "focus" of the communication, any "position" it manifests, and whether

the "content is consistent" with "genuine" issue advocacy. *Id*. Indeed, when the Court analyzed

whether the content of WRTL's ads contained "indicia of express advocacy," it reviewed

whether the ads "mention an election, candidacy, political party, or challenger," and whether

they "take a position on a candidate's character, qualifications, or fitness for office," not whether

the ads contain specific words exhorting viewers to vote for or against a candidate. *Id.* Thus,

*WRTL* does not support Plaintiff's argument that the presence or absence of specific words of

electoral advocacy is the determining factor in whether a communication is the *functional*

*equivalent* of express advocacy.[21]

---

[21]     Plaintiff's extended discussion of *FEC v. Furgatch*, 807 F.2d 857 (9th Cir. 1987), is
irrelevant: That case entailed a dispute about *Buckley*'s "express advocacy" narrowing

As set forth above, Plaintiff's film is overwhelmingly focused on Senator Clinton's candidacy for president and devoted to attacking her character and her fitness for that office, such that it is susceptible of no reasonable interpretation other than as an appeal to vote against her. *See supra* Part II.D.2; *Citizens United*, 530 F. Supp. 2d at 279-80 ("*The Movie* is susceptible of no other interpretation than to inform the electorate that Senator Clinton is unfit for office, that the United States would be a dangerous place in a President Hillary Clinton world, and that viewers should vote against her."). Under the *WRTL* test, *Hillary: The Movie* "is thus the functional equivalent of express advocacy." *Citizens United*, 530 F. Supp. 2d at 280.

Plaintiff's related argument (Pl.'s Mem. at 1, 35-36) that the film is issue advocacy — because of what Plaintiff calls the "dissolving-distinction problem" (*id.* at 14-15, 35) — is similarly untenable. As the Chief Justice wrote in *WRTL*, the relevant constitutional question for communications that purport to be issue speech is not whether the communications *contain* issue speech, but whether they "*focus* on a legislative issue . . . and urge the public to contact public officials with respect to the matter." *WRTL*, 127 S. Ct. at 2667 (emphasis added). Merely including references to an "issue" within a communication that focuses on a candidate's fitness for office neither immunizes the communication from regulation nor renders it issue speech. *See McConnell*, 540 U.S. at 193 & n.78 (noting that, despite ad's references to family values issues, "[t]he notion that [the Bill Yellowtail ad] was designed purely to discuss the issue of family values strains credulity"); *Citizens United*, 530 F. Supp. 2d at 279 ("Citizens contends . . . that issue speech is any speech that does not expressly say how a viewer should vote. The trouble is that the controlling opinion in *WRTL* stands for no such thing.").[22] Thus, as *WRTL* confirmed,

---

construction due to vagueness concerns — concerns that are absent with respect to the statutory EC definition. *See supra* Part II.B.2.

[22] For this reason, Plaintiff's statement that "ads stating a candidate's position and criticizing or praising that position *may* be fully protected political speech" (Pl.'s Mem. at 17

the relevant question is whether "the substance of the communication" as a whole is the functional equivalent of express advocacy. *See WRTL*, 127 S. Ct. at 2666; *see also MCFL,* 479 U.S. at 249-50 (holding that newsletter's combination of exhortation to vote pro-life, plus separate list of pro-life candidates, constituted express advocacy, even though newsletter did not explicitly appeal for votes for named candidates).

    *Hillary: The Movie* contains only brief references to legislative issues, while focusing on Senator Clinton's character and fitness for office and omitting any appeal for public action (other than voting against Senator Clinton). *See supra* Part II.D.2.  In fact, even the fleeting instances of issue-related discussion within *Hillary: The Movie* are not genuine issue speech, for each issue is discussed only as a further means of attacking Senator Clinton's character and fitness for higher office.  *Id*.  In addition to contemporaneously tying its brief issue discussions to her character, the film concludes emphatically that these are reasons that she should not be elected to the presidency.  (*See* Am. Compl. Exh. 2 at 68-72 (concluding, *inter alia*, that Senator Clinton "has great defects" as potential president, lacks experience to "become the most powerful person in the country," is not "going to [be] good for the security of the United States," and poses "fundamental danger . . . to every value that we hold dear").)  Plaintiff does not and cannot identify a single issue that is raised in the film without being connected to Senator Clinton's candidacy.  Because the film has no reasonable interpretation other than as an appeal to vote against Senator Clinton, Count 3 of the Amended Complaint must fail as a matter of law.

---

(emphasis added)) misses the point.  As *WRTL* explained, an ad's use of a candidate's position as a basis for attacking his character, qualifications, and fitness for office is "indic[ative] of express advocacy," not "a genuine issue ad."  *See* 127 S. Ct. at 2667 & n.6.  Similarly, as the Court has noted in the context of express advocacy, when a communication goes "beyond issue discussion" to campaign speech, the communication "falls squarely within" the corporate financing restriction.  *See MCFL*, 479 U.S. at 249-50 (holding that corporation's newsletter was express advocacy, despite inclusion of issue speech as part of the communication).

Plaintiff makes three additional arguments, each of which lacks merit.  First, Plaintiff claims that the EC financing restriction should be construed to apply only to "ads," not to "a full-length documentary movie shown in theaters, sold on DVD, and with a compendium book." (Pl.'s Mem. at 40-41.)  But none of these cited methods of distributing *Hillary: The Movie* is subject to any EC regulations whatsoever; only the cable television distribution of the film falls within the statutory definition of an EC, and that definition draws no distinction between advertisements or movies.  *See* 2 U.S.C. § 434(f)(3)(A)(i) (defining EC as "broadcast, cable, or satellite communication").  Furthermore, although *McConnell* upheld BCRA's corporate financing restriction on its face, 540 U.S. at 209, Plaintiff attempts to limit this holding to advertisements, stating that "[t]here was no record evidence [in *McConnell*] that *movies* were a problem."  (Pl.'s Mem. at 41.)  This assertion, however, is belied by the paid, thirty-minute "infomercials"[23] that, as Plaintiff notes, were not only in the *McConnell* record, but were actually discussed by the district court in that case.  *See* Pl.'s Mem. at 40 (*citing McConnell*, 251 F. Supp. 2d at 305-06, 316-17); *see also McConnell*, 251 F. Supp. 2d at 547-48 (opinion of Kollar-Kotelly, J.), 906 (opinion of Leon, J.).  Thus, the *McConnell* Court was aware of the existence of ECs longer than thirty- or sixty-second ads when it upheld the EC definition.[24]

Second, Plaintiff argues (Pl.'s Mem. at 41-42, 44-45) that *Hillary: The Movie* is "the functional equivalent of a book," and therefore it is entitled to greater First Amendment protections than is a standard television advertisement.  Under FECA, however, this is an irrelevant comparison, for a book (such as the companion book to Plaintiff's film) could never be

---

[23]      *Cf.* Def.'s Exh. 8 (filed under seal) (offering option to pay to air film on cable television).

[24]      Plaintiff also repeatedly quotes isolated words from *McConnell* in an attempt to argue that the Court never *specifically* found movies to be constitutionally regulable.  (*See* Pl.'s Mem. at 39-40.)  This argument, however, is baseless, for *McConnell*'s facial upholding of the EC corporate funding restriction included film-length broadcasts by definition.  *See* 2 U.S.C. § 434(f)(3)(A)-(B) (defining ECs by method of broadcast and providing no exemption based on length of broadcast).

an EC. Plaintiff's choice to broadcast the film on cable television falls squarely within the EC provision, and neither this provision nor the Supreme Court's opinions provide a basis for exempting certain broadcasts simply because they differ in form from standard television advertisements, much less because they might *theoretically* have been distributed in some other medium subject to different regulation.[25] *Cf. McConnell*, 540 U.S. at 207 (rejecting argument that EC provision is "underinclusive because it does not apply to advertising in the print media").

Third, as it has done several times throughout this litigation, Plaintiff again attempts to draw a parallel between *Hillary: The Movie* and the film *Fahrenheit 9/11*. (Pl.'s Mem. at 41.) The apparent implication of Plaintiff's argument is that, if Michael Moore's film criticizing President Bush was not subject to regulation as an EC, then neither should Plaintiff's film criticizing Senator Clinton. But this comparison is meaningless, for *Fahrenheit 9/11* was never shown on television during an electioneering communication window, and thus it was never an EC or otherwise subject to the Commission's jurisdiction.

In sum, none of Plaintiff's arguments regarding *Hillary: The Movie* has any merit, and Count 3 fails as a matter of law.

## III.    CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court grant the Commission summary judgment as to Counts 1, 2, and 3 of the Amended Complaint.

---

[25]    Plaintiff's argument also fails as a factual matter: Plaintiff's film contains multiple visual attacks on Senator Clinton's character that are not reflected in the written script. (*See*, *e.g.*, Def.'s Facts ¶ 5(m).) Because these attacks consist primarily of carefully edited video montages that could not be duplicated on the pages of a book, *Hillary: The Movie* cannot reasonably be considered "the functional equivalent of a book."

Respectfully submitted,

Thomasenia P. Duncan (D.C. Bar No. 424222)
General Counsel

David Kolker (D.C. Bar No. 394558)
Associate General Counsel

Kevin Deeley
Assistant General Counsel

   /s/ Adav Noti
Adav Noti (D.C. Bar No. 490714)
Attorney

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street NW
Washington, DC 20463
Dated:  June 6, 2008                                        (202) 694-1650

46

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

CITIZENS UNITED,                              )
                                              )
              Plaintiff,                      )
                                              )
       v.                                     )    Civ. No. 07-2240 (ARR, RCL, RWR)
                                              )
FEDERAL ELECTION COMMISSION,                  )    STATEMENT OF MATERIAL FACTS
                                              )
              Defendant.                      )
_____)

**DEFENDANT FEDERAL ELECTION COMMISSION'S STATEMENT
OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Fed. R. Civ. P. 56 and LCvR 7(h) and 56.1, Defendant Federal Election

Commission ("Commission") submits the following statement of material facts as to which there

is no genuine dispute.

**THE PARTIES**

1.    Plaintiff Citizens United is a Virginia corporation holding tax-exempt status under

section 501(c)(4) of the Internal Revenue Code.  (Am. Compl. ¶ 5.)

2.    The Commission is the independent agency of the United States responsible for

the administration, interpretation, and civil enforcement of the Federal Election Campaign Act

("FECA").  *See* 2 U.S.C. §§ 437c(b)(1), 437d(a),(e).

**PLAINTIFF'S ELECTIONEERING COMMUNICATIONS**

3.    Plaintiff has produced a film entitled *Hillary: The Movie*.  (*See* Am. Compl. ¶ 14.)

Plaintiff's name and logo appear at the beginning of the film.  (*See Hillary: The Movie* (available

for viewing pursuant to Jan. 10, 2008 Order (Docket No. 37)).)

4.    Plaintiff's film focuses on the ongoing presidential election, specifically Senator

Hillary Clinton's candidacy for President of the United States.  For example:

a.    "[S]he will run on attacking republicans, and being the first woman president — oh isn't that amazing, she's a woman she can walk and talk." (Am. Compl. Exh. 2 at 1.)

b.    "Hillary Rodham Clinton.  Could she become the first female President in the history of the United States?"  (*Id*. at 5.)

c.    "Hillary Clinton points to her time in the White House as a large part of her qualification for the job as President."  (*Id*.)

d.    "Over the past 16 years Hillary Clinton has undoubtedly become one of the most divisive figures in America.  How this makes her suited to unite the country as the next president is troubling to many."  (*Id*. at 6.)

e.    "There are any number of things in the Clinton's political history worth recalling before you go in to potentially vote for a Clinton, in this case a Hillary Clinton."  (*Id*. at 9.)

f.    "Hillary's got an agenda and she's willing to put up with that to be [P]resident of the [U]nited [S]tates, she's got a to do list when she gets to the White House."  (*Id*. at 21-22.)

g.    "I'm asking people to look at the record that is undisputed and to come to their own conclusions regarding the suitability of Hillary Clinton to acquire the highest office in this country."  (*Id*. at 32.)

h.    "As a presidential candidate, Hillary has made other promises that may also prove difficult to keep."  (*Id*. at 39.)

i.    "Both Clintons are well aware the war on terror could be [a] key issue in Hillary's run for the presidency."  (*Id*. at 52.)

j.    "Sandy Berger was fined, lost his security clearance for 3 years, and disgraced, especially in Washington.  But he has resurfaced.  Reportedly, Berger is now an adviser to the presidential campaign of . . . Hillary Rodham Clinton."  (*Id*. at 57 (alterations omitted; ellipsis in original).)

k.    "I think the American people have a right to as much of a public record as possible about Hillary Clinton.  Those records should be released before the 2008 elections so that we can learn a lot more about exactly how much influence she had in the White House, what her positions were in the White House, and how she acted in the White House."  (*Id*. at 60.)

l.    "Candidate Clinton claims she is the most experienced."  (*Id*. at 67.)

m.    "It's worth remembering that a vote for Hillary is a vote to continue 20 years of a Bush or a Clinton in the White House."  (*Id*. at 68.)

       n.      "Finally, before America decides on our next president, voters should need no reminders of . . . what's at stake — the well being and prosperity of our nation."  (*Id*. at 69.)

    5.    *Hillary: The Movie* is devoted to criticizing Senator Clinton's character and arguing that she lacks the qualifications for, and is not fit to become, President of the United States.  For example:

       a.      "[S]he is steeped in controversy, steeped in sleaze, that's why they don't want us to look at her record."  (*Id*. at 2.)

       b.      "After announcing her bid for the presidency, fellow Democrats including former Clinton confidant and Hollywood mogul David Geffen publicly questioned Hillary's integrity and truthfulness."  (*Id*. at 7.)

       c.      "So, who is the real Hillary Clinton?  Is she a [ ] brilliant trailblazer, poised to make history as the first female president, or is she ruthless, cunning, dishonest — willing to do anything for power?"  (*Id*. at 8.)

       d.      "Is Hillary really the most qualified to hit the ground running if elected President? After all, she was First Lady for 8 years and now a Senator from New York.  Referring to her opponents she's said, quote, 'there is one job we can't afford on-the-job training for:  that is the job of our next President.'"  (*Id*. at 35-36.)

       e.      "Hillary says we should elect her president because of her tremendous accomplishments in the United States Senate. . . .  But is that the legislative gravitas and qualifications enough to elect her [P]resident of the [U]nited [S]tates?  Is she kidding?"  (*Id*. at 36.)

       f.      "There's one Hillary who says, 'I'm gonna bring the troops home right away when I'm elected President' and another Hillary who says, 'I'm gonna keep troops in Iraq indefinitely.'  One of these two women is lying."  (*Id*. at 47-48.)

       g.      "As much as those pardons reveal about Bill, an earlier pardon may have revealed  even more about Hillary's character — and her willingness to do *anything* to get elected."  (*Id*. at 61.)

       h.      "It[']s been said and I agree with it that this is the most personal political choice that Americans make. They want, they — their personality traits, their — will they consider a person that they could trust, that they would like, that they were comfortable with, and that's [where] I think Hillary Clinton as a candidate has great defects."  (*Id*. at 69.)

i.  "[I]f she weren't married to Bill Clinton, what is there that she has accomplished in her life-that would lead you to believe that she should become the most powerful person in the country?"  (*Id*. at 69-70.)

j.  "If she reverts to form, Hillary Clinton will likely be in the future what she has been in the past, which is a person, a woman, a politician of the left, and I don't think that's going to [be] good for the security of the United States."  (*Id.* at 70.)

k.  "I can tell you beyond a shadow of a doubt that uh, the Hillary Clinton that I know is not equipped, not qualified to be our commander in chief."  (*Id.* at 71.)

l.  "[W]e must not ever underestimate this woman. We must not ever understate her chances of winning. We mustn't be lolled [sic] into a state of security and complacency by the new found moderation that she likes to talk about. And we must never forget the fundamental danger that this woman [poses] to every value that we hold dear."  (*Id.* at 72.)

m.  In addition to these oral statements, the film contains multiple visual attacks on Senator Clinton's character — generally in the form of abridged newspaper headlines — that are not reflected in the written script.  For example, thirty-seven seconds into the movie, after a montage of headlines containing the phrase "Mrs. Clinton," the visual zooms in and lingers on the word "perjury" (omitting the remainder of the headline).  Four seconds later, after a montage of headlines referring to the "First Lady," the visual zooms in and lingers on the word "lies" (again omitting the remainder of the headline).

6.  *Hillary: The Movie* does not focus on legislative issues, and it does not take a position on an issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter; instead, the only focuses of the film are Senator Clinton's character and fitness for office and her actions in relation to certain controversies during Bill Clinton's presidency.  (*See, e.g.*, Am. Compl. Exh. 2 at 10-35 (discussing, *inter alia*, "travelgate"), 50-67 (discussing, *inter alia*, Bill Clinton's presidential pardons).)  Legislative issues are mentioned only in the context of critiquing Senator Clinton's character and fitness for the presidency.  (*See, e.g.*, *id*. at 46-47 (discussing immigration debate and concluding that "it raised the question can you withstand the criticism . . . and if [you're] gonna whine about people complaining about you, that doesn't suggest presidential stature or character"); *id*. at 47-50

(discussing Iraq war and concluding that Senator Clinton is "not flipping and flopping. [S]he's lying.").)

7.     *Hillary: The Movie* is available for available for purchase by the general public on DVD, and it has been exhibited in movie theaters.  (Bossie Aff. ¶¶ 5-6.)

8.     Several of these theater showings occurred in states that had already held their presidential primaries or conventions by the date of the exhibition.  *Compare* Bossie Aff. ¶ 5 (showings Feb. 11 in Wash., Mar. 4 in Fla., Apr. 3 in Calif., Apr. 21 in Ohio) *with* FEC, Electioneering Communications Periods, http://www.fec.gov/info/charts_ec_dates_prez.shtml#Presidential.

9.     On December 20, 2007, Plaintiff received a solicitation to pay to have *Hillary: The Movie* distributed for four weeks through a nationwide cable-television video-on-demand system.  (Am. Compl. ¶ 28; *see also* Def.'s Exh. 8 (filed separately under seal).)[26]

10.     Pursuant to this solicitation, the film would be broadcast on "Elections '08" (Am. Compl. ¶ 28), which bills itself as a "breakthrough platform [that] allows you to speak directly to voters — 24/7 — in their own living rooms.  By crafting and controlling your own long-form campaign message, you reach voters with no media dilution or bias."  Spot Cable, Elections '08 On Demand, http://www.spotcable.com/political_sub2.html (Def.'s Exh. 2).

11.     Plaintiff wishes to pay to distribute its film through this medium within the thirty-day period before the Democratic national convention.  (*See* Am. Compl. ¶ 29.)

12.     No presidential primary or nominating convention is scheduled to take place until August 25, 2008.  *See* FEC, Electioneering Communications Periods, http://www.fec.gov/info/charts_ec_dates_prez.shtml#Presidential.

---

[26]     Because Plaintiff has insisted that the terms of the December 2007 offer remain confidential (*see* First Supp. to Pl.'s Resp. to FEC's First Interrogs. at 5-6 (Def.'s Exh. 1)), this offer is being filed under seal.

13.     Plaintiff wishes to promote its film through television advertisements.  (Bossie Aff. ¶ 8.)

14.     These advertisements would mention Senator Clinton and would air on nationwide cable and network television within the thirty-day period before the Democratic national convention.  (*See id*.)

15.     The audio of the first intended ad, a 10-second ad entitled "Wait," is "If you thought you knew everything about Hillary Clinton . . . wait 'til you see the movie."  (Am. Compl. Exh. 1.)  The second ad, a ten-second ad entitled "Pants," includes a narrator saying "First a kind word about Hillary Clinton," Ann Coulter saying "She looks good in a pant suit," and then a narrator saying "Now a movie about everything else."  (*Id.*)  The third, a thirty-second ad entitled "Questions," contains three quotations regarding Senator Clinton, including Ann Coulter saying "[A]t least with Bill Clinton he was just good time Charlie.  Hillary's got an agenda," and Dick Morris saying "Hillary is the closest thing we have in America to a European socialist."  (*Id.*)  All three ads contain images of Senator Clinton and, at the end, the visuals "Hillary: The Movie" and "www.hillarythemovie.com" appear on the screen.  (*Id.*)

16.     Plaintiff has stated that it would fund these advertisements from a bank account consisting solely of donations made for the purpose of furthering the production or distribution of electioneering communications (Am. Compl. ¶ 24), even though the use of a segregated account would likely increase Plaintiff's reporting obligations.  *Compare* 11 C.F.R. § 104.20(c)(9) (reporting requirements for general treasury disbursements) *with* 11 C.F.R. § 104.20(c)(7)(ii) (reporting requirements for disbursements from separate bank account).

17.     Since December 2006, twenty-eight individuals, two for-profit corporations, and three other entities have donated $1,000 or more to Plaintiff for the purpose of furthering the

production or distribution of Plaintiff's electioneering communications.  (First Supp. to Pl.'s Resp. to FEC's First Interrogs. at 10-11 (Def.'s Exh. 1).)

18.    Four days after Senator Barack Obama won the Iowa presidential caucuses, Plaintiff announced its intent to produce and broadcast a "documentary" film about Senator Obama, as well as television advertising for that film.  (*See* Mot. for Leave to File Aff. of David N. Bossie (Docket No. 35).)

### ABSENCE OF CONSTITUTIONAL BURDENS

19.    Citizens United Political Victory Fund ("CU-PVF"), is Plaintiff's political committee (or "separate segregated fund"), and it is registered with the Commission as such. Citizens United Political Victory Fund, Statement of Organization (June 15, 1994) (Def.'s Exh. 3).

20.    As a political committee, CU-PVF files with the Commission publicly available, monthly reports identifying, *inter alia*, the name and address of each person who has donated $200 or more to CU-PVF in that calendar year.  2 U.S.C. § 434(a)(4)(B),(b)(3).

21.    Since 1994, CU-PVF has filed approximately 160 reports, identifying a total of approximately 1,214 donations.  Citizens United Political Victory Fund, All Campaign Finance Reports, http://query.nictusa.com/cgi-bin/fecimg/?C00295527 (Def.'s Exh. 4); Citizens United Political Victory Fund, Individuals Who Gave to This Committee, http://query.nictusa.com/cgi-bin/com_ind/C00295527/ (Def.'s Exh. 5).

22.    Citizens United also operates The Presidential Coalition, LLC, and 2007 Conservative Victory Committee, which are entities holding tax-exempt status under section 527 of the Internal Revenue Code.  (*See* First Supp. to Pl.'s Resp. to FEC's First Interrogs. at 10 n.2 (Def.'s Exh. 1).)

23.     As "527" organizations, these entities file annually with the Internal Revenue Service two to six publicly available reports listing, *inter alia*, the name, address, occupation, and employer of each person who has donated $200 or more to the organization in that calendar year.  26 U.S.C. § 527(j).

24.     Since 2005, The Presidential Coalition has filed ten reports, identifying a total of approximately 11,500 donations.[27]

25.     Ten of the twenty-eight individuals who have contributed $1,000 or more to Plaintiff for the purpose of furthering Plaintiff's electioneering communications have been publicly identified in IRS filings as donors to The Presidential Coalition.  (First Supp. to Pl.'s Resp. to FEC's First Interrogs. at 10-11 (Def.'s Exh. 1).)

26.     In addition, one individual and two other entities, who have donated a total of $173,500 to Plaintiff for the purpose of furthering Plaintiff's electioneering communications, are identified in the credits of *Hillary: The Movie*.  (*Id.*)

27.     Despite this extensive record of donor disclosure, there is no evidence before the Court that any of the persons who have been publicly identified as contributors to Plaintiff, CU-PVF, or The Presidential Coalition have been subject to any threats, harassment, or reprisals as a result of their affiliation with Citizens United.

28.     Far from suffering reprisals, Plaintiff holds itself out as a well connected, mainstream organization.  Joe Murray, *Lawsuit Threatened Over CNN's 'Campaign Killers*,' The Bulletin (Dec. 6, 2007) (Def.'s Exh. 6) (quoting written statement by plaintiff's spokesman that "Citizens United [is] hardly a 'fringe' group (unless consistent and open association with the

---

[27]     The Presidential Coalition's IRS filings are available by searching the IRS website at http://forms.irs.gov/politicalOrgsSearch/search/basicSearch.jsp.  The Commission calculated the number of donations disclosed by multiplying the aggregate number of pages of donations in the reports (1,152) by the number of donations listed on each page (10).

former Speaker of the House, a current leading presidential candidate and numerous other leading Republicans can be considered 'fringe')").  Plaintiff has, in fact, threatened to file suit against a news organization for referring to Citizens United as a "fringe militia."  *See* Press Release, Citizens United to Sue CNN, http://www.citizensunited.org/press/?entryid=1972618 (Dec. 4, 2007) (Def.'s Exh. 7).

29.     There is no evidence before the Court that the general public is misled by the electioneering communication disclosures or disclaimers.

<div style="margin-left:40%">

Respectfully submitted,

Thomasenia P. Duncan (D.C. Bar No. 424222)
General Counsel

David B. Kolker (D.C. Bar No. 394558)
Associate General Counsel

Kevin Deeley
Assistant General Counsel

   /s/ Adav Noti
Adav Noti (D.C. Bar No. 490714)
Attorney

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street NW
Washington, DC 20463
(202) 694-1650

</div>

Dated:  June 6, 2008

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                                      )
CITIZENS UNITED,                      )
                                      )
            Plaintiff,                )
                                      )
      v.                              )      Civ. No. 07-2240 (ARR, RCL, RWR)
                                      )
FEDERAL ELECTION COMMISSION,          )      STATEMENT OF GENUINE ISSUES
                                      )
            Defendant.                )
_____)
```

## DEFENDANT FEDERAL ELECTION COMMISSION'S STATEMENT OF GENUINE ISSUES AND OBJECTIONS TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Pursuant to LCvR 7(h) and 56.1, Defendant Federal Election Commission ("Commission") submits the following statement of genuine issues in opposition to Plaintiff's Statement of Undisputed Material Facts ("Pl.'s Facts"). The Commission's statements below are presented in numbered paragraphs corresponding to the paragraph numbers in Plaintiff's statement.

1-9.   No response.

10.   *Hillary: The Movie* is not "issue advocacy." (*See* Def.'s Statement of Material Facts As To Which There Is No Genuine Dispute ("Def.'s Facts") ¶¶ 4-6.) Furthermore, "[a]t the time of filing its complaint," the film was not "slated for . . . cable on-demand broadcast." (*See* Pl.'s Facts ¶ 40 (noting that offer for on-demand distribution was made on December 20, 2007).)

11.   The transcript filed with the Court does not appear to be a "true and correct copy of the final transcript" of the film, for the filed transcript contains numerous placeholders (*see*,

*e.g.*, Am. Compl. Exh. 2 at 2, 6, 9) and differs from the words actually spoken in the film. The

filed document also omits description of many of the film's visuals.

12-13. No response.

14.    This statement is not supported by the record before the Court. First, Mr.

Bossie's "opinion" is improper in support of a motion for summary judgment. *See* Fed. R. Civ.

P. 56(e)(1). Second, there has been no complete "inability" of Plaintiff to advertise its film in

advance of theater screenings, as several of Plaintiff's screenings have been held outside the

electioneering communication periods, and therefore Plaintiff was free to advertise for them in

the relevant markets. (Def.'s Facts ¶ 8.) Finally, for the same reason, it has not been

"impossible" for Plaintiff to theatrically release its film. (*See id.* ¶¶ 7-8.)

15.    No response, except that the intentions of "HLW"[1] are immaterial to this action.

16.    First, because *Hillary: The Movie* is not issue speech, but rather is focused on

criticizing Senator Hillary Clinton's character, qualifications, and fitness for office (*id.* ¶¶ 5-6),

Plaintiff's assertion that its film regarding Senator Obama will "raise similar issues as *Hillary*" is

vague and ambiguous. Second, if Plaintiff's new film is released and broadcast in June or the

first four weeks of July, it will not be an electioneering communication. (*See id.* ¶ 12.) Third, it

is not "impossible to present the movie and ads to the Court now in a request for declaratory and

injunctive relief" because Plaintiff can seek (and has sought) a declaratory judgment that all

communications exempt from the electioneering communication funding restriction under *FEC*

*v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652 (2007) ("*WRTL*"), are exempt from the

disclosure requirements. (*See* Am. Compl. ¶¶ 35-36.) Finally, to the extent the film or ads

---

[1]    "HLW" appears to refer to Human Life of Washington, Inc., another client of Plaintiff's
counsel. *See* http://www.jamesmadisoncenter.org/WA/Complaint-Final.pdf. The identical
erroneous reference to HLW appears in Mr. Bossie's affidavit (¶ 8).

regarding Senator Obama are not exempt from the funding restriction (*i.e.*, are not "*WRTL* ads"), such communications are immaterial to this action.

17.     Plaintiff's assertion that it "could not obtain an FEC advisory opinion . . . in the near future" is speculative, as nominations to fill the Commission's vacancies were recently made by the President, 154 Cong. Rec. S3838 (May 6, 2008), and favorably reported to the full Senate, *id*. S4792 (May 22, 2008).  In any event, if Plaintiff were to request an advisory opinion from the Commission upon completion of the film this month, there would be between four and eight weeks for the Commission to issue such an opinion before the next electioneering communication window opens.  (*See* Def.'s Facts ¶ 12.)  In addition, to the extent the film or ads regarding Senator Obama are not *WRTL* ads, such communications are immaterial to this action.

18.     There is no evidence before the Court supporting Plaintiff's assertion that offers to purchase 'infomercial' airtime are made only after the relevant communication is finalized; instead, the evidence indicates that Plaintiff can purchase such airtime whenever it chooses to do so.  (*See* Def.'s Exh. 8 (filed under seal); *see also* Def.'s Facts ¶ 10.)

19.     The disclosure requirements "d[o] not prevent anyone from speaking." *McConnell v. FEC*, 540 U.S. 93, 201 (2003) (internal quotation marks and alteration omitted). Furthermore, both *WRTL* and the Commission's regulations implementing that decision, *see* 11 C.F.R. § 114.15, provide extensive guidance as to whether an electioneering communication is or is not the functional equivalent of express advocacy.  In the unlikely event that Plaintiff remains unclear as to the permissibility of its next film and ads after they have been completed, Plaintiff may request an advisory opinion from the Commission and will receive a timely response.  *See* 2 U.S.C. § 437f(a).

20.     On December 20, 2007, the Commission's brief stated:

> Although plaintiff's first two proposed ads appear to come within the *WRTL* exemption — thus placing Citizens United's constitutional claim squarely before the Court as applied to those two ads — "Questions" poses a closer question that the Commission has not had an adequate opportunity to address.  Moreover, the Commission has not been asked through the advisory opinion process (*see* 2 U.S.C. § 437f) to apply its new regulation to that or any other ad.  Accordingly, the Commission is not yet prepared to present its full case on the merits concerning the "Questions" ad."

(Def.'s Mem. in Opp. to Pl.'s Mot. for Consol. at 8-9.)  On January 8, 2008, the Commission's

brief stated:

> Although the Commission now agrees that "Questions" is a *WRTL* ad, . . . there was no reason for the Commission to address this issue in the context of plaintiff's first preliminary injunction motion.  The only question presented in the first motion was whether BCRA's EC *disclosure* provisions could constitutionally be applied to *WRTL* ads in general, and that question was already properly before the Court on the basis of plaintiff's "Wait" and "Pants" ads alone.  (*See* Def.'s Opp. to Pl.'s Mot. to Consol. at 9; *see also* Def.'s First P.I. Opp. at 17 n.7).)  In other words, plaintiff's first preliminary injunction motion purported to encompass *all WRTL* ads, and there were two such ads plainly presented by the Complaint, so whether "Questions" also met the *WRTL* definition had no bearing on the motion.  Because (1) this determination was immaterial to the then-pending motion, (2) the appropriate application of the Commission's new regulations was less immediately obvious as to "Questions" than it was as to the other ads alleged in the original Complaint . . . , and (3) the FEC's Commissioners had begun to disperse for the holidays (as noted in the Commission's motion for an extension of time to respond to the current motion), the Commission's brief — filed five business days after plaintiff's first motion — simply did not take a position about whether "Questions" qualifies as a *WRTL* ad. . . .

> The Commission agrees with plaintiff that "Questions" is a *WRTL* ad exempt from the funding restriction pursuant to 11 C.F.R. § 114.15(c).  This analysis was slightly more complicated than it was for plaintiff's "Wait" and "Pants" ads because, while the ten-second ads qualify for the safe-harbor of 11 C.F.R. § 114.15(b) by omitting any indicia of express advocacy and promoting a commercial transaction, "Questions" arguably addresses a candidate's "character, qualifications, [and] fitness for office."  11 C.F.R. § 114.15(b).  Thus, the safe harbor provision may not apply to "Questions," but it is, "on balance," susceptible of a reasonable interpretation as a commercial advertisement for *Hillary: The Movie*, rather than solely as an appeal to vote against Senator Clinton.  11 C.F.R.

4

> § 114.15(c).  Accordingly, "Questions" is exempt from the funding
> restriction of 2 U.S.C. § 441b(a),(b)(2) . . . .

(Def.'s Mem. in Opp. to Pl.'s Second Mot. for Prelim. Inj. at 11, 17.)

21.     In response to Plaintiff's Amended Complaint, the Commission analyzed

Plaintiff's film and ads under the standard set forth in *WRTL* and the Commission's regulations

implementing that decision, 11 C.F.R. § 114.15.  (*See, e.g.*, Def.'s Mot. to Dismiss Counts 3 & 4

of Pl.'s Am. Compl. at 4-10.)

22.     Both *WRTL* and the Commission's implementing regulations, 11 C.F.R. § 114.15,

provide extensive guidance as to whether an electioneering communication is or is not the

functional equivalent of express advocacy.  In the unlikely event that Plaintiff remains unclear as

to the permissibility of its next film and ads after they have been completed, Plaintiff may

request an advisory opinion from the Commission and will receive a timely response.  *See* 2

U.S.C. § 437f(a).  There was no "delay" or "imprecision" in the analysis in the Commission's

briefs of Plaintiff's film and the "Questions" ad; that analysis was conducted under the plain

language of *WRTL*, *supra* ¶ 21, promptly upon Plaintiff's addition of the funding restriction to

this case, *supra* ¶ 20.

23.     Plaintiff's film is susceptible of no reasonable interpretation other than as an

appeal to vote against Senator Clinton, and it is therefore, at a minimum, the functional

equivalent of express advocacy.  (*See* Def.'s Facts ¶¶ 4-6.)

24.     The electioneering communication funding restriction permits Plaintiff to

broadcast electioneering communications, provided that the funds are disbursed from Plaintiff's

separate segregated fund, or "PAC."  *See* 2 U.S.C. § 441b(b)(2)(C).  Furthermore, Plaintiff may

fund an electioneering communication from its general corporate treasury if that communication

is susceptible of a reasonable interpretation other than as an appeal to vote for or against a

candidate.  *WRTL*, 127 S. Ct. at 2667.  To the extent that Plaintiff cites FEC Advisory Opinion

2004-30 for any proposition regarding electioneering communications that are not the functional

equivalent of express advocacy, that Advisory Opinion is immaterial because it was decided

prior to *WRTL*.

     25-28.  No response.

     29-30.  Plaintiff's advertisements would not have been electioneering communications if

Plaintiff had broadcast them in the states where Plaintiff screened its film after the Democratic

primary.  (*See* Def.'s Facts ¶ 8.)  Nor would Plaintiff's advertisements be electioneering

communications if Plaintiff were to broadcast them any time between now and the thirty days

before the Democratic national convention.  (*Id.* ¶ 12.)

     31.     "Questions," although exempt from the electioneering communication funding

restriction, is not an "issue-advocacy ad."  *See supra* ¶ 20.  There is no support in the factual

record for Plaintiff's allegations that "10-second ads [are] virtually impossible and 30-second ads

extremely difficult to do" in light of FECA's disclaimer requirements.  Furthermore, the phrases

"virtually impossible" and "extremely difficult" are vague, both within this paragraph and in

relation to paragraph 39 of Plaintiff's statement, which alleges that ten-second ads are

"preclude[d]" and thirty-second ads must be "revise[d]."

     32.     No response.

     33.     Citizens United's assertion based on "belief" is improper in support of a summary

judgment motion.  *See* Fed. R. Civ. P. 56(e)(1).

     34.     The ads would be subject to the disclosure requirements because they would be

electioneering communications under 2 U.S.C. § 434(f)(3).  (*See* Pl.'s Facts ¶¶ 29, 33.)

35.    Allegations "on information and belief" are improper in support of a motion for summary judgment, *see* Fed. R. Civ. P. 56(e)(1), and the cited newspaper article, which Plaintiff offers for the truth of its contents, is inadmissible hearsay.  Fed. R. Evid. 801.  In addition, the cited article was published on June 26, 1996, not June 12, 2007, and it is irrelevant and immaterial because it has nothing to do with Plaintiff.

36.    Plaintiff's statement that it "will pay for the ads exclusively from a segregated bank account" (internal quotation marks omitted) is inconsistent with Plaintiff's statement that it "will not make any electioneering communications" if it is subject to disclosure, for the use of a "segregated bank account" would likely increase Plaintiff's disclosure obligations.  *Compare* 11 C.F.R. § 104.20(c)(9) (reporting requirements for general treasury disbursements) *with* 11 C.F.R. § 104.20(c)(7)(ii) (reporting requirements for disbursements from separate bank account).

37.    Plaintiff's assertions regarding "materially-similar ads" are so vague and ambiguous that they are irrelevant to this action.

38.    Plaintiff has not broadcast — and is not broadcasting — its advertisements even during the times when the electioneering communication regulations are inapplicable.  (*See* Pl.'s Facts ¶ 33.)

39.    There is no support in the factual record for Plaintiff's allegations that electioneering communication disclaimers and disclosures "mislead the public."  There also is no support in the factual record for Plaintiff's allegation that electioneering communication disclaimers "preclude" Plaintiff from airing ten-second ads or require Plaintiff to "revise" its thirty-second ads.  *See supra* ¶ 31.  Finally, Plaintiff has not broadcast — and is not broadcasting — its advertisements even during the times when the electioneering communication regulations are inapplicable.  (*See* Pl.'s Facts ¶ 33.)

40-41.  No response.

42.     The electioneering communication funding restriction permits Plaintiff to broadcast electioneering communications, provided that the funds are disbursed from Plaintiff's separate segregated fund, or "PAC."  *See* 2 U.S.C. § 441b(b)(2)(C).

43-44.  Plaintiff's allegations regarding "constitutional rights" and a "remedy at law" are not statements of fact.

Respectfully submitted,

Thomasenia P. Duncan (D.C. Bar No. 424222)
General Counsel

David B. Kolker (D.C. Bar No. 394558)
Associate General Counsel

Kevin Deeley
Assistant General Counsel

_____/s/ Adav Noti_____
Adav Noti (D.C. Bar No. 490714)
Attorney

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street NW
Washington, DC 20463
Dated:  June 6, 2008          (202) 694-1650

8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| CITIZENS UNITED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. No. 07-2240 (ARR, RCL, RWR) |
| ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**[PROPOSED] ORDER**

This matter having come before the Court upon the parties' motions for summary

judgment, it is hereby ORDERED that:

(1)    Defendant's motion for summary judgment is GRANTED;

(2)    Plaintiff's motion for summary judgment is DENIED; and

(3)    Judgment is entered in favor of Defendant as to Counts 1, 2, and 3 of the

Amended Complaint.

SO ORDERED.


_____, 2008        _____
                                       United States Circuit Judge A. Raymond Randolph


                                       _____
                                       United States District Judge Royce C. Lamberth


                                       _____
                                       United States District Judge Richard W. Roberts

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CITIZENS UNITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-2240 (RCL) |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | DECLARATION |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF ADAV NOTI

1.  I am an attorney in the Litigation Division of the Office of the General Counsel of the Federal Election Commission ("Commission").

2.  I submit this declaration in support of the Commission's Motion for Summary Judgment.

3.  Attached to this Declaration as Exhibit 1 is a true and correct copy of Plaintiff's First Supplement to Plaintiff's Responses to FEC's First Interrogatories.

4.  Attached to this Declaration as Exhibit 2 is a true and correct copy of Spot Cable, Elections '08 On Demand, http://www.spotcable.com/political_sub2.html.

5.  Attached to this Declaration as Exhibit 3 is a true and correct copy of Citizens United Political Victory Fund, Statement of Organization (June 15, 1994).

6.  Attached to this Declaration as Exhibit 4 is a true and correct copy of Citizens United Political Victory Fund, All Campaign Finance Reports, http://query.nictusa.com/cgi-bin/fecimg/?C00295527.

7.      Attached to this Declaration as Exhibit 5 is a true and correct copy of Citizens United Political Victory Fund, Individuals Who Gave to This Committee, http://query.nictusa.com/cgi-bin/com_ind/C00295527/.

8.      Attached to this Declaration as Exhibit 6 is a true and correct copy of Joe Murray, *Lawsuit Threatened Over CNN's 'Campaign Killers*,' The Bulletin (Dec. 6, 2007).

9.      Attached to this Declaration as Exhibit 7 is a true and correct copy of Press Release, Citizens United to Sue CNN, http://www.citizensunited.org/press/?entryid=1972618 (Dec. 4, 2007).

10.     Exhibit 8, filed separately from this Declaration, is a true and correct copy of a document produced by Plaintiff to the Commission during discovery under the terms of the Protective Order entered by this Court on April 18, 2008 (Docket No. 51).


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 6, 2008                      __/s/ Adav Noti_____
                                              Adav Noti (D.C. Bar No. 490714)

# Exhibit 1

**United States District Court**
**District of Columbia**

| Citizens United, | | |
|---|---|---|
| | *Plaintiff,* | **Case No.** 07-2240 (ARR, RCL, RWR) |
| *v.* | | |
| Federal Election Commission, | | THREE-JUDGE COURT |
| | *Defendant.* | |

**First Supplement to Plaintiff's Responses to FEC's First Interrogatories**

Pursuant to Federal Rule of Civil Procedure 33, Citizens United ("CU") submits these supplemental responses to *Defendant Federal Election Commission's First Set of Interrogatories to Plaintiff Citizens United* ("Interrogatories") served on CU. All prior objections are incorporated by reference and the following responses are made without waiving any objections.

## Specific Objections & Responses

**1.** Describe in detail each instance in which a person has been subjected to threats, harassment, or reprisal because of that individual's association with you.

**Supplemental Response.** None.

**2.** For each person who has made or pledged to make a donation to the Account since January 1, 2007, indicate: (a) the dates of the person's donations or pledges (specifying whether each was a donation or a pledge); (b) the amounts of the person's donations or pledges; (c) whether the person is an individual, business corporation, nonprofit corporation, labor organization, or other person; (d) whether the person has been identified in any public filing with the Commission or the Internal Revenue Service as having donated to Citizens United Political Victory Fund or any entity organized under Section 527 of the Internal Revenue Code and affiliated or connected to you; and (e) whether the person is named in the credits of *Hillary: The Movie.*

**First Supplement to**
**Responses to 1st Interrogatories**          1

**Supplemental Response.** As part of its objection, CU stated the following (emphasis added):

> As to any communications that would be "electioneering communications" *if* run within the statutory prohibition periods, CU is fully free to use any form of donations to pay for those communications, but such donations and expenditures are wholly irrelevant to any claim or defense in this case, FRCP 26(b)(1), even if such information had been requested.

In an April 4 letter, FEC counsel asked CU to clarify whether this sentence was intended to read: "'As to any communications that would *not* be ECs . . . .'"

The FEC-suggested reading is not what CU intended. The key to understanding CU's statement is the word "*if*," i.e., the objection speaks of communications that would otherwise fit the "electioneering communications" but for the fact that they are run *outside* the statutory 30- and 60-day periods for "electioneering communications." The government has asserted no interest in BCRA, and none was recognized in *McConnell v. FEC*, 540 U.S. 93 (2003), in regulating communication that would otherwise fit the "electioneering communications" definition but are *not* run during electioneering communication periods. They are *not* "electioneering communications." There is no government interest in regulating them. CU is absolutely free to run its ads or its documentary outside the 30- and -60 day periods without *any* disclosure. The objection simply made the point that CU is free to receive and use donations into any account, including its general fund, and to use those funds for making communications that would be "electioneering communications" if run within the 30- and 60-day periods, all without any obligation to disclose any information about donors or their donations. And as to such wholly unregulable activity, any donations, receipts, or disbursements are wholly irrelevant to any claim

**First Supplement to**
**Responses to 1st Interrogatories**          2

or defense in this case. So long as CU does not make one of these communications within the 30- and 60-day periods, which it has declared it will not due absent the requested judicial relief, the government has no interest in requiring any disclosure, even in discovery, of the communications because they are *not* electioneering communications. The objection merely points out the obvious, i.e., that there is a large field of permissible activity (including receipts and disbursements) related to the documentary and ads that is not subject to regulation and so has no bearing on this litigation. And, as noted, CU will not make broadcast communications that would be "electioneering communications" during the 30- and 60-day time periods unless the court holds that communications that are excluded from prohibition by the appeal-to-vote test, *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652, 2667 (2007) ("*WRTL II*"), are also excluded from disclosure by the same test. So there is *no* actually or potentially disclosable information in which the government has asserted an interest in disclosure, and, consequently, discovery into such information cannot be relevant to any claim or defense. CU repeats this objection in a slightly different form in the second paragraph of its objection to Interrogatory #3.

> **3.** For each person who has made or pledged to make a donation to Citizens United for the purpose of furthering the production or public distribution of the Movies, indicate: (a) the dates of the person's donations or pledges (specifying whether each was a donation or a pledge); (b) the amounts of the person's donations or pledges; (c) whether the person is an individual, business corporation, nonprofit corporation, labor organization, or other person; (d) whether the person has been identified in any public filing with the Commission or the Internal Revenue Service as having donated to Citizens United Political Victory Fund or any organization you operate under Section 527 of the Internal Revenue Code; (e) whether the person is named in the credits of Hillary: The Movie; and (f) which Movie each donation or pledge was made to further.

**Supplemental Response.** CU supplements Attachment 1 with added information. *See infra* (revised Attachment 1).

> **4.** Describe in detail the factual basis for any belief you have that a person who has made a donation or pledge listed in response to Interrogatory 2 or Interrogatory 3 will be subject to threats, harassment, or reprisal if that person is publicly identified as having made the donation or pledge. In addition, identify any documents in your possession relating to this belief.

**Supplemental Response.** CU intends to recite in support of its court-recognized interests (as set out in its prior objections and responses) in avoiding invasion of privacy, reduced donors, reduced donations, etc. the evidence recited in such cases, e.g., *Buckley v. Valeo*, 424 U.S. 1 (1976), *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), and *McConnell v. FEC*, 540 U.S. 93 (2003), including materials from the record, e.g., the *McConnell* district court's findings of fact as to such matters. In addition, CU intends to do a literature search for available literature on the problems caused by disclosure requirements, and at present can cite the following items: Dick M. Carpenter II, *Disclosure Costs: Unintended Consequences of Campaign Finance Reform* (Institute for Justice, March 2007); Brian Doherty, *Disclosure Flaw: The perils of campaign-finance disclosure laws* (www.reason.com, March 2007); Brian Doherty, *How Campaign finance law hurts participation in politics* (www.reason.com, March 2007); Center for Competitive Politics, *Disclosure 50 years later* (www.campaignfreedom.org, Jan. 31, 2008); Rich Lowry, *Youtube Nation: Debate No One Can Control Makes for the Best Politics* (New York Post, www.nypost.com, March 27, 2007).

> **5.** Describe in detail the factual basis for your allegation (Am. Compl. ¶ 27) that the reporting requirements will "in [your] belief based on long experience, substantially reduce the number of donors

**First Supplement to**
**Responses to 1st Interrogatories**          4

and amount of donations to Citizens United." Include all facts relating to the bases for the alleged "belief," numerical estimates of the "substantial[ ] reduc[tion]" in the "number of donors and amount of donations," and description of any specific donations that you believe you will not receive or that the donor will ask you to return unless you are exempted from the disclosure requirements. In addition, identify any documents in your possession relating to this belief.

**Supplemental Response.** None.

**6.** Describe in detail the factual basis for your allegation (Am. Compl. ¶ 27) that the disclaimer requirement will cause you "to mislead the public," and identify any documents in your possession relating to whether the public is misled by the requirement.

**Supplemental Response.** CU intends to cite to *WRTL II* and *McConnell*, and any other applicable cases that it may discover, for the manner in which the term "electioneering" is employed.

**7.** Indicate the source of the funds that you intend to use to pay (a) the "fee" mentioned in Paragraph 28 of the Amended Complaint, and (b) any other fee you intend to pay for the public distribution of either of the Movies. Indicate whether these funds will be drawn from Citizens United's general treasury, the Account, or some other source.

**Supplemental Response.** None.

**8.** Describe in detail (a) the "contract offer[ ]" mentioned in Paragraph 28 of the Amended Complaint, and (b) any other offer you have received or expect to receive regarding public distribution of either of the Movies. Include the identity of the offeror and the material terms of the contract.

**Supplemental Response.** The FEC asks for details as to why CU wishes a protective order as to the offer, claiming that it "cannot determine from the response, . . . why a protective order would be required for the details of a commercial transaction between two corporations to publicly distribute a film." The FEC response reveals a misunderstanding of how commercial

**First Supplement to**
**Responses to 1st Interrogatories**          5

transactions happen between corporations, most or all of whom do not place contract negotiations on the record for review by the public, competitors, and adversaries for a wide variety of legitimate reasons. It is doubtful that the FEC can cite many examples of corporations routinely putting their contract negotiations on the public record for all to see what the corporation is being offered, by whom, and for how much. As already stated in the first response to this interrogatory, CU believes that "the negotiations were confidential and CU reasonably fears that making the offer public might cause it to be withdrawn or might interfere with CU receiving similar future offers." To avoid that eventuality, CU does not wish to disclose the identity of the offeror. Moreover, CU does not wish to disclose the offer amount or other terms because it considers that information also to be confidential, because disclosure of terms might alter future offers, and because, as already stated, "contract terms would be the subject of negotiations based on the actual timing of the judicial relief and the situation existing at the time," so that the offered cost for one offered option would not likely reflect what would actually be the cost and scope of the broadcasting done if CU were able to proceed with the broadcasting. CU has already provided, in the *Amended Complaint* the material terms that it believes do not require a protective order. CU believes that the sort of protective order employed in the *WRTL* case would be suitable. *See* attachments to cover letter.

> **9.** Describe any television or radio advertising that you paid
> to produce or air to promote any of the films listed at Paragraphs 9-13
> of the Amended Complaint, including, for each film, the number of
> ads you aired, the geographic areas in which you aired them, and the
> production and airtime costs of each such ad.

**Supplemental Response.** None.

**First Supplement to
Responses to 1st Interrogatories**          6

**10.** For each of your planned television ads regarding the Hillary: The Movie, state the geographic areas in which you intend to air the ad, the networks on which you intend to air the ad, the number of times you intend to air the ad on each network, and the production and airtime costs of the ad.

**Supplemental Response.** None.

**11.** Describe any plans you have to air advertisements "materially-similar" to your advertisements for Hillary: The Movie, as described in Paragraph 25 of the Amended Complaint. For each such ad, include the subject matter of the ad, the geographic areas in which you intend to air the ad, the networks on which you intend to air the ad, the number of times you intend to air the ad on each network, and the production and airtime costs of the ad.

**Supplemental Response.** None.

**12.** Describe in detail each reason that you intend to fund your advertising for Hillary: The Movie from the Account instead of from your general treasury.

**Supplemental Response.** None.

## Verification

I declare under penalty of perjury that the foregoing *First Supplement to Plaintiff's*

*Responses to FEC's First Interrogatories* is true and correct. Executed on April 8, 2008.


/s/ David N. Bossie
_____
David N. Bossie
Citizens United

Dated: April 9, 2008                         Respectfully Submitted,


                                             /s/ James Bopp, Jr.
                                             James Bopp, Jr., D.C. Bar #CO0041
                                             Richard E. Coleson*
                                             Jeffrey P. Gallant*
                                             Clayton J. Callen*
                                             BOPP, COLESON & BOSTROM
                                             1 South Sixth Street
                                             Terre Haute, IN 47807-3510
                                             812/232-2434 telephone
                                             812/234-3685 facsimile
                                             * Pro Hac Vice Motion granted
                                             Counsel for Plaintiff

**Interrogatory No. 3, Attachment 1** (Revised, April 9, 2008)

| Person # | (a) Date(s) | (b) Amounts | (c) Status | (d) Public Disclosure | | (e) Film Credits |
|---|---|---|---|---|---|---|
| | | | | FEC[1] | IRS-527[2] | |
| 1 | 12/22/2006 | $1000.00 | Individual | No | Yes | No |
| 2 | 02/27/2007 | $1000.00 | Individual | No | Yes | No |
| 3 | 11/19/2007 | $1000.00 | Individual | No | No | No |
| 4 | 11/20/2007 | $1000.00 | Individual | No | No | No |
| 5 | 02/05/2007 | $500.00 | Individual | No | No | No |
| 5 | 03/22/2007 | $500.00 | Individual | No | No | No |
| 5 | 02/14/2007 | $500.00 | Individual | No | No | No |
| 6 | 02/16/2007 | $1000.00 | Individual | No | Yes | No |
| 7 | 04/18/2007 | $1000.00 | Individual | No | No | No |
| 8 | 02/27/2007 | $1000.00 | Individual | No | No | No |
| 9 | 12/14/2007 | $1000.00 | Individual | No | Yes | No |
| 10 | 11/20/2007 | $1000.00 | Individual | No | No | No |
| 11 | 04/18/2007 | $1000.00 | Individual | No | No | No |
| 12 | 02/27/2007 | $1000.00 | Individual | No | No | No |
| 13 | 01/09/2007 | $1000.00 | Individual | No | No | No |
| 14 | 12/12/2007 | $500.00 | Individual | No | Yes | No |
| 14 | 01/29/2008 | $500.00 | Individual | No | Yes | No |
| 15 | 06/25/2007 | $35.00 | Individual | No | No | No |
| 15 | 12/04/2007 | $1000.00 | Individual | No | No | No |
| 16 | 02/27/2007 | $1000.00 | Individual | No | No | No |
| 17 | 03/05/2007 | $1000.00 | Individual | No | No | No |
| 18 | 02/19/2007 | $1000.00 | Individual | No | No | No |
| 19 | 02/04/2008 | $1000.00 | Individual | No | No | No |
| 20 | 12/03/2007 | $1000.00 | Individual | No | No | No |
| 21 | 02/19/2007 | $1000.00 | Individual | No | No | No |
| 22 | 01/22/2008 | $1000.00 | Individual | No | Yes | No |
| 23 | 12/10/2007 | $1000.00 | Individual | No | No | No |
| 24 | 04/20/2007 | $500.00 | Individual | No | Yes | No |

[1]Responses are based on contributions received between October 1998 and February 2008. Answers are based on a review of reports filed by CU-PVF and information available from the FEC's online search data-base of contributors. CU-PVF does not maintain contribution information dating back to its formation in 1994, and the FEC's online search database of contributors does not appear to include any CU-PVF donor information for periods prior to October 1998

[2]Responses are based on reports filed by The Presidential Coalition, LLC and 2007 Conservative Victory Committee, which are the only Section 527 organizations filing reports with the IRS that are either affiliated with or connected to Citizens United.

**First Supplement to**
**Responses to 1st Interrogatories**          10

```
24 .... 02/26/2007 ....... $500.00 .... Individual ... No ....... Yes ......... No
25 .... 12/11/2006 ..... $1000.00 .... Individual ... No ....... Yes ......... No
26 .... 11/20/2007 ..... $1000.00 .... Individual ... No ....... Yes ......... No
27 .... 03/12/2008 ..... $1000.00 .... Individual ... No ......... No ......... No
28 .... 01/11/2008 .... $25000.00 .... Individual ... No ......... No ........ Yes
28 .... 07/26/2005 .. $100000.00 .... Individual ... No ......... No ........ Yes
29 .... 01/24/2008 .... $48500.00 .. Other Person .. Yes³ ....... No ........ Yes
30 .... 08/15/2007 ..... $1000.00 ... Bus. Corp. ... No ......... No ......... No
31 .... 08/22/2007 ..... $2500.00 .. Other Person ... No ......... No ......... No
32 .... 08/15/2007 ..... $1000.00 .. Other Person ... No ......... No ......... No
33 .... 08/08/2007 ..... $1000.00 ... Bus. Corp. .... No ......... No ......... No
```

---

[3]The FEC's online data base erroneously lists this entity as having made a contribution to CU-PVF in 2007. This is an error on the part of the FEC. CU-PVF did not receive a contribution from that person in 2007, nor did CU-PVF report that it received such a contribution. A review of the contributor's FEC report also reveals that it did not report having made a contribution to CU-PVF in 2007. The contributor correctly reported that the contribution was to Citizens United.

**First Supplement to**
**Responses to 1st Interrogatories**          11

# **Exhibit 2**



# NCC

**Put your money where your market is. Spot Cable.**

SITE MAP    HELP    CONTACT

SEARCH [          ] ▾    Quicklinks ↵

Home > Political > Elections '08 On Demand

## Elections '08 On Demand



WHY SPOT CABLE WORKS
MARKETS
NETWORKS
PLANNING & BUYING SPOT CABLE
MULTICULTURAL
POLITICAL
> OVERVIEW
> MICROTARGETING VOTERS
> CONTACT
PROMOTIONS
SPORTS
VOD & ADVANCED ADVERTISING
ABOUT NCC
MEMBER LINKS

**Advanced Advertising**
NCC takes your candidate beyond Spot Cable media to advanced advertising opportunities in Video On Demand. VOD's benefits to your campaign are unmatched by conventional media.

Our breakthrough platform allows you to speak directly to voters—24/7—in their own living rooms. By crafting and controlling your own long-form campaign message, you reach voters with no media dilution or bias.

You can take all the time needed to fully deliver your positions and leverage the leading technology advancements for information consumption.

Elections '08 On Demand is an informative, easy-to-use resource for voters and gives the voter incredible, deep access to the campaign messages that are most important to them.

Click on the video player below to hear more about Political Video on Demand.





Better Way

http://www.spotcable.com/political_sub2.html

For more information on Political Advertising opportunites, contact a specialist.



# Exhibit 3

From :                          PHONE No. : 703 356 5085          Jun.06 1994 11:14AM  P02

# STATEMENT OF ORGANIZATION
(See reverse side for instructions)

1. (a) NAME OF COMMITTEE IN FULL   [ ] (Check if name is changed)

Citizens United Political Victory Fund

2. DATE  6/15/94

(b) Number and Street Address   [ ] (Check if address is changed)   Jun 24  19 57

11094-D Lee Highway #200

3. FEC IDENTIFICATION NUMBER

(c) City, State and ZIP Code

Fairfax, VA 22030

4. IS THIS STATEMENT AN AMENDMENT?
[ ] YES   [X] NO

5. TYPE OF COMMITTEE (Check one)

[ ] (a) This committee is a principal campaign committee. (Complete the candidate information below.)

[ ] (b) This committee is an authorized committee, and is NOT a principal campaign committee. (Complete the candidate information below.)

| Name of Candidate | Candidate Party Affiliation | Office Sought | State/District |
|---|---|---|---|
|  |  |  |  |

[ ] (c) This committee supports/opposes only one candidate _____ (name of candidate), and is NOT an authorized committee.

[ ] (d) This committee is a _____ (National, State or subordinate) committee of the _____ Party. (Democratic, Republican, etc.)

[X] (e) This committee is a separate segregated fund.

[ ] (f) This committee supports/opposes more than one Federal candidate and is NOT a separate segregated fund or a party committee.

| Name of Any Connected Organization or Affiliated Committee | Mailing Address and ZIP Code | Relationship |
|---|---|---|
| Citizens United | 11094-D Lee Highway #200 Fairfax, VA 22030 | Connected Organization |

Type of Connected Organization

[ ] Corporation  [ ] Corporation w/o Capital Stock  [ ] Labor Organization  [X] Membership Organization  [ ] Trade Association  [ ] Cooperative

7. Custodian of Records: Identify by name, address (phone number -- optional) and position of the person in possession of committee books and records.

| Full Name | Mailing Address Same | Title or Position |
|---|---|---|
| Kevin Allen |  | Treasurer |

8. Treasurer: List the name and address (phone number - optional) of the treasurer of the committee; and the name and address of any designated agent (e.g., assistant treasurer).

| Full Name | Mailing Address | Title or Position |
|---|---|---|
| Kevin Allen | Same | Treasurer |

9. Banks or Other Depositories: List all banks or other depositories in which the committee deposits funds, holds accounts, rents safety deposit boxes or maintains funds.

| Name of Bank, Depository, etc. | Mailing Address and ZIP Code |
|---|---|
|  |  |

I certify that I have examined this Statement and to the best of my knowledge and belief it is true, correct and complete.

| TYPE OR PRINT NAME OF TREASURER | SIGNATURE OF TREASURER | DATE |
|---|---|---|
| Kevin Allen | IC all | 6/15/94 |

NOTE: Submission of false, erroneous, or incomplete information may subject the person signing this document to the penalties of 2 U.S.C. 437g.
ANY CHANGE IN INFORMATION SHOULD BE REPORTED WITHIN 10 DAYS.

For further information contact:
Federal Election Commission
Toll Free 800-424-9530
Local 202-376-5180

**FEC FORM 1**
(revised 4/87)

# Exhibit 4

**Presented by the Federal Election Commission**

TRY A: <u>NEW SEARCH</u>    RETURN TO: <u>FEC HOME PAGE</u>

**Committee ID:** C00295527

# CITIZENS UNITED POLITICAL VICTORY FUND

1006 PENNSYLVANIA AVE SE
WASHINGTON, DC 20003

| | |
|---|---|
| **Treasurer Name:** | Allen, Kevin |
| **Committee Designation:** | (N/A) |
| **Committee Type:** | Q (QUALIFIED NON-PARTY(SEE 2USC SECT.441(A)(4))) |

**NOTE:**

**Candidate listings may appear here as a result of draft committees or independent expenditure committees
registering with the FEC. If no official documents of an authorized committee appear below, the individual identified here has taken no action to become a candidate.**

Click the Display Image column to quickly view a report page by page.
Click the Display PDF column to receive and view/print entire reports in PDF format.

### Year 2008

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| 24 HOUR CONTRIBUTION NOTICE | | 01/30/2008 | | | 1 | 28990165030 PDF |
| MISCELLANEOUS REPORT TO FEC | | 05/16/2008 | | | 4 | 28039731107 PDF |
| FEBRUARY MONTHLY | | 02/19/2008 | 01/01/2008 | 01/31/2008 | 13 | 28930597853 PDF |
| FEBRUARY MONTHLY | AMEND | 03/20/2008 | 01/01/2008 | 01/31/2008 | 15 | 28990627829 PDF |
| FEBRUARY MONTHLY | AMEND | 04/18/2008 | 01/01/2008 | 01/31/2008 | 15 | 28931224351 PDF |
| REQUEST FOR ADDITIONAL | | 04/16/2008 | 01/01/2008 | 01/31/2008 | 3 | 28039693418 PDF |

INFORMATION

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| MARCH MONTHLY | | 03/20/2008 | 02/01/2008 | 02/29/2008 | 21 | 28930824533 PDF |
| MARCH MONTHLY | AMEND | 04/18/2008 | 02/01/2008 | 02/29/2008 | 22 | 28931224430 PDF |
| APRIL MONTHLY | | 04/18/2008 | 03/01/2008 | 03/31/2008 | 50 | 28990876670 PDF |
| MAY MONTHLY | | 05/20/2008 | 04/01/2008 | 04/30/2008 | 16 | 28931617975 PDF |

## Year 2007

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| MISCELLANEOUS REPORT TO FEC | | 05/01/2007 | | | 4 | 27039433289 PDF |
| MISCELLANEOUS REPORT TO FEC | | 08/17/2007 | | | 6 | 27039511335 PDF |
| FEBRUARY MONTHLY | | 02/20/2007 | 01/01/2007 | 01/31/2007 | 13 | 27950077886 PDF |
| FEBRUARY MONTHLY | AMEND | 07/19/2007 | 01/01/2007 | 01/31/2007 | 13 | 27930974066 PDF |
| REQUEST FOR ADDITIONAL INFORMATION | | 07/18/2007 | 01/01/2007 | 01/31/2007 | 2 | 27039474463 PDF |
| MARCH MONTHLY | | 03/20/2007 | 02/01/2007 | 02/28/2007 | 67 | 27930338259 PDF |
| MARCH MONTHLY | AMEND | 07/20/2007 | 02/01/2007 | 02/28/2007 | 67 | 27930979245 PDF |
| REQUEST FOR ADDITIONAL INFORMATION | | 07/18/2007 | 02/01/2007 | 02/28/2007 | 3 | 27039474465 PDF |
| APRIL MONTHLY | | 04/19/2007 | 03/01/2007 | 03/31/2007 | 35 | 27930657293 PDF |
| APRIL MONTHLY | AMEND | 05/17/2007 | 03/01/2007 | 03/31/2007 | 35 | 27990072771 PDF |
| APRIL MONTHLY | AMEND | 07/20/2007 | 03/01/2007 | 03/31/2007 | 36 | 27990323913 PDF |
| REQUEST FOR ADDITIONAL INFORMATION | | 08/03/2007 | 03/01/2007 | 03/31/2007 | 3 | 27039501394 PDF |
| MAY MONTHLY | | 05/17/2007 | 04/01/2007 | 04/30/2007 | 72 | 27930725264 PDF |

| MAY MONTHLY | AMEND | 07/20/2007 | 04/01/2007 | 04/30/2007 | 73 | 27990324093 PDF |
| JUNE MONTHLY | | 06/19/2007 | 05/01/2007 | 05/31/2007 | 49 | 27990159477 PDF |
| JUNE MONTHLY | AMEND | 07/20/2007 | 05/01/2007 | 05/31/2007 | 50 | 27930979780 PDF |
| JULY MONTHLY | | 07/20/2007 | 06/01/2007 | 06/30/2007 | 155 | 27990344057 PDF |
| AUGUST MONTHLY | | 08/20/2007 | 07/01/2007 | 07/31/2007 | 76 | 27990500552 PDF |
| SEPTEMBER MONTHLY | | 09/18/2007 | 08/01/2007 | 08/31/2007 | 162 | 27990620721 PDF |
| OCTOBER MONTHLY | | 10/19/2007 | 09/01/2007 | 09/30/2007 | 79 | 27990850773 PDF |
| NOVEMBER MONTHLY | | 11/19/2007 | 10/01/2007 | 10/31/2007 | 86 | 27990943558 PDF |
| DECEMBER MONTHLY | | 12/20/2007 | 11/01/2007 | 11/30/2007 | 112 | 27991053362 PDF |
| YEAR-END | | 01/30/2008 | 12/01/2007 | 12/31/2007 | 60 | 28990142692 PDF |
| YEAR-END | AMEND | 03/20/2008 | 12/01/2007 | 12/31/2007 | 62 | 28990627743 PDF |

## Year 2006

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| STATEMENT OF ORGANIZATION | AMEND | 10/18/2006 | | | 6 | 26940490061 PDF |
| 24 HOUR CONTRIBUTION NOTICE | | 10/31/2006 | | | 1 | 26950734040 PDF |
| MISCELLANEOUS REPORT TO FEC | | 11/27/2006 | | | 2 | 26039274764 PDF |
| FEBRUARY MONTHLY | | 02/17/2006 | 01/01/2006 | 01/31/2006 | 5 | 26980125096 PDF |
| FEBRUARY MONTHLY | AMEND | 02/17/2006 | 01/01/2006 | 01/31/2006 | 5 | 26980125230 PDF |
| MARCH MONTHLY | | 03/16/2006 | 02/01/2006 | 02/28/2006 | 5 | 26990334372 PDF |
| APRIL MONTHLY | | 04/18/2006 | 03/01/2006 | 03/31/2006 | 7 | 26930077667 PDF |

| MAY MONTHLY | | 05/18/2006 | 04/01/2006 | 04/30/2006 | 12 | 26950115388 PDF |
|---|---|---|---|---|---|---|
| JUNE MONTHLY | | 06/20/2006 | 05/01/2006 | 05/31/2006 | 10 | 26960153532 PDF |
| JUNE MONTHLY | AMEND | 07/18/2006 | 05/01/2006 | 05/31/2006 | 10 | 26960237229 PDF |
| JULY MONTHLY | | 07/18/2006 | 06/01/2006 | 06/30/2006 | 13 | 26960237793 PDF |
| AUGUST MONTHLY | | 08/17/2006 | 07/01/2006 | 07/31/2006 | 13 | 26950417633 PDF |
| AUGUST MONTHLY | AMEND | 11/21/2006 | 07/01/2006 | 07/31/2006 | 13 | 26930556472 PDF |
| REQUEST FOR ADDITIONAL INFORMATION | | 11/03/2006 | 07/01/2006 | 07/31/2006 | 4 | 26039270423 PDF |
| SEPTEMBER MONTHLY | | 09/19/2006 | 08/01/2006 | 08/31/2006 | 8 | 26960368895 PDF |
| OCTOBER MONTHLY | | 10/18/2006 | 09/01/2006 | 09/30/2006 | 8 | 26950619990 PDF |
| PRE-GENERAL | | 10/24/2006 | 10/01/2006 | 10/18/2006 | 10 | 26950671724 PDF |
| POST-GENERAL | | 12/07/2006 | 10/19/2006 | 11/27/2006 | 119 | 26930712750 PDF |
| POST-GENERAL | AMEND | 12/11/2006 | 10/19/2006 | 11/27/2006 | 119 | 26940902666 PDF |
| POST-GENERAL | AMEND | 04/26/2007 | 10/19/2006 | 11/27/2006 | 119 | 27930685464 PDF |
| REQUEST FOR ADDITIONAL INFORMATION | | 03/30/2007 | 10/19/2006 | 11/27/2006 | 4 | 27039412113 PDF |
| YEAR-END | | 01/25/2007 | 11/28/2006 | 12/31/2006 | 16 | 27930074722 PDF |

### Year 2005

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| FEBRUARY MONTHLY | | 02/15/2005 | 01/01/2005 | 01/31/2005 | 5 | 25970186775 PDF |
| MARCH MONTHLY | | 03/17/2005 | 02/01/2005 | 02/28/2005 | 6 | 25990246713 PDF |
| APRIL MONTHLY | | 04/20/2005 | 03/01/2005 | 03/31/2005 | 6 | 25990527592 PDF |

| MAY MONTHLY | | 05/19/2005 | 04/01/2005 | 04/30/2005 | 6 | 25990887884<br>PDF |
|---|---|---|---|---|---|---|
| JUNE MONTHLY | | 06/20/2005 | 05/01/2005 | 05/31/2005 | 6 | 25970394382<br>PDF |
| JULY MONTHLY | | 07/18/2005 | 06/01/2005 | 06/30/2005 | 6 | 25970679747<br>PDF |
| AUGUST MONTHLY | | 08/16/2005 | 07/01/2005 | 07/31/2005 | 6 | 25980615934<br>PDF |
| SEPTEMBER<br>MONTHLY | | 09/20/2005 | 08/01/2005 | 08/31/2005 | 6 | 25971058511<br>PDF |
| OCTOBER MONTHLY | | 10/18/2005 | 09/01/2005 | 09/30/2005 | 6 | 25971356762<br>PDF |
| NOVEMBER<br>MONTHLY | | 11/21/2005 | 10/01/2005 | 10/31/2005 | 6 | 25971537108<br>PDF |
| DECEMBER<br>MONTHLY | | 12/15/2005 | 11/01/2005 | 11/30/2005 | 6 | 25971599585<br>PDF |
| YEAR-END | | 01/23/2006 | 12/01/2005 | 12/31/2005 | 6 | 26980028340<br>PDF |

## Year 2004

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image<br>or PDF |
|---|---|---|---|---|---|---|
| FEBRUARY<br>MONTHLY | | 02/20/2004 | 01/01/2004 | 01/31/2004 | 6 | 24038323864<br>PDF |
| MARCH MONTHLY | | 03/18/2004 | 02/01/2004 | 02/29/2004 | 6 | 24038342952<br>PDF |
| APRIL MONTHLY | | 04/20/2004 | 03/01/2004 | 03/31/2004 | 8 | 24038392969<br>PDF |
| MAY MONTHLY | | 05/18/2004 | 04/01/2004 | 04/30/2004 | 8 | 24038420093<br>PDF |
| MAY MONTHLY | AMEND | 05/28/2004 | 04/01/2004 | 04/30/2004 | 13 | 24038422046<br>PDF |
| MAY MONTHLY | AMEND | 06/17/2004 | 04/01/2004 | 04/30/2004 | 13 | 24038431221<br>PDF |
| JUNE MONTHLY | | 06/17/2004 | 05/01/2004 | 05/31/2004 | 8 | 24038431234<br>PDF |
| JULY MONTHLY | | 07/26/2004 | 06/01/2004 | 06/30/2004 | 7 | 24038480998<br>PDF |
| AUGUST MONTHLY | | 08/23/2004 | 07/01/2004 | 07/31/2004 | 7 | 24038502474<br>PDF |

| | | | | | | |
|---|---|---|---|---|---|---|
| SEPTEMBER MONTHLY | | 09/20/2004 | 08/01/2004 | 08/31/2004 | 9 | 24038522369 PDF |
| SEPTEMBER MONTHLY | AMEND | 09/28/2004 | 08/01/2004 | 08/31/2004 | 10 | 24038523163 PDF |
| OCTOBER MONTHLY | | 10/18/2004 | 09/01/2004 | 09/30/2004 | 8 | 24962552367 PDF |
| PRE-GENERAL | | 10/18/2004 | 10/01/2004 | 10/13/2004 | 8 | 24962552568 PDF |
| POST-GENERAL | | 11/30/2004 | 10/14/2004 | 11/22/2004 | 10 | 24971961334 PDF |
| YEAR-END | | 01/25/2005 | 11/23/2004 | 12/31/2004 | 6 | 25980329754 PDF |

## Year 2003

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| FEBRUARY MONTHLY | | 02/20/2003 | 01/01/2003 | 01/31/2003 | 5 | 23037992212 PDF |
| MARCH MONTHLY | | 03/19/2003 | 02/01/2003 | 02/28/2003 | 6 | 23038021536 PDF |
| APRIL MONTHLY | | 04/18/2003 | 03/01/2003 | 03/31/2003 | 6 | 23038054848 PDF |
| MAY MONTHLY | | 05/20/2003 | 04/01/2003 | 04/30/2003 | 5 | 23038091592 PDF |
| JUNE MONTHLY | | 06/19/2003 | 05/01/2003 | 05/31/2003 | 6 | 23038111866 PDF |
| JULY MONTHLY | | 07/19/2003 | 06/01/2003 | 06/30/2003 | 9 | 23038152285 PDF |
| AUGUST MONTHLY | | 08/25/2003 | 07/01/2003 | 07/31/2003 | 7 | 23038192900 PDF |
| SEPTEMBER MONTHLY | | 09/17/2003 | 08/01/2003 | 08/31/2003 | 10 | 23038203055 PDF |
| OCTOBER MONTHLY | | 10/20/2003 | 09/01/2003 | 09/30/2003 | 10 | 23038232165 PDF |
| NOVEMBER MONTHLY | | 11/18/2003 | 10/01/2003 | 10/31/2003 | 10 | 23038243014 PDF |
| DECEMBER MONTHLY | | 12/19/2003 | 11/01/2003 | 11/30/2003 | 6 | 23038253065 PDF |
| YEAR-END | | 01/27/2004 | 12/01/2003 | 12/31/2003 | 7 | 24038332044 PDF |

## Year 2002

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| FEBRUARY MONTHLY | | 02/20/2002 | 01/01/2002 | 01/31/2002 | 6 | 22037493792 PDF |
| MARCH MONTHLY | | 03/20/2002 | 02/01/2002 | 02/28/2002 | 5 | 22037511931 PDF |
| APRIL MONTHLY | | 04/19/2002 | 03/01/2002 | 03/31/2002 | 5 | 22037570567 PDF |
| MAY MONTHLY | | 05/20/2002 | 04/01/2002 | 04/30/2002 | 5 | 22037611145 PDF |
| NOTICE OF FAILURE TO FILE | | 06/07/2002 | 04/01/2002 | 04/30/2002 | 2 | 22037604431 PDF |
| JUNE MONTHLY | | 06/18/2002 | 05/01/2002 | 05/31/2002 | 6 | 22037621233 PDF |
| JUNE MONTHLY | AMEND | 07/18/2002 | 05/01/2002 | 05/31/2002 | 6 | 22037674419 PDF |
| JULY MONTHLY | | 07/18/2002 | 06/01/2002 | 06/30/2002 | 5 | 22037674414 PDF |
| AUGUST MONTHLY | | 08/19/2002 | 07/01/2002 | 07/31/2002 | 6 | 22037711092 PDF |
| SEPTEMBER MONTHLY | | 09/23/2002 | 08/01/2002 | 08/31/2002 | 7 | 22037733829 PDF |
| OCTOBER MONTHLY | | 10/17/2002 | 09/01/2002 | 09/30/2002 | 6 | 22037820659 PDF |
| PRE-GENERAL | | 10/17/2002 | 10/01/2002 | 10/16/2002 | 6 | 22037820665 PDF |
| POST-GENERAL | | 12/04/2002 | 10/17/2002 | 11/25/2002 | 10 | 22037882484 PDF |
| YEAR-END | | 01/31/2003 | 11/26/2002 | 12/31/2002 | 5 | 23037970647 PDF |

## Year 2001

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| FEBRUARY MONTHLY | | 02/20/2001 | 01/01/2001 | 01/31/2001 | 8 | 21036933331 PDF |
| MARCH MONTHLY | | 03/20/2001 | 02/01/2001 | 02/28/2001 | 6 | 21036982027 PDF |
| APRIL MONTHLY | | 04/19/2001 | 03/01/2001 | 03/31/2001 | 7 | 21037032988 PDF |

| | | | | | | |
|---|---|---|---|---|---|---|
| MAY MONTHLY | | 05/18/2001 | 04/01/2001 | 04/30/2001 | 6 | 21037090818 PDF |
| JUNE MONTHLY | | 06/20/2001 | 05/01/2001 | 05/31/2001 | 6 | 21037141616 PDF |
| JULY MONTHLY | | 07/20/2001 | 06/01/2001 | 06/30/2001 | 6 | 21037203204 PDF |
| AUGUST MONTHLY | | 08/17/2001 | 07/01/2001 | 07/31/2001 | 7 | 21037281780 PDF |
| AUGUST MONTHLY | AMEND | 01/29/2002 | 07/01/2001 | 07/31/2001 | 7 | 22037410864 PDF |
| SEPTEMBER MONTHLY | | 09/20/2001 | 08/01/2001 | 08/31/2001 | 7 | 21037313046 PDF |
| SEPTEMBER MONTHLY | AMEND | 01/29/2002 | 08/01/2001 | 08/31/2001 | 8 | 22037410856 PDF |
| OCTOBER MONTHLY | | 10/19/2001 | 09/01/2001 | 09/30/2001 | 6 | 22037401203 PDF |
| OCTOBER MONTHLY | AMEND | 01/29/2002 | 09/01/2001 | 09/30/2001 | 6 | 22037410850 PDF |
| NOVEMBER MONTHLY | | 11/09/2001 | 10/01/2001 | 10/31/2001 | 6 | 22037442117 PDF |
| NOVEMBER MONTHLY | AMEND | 12/19/2001 | 10/01/2001 | 10/31/2001 | 6 | 22037410844 PDF |
| DECEMBER MONTHLY | | 01/29/2002 | 11/01/2001 | 11/30/2001 | 6 | 22037410838 PDF |
| YEAR-END | | 02/19/2002 | 12/01/2001 | 12/31/2001 | 7 | 22037453807 PDF |

## Year 2000

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| FEBRUARY MONTHLY | | 02/18/2000 | 01/01/2000 | 01/31/2000 | 5 | 20035291244 PDF |
| MARCH MONTHLY | | 03/22/2000 | 02/01/2000 | 02/29/2000 | 7 | 20035370351 PDF |
| APRIL MONTHLY | | 04/20/2000 | 03/01/2000 | 03/31/2000 | 7 | 20035523604 PDF |
| MAY MONTHLY | | 05/19/2000 | 04/01/2000 | 04/30/2000 | 5 | 20035612495 PDF |
| JUNE MONTHLY | | 06/21/2000 | 05/01/2000 | 05/31/2000 | 4 | 20035673598 PDF |

| JUNE MONTHLY | AMEND | 10/20/2000 | 05/01/2000 | 05/31/2000 | 4 | 20036320386 PDF |
|---|---|---|---|---|---|---|
| REQUEST FOR ADDITIONAL INFORMATION | | 10/11/2000 | 05/01/2000 | 05/31/2000 | 2 | 20036180325 PDF |
| JULY MONTHLY | | 07/20/2000 | 06/01/2000 | 06/30/2000 | 6 | 20035901485 PDF |
| JULY MONTHLY | AMEND | 10/20/2000 | 06/01/2000 | 06/30/2000 | 6 | 20036320390 PDF |
| JULY MONTHLY | AMEND | 01/04/2001 | 06/01/2000 | 06/30/2000 | 6 | 21036734508 PDF |
| REQUEST FOR ADDITIONAL INFORMATION | | 10/11/2000 | 06/01/2000 | 06/30/2000 | 4 | 20036321236 PDF |
| REQUEST FOR ADDITIONAL INFORMATION | | 12/06/2000 | 06/01/2000 | 06/30/2000 | 2 | 20036593484 PDF |
| REQUEST FOR ADDITIONAL INFORMATION 2ND | | 12/28/2000 | 06/01/2000 | 06/30/2000 | 3 | 21036723248 PDF |
| AUGUST MONTHLY | | 08/18/2000 | 07/01/2000 | 07/31/2000 | 5 | 20035962684 PDF |
| SEPTEMBER MONTHLY | | 09/19/2000 | 08/01/2000 | 08/31/2000 | 5 | 20036043719 PDF |
| SEPTEMBER MONTHLY | AMEND | 01/04/2001 | 08/01/2000 | 08/31/2000 | 6 | 21036734502 PDF |
| REQUEST FOR ADDITIONAL INFORMATION | | 12/06/2000 | 08/01/2000 | 08/31/2000 | 2 | 20036593486 PDF |
| REQUEST FOR ADDITIONAL INFORMATION 2ND | | 12/28/2000 | 08/01/2000 | 08/31/2000 | 4 | 21036723251 PDF |
| OCTOBER MONTHLY | | 10/20/2000 | 09/01/2000 | 09/30/2000 | 4 | 20036320382 PDF |
| PRE-GENERAL | | 10/23/2000 | 10/01/2000 | 10/18/2000 | 5 | 20036374395 PDF |
| POST-GENERAL | | 12/07/2000 | 10/19/2000 | 11/27/2000 | 4 | 20036620628 PDF |
| YEAR-END | | 01/30/2001 | 11/28/2000 | 12/31/2000 | 4 | 21036844109 PDF |
| YEAR-END | AMEND | 08/17/2001 | 11/28/2000 | 12/31/2000 | 7 | 21037280959 PDF |

| | | 08/01/2001 | 11/28/2000 | 12/31/2000 | 2 | 21037250768 PDF |

REQUEST FOR ADDITIONAL INFORMATION

## Year 1999

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| STATEMENT OF ORGANIZATION | AMEND | 07/29/1999 | | | 2 | 99034634797 PDF |
| FEBRUARY MONTHLY | | 02/22/1999 | 01/01/1999 | 01/31/1999 | 5 | 99034343460 PDF |
| MARCH MONTHLY | | 03/23/1999 | 02/01/1999 | 02/28/1999 | 4 | 99034393828 PDF |
| APRIL MONTHLY | | 04/20/1999 | 03/01/1999 | 03/31/1999 | 4 | 99034452089 PDF |
| MAY MONTHLY | | 05/20/1999 | 04/01/1999 | 04/30/1999 | 5 | 99034493907 PDF |
| JUNE MONTHLY | | 06/22/1999 | 05/01/1999 | 05/31/1999 | 4 | 99034532130 PDF |
| JULY MONTHLY | | 07/21/1999 | 06/01/1999 | 06/30/1999 | 6 | 99034603974 PDF |
| JULY MONTHLY | AMEND | 08/23/1999 | 06/01/1999 | 06/30/1999 | 6 | 99034783869 PDF |
| AUGUST MONTHLY | | 08/23/1999 | 07/01/1999 | 07/31/1999 | 6 | 99034783863 PDF |
| AUGUST MONTHLY | AMEND | 10/21/1999 | 07/01/1999 | 07/31/1999 | 6 | 99034882158 PDF |
| SEPTEMBER MONTHLY | | 09/21/1999 | 08/01/1999 | 08/31/1999 | 7 | 99034823098 PDF |
| SEPTEMBER MONTHLY | AMEND | 10/21/1999 | 08/01/1999 | 08/31/1999 | 7 | 99034882151 PDF |
| OCTOBER MONTHLY | | 10/21/1999 | 09/01/1999 | 09/30/1999 | 8 | 99034882143 PDF |
| OCTOBER MONTHLY | AMEND | 11/18/1999 | 09/01/1999 | 09/30/1999 | 8 | 99034912427 PDF |
| NOVEMBER MONTHLY | | 11/18/1999 | 10/01/1999 | 10/31/1999 | 6 | 99034912421 PDF |
| DECEMBER MONTHLY | | 12/20/1999 | 11/01/1999 | 11/30/1999 | 6 | 99034971593 PDF |
| DECEMBER MONTHLY | AMEND | 06/21/2000 | 11/01/1999 | 11/30/1999 | 6 | 20035673602 PDF |

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| REQUEST FOR ADDITIONAL INFORMATION | | 06/14/2000 | 11/01/1999 | 11/30/1999 | 2 | 20035651954 PDF |
| YEAR-END | AMEND | 01/31/2000 | 12/01/1999 | 12/31/1999 | 5 | 20035113818 PDF |

## Year 1998

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| FEBRUARY MONTHLY | | 02/24/1998 | 01/01/1998 | 01/31/1998 | 3 | 98032841366 PDF |
| MARCH MONTHLY | | 03/16/1998 | 02/01/1998 | 02/28/1998 | 3 | 98032870935 PDF |
| APRIL MONTHLY | | 04/20/1998 | 03/01/1998 | 03/31/1998 | 4 | 98033031695 PDF |
| MAY MONTHLY | | 05/20/1998 | 04/01/1998 | 04/30/1998 | 6 | 98033120296 PDF |
| JUNE MONTHLY | | 06/23/1998 | 05/01/1998 | 05/31/1998 | 3 | 98033200283 PDF |
| JULY MONTHLY | | 07/17/1998 | 06/01/1998 | 06/30/1998 | 3 | 98033304590 PDF |
| AUGUST MONTHLY | | 08/21/1998 | 07/01/1998 | 07/31/1998 | 3 | 98033472812 PDF |
| SEPTEMBER MONTHLY | | 09/22/1998 | 08/01/1998 | 08/31/1998 | 5 | 98033563026 PDF |
| OCTOBER MONTHLY | | 10/21/1998 | 09/01/1998 | 09/30/1998 | 5 | 98033794148 PDF |
| PRE-GENERAL | | 11/18/1998 | 10/01/1998 | 10/14/1998 | 4 | 98033923306 PDF |
| NOTICE OF FAILURE TO FILE | | 11/12/1998 | 10/01/1998 | 10/14/1998 | 2 | 98033922341 PDF |
| POST-GENERAL | | 12/03/1998 | 10/15/1998 | 11/23/1998 | 9 | 98033994679 PDF |
| YEAR-END | | 02/01/1999 | 11/24/1998 | 12/31/1998 | 5 | 99034263868 PDF |
| YEAR-END | AMEND | 05/20/1999 | 11/24/1998 | 12/31/1998 | 5 | 99034493912 PDF |
| 1'ST LETTER INFORMATIONAL NOTICE | | 04/26/1999 | 11/24/1998 | 12/31/1998 | 2 | 99034463285 PDF |

## Year 1997

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| FEBRUARY MONTHLY | | 02/26/1997 | 01/01/1997 | 01/31/1997 | 4 | 97031863901 PDF |
| MARCH MONTHLY | | 03/20/1997 | 02/01/1997 | 02/28/1997 | 3 | 97031912561 PDF |
| APRIL MONTHLY | | 04/18/1997 | 03/01/1997 | 03/31/1997 | 3 | 97031970707 PDF |
| MAY MONTHLY | | 05/20/1997 | 04/01/1997 | 04/30/1997 | 3 | 97032040768 PDF |
| JUNE MONTHLY | | 06/20/1997 | 05/01/1997 | 05/31/1997 | 3 | 97032100471 PDF |
| JULY MONTHLY | | 07/22/1997 | 06/01/1997 | 06/30/1997 | 3 | 97032183601 PDF |
| AUGUST MONTHLY | | 08/21/1997 | 07/01/1997 | 07/31/1997 | 3 | 97032352367 PDF |
| SEPTEMBER MONTHLY | | 10/01/1997 | 08/01/1997 | 08/31/1997 | 3 | 97032424396 PDF |
| OCTOBER MONTHLY | | 10/20/1997 | 09/01/1997 | 09/30/1997 | 4 | 97032461407 PDF |
| REQUEST FOR ADDITIONAL INFORMATION | | 01/21/1998 | 09/01/1997 | 09/30/1997 | 3 | 98032610913 PDF |
| REQUEST FOR ADDITIONAL INFORMATION 2ND | | 02/12/1998 | 09/01/1997 | 09/30/1997 | 4 | 98032821682 PDF |
| NOVEMBER MONTHLY | | 11/24/1997 | 10/01/1997 | 10/31/1997 | 3 | 97032522836 PDF |
| NOVEMBER MONTHLY | AMEND | 02/24/1998 | 10/01/1997 | 10/31/1997 | 3 | 98032841369 PDF |
| DECEMBER MONTHLY | | 12/22/1997 | 11/01/1997 | 11/30/1997 | 3 | 97032563018 PDF |
| YEAR-END | | 01/28/1998 | 12/01/1997 | 12/31/1997 | 4 | 98032632369 PDF |

## Year 1996

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| MISCELLANEOUS NOTICE FROM FEC | | 03/15/1996 | | | 3 | 96030341096 PDF |
| STATEMENT OF ORGANIZATION | AMEND | 04/12/1996 | | | 3 | 96030400885 PDF |

| | | | | | |
|---|---|---|---|---|---|
| FEBRUARY MONTHLY | | 04/12/1996 | 01/01/1996 | 01/31/1996 | 4 96030400928 PDF |
| NOTICE OF FAILURE TO FILE | | 03/12/1996 | 01/01/1996 | 01/31/1996 | 1 96030334008 PDF |
| MARCH MONTHLY | | 04/12/1996 | 02/01/1996 | 02/29/1996 | 3 96030400932 PDF |
| NOTICE OF FAILURE TO FILE | | 04/09/1996 | 02/01/1996 | 02/29/1996 | 2 96030384252 PDF |
| APRIL MONTHLY | | 04/12/1996 | 03/01/1996 | 03/31/1996 | 4 96030400935 PDF |
| MAY MONTHLY | | 05/17/1996 | 04/01/1996 | 04/30/1996 | 5 96030511921 PDF |
| JUNE MONTHLY | | 06/21/1996 | 05/01/1996 | 05/31/1996 | 3 96030580003 PDF |
| JULY MONTHLY | | 07/22/1996 | 06/01/1996 | 06/30/1996 | 3 96030692337 PDF |
| AUGUST MONTHLY | | 08/20/1996 | 07/01/1996 | 07/31/1996 | 5 96030733452 PDF |
| AUGUST MONTHLY | AMEND | 10/21/1996 | 07/01/1996 | 07/31/1996 | 5 96031053538 PDF |
| SEPTEMBER MONTHLY | | 09/20/1996 | 08/01/1996 | 08/31/1996 | 4 96030804663 PDF |
| SEPTEMBER MONTHLY | AMEND | 10/21/1996 | 08/01/1996 | 08/31/1996 | 4 96031053534 PDF |
| OCTOBER MONTHLY | | 10/21/1996 | 09/01/1996 | 09/30/1996 | 4 96031053530 PDF |
| PRE-GENERAL | | 10/21/1996 | 10/01/1996 | 10/16/1996 | 5 96031053525 PDF |
| PRE-GENERAL | AMEND | 12/05/1996 | 10/01/1996 | 10/16/1996 | 4 96031354848 PDF |
| POST-GENERAL | | 12/05/1996 | 10/17/1996 | 11/25/1996 | 7 96031354841 PDF |
| YEAR-END | | 01/31/1997 | 11/26/1996 | 12/31/1996 | 6 97031754022 PDF |

## Year 1995

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
|---|---|---|---|---|---|---|
| FEBRUARY MONTHLY | | 07/28/1995 | 01/01/1995 | 01/31/1995 | 4 | 95039881653 PDF |

| NOTICE OF FAILURE TO FILE | | 05/12/1995 | 01/01/1995 | 01/31/1995 | 2 | 95039761845 PDF |
|---|---|---|---|---|---|---|
| MARCH MONTHLY | | 07/28/1995 | 02/01/1995 | 02/28/1995 | 4 | 95039881657 PDF |
| NOTICE OF FAILURE TO FILE | | 04/12/1995 | 02/01/1995 | 02/28/1995 | 2 | 95039715367 PDF |
| APRIL MONTHLY | | 07/28/1995 | 03/01/1995 | 03/31/1995 | 3 | 95039881661 PDF |
| NOTICE OF FAILURE TO FILE | | 05/12/1995 | 03/01/1995 | 03/31/1995 | 2 | 95039761847 PDF |
| MAY MONTHLY | | 07/28/1995 | 04/01/1995 | 04/30/1995 | 3 | 95039881664 PDF |
| MAY MONTHLY | AMEND | 04/12/1996 | 04/01/1995 | 04/30/1995 | 4 | 96030400888 PDF |
| NOTICE OF FAILURE TO FILE | | 06/09/1995 | 04/01/1995 | 04/30/1995 | 2 | 95039791119 PDF |
| JUNE MONTHLY | | 07/28/1995 | 05/01/1995 | 05/31/1995 | 4 | 95039881667 PDF |
| JUNE MONTHLY | AMEND | 04/12/1996 | 05/01/1995 | 05/31/1995 | 4 | 96030400892 PDF |
| NOTICE OF FAILURE TO FILE | | 07/12/1995 | 05/01/1995 | 05/31/1995 | 2 | 95039814970 PDF |
| JULY MONTHLY | | 07/28/1995 | 06/01/1995 | 06/30/1995 | 5 | 95039881671 PDF |
| JULY MONTHLY | AMEND | 04/12/1996 | 06/01/1995 | 06/30/1995 | 5 | 96030400896 PDF |
| AUGUST MONTHLY | | 04/12/1996 | 07/01/1995 | 07/31/1995 | 4 | 96030400901 PDF |
| NOTICE OF FAILURE TO FILE | | 09/08/1995 | 07/01/1995 | 07/31/1995 | 2 | 95039964558 PDF |
| SEPTEMBER MONTHLY | | 04/12/1996 | 08/01/1995 | 08/31/1995 | 4 | 96030400905 PDF |
| NOTICE OF FAILURE TO FILE | | 10/10/1995 | 08/01/1995 | 08/31/1995 | 2 | 95039993580 PDF |
| OCTOBER MONTHLY | | 04/12/1996 | 09/01/1995 | 09/30/1995 | 4 | 96030400909 PDF |
| NOTICE OF FAILURE TO FILE | | 11/08/1995 | 09/01/1995 | 09/30/1995 | 2 | 95030063727 PDF |
| NOVEMBER MONTHLY | | 04/12/1996 | 10/01/1995 | 10/31/1995 | 4 | 96030400913 PDF |

| NOTICE OF FAILURE TO FILE | | 02/23/1996 | 10/01/1995 | 10/31/1995 | 2 | 96030320955 PDF |
| DECEMBER MONTHLY | | 04/12/1996 | 11/01/1995 | 11/30/1995 | 5 | 96030400917 PDF |
| NOTICE OF FAILURE TO FILE | | 02/23/1996 | 11/01/1995 | 11/30/1995 | 1 | 96030320954 PDF |
| YEAR-END | | 04/12/1996 | 12/01/1995 | 12/31/1995 | 6 | 96030400922 PDF |
| NOTICE OF FAILURE TO FILE | | 02/23/1996 | 12/01/1995 | 12/31/1995 | 1 | 96030320953 PDF |

## Year 1994

| Document Filed | Amended | Filed On | From Date | End Date | Pages | Display Image or PDF |
| --- | --- | --- | --- | --- | --- | --- |
| STATEMENT OF ORGANIZATION | | 06/24/1994 | | | 2 | 94039043287 PDF |
| REQUEST FOR ADDITIONAL INFORMATION | | 07/13/1994 | 07/13/1994 | 07/13/1994 | 2 | 94039072047 PDF |
| REQUEST FOR ADDITIONAL INFORMATION 2ND | | 08/04/1994 | 08/04/1994 | 08/04/1994 | 3 | 94039153618 PDF |
| AUGUST MONTHLY | | 08/24/1994 | 07/01/1994 | 07/31/1994 | 3 | 94039191577 PDF |
| SEPTEMBER MONTHLY | | 09/19/1994 | 08/01/1994 | 08/31/1994 | 5 | 94039213934 PDF |
| OCTOBER MONTHLY | | 10/20/1994 | 09/01/1994 | 09/30/1994 | 5 | 94039345348 PDF |
| PRE-GENERAL | | 10/24/1994 | 10/01/1994 | 10/19/1994 | 8 | 94039373658 PDF |
| POST-GENERAL | | 01/04/1995 | 10/20/1994 | 11/27/1994 | 6 | 95039550573 PDF |
| 1'ST LETTER INFORMATIONAL NOTICE | | 02/10/1995 | 10/20/1994 | 11/27/1994 | 2 | 95039655105 PDF |
| NOTICE OF FAILURE TO FILE | | 01/04/1995 | 10/20/1994 | 11/28/1994 | 2 | 95039550889 PDF |
| YEAR-END | | 03/14/1995 | 11/27/1994 | 12/31/1994 | 4 | 95039684653 PDF |
| NOTICE OF FAILURE TO FILE | | 02/17/1995 | 11/28/1994 | 12/31/1994 | 2 | 95039663820 PDF |

**TRY A:** NEW SEARCH   NEW ADVANCED SEARCH
**RETURN TO: FEC HOME PAGE**

# Exhibit 5

Presented by the Federal Election Commission

# Individuals Who Gave To This Committee

## CITIZENS UNITED POLITICAL VICTORY FUND

**Party:** No Associated Party

**1006 PENNSYLVANIA AVE SE**
**WASHINGTON, DC 20003**

**The query you have chosen matched 1214 individual contributions.**

**Due to the large number of records it is recommended that you choose a group of letters that correspond to the last name of the individual whose contribution you are searching for.**

**A-E   F-J   K-O   P-T   U-Z**

**TRY A: NEW QUERY**
**RETURN TO: FEC HOME PAGE**

# Exhibit 6



**12/06/2007**

# Lawsuit Threatened Over CNN's 'Campaign Killers'

**By: Joe Murray , The Bulletin**

A prominent conservative group featured in the CNN feature "Broken Government: Campaign Killers," an investigative report concerning the effects of negative political advertisements, is threatening a lawsuit claiming reporter Campbell Brown damaged the organization's reputation when she referred to the group as part of a "fringe militia."

"Not only is Citizens United hardly a 'fringe' group (unless consistent and open association with the former Speaker of the House, a current leading presidential candidate and numerous other leading Republicans can be considered 'fringe'), but to refer to it as a 'militia' is a clear and obvious falsehood. We demand a retraction," Quin Hillyer, Citizens United's director of strategic communications, wrote CNN.

Mr. Hillyer told The Bulletin the group has just unveiled a new immigration commercial featuring New Gingrich and, prior to his seeking the GOP nomination, had assisted Fred Thompson.

On its Web site, Citizens United describes itself as "an organization dedicated to restoring our government to citizens' control." The group "seeks to reassert the traditional American values of limited government, freedom of enterprise, strong families and national sovereignty and security." Because of his involvement in political campaigns, David Bossie, Citizens United's president, was featured in Ms. Brown's report.

Along with labeling the group a "fringe militia," Ms. Brown called Mr. Bossie a "dirty trickster" and stated that "many mainstream Republicans have denounced his tactics." Mr. Hillyer challenged CNN to provide factual evidence to support these allegations.

"The only example she offered was of the elder President Bush complaining about an ad 15 years ago that Mr. Bossie did not produce," Mr. Hillyer wrote. "I challenge her to find mainstream Republicans, right now, in 2007, who are familiar with the work of Mr. Bossie at Citizens United and yet who distance themselves from him or his organization."

Last week, Ms. Brown released a statement saying she is "glad that this documentary is generating discussion." Ms. Brown further contends that CNN "presented a balanced and entertaining look at how various groups of all political persuasions try to influence the process." Mr. Hillyer is not satisfied.

"This story can disappear very quickly," stated Mr. Hillyer. "All CNN has to do is go on air and retract the statement." Citizens United is also asking for a public apology.

©*The Evening Bulletin 2008*

# Exhibit 7

Case 1:07-cv-02240-RCL-RWR    Document 55-3    Filed 06/06/2008    Page 42 of 42



# Citizens United
## Dedicated to restoring our government to citizen control.

Home
About
News
Events
Pictures
Multimedia
Blog

## Take Action



**TUESDAY DECEMBER 4, 2007**

### Citizens United to Sue CNN

**FOR IMMEDIATE RELEASE**
December 4, 2007

Dan Wilson
dwilson@sbpublicaffairs.com
703.739.5920

**Washington, D.C.** — Citizens United and its president, David Bossie, today issued the following statement:

"Citizens United (CU), and its President David Bossie, have retained counsel to pursue claims against CNN for reporting in a November 28th CNN show called *Broken Government – 'Campaign Killers,'* hosted by Campbell Brown, that David Bossie and CU were part of a 'fringe militia.' CU through counsel will seek a formal apology and public retraction of those statements, and for calling Bossie a 'dirty trickster.' If no retraction is forthcoming, CU will then bring legal action to hold CNN accountable for these and other misrepresented facts. These baseless allegations were a disservice to CU and its 500,000 members, CNN and its audience, and to general principles of responsible, fact-based journalism."

Posted by David N. Bossie
at 4:23 PM

Sign up for our Email List

[ Sign-Up ]

Search our Site

[ Search ]

## All Movies Now For Sale On DVD!
Support our cause by purchasing items from our online store!


**Hillary**
The Movie


**Newt**
Rediscovering God in America


**Border War**
The Battle over Illegal Immigration


**ACLU**
At War with America


**Broken Promises**
The UN at 60


**Celsius 41.11**
The Truth Behind the Lies of Fahrenheit 9/11

## Contact Us
**Citizens United**
1006 Pennsylvania Ave SE
Washington, DC 20003
Office: (202) 547-5420
Fax: (202) 547-5421

Copyright 2008 Citizens United