# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                              )
CITIZENS UNITED,                              )
                                              )
                     Plaintiff,               )
                                              )
          v.                                  )
                                              )        Civ. No. 07-2240 (RCL)
FEDERAL ELECTION COMMISSION,                  )
                                              )
                     Defendant.               )
_____)


## MEMORANDUM OF CAMPAIGN LEGAL CENTER AND DEMOCRACY 21
## AS *AMICI CURIAE* IN SUPPORT
## OF DEFENDANT FEDERAL ELECTION COMMISSION

Donald J. Simon
(D.C. Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
ENDRESON & PERRY, LLP
1425 K Street, N.W.
Suite 600
Washington, D.C. 20005
(202) 682-0240

Fred Wertheimer
(D.C. Bar No. 154211)
DEMOCRACY 21
1875 I Street, N.W.
Suite 500
Washington, D.C. 20005
(202) 429-2008

Counsel for *Amicus Curiae*
  Democracy 21

J. Gerald Hebert
(D.C. Bar No. 447676)
Paul S. Ryan
(D.C. Bar No. 502514)
THE CAMPAIGN LEGAL CENTER
1640 Rhode Island Ave., N.W.
Suite 650
Washington, DC  20036
Tel: (202) 736-2200

Counsel for *Amicus Curiae*
  Campaign Legal Center

# TABLE OF CONTENTS

Page

**INTERESTS OF AMICI CURIAE** ........................................................................ 1

**SUMMARY OF ARGUMENT** .............................................................................. 1

**ARGUMENT** .......................................................................................................... 4

I. *McConnell* Upheld the Disclosure Requirements on Their Face. ............... 4

    A. Contrary to Plaintiff's Allegations, *McConnell* Reviewed the EC Disclosure Requirements under Intermediate Scrutiny. ................................ 4

    B. *McConnell* Made Clear that the EC Disclosure Requirements Are Supported by Important Governmental Interests. ................................ 7

II. **The *WRTL II* Decision in No Way Undercuts the *McConnell* Decision Upholding the EC Disclosure Requirements as to the Entire Range of Electioneering Communications.** ................................ 9

    A. *WRTL II* Has No Direct Application to This Case Because the Supreme Court Reviewed Only the EC Funding Prohibition. ................................ 9

    B. The Legal Analysis in *WRTL II* Does Not Have Any Indirect Relevance to This Case. ................................ 10

III. **This Court Should Reject Plaintiff's Attempt to Extend the Supreme Court's Holding in *WRTL II* to Apply to the EC Disclosure Requirements.** ................................ 11

    A. Plaintiff's "Unambiguously Campaign Related" Requirement is Contradicted by Supreme Court Decisions Upholding Disclosure Laws in Non-Campaign Related Contexts. ................................ 13

    B. The EC Disclosure Requirements Are Constitutional as Applied to Plaintiff's Advertisements. ................................ 17

**CONCLUSION** ................................................................................................ 22

i

## TABLE OF AUTHORITIES

**Cases:**

*Alaska Right To Life Comm. v. Miles*, 441 F.3d 773 (9th Cir. 2006)................................................ 5

*Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182 (1999) ................................... 15, 16, 19

*Buckley v. Valeo*, 424 U.S. 1 (1976) ....................................................................................*passim*

*California Pro-Life Council v. Getman*, 328 F.3d 1088 (9th Cir. 2003) ............................... 16, 19

*Citizens against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981) .................................... 16

*Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1 (1961) .................................. 7

*Commission on Independent Colleges and Universities v. New York Temporary State Commission*, 534 F. Supp. 489 (N.D.N.Y. 1982) ........................................................................... 14

*FEC v. Beaumont,* 539 U.S. 146 (2003)........................................................................................ 6

*FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986)..................................................... 21

*FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652 (2007) ..................................................... passim

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) ................................ 11, 15, 16, 19

*Florida League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457 (11th Cir. 1996)................ 13, 15

*Kimbell v. Hooper*, 665 A.2d 44 (Vt. 1995).......................................................................... 14, 15

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) ..................................................... 5

*McConnell v. FEC*, 540 U.S. 93 (2003) .................................................................................*passim*

*McConnell v. FEC*, 251 F. Supp. 2d 176, 241 (D.D.C. 2003) .................................................. 6, 8

*Minn. State Ethical Practices Bd. v. NRA*, 761 F.2d 509 (8th Cir. 1985).................. 13, 14, 15, 19

*National Association of Manufacturers v. Taylor*, No. 08-cv-00208-CKK (D.D.C. Apr. 11, 2008) .................................................................................................................................... 14

*U.S. v. Harriss*, 347 U.S. 612 (1954) .............................................................................. 13, 14, 19

**Statutes and Legislative Materials:**

Federal Communications Act of 1934, 47 U.S.C. §§ 301 *et seq*. ................................................ 17

Federal Election Campaign Act, 2 U.S.C. §§ 431, *et seq*. ........................................................... 1

2 U.S.C. § 434(f) ................................................................................. 1, 2, 19, 22

2 U.S.C. § 434(f)(1) ......................................................................................... 1

2 U.S.C. § 434(f)(3) ..................................................................................... 1, 19

2 U.S.C. § 441b(b)(2) .................................................................................. 1, 2, 9

2 U.S.C. § 441d ......................................................................................... 1, 2, 22

47 U.S.C. § 315(e)(1) ..................................................................................... 17

47 U.S.C. § 315(e)(1)(B) ................................................................................ 17

47 U.S.C. § 315(e)(1)(B)(iii) .......................................................................... 17

47 U.S.C. § 315(e)(2) ..................................................................................... 17

H.R. Rep. No. 107-131(I) (2001) ................................................................... 20

## Administrative Materials:

11 C.F.R. § 104.20(c)(9). ................................................................................. 1

11 C.F.R. § 109.21(c) ..................................................................................... 21

FEC Explanation and Justification, Political Committee Status, 72 Fed. Reg. 5595 (Feb. 7, 2007), *available at* http://www.fec.gov/law/cfr/ej_compilation/2007/notice_2007-3.pdf ....... 21

## Miscellaneous Resources:

CRS Report: Grassroots Lobbying: Constitutionality of Disclosure Requirements (Jan. 12, 2007), *available at* http://assets.opencrs.com/rpts/RL33794_20070112.pdf .........................................14-15

GAO Report, Information on States' Lobbying Disclosure Requirements (May 2, 1997)................................................................................................... 15

**INTERESTS OF AMICI CURIAE**

The present case raises important questions about the constitutionality of the "electioneering communications" disclosure provisions of Title II of the Bipartisan Campaign Reform Act of 2002 (BCRA), *codified at* 2 U.S.C. §§ 434(f), 441d, in light of the Supreme Court's recent decision in *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652 (2007) ("*WRTL II*"). *Amici* Campaign Legal Center (CLC) and Democracy 21 have a longstanding, demonstrated interest in campaign finance disclosure and this interest is directly implicated here.

**SUMMARY OF ARGUMENT**

In this case, Citizens United, a not-for-profit corporation, wishes to use its general treasury funds to broadcast a film entitled "Hillary: the Movie" and three promotional advertisements referencing Senator Clinton shortly before the 2008 elections. Moreover, plaintiff seeks to make these communications in complete anonymity.

Plaintiff does not dispute that its proposed film and advertisements are electioneering communications ("EC"), as defined by the Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431, *et seq*. *See* 2 U.S.C. § 434(f)(3) (defining an EC as a "broadcast, cable, or satellite communication" that "refers to a clearly identified federal candidate," is "targeted to the relevant electorate," and airs within sixty days of general election or thirty days of a primary election or nominating convention). Such communications are subject to a funding restriction that prohibits corporations and unions from using general treasury funds to finance such communications, *see* 2 U.S.C. § 441b(b)(2), as well as to disclosure requirements, including reporting requirements, *see* 2 U.S.C. § 434(f), and disclaimer requirements, *see* 2 U.S.C. § 441d.[1] Nor does plaintiff

---

[1]    The reporting requirement, 2 U.S.C. § 441b(b)(2), requires any person or entity that spends more than an aggregate of $10,000 in a calendar year on electioneering communications to disclose the names and addresses of any contributor giving $1,000 or more to fund the electioneering communications. 2 U.S.C. §§ 434(f)(1), (2)(F); 11 C.F.R. § 104.20(c)(9). The disclaimer requirement, 2 U.S.C. § 441d,

dispute that the EC funding restriction and disclosure requirements were upheld as facially constitutional a mere five years ago in *McConnell v. FEC*, 540 U.S. 93 (2003).

Instead, plaintiff challenges the constitutionality of the EC funding restriction, *see* 2 U.S.C. § 441b(b)(2), as applied to its film and advertisements, and the EC reporting and disclaimer requirements ("disclosure requirements"), *see* 2 U.S.C. §§ 434(f), 441d, as applied to its film and advertisements. *Amici* will address only plaintiff's challenge to the constitutionality of the EC disclosure requirements as applied to plaintiff's proposed advertisements (Count 1 of the Amended Complaint). Plaintiff moved for summary judgment on this claim on May 16, 2008, and *amici* oppose this motion.[2]

The basis for plaintiff's as-applied challenge to the EC disclosure requirements is the Supreme Court's recent decision in *WRTL II*. There, the Court held that the EC funding restriction was unconstitutional as applied to any electioneering communication that was not express advocacy or the functional equivalent of express advocacy. 127 S. Ct. at 2667 (defining the "functional equivalent of express advocacy" as communications that are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate"). Plaintiff reads this holding expansively, arguing that the *WRTL II* Court implicitly found that

---

requires an electioneering communication not authorized by a candidate committee to include the following information: (1) a statement orally and in text that identifies the person or entity "responsible for the content of this advertising," and (2) the name and permanent street address, telephone number, or World Wide Web address of the person who paid for the electioneering communication.

[2]      *Amici* will not address plaintiff's motion for summary judgment as to Counts 2 and 3 of the Amended Complaint, which concern the application of the EC funding restriction and disclosure requirements to "Hillary: the Movie." Pl. SJ Motion (May 16, 2008) at 1. This Court has already found that the movie constitutes express advocacy under the *WRTL* standard. Opinion, *Citizen United v. FEC*, 07-cv-02240 (Jan. 1, 2008) at 8-9. Consequently, there is no legal question as to whether the EC regulations can constitutionally be applied to the film, and the FEC has already moved to dismiss Count 3 on this ground. Def.'s Mot. to Dismiss Counts 3 & 4 of Amnd. Complaint (Feb. 11, 2008). By contrast, the FEC has conceded that plaintiff's three advertisements do not meet the test for express advocacy established by *WRTL*. *Id.* at 11-12; Def.'s Mem. in Opp. to Pl.'s Mot. for Consol. at 8-9.

electioneering communications that do not meet its standard for express advocacy are wholly-protected issue speech. As such, plaintiff theorizes, these communications are not merely exempt from the funding restriction, but also from the disclosure requirements, and indeed from *any* campaign finance regulation at all. Plaintiff maintains that its proposed advertisements are not express advocacy or its functional equivalent, and therefore also constitute wholly-protected issue speech, exempt from both the funding restriction and the disclosure requirements.

This argument has no merit. First, plaintiff's assertion that *WRTL II* implicitly exempted communications that were not express advocacy or its functional equivalent from the EC disclosure requirements is pure conjecture. The *WRTL II* Court examined only the funding restriction, and the Court had no reason to, and indeed did not, consider whether the ads at issue in the case could constitutionally be subject to the EC disclosure requirements. The *WRTL II* decision therefore provides no basis for this Court to overrule standing Supreme Court precedent upholding the disclosure requirements. *McConnell*, 540 U.S. at 194-202. Second, plaintiff's argument completely disregards the scope of disclosure laws that have been upheld by the Supreme Court. Statutes requiring disclosure of lobbying activities, as well as ballot measure advocacy, have been found constitutional by the Supreme Court and lower federal courts. These cases contradict plaintiff's assertion that issue advocacy can not be subject to disclosure laws and must be exempt from all regulation.

For all these reasons, plaintiff's motion for summary judgment on Count 1 of the Amended Complaint fails, and this court should deny plaintiff's motion, as it denied plaintiff's earlier motion for a preliminary injunction on the same claim.

## ARGUMENT

I.    *McConnell* **Upheld the EC Disclosure Requirements on Their Face.**

There is no dispute that *McConnell* rejected a facial challenge to the EC disclosure requirements.  Applying intermediate scrutiny, eight Justices upheld both the reporting requirement and the disclaimer requirement, finding that these requirements were substantially related to important state interests.[3]  *See* 540 U.S. at 196 (Stevens, J.) and 321 (Kennedy, J.) (upholding the EC reporting requirements); 540 U.S. at 230 (Rehnquist, C.J., joined by all Justices except Thomas, J.) (upholding the EC disclaimer requirements).

A.    Contrary to Plaintiff's Allegations, *McConnell* Reviewed the EC Disclosure Requirements Under Intermediate Scrutiny.

Relying upon the analysis in *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court in *McConnell* applied an intermediate level of scrutiny to the EC disclosure requirements.

In *Buckley*, the Supreme Court reviewed FECA's comprehensive reporting and recording-keeping requirements for political committees, *see* 424 U.S. at 60-74, as well as its more limited reporting requirements for independent expenditures, *see id*. at 74-82.  The standard of review established by the Court was whether there was a "'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed."  *Id*. at 64.  This intermediate standard of review was appropriate because disclosure requirements "appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist."  *Id*. at 68 (footnotes omitted).

---

[3]    The three concurring Justices noted one exception, and found unconstitutional the requirement in section 202 of BCRA that speakers provide "advance disclosure" of executory contracts to purchase airtime for electioneering communications to be run in the future.  540 U.S. at 321 (Kennedy, J., concurring).

Although the majority opinion in *McConnell* did not explicitly state the standard of review applicable to the EC disclosure requirements, the opinion made clear that the Court was adopting *Buckley*'s standard of review. 540 U.S. at 196.[4] Moreover, the three concurring Justices expressly employed *Buckley*'s "substantial relation" standard, holding that disclosure requirements "do[] substantially relate" to the governmental interest in providing the electorate with information. *Id.* at 321 (Kennedy, J., concurring).

Undeterred by this precedent, plaintiff asserts that this court should nonetheless apply strict scrutiny to the EC disclosure requirements. Plaintiff argues that "exacting scrutiny" is the proper standard for the review of disclosure requirements, and "exacting scrutiny" is the equivalent of strict scrutiny. Pl. SJ Motion (May 16, 2008), at 9 ("[T]he [*Buckley*] Court established the standard of review as requiring … 'exacting scrutiny' (i.e., strict scrutiny)").

Plaintiff is attempting to exploit the inconsistent use of the term "exacting scrutiny" by the Supreme Court in past cases.[5] While it is true that this term has denominated different standards of review, the crucial point is that the actual "substantial relation" test applied in *Buckley* and *McConnell* bears no resemblance to strict scrutiny review. Even a cursory reading

---

[4]    *See Alaska Right To Life Comm. v. Miles*, 441 F.3d 773, 788 (9th Cir. 2006) ("The [*McConnell*] Court was not … explicit about the appropriate standard of scrutiny with respect to disclosure requirements. However, in addressing extensive reporting requirements applicable to … 'electioneering communications' … the Court did not apply 'strict scrutiny' or require a 'compelling state interest.' Rather, the Court upheld the disclosure requirements as supported merely by 'important state interests.'") (internal quotations omitted).

[5]    The Supreme Court has used the phrase "exacting scrutiny" to describe significantly different standards of review. In *Buckley*, the court applied "exacting scrutiny" by reviewing the challenged disclosure provisions for a "relevant correlation" or "substantial relation" to a "substantial" governmental interest." 424 U.S. at 64. In *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), the Supreme Court also applied "exacting scrutiny" to a state ballot measure disclaimer requirement but in contrast reviewed whether the requirement was "narrowly tailored serve an overriding state interest." *Id.* at 347. *Compare also Citizens against Rent Control v. City of Berkeley*, 454 U.S. 290, 299 (1981) (applying "exacting scrutiny" to ballot measure committee contribution limit by assessing whether law "advance[s] a *legitimate* governmental interest *significant* enough to justify its infringement of First Amendment rights") (emphasis added).

of *Buckley* and *McConnell* indicates that the Supreme Court did not consider whether the challenged disclosure requirements implicated a "compelling state interest," nor whether the requirements were "narrowly tailored" to serve that interest.

Indeed, given that the *Buckley* Court recognized that disclosure requirements are the "least restrictive" of campaign finance regulations, it would be illogical to subject disclosure requirements to the strictest level of scrutiny. On the spectrum of campaign finance regulations, the *Buckley* Court realized that expenditure limits were the most burdensome regulations because they bar individuals from "any significant use of the most effective modes of communication." 424 U.S. at 19-20. Consequently, expenditure restrictions, such as the EC funding restriction reviewed in *WRTL II*, are subject to strict scrutiny. *Id.* at 44-45; *McConnell*, 540 U.S. at 205. Contribution limits are deemed less burdensome of speech because they "permit[] the symbolic expression of support evidenced by a contribution but do[] not in any way infringe the contributor's freedom to discuss candidates and issues." *McConnell*, 540 U.S. at 135; *see also FEC v. Beaumont,* 539 U.S. 146, 161 (2003). They thus warrant "less rigorous" review. 540 U.S. at 137. On the opposite end of the spectrum are disclosure requirements, described as the "least restrictive" requirements because they "impose no ceiling on campaign-related activities." *Buckley*, 424 U.S at 64, 68; *see also McConnell*, 540 U.S. at 201 (observing that disclosure requirements are "'d[o] not prevent anyone from speaking'") (citing *McConnell v. FEC,* 251 F. Supp. 2d 176, 241 (D.D.C. 2003) (per curiam)). Logic thus dictates that disclosure requirements should receive less stringent review than limits on expenditures or contributions. It would confound reason to apply strict scrutiny both to expenditure limits, the most restrictive campaign finance regulation, and disclosure requirements, the least restrictive regulation, as plaintiff urges here.

6

B. *McConnell* Made Clear that the EC Disclosure Requirements Are Supported by Important Governmental Interests.

The *McConnell* Court's analysis of the state interests supporting the Title II disclosure requirements also has its roots in the *Buckley* decision.

In *Buckley*, the Court acknowledged that "compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights," but found "that there are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the 'free functioning of our national institutions' is involved." *Id.* at 66 (*quoting Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 97 (1961)). The Court then identified three "substantial" governmental interests served by disclosure requirements. First, "disclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek federal office." *Id.* at 66-67 (footnotes omitted). In addition to this informational interest, the Court also found that "disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Id.* at 67. Finally, "recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations" of the federal campaign finance laws. *Id.* at 67-68.

The Supreme Court relied upon this analysis in *McConnell*. The majority held that the three "important" state interests identified by *Buckley* – providing the electorate with information, deterring corruption, and enabling enforcement of the law – "apply in full" to the EC disclosure requirements. 540 U.S. at 196. The Court also noted that striking down the disclosure provisions would not serve the First Amendment interests of the public:

> Plaintiffs' disdain for BCRA's disclosure provisions is nothing short of surprising. … Curiously, Plaintiffs want to preserve the ability to run these advertisements while hiding behind dubious and misleading names like: 'The Coalition-Americans Working for Real Change' (funded by business organizations opposed to organized labor), 'Citizens for Better Medicare' (funded by the pharmaceutical industry), 'Republicans for Clean Air' (funded by brothers Charles and Sam Wyly). … <u>Given these tactics, Plaintiffs never satisfactorily answer the question of how 'uninhibited, robust, and wide-open' speech can occur when organizations hide themselves from the scrutiny of the voting public</u>. Plaintiffs' argument for striking down BCRA's disclosure provisions does not reinforce the precious First Amendment values that Plaintiffs argue are trampled by BCRA, but ignores the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace."

*Id.* at 196-97 (quoting *McConnell,* 251 F. Supp. 2d at 237 (internal citations omitted) (emphasis added).

Importantly, the Court upheld the EC disclosure requirements as "to the entire range of 'electioneering communications,'" 540 U.S. at 196, even though it had acknowledged that the definition of "electioneering communications" potentially encompassed both express advocacy and "genuine issue ads." *Id.* at 206 (noting that "precise percentage of issue ads that clearly identified a candidate and were aired during those relatively brief preelection timespans but had no electioneering purpose is a matter of dispute between the parties"). In so holding, the majority suggested that the governmental interests that had led the *Buckley* Court to uphold FECA's disclosure provisions also supported disclosure of electioneering communications, even if some percentage of "genuine issue ads" were covered by the EC disclosure requirement.

In sum, review of the *McConnell* decision to uphold the EC disclosure requirements yields two key propositions. First, the EC disclosure requirements are subject to intermediate scrutiny; and second, the governmental interests in providing the electorate with information, deterring corruption, and enforcing the law apply to the "entire range" of electioneering communications, without an exception for "genuine issue advertisements."

II.  **The *WRTL II* Decision in No Way Undercuts the *McConnell* Decision Upholding the EC Disclosure Requirements as to the Entire Range of Electioneering Communications.**

A.  <u>*WRTL II* Has No Direct Application to This Case Because the Supreme Court Reviewed Only the EC Funding Prohibition.</u>

The Court's decision in *WRTL II* did not even consider, let alone invalidate, the EC disclosure requirements.

The narrow focus of *WRTL II* is apparent on the face of the decision.  The first sentence of the controlling opinion announces that the Court is considering the constitutionality of the funding prohibition, 2 U.S.C. § 441b(b)(2), as applied to WRTL's specific ads.  The Court did not even mention the EC disclosure requirements, and did not discuss the definition of "electioneering communication" beyond setting forth the text of the definition in a footnote.  127 S. Ct. at 2660 & n.1.

Indeed, the plaintiff WRTL explicitly did not seek review of the reporting and disclaimer provisions of the law.  In the original complaint filed by WRTL that led to the Supreme Court decision, the plaintiff made clear that, "WRTL does not challenge the reporting and disclaimer requirements for electioneering communications, only the prohibition on using its corporate funds for its grass-roots lobbying advertisements."  Complaint at ¶ 36.

The narrow scope of its suit was repeatedly stressed by WRTL in its brief to the Supreme Court.  The introductory section of the brief stated: "WRTL challenged the prohibition, not disclosure, and was prepared to provide the full disclosure required under BCRA."  Brief for Appellee, *FEC v. Wisconsin Right to Life*, No. 06-969 (March 2006) at 10; *see also id*. at n.18 ("Full disclosure of WRTL's identity and activities would have been forthcoming."); *id*. at 29 n.39 ("WRTL did not challenge the electioneering communication disclosure requirements.").

9

WRTL stressed to the Court that its challenge to the statute, if successful, would leave a fully

"transparent" system:

> Because WRTL does not challenge the disclaimer and disclosure requirements, there will be no ads done under misleading names. There will continue to be full disclosure of all electioneering communications, both as to disclaimer and public reports. The whole system will be transparent. With all this information, it will then be up to the people to decide how to respond to the call for grassroots lobbying on a particular government issue. And to the extent that there is a scintilla of perceived support or opposition to a candidate, … the people, with full disclosure as to the messenger, can make the ultimate judgment.

*Id*. at 49.

Given that the plaintiff in *WRTL II* did not challenge the constitutionality of the EC

disclosure requirements and the Supreme Court accordingly did not address these requirements,

the *WRTL II* decision provides no basis for overturning the 8-1 decision of the *McConnell* Court

to uphold the Title II disclosure requirements.


B.  <u>The Legal Analysis in *WRTL II* Does Not Have Any Indirect Relevance to This Case</u>.

The Court in *WRTL II* reviewed the constitutionality of the Title II funding restriction –

not its disclosure requirements.  Because the funding restriction and the disclosure requirements

are subject to different standards of scrutiny and are supported by different governmental

interests, the *WRTL II* Court's assessment of the former has no bearing on the constitutionality of

the latter.

*First*, wholly different constitutional standards of review apply to the two provisions.

Whereas a reporting requirement is constitutional so long as there is a "'relevant correlation' or

'substantial relation' between the governmental interest and the information required to be

disclosed," *Buckley*, 424 U.S. at 64, a restriction on political spending is constitutional only if it

meets the strict scrutiny requirement of being "narrowly tailored to further a compelling

interest," *WRTL II,* 127 S. Ct. at 2671 (quoting *McConnell*, 540 U.S. at 205; *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 786 (1978); *Buckley*, 424 U.S. at 44-45). Examining the source prohibition, and that provision alone, the Court in *WRTL II* applied strict scrutiny. The *WRTL II* Court did not consider whether the disclosure requirements of Title II could be constitutionally applied to the ads at issue under the intermediate standard of review applicable to such disclosure laws.

*Second*, disclosure requirements serve different governmental interests than do restrictions on expenditures. The Supreme Court considered only two governmental interests in its review of the funding restriction in *WRTL II*: the government's interest in preventing actual or apparent corruption, and its interest in avoiding the "corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form." *WRTL II,* 127 S. Ct. at 2672. Indeed, these two goals are the only state interests recognized by the Supreme Court as sufficiently compelling to justify a restriction on expenditures or contributions. By contrast, disclosure provisions serve a broader range of governmental goals, including providing the electorate with information and enabling meaningful enforcement of the substantive provisions of the federal campaign finance laws. *Buckley*, 424 U.S. at 66-68. The *WRTL II* Court's decision that the state's anti-corruption and "corporate form" interests did not justify an expenditure restriction thus does not speak to whether the state's informational and enforcement interests will support a disclosure requirement.

**III.    This Court Should Reject Plaintiff's Attempt to Extend the Supreme Court's Holding in *WRTL II* to Apply to the EC Disclosure Requirements.**

As set forth in Section II, *supra*, the EC funding restriction reviewed in *WRTL II* and the disclosure requirements at issue here are fundamentally dissimilar. Plaintiff attempts to bridge the divide by arguing that the *WRTL II* Court found that electioneering communications that are

not express advocacy are wholly-protected issue speech, and as such, are exempt from *both* the funding restriction and the disclosure requirements.

Indeed, plaintiff takes this argument even further. It argues that the threshold inquiry in the context of campaign finance regulation is whether the speech at issue is express advocacy, or in plaintiff's words, is "unambiguously related to the campaign of a particular candidate." According to plaintiff, only speech which meets this "unambiguously campaign related" test can be constitutionally subject to regulation. *See* Pl. SJ Br. at 20 (arguing that speech that "is not unambiguously campaign related" must be "exempted from all regulation").

Plaintiff's "unambiguously campaign related" test has no basis in the law. The phrase appeared in *Buckley,* but was merely incidental to the Supreme Court's discussion of its narrowing construction of the term "expenditure" to encompass only express advocacy. 424 U.S. at 80.[6] The phrase certainly was not adopted as an independent constitutional test, and has not even been mentioned, much less applied in any subsequent Supreme Court case. It is simply plaintiff's attempt to replace the actual standard of review for disclosure requirements – *i.e.* that there exist a "'relevant correlation' or 'substantial relation' between the governmental interest

---

[6]     Reviewing the context in which the language "unambiguously campaign related" appeared in *Buckley* illustrates the ancillary nature of the phrase. To address "serious problems of vagueness," the *Buckley* Court construed the term "expenditure" in FECA to reach only "funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Buckley*, 424 U.S. at 76, 80. The Court then stated that "this reading is directed precisely to that spending that is *unambiguously related* to the campaign of a particular federal candidate." *Id.* at 80 (emphasis added). It is clear that the only constitutional "test" created by the *Buckley* Court was the express advocacy standard, and the "unambiguously campaign related" language merely described its application in this context.

     Furthermore, the express advocacy standard is also not relevant to this case. It was created to alleviate concerns of unconstitutional vagueness, whereas the "definition of 'electioneering communication' raises none of the vagueness concerns that drove [the Court's] analysis in *Buckley*." *McConnell*, 540 U.S. at 194. As stated by the *McConnell* Court in its consideration of the EC disclosure requirements, "the constitutional objection that persuaded the Court in *Buckley* to limit FECA's reach to express advocacy is simply inapposite here." *Id.*

and the information required to be disclosed" – with a test more to its liking.  424 U.S. at 64.

This court should reject the plaintiff's invented test, and adhere to the established standard of review.  Pursuant to the correct standard, requiring disclosure of even those electioneering communications that do not meet *WRTL II*'s test for express advocacy is constitutional because such disclosure is substantially related to important governmental interests.

A.  Plaintiff's "Unambiguously Campaign Related" Requirement is Contradicted by Supreme Court Decisions Upholding Disclosure Laws in Non-Campaign Related Contexts.

The error of plaintiff's argument is underscored by two types of disclosure laws regulating issue advocacy that have been approved by the Supreme Court, namely laws relating to lobbying and ballot measure advocacy.  These statutes confirm that the constitutionality of a disclosure requirement does not depend on whether the regulated speech is "unambiguously campaign related" or constitutes express advocacy under the standard established by *WRTL II*.

Both federal and state courts have consistently upheld lobbying disclosure statutes.  The leading Supreme Court case on lobbying disclosure, *U.S. v. Harriss*, 347 U.S. 612 (1954), considered the Federal Regulation of Lobbying Act, which required every person "receiving any contributions or expending any money for the purpose of influencing the passage or defeat of any legislation by Congress" to report information about their clients and their contributions and expenditures.  *Id*. at 615 & n.1.  After evaluating the Act's burden on First Amendment rights, the Court held that lobbying disclosure was justified by the state's informational interests.[7]  The Supreme Court explained that:

---

[7]    The *Harriss* decision has been followed by lower courts which have uniformly upheld state lobbying statutes on the grounds that the state's informational interest in lobbying disclosure outweighs the associated burdens.  *Florida League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 460 (11th Cir. 1996) (upholding a state lobbying disclosure statute in light of the "interest of voters" in receiving information to "apprais[e] the integrity and performance of officeholders and candidates"); *Minnesota*

> Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. … Toward that end, Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose.

> *Id*. at 625-626.

The fact that the Lobbying Act was unrelated to candidate campaigns and instead pertained only to issue speech was not constitutionally significant. The Supreme Court nonetheless found that the disclosure it required served the state's informational interest and "maintain[ed] the integrity of a basic governmental process." *Id*. at 625. *See also National Association of Manufacturers v. Taylor*, No. 08-cv-00208-CKK (D.D.C. Apr. 11, 2008) (dismissing First Amendment challenge to federal lobbying disclosure law as recently amended by the Honest Leadership and Open Government Act of 2007).

Further, the Supreme Court has recognized that even "grassroots" or "indirect" lobbying, *i.e.* communications to persuade the *public* to lobby government officials, may be constitutionally subject to disclosure. The *Harriss* case upheld not only disclosure of lobbyists' *direct* communications with legislators, but also their "artificially stimulated" public "letter campaign[s]" to Congress. *Id*. at 620; *see also id*. at 621 n.10 (noting that the Act covered lobbyists' "initiat[ion] of propaganda from all over the country, in the form of letters and telegrams," to influence the acts of legislators); *see also* CRS REPORT: GRASSROOTS LOBBYING:

---

*State Ethical Practices Board v. NRA*, 761 F.2d 509, 512 (8th Cir. 1985) (finding that "the State of Minnesota's interest in disclosure outweighs any infringement of the appellants' first amendment rights"); *Commission on Independent Colleges and Universities v. New York Temporary State Commission*, 534 F. Supp. 489, 494 (N.D.N.Y. 1982) ("The lobby law serves to apprise the public of the sources of pressure on government officials, thus better enabling the public to access their performance."); *Kimbell v. Hooper*, 665 A.2d 44, 49 (Vt. 1995) ("Vermont's lobbyist disclosure law is a reasonable means of evaluating the lobbyist's influence on the political process.").

CONSTITUTIONALITY OF DISCLOSURE REQUIREMENTS (Jan. 12, 2007), *available at*
http://assets.opencrs.com/rpts/RL33794_20070112.pdf (noting that state and federal courts have
followed *Harriss* to uphold state disclosure laws that reach "indirect" or "grassroots" lobbying).[8]
Such communications generally describe a legislative action favored by the sponsor, and urge the
public to contact the relevant lawmakers regarding this action.  *See, e.g., Minn. State Ethical
Practices Bd. v. NRA*, 761 F.2d 509, 511 (8th Cir. 1985) (upholding Minnesota disclosure
requirement as applied to four communications sent from the NRA to its Minnesota members
urging them to contact their state legislators about pending legislation).  That these "classic"
issue ads can be subject to disclosure gives lie to plaintiff's claim that only "unambiguously
campaign related" communications can be constitutionally regulated.

    In a similar vein, the Supreme Court has expressed approval of statutes requiring the
disclosure of expenditures relating to ballot measures, although such statutes also lack a
connection to candidate campaigns and thus implicate none of the corruption concerns raised by
candidate campaigns.  *See, e.g., Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 203
(1999) (noting that "ballot initiatives do not involve the risk of 'quid pro quo' corruption present
when money is paid to, or for, candidates").  In *First National Bank of Boston v. Bellotti*, 435
U.S. 765 (1978), the Court struck down limits on corporate expenditures to influence ballot
measures, but did so in part because "[i]dentification of the source of advertising may be
required as a means of disclosure, so that the people will be able to evaluate the arguments to

---

[8]     Over twenty states have laws that require disclosure of expenditures funding grassroots lobbying.
GAO REPORT, INFORMATION ON STATES' LOBBYING DISCLOSURE REQUIREMENTS, B-129874 (May 2,
1997), at 2.  These statutes have been routinely upheld by the courts.  *See, e.g., Florida League of Prof'l
Lobbyists, Inc.*, 87 F.3d at 460-61 (upholding Florida law which required disclosure of expenditures both
for direct lobbying and for indirect lobbying activities which did not involve contact with governmental
officials); *Minn. State Ethical Practices Bd.*, 761 F.2d at 512 (upholding Minnesota statute requiring
disclosure from groups who conduct grassroots lobbying campaigns); *Kimbell*, 665 A.2d at 46 (upholding
provisions of Vermont statute requiring reporting of indirect contacts to influence legislators, such as
"solicitation of others to influence legislative or administrative action").

which they are being subjected." 435 U.S. at 792 n.32. Citing *Buckley* and *Harriss*, the Court

took note of "the prophylactic effect of requiring that the source of communication be

disclosed." *Id*.

The Court again recognized this state "informational interest" in *Citizens Against Rent

Control v. City of Berkeley*, 454 U.S. 290 (1981), where it considered a challenge to the City's

ordinance that limited contributions to committees formed to support or oppose ballot measures.

Although the Court struck down the contribution limit, it based this holding in part on the

disclosure that the law required from ballot measure committees. *See* 454 U.S. at 298 ("[T]here

is no risk that the Berkeley voters will be in doubt as to the identity of those whose money

supports or opposes a given ballot measure since contributors must make their identities known

under [a different section] of the ordinance, which requires publication of lists of contributors in

advance of the voting."); *see also Am. Constitutional Law Found.*, 525 U.S. at 205 (invalidating

several Colorado regulations concerning the state's ballot petition process but upholding the

regulation requiring "sponsors of ballot initiatives to disclose who pays petition circulators, and

how much" because this requirement informed voters of "the source and amount of money spent

by proponents to get a measure on the ballot").

These precedents led the Ninth Circuit to hold that, "[g]iven the Supreme Court's

repeated pronouncements, we think there can be no doubt that states may regulate express ballot-

measure advocacy through disclosure laws." *California Pro-Life Council v. Getman*, 328 F.3d

1088, 1104 (9th Cir. 2003), *appeal after remand California Pro-Life Council, Inc. v. Randolph*,

507 F.3d 1172 (9th Cir. 2007). It also noted that "[t]hough the *Buckley* Court discussed the value

of disclosure for candidate elections, the same considerations apply just as forcefully, if not more

so, for voter-decided ballot measures." *Id*. at 1105. Otherwise stated, the court recognized that

the informational interest recognized by *Buckley* applies equally to ballot measure disclosure, although the underlying speech is neither "campaign related" nor express advocacy under the standard established by *WRTL II*.[9]

B.  The EC Disclosure Requirements Are Constitutional as Applied to Plaintiff's Advertisements.

As discussed in the foregoing sections, the applicable constitutional standard here is not plaintiff's "unambiguously campaign related" test, rather the "substantial relation" standard set forth in *Buckley*.  Under this standard, the application of the EC disclosure requirements to plaintiff's advertisements, *i.e.* to non-express-advocacy electioneering communications, is constitutional because such disclosure is "substantially related" to the governmental interests in informing the electorate and enforcing federal campaign finance laws.

*1. Informational Interest*

The principal state interest justifying compelled disclosure is its interest in "providing the electorate with information."  *McConnell*, 540 U.S. at 196.  Indeed, disclosure laws have been sustained on the basis of this interest alone.  *See, e.g., Buckley*, 424 U.S. at 80-81 (upholding FECA's independent expenditure disclosure provisions although they did not "stem corruption or

---

[9]    Another example of a disclosure system that regulates "pure" issue advocacy is the political broadcast disclosure requirements of the Federal Communications Act of 1934, 47 U.S.C. §§ 301 *et seq*. Section 504 of BCRA amended the Communication Act to require television broadcasters to keep records of requests to broadcast "message[s]" about "a national legislative issue of public importance" or "any political matter of national importance."  47 U.S.C. §§ 315(e)(1)(B), (e)(1)(B)(iii).  The records must include information about the name of the person purchasing the time, and in the case of an entity, a list of the chief executive officers or members of the executive committee or of the board of directors of such entity.  47 U.S.C. § 315(e)(2).  Because these records must be made available to the public, 47 U.S.C. § 315(e)(1), this statute ensures that the name of every person and entity wishing to broadcast an "issue ad" will be publicly disclosed.

Although this statute thus regulates issue advocacy in arguably its "purest" form, the Supreme Court upheld the statute in *McConnell*.  The Court determined that the requirements "seem likely to help the FCC determine whether broadcasters are carrying out their 'obligations to afford reasonable opportunity for the discussion of conflicting views on issues of public importance,' and whether broadcasters are too heavily favoring entertainment."  540 U.S. at 240 (internal citations omitted).

its appearance" but rather "serve[d] another, informational interest," namely "increasing the fund of information concerning those who support the candidates"); *see also* discussion of ballot measure cases in Section III.A *supra*. Plaintiff offers no reason why this interest would not support application of the EC disclosure requirements to its proposed advertisements, and to non-express-advocacy electioneering communications more generally.[10]

First, the *WRTL II* Court recognized that even those electioneering communications that do not constitute express advocacy or its functional equivalent are not necessarily "pure" issue advocacy. Instead, such communications will often consist of a *mix* of issue advocacy and electioneering. 127 S. Ct. at 2669 (acknowledging that distinction between electioneering and issue advocacy "may often dissolve in practical application," and that "discussion of issues" may be "pertinent in an election") (internal quotations omitted). *WRTL II*'s test for express advocacy is whether an ad is "susceptible of a no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id*. at 2667. This means that an electioneering communication that is susceptible of dual interpretations – both as issue advocacy and as electioneering – will not be deemed express advocacy.

Although the *WRTL II* court determined that such a dual-interpretation ad could not be subjected to the heavy burden of the EC funding restriction, such ads certainly can be subject to the far less onerous EC reporting and disclaimer requirements. It is important to remember that an electioneering communication, by definition, is an advertisement broadcast in very close

---

[10]    *Amici* note that plaintiff has not even attempted to meet the rigorous standard set by the *Buckley* decision for an as-applied exemption from a political disclosure statute based upon a "reasonable probability" that the disclosure will subject the regulated parties to "threats, harassment, or reprisals from either Government officials or private parties." *Buckley*, 424 U.S. at 74. *See also McConnell*, 540 U.S. at 198, 199 (reiterating *Buckley*'s standard for as-applied challenges). *See also* Opinion, *Citizen United v. FEC*, 07-cv-02240 (Jan 15, 2008) at 111 (noting that plaintiff "states that there may be reprisals, but it has presented no evidence to back up this bald assertion"); Pl. SJ Br. at 25-32 (discussing only general burdens of disclosure).

proximity to a federal election that refers to a clearly identified candidate.  As such, it is likely to have an effect on a federal election.  If the EC disclosure requirements do not encompass the "entire range of electioneering communications," the public will have difficulty discovering who is broadcasting such communications, and will be deprived of information crucial to their assessment of the ads and the formulation of their electoral decisions.  Therefore, even where an electioneering communication does not meet *WRTL II*'s high bar for express advocacy, it most likely will be *susceptible* of an interpretation as an electioneering message, and thus will directly implicate the state's informational interest in "aid[ing] the voters in evaluating those who seek federal office."  *Buckley*, 424 U.S. at 66-67.

Furthermore, as the case law on lobbying and ballot measure advocacy demonstrates, the state has an interest in providing information to the public about even those activities that constitute "pure" issue advocacy.  *See, e.g., Harriss*, 347 U.S. at 625 (lobbying and grassroots lobbying disclosure); *Am. Constitutional Law Found.*, 525 U.S. at 205 (ballot measure disclosure).  *See also McConnell*, 540 U.S. at 240 (upholding political broadcast disclosure requirements), discussed in n.9 *supra*.  Indeed, the courts have consistently upheld statutes requiring the disclosure of "grassroots lobbying" communications – a far broader category of advertisements than electioneering communications since grassroots lobbying ads, for instance, do not necessarily mention a candidate or air in the pre-election period as the EC regulations would require.  *See* 2 U.S.C. § 434(f)(3)(A)(i).  There is value in disclosure connected to issue advocacy, as the Ninth Circuit recognized in the context of ballot measure advocacy: "[M]oney produces a cacophony of political communications through which [] voters must pick out meaningful and accurate messages. … Given the complexity of the issues  . . . we think being able to evaluate who is doing the talking is of great importance."  *Calif. Pro-Life Council*, 328

F.3d at 1105. *See also Bellotti*, 435 U.S. at 792 n.32 (noting disclosure relating to ballot measure issue advocacy is necessary "so that the people will be able to evaluate the arguments to which they are being subjected").[11] Thus, even if plaintiff's advertisements are deemed pure issue speech, the public has an interest in receiving information about the sponsor and funders of the ads in order to judge the legitimacy and credibility of their messages.

### 2. Enforcement interest

*McConnell* also upheld FECA's disclosure requirements based upon a second governmental interest, namely "gathering the data necessary to enforce more substantive electioneering restrictions." 540 U.S. at 196. *See also Buckley* 424 U.S. at 67-68 (disclosure "gather[s] the data necessary to detect violations of the contribution limitations"). This interest is not any less relevant when applied to electioneering communications that do not constitute express advocacy or its functional equivalent under *WRTL II*.

Without disclosure of the "entire range" of electioneering communications, the FEC will be hampered in its efforts to enforce the federal campaign finance laws in several respects. First, comprehensive disclosure enables the FEC to review the activities of groups active in federal elections and to determine whether the electioneering communications of such groups may be

---

[11]    Congressional supporters of BCRA were also well aware of the need for comprehensive disclosure. As pointed out by Representatives Steny H. Hoyer, Chaka Fattah and Jim Davis in a 2001 House committee report:

> Insufficient disclosure is a serious problem that real reform must address. Messages are not identifiable for most audiences until they are sourced. As a result, viewers rarely interpret messages without interpreting the credibility of the source who is sponsoring the message. As long as pseudonymous groups are able to communicate to the electorate, the ability of the electorate to judge the legitimacy of the message that is being offered is seriously weakened. Voters cannot confidently determine how much credibility to lend a communication when they do not know the source of the communication. In short, without real disclosure of the sources of money funding sham issue ads, the ability of the voters to make informed decisions is severely undermined.

H.R. REP. NO. 107-131(I) (2001).

financed by corporate or union treasury funds.  If the EC disclosure requirements are invalidated as applied to non-express-advocacy electioneering communications, the FEC's enforcement of the substantive EC funding restriction will be compromised.

Furthermore, comprehensive disclosure of electioneering communications is also crucial to the FEC's ability to make determinations of political committee status.  This determination rests on the FEC's assessment of whether a group meets the statutory definition of "political committee," *see* 2 U.S.C. § 431(4), and whether its "major purpose" is campaign related.  *See Buckley*, 424 U.S. at 79.  Comprehensive disclosure aids the FEC in making these assessments. For instance, a group's expenditures for even non-express-advocacy electioneering communications may be indicative of its major purpose.  *See FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 262 (1986) (finding that a group's major purpose can be established by the nature of its "independent spending"); *see also* FEC Explanation and Justification, Political Committee Status, 72 Fed. Reg. 5595, 5601 (Feb. 7, 2007) (noting that to determine major purpose FEC may "evaluate the organization's spending on Federal campaign activity, as well as any other spending by the organization"), *available at* http://www.fec.gov/law/cfr/ ej_compilation/2007/notice_2007-3.pdf.

Finally, in addition to the EC funding restriction and disclosure requirements, other FEC regulations also rely on the definition of "electioneering communications," such as the coordination regulations.  *See, e.g.*, 11 C.F.R. § 109.21(c)(1).  Without disclosure of the entire range of electioneering communications, the FEC will have a limited ability to enforce the longstanding requirement that money spent by outside groups in coordination with candidates be regulated as political contributions to those candidates.  If this court were to find that non-express-advocacy electioneering communications were exempt from all federal regulation, as

plaintiff urges, this would have repercussions for multiple aspects of the federal campaign finance law.

## CONCLUSION

For the foregoing reasons, the electioneering communications disclosure requirements, *see* 2 U.S.C. §§ 434(f), 441d, as applied to plaintiff's proposed advertisements, are consistent with the First Amendment.  Accordingly, this Court should deny plaintiffs' motion for summary judgment as to Count 1, and grant defendant's motion for summary judgment.

**Respectfully submitted**,

/s/ J. Gerald Hebert
J. GERALD HEBERT
(D.C. Bar No. 447676)
PAUL S. RYAN
(D.C. Bar No. 502514)
THE CAMPAIGN LEGAL CENTER
1640 Rhode Island Ave., NW
Suite 650
Washington, D.C.  20036
Tel: (202) 736-2200

Counsel for *Amicus Curiae*
  Campaign Legal Center


Donald J. Simon
(D.C. Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
ENDRESON & PERRY, LLP
1425 K Street, N.W.
Suite 600
Washington, D.C. 20005
(202) 682-0240

Fred Wertheimer
(D.C. Bar No. 154211)
DEMOCRACY 21
1875 I Street, N.W.
Suite 500
Washington, D.C. 20005
(202) 429-2008

Counsel for *Amicus Curiae*
  Democracy 21

**Dated:  June 6, 2008**