**United States District Court**
**District of Columbia**

| Citizens United, | |
|---|---|
| *Plaintiff,* | **Civ. No. 07-2240** (ARR, RCL, RWR) |
| *v.* | |
| Federal Election Commission, | |
| *Defendant.* | |

# Plaintiff's Memorandum
# Opposing FEC's Summary Judgment Motion &
# Replying on It's Own Summary Judgment Motion

———————

James Bopp, Jr., D.C. Bar #CO0041
Richard E. Coleson*
Jeffrey P. Gallant*
Clayton J. Callen*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/235-3685 facsimile
  *pro hac vice motion granted
*Counsel for Plaintiff*

June 27, 2008

# Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   I.   All Campaign Restrictions Must Be "Unambiguously Campaign Related.". . . . . . . . . 2

       A.   The Mandate that "Congress Shall Make No Law" Requires the Government to Demonstrate *Unambiguous* Authority Before Regulating Speech. . . . . . . . . . . . . 3

       B.   *Buckley* Drew the Disclosure Line Between Unambiguous *Campaign* Speech and Ordinary Political Speech. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       C.   *WRTL II* Recognized a Line Between "*Campaign* Speech" and "*Political*" Speech." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       D.   The FEC's Proffered Line Is Not Based in the Candidate Election Campaign Context. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

           1.   Ballot-Initiative Campaigns Are Beyond the Relevant Context, But the Unambiguously-Campaign-Related Requirement Also Prevails in That Context. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

           2.   Lobbying Regulations Have Nothing to Do With Elections, But the Lobbying Would Have to Be Unambiguously Related to its Constitutional Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

           3.   *MCFL* Clearly Employed the Unambiguously-Campaign-Related Requirement and Is in the Relevant Candidate Election Campaign Context. . . . . . . . 18

   II.   The Disclosure Requirements Fail the Required Strict Scrutiny . . . . . . . . . . . . . . . . 21

       A.   *Davis* Relied on *Buckley*, Not *McConnell*, and Distinguished "Exacting Scrutiny" from the Relevant-and-Substantial-Relation Requirement. . . . . . . . . . . . . 22

       B.   *Davis* Required the Interest to Match the Burden, and Burdens on Core Political Speech Require Strict Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       C.   If the *Davis* Disclosure Was Unconstitutional, the Present Disclosure Is More So. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

       D.   The Use of Synonyms Does Not Alter the High Scrutiny Required. . . . . . . . . . . 26

E.    All Governmental Interests in this Context Are Restricted to Disclosure of "Unambiguously Campaign Related" Expenditures. . . . . . . . . . . . . . . . . . . . . . . . 31

III.    *McConnell* Neither Precluded As-Applied Challenges Nor Decided This Case.. . . . . . 33

IV.    Disclosure Imposes Substantial Burdens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

V.    The Disclosure Requirements and Prohibition Are Unconstitutional as Applied. . . . . 38

A. The Ads Are Not Unambiguously Campaign Related . . . . . . . . . . . . . . . . . . . . . . 38

B. *Hillary* Is Not Unambiguously Campaign Related. . . . . . . . . . . . . . . . . . . . . . . . . 39

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Plaintiff's Statement of Material Issues and Objections to Defendant's Statement of Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *appended*

# Table of Authorities

**Cases**

*Alaska Right to Life Committee v. Miles*, 441 F.3d 773 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . 29

*American Civil Liberties Union of Nevada v. Heller*, 378 F.3d 979 (9th Cir. 2004) . . . . . . . . . 29

*Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652 (1990) . . . . . . . . . . . . . . . . . 8, 25, 29

*Black v. Warden,* 467 F.2d 202 (10th Cir.1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87 (1982) . . . . . . . . . . . . . . . . . . . 34

*Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999) . . . . . . . . . 25, 28, 29

*\*Buckley v. Valeo*, 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Davis v. FEC*, No. 07-320, slip op. (U.S. June 26, 2008) . . . . . . . . . . . . . . . . . . . . 22, 24, 26, 35

*FEC v. Furgatch*, 807 F.2d 857 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15-16, 42- 43

*FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986) . . . . . . . . . . . . . . . . 18-21, 25, 29

*\*FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652 (2007) ("*WRTL II*") . . . . . . . . . . . . . . . *passim*

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) . . . . . . . . . . . . . . . . 16, 24-25, 27

*Jackson v. Leake*, 476 F. Supp. 2d 515 (E.D.N.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Kansans for Life v. Gaede*, 38 F. Supp. 2d 928 (D. Kan. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Kerr v. Farrey,* 95 F.3d 472 (7th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Marbury v. Madison*, 5 U.S. 1 (1 Cranch) 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*McConnell v. FEC*, 540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Meese v. Keene*, 481 U.S. 465 (1987 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*NAACP v. Alabama*, 357 U.S. 449 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*National Electric Mfrs. Ass'n v. Sorrell*, 262 F.3d 104 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . 38

*North Carolina Right to Life Committee Fund for Independent Political Expenditures v. Leake*, 524 F.3d 427 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*North Carolina Right to Life v. Leake*, 525 F.3d 274 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . 30

*Paton v. LaPrade,* 524 F.2d 862 (3rd Cir.1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Roe v. Wade*, 410 U.S. 113 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Talley v. California*, 362 U.S. 60 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Thomas v. Collins*, 323 U.S. 516 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Harriss*, 347 U.S. 612 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17


***Statutes, Rules, and Constitutional Provisions***
Bipartisan Campaign Reform Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 25, 27, 30, 36

Federal Election Campaign Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17

U.S. Const. amend I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-6, 11, 21-28, 35-36, 40-41, 45


***Other Authorities***
William McGeveran, *Mrs. McIntyre's Checkbook: Privacy Costs of Political Contribution Disclosure*, 6 U. Pa. J. Const. L. 1 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# Facts

Citizens United ("Citizens")[1] adopts the Facts statement in its opening Memorandum, CU

Mem. 2-6, and in *Plaintiff's Statement of Undisputed Material Facts*, Doc. 52 at pdf 53.[2]

# Argument

The answers to four questions of law resolve this case. They have to do with the required

drawing of bright lines concerning compelled disclosure (disclaimers and reporting) as to "politi-

cal speech," *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652, 2673 (2007) ("*WRTL II*") ("These

cases are about political speech."), in the *candidate election campaign* context.

First, when the United States Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976), said

that a compelled disclosure law is subject to "exacting scrutiny" *and* that the Court "has *also* in-

sisted that there be a '*relevant correlation*' or '*substantial relation*' between the governmental

*interest* and the *information* required to be disclosed," *id.* at 64 (emphasis added), did it then (in

the context of non-political-committee, non-candidate expenditure disclosure) require that the

compelled disclosure may only reach "spending that is *unambiguously related* to the *campaign* of

a particular federal candidate" in order to meet this relevant-and-substantial-relation require-

ment? *Id.* at 80. In short, must the line where disclosure may be compelled be drawn where com-

---

[1]Abbreviations employed herein: Bipartisan Campaign Reform Act ("BCRA"); Citizens United ("Citizens"); Citizens' opening memorandum, doc. 52 ("CU Mem."); Federal Election Commission ("FEC"); FEC opening memorandum, doc. 55 ("FEC Mem."); Federal Election Campaign Act ("FECA"); Campaign Legal Center & Democracy 21 (collectively "CLC"); CLC amici curiae memorandum, doc. 58-2 ("CLC Mem."); electioneering communication ("EC"); political committee ("PAC"); ban on corporate and union electioneering communications at 42 U.S.C. § 441b ("prohibition").

[2]As to the prior factual *Statement*, Citizens corrects any references to "HLW" to "CU." To avoid burdening the Court with needless repetition, Citizens does not here reproduce all of the elements and arguments in its opening summary judgment memorandum. Citizens incorporates those arguments by reference and asks the Court to consider all of the briefing and factual statements on the cross-motions for summary judgment together in deciding both motions.

**SJ Opposition & Reply**                                    1

munications become "unambiguously campaign related"? *Id*. at 81. *See* Part I.B.

Second, in applying this unambiguously-campaign-related line specifically to "electioneering communication" disclosure, must the line be drawn where the Supreme Court drew it with regard to the electioneering communication prohibition, i.e., whether an "ad is susceptible of *no reasonable interpretation other than* as an *appeal to vote* for or against a specific *candidate*." *WRTL II*, 127 S. Ct. at 2667 (emphasis added)? In other words, is *WRTL II*'s unambiguous-appeal-to-vote requirement the required application of the unambiguously-campaign-related requirement to the electioneering communication context?  *See* Part I.C.

Third, is a full-length documentary *movie* the same as the *ads* that provided the evidentiary basis for, and to which the trial and Supreme Court limited their analysis in, *McConnell v. FEC*, 540 U.S. 93, 126 (2003) ("[s]o-called issue ads"), or different in kind and more like a fully-protected book that one must select in order to see its content? *See* Part V.B.

Fourth, when *WRTL II* limited "the functional equivalent of express advocacy" to communications that could only be unambiguously "interpreted as an appeal to vote for or against a specific candidate," 127 S. Ct. at 2667, does "appeal to vote" require some "exhortation to vote," i.e., a "clear plea for action" that "encourages a vote," such as *FEC v. Furgatch*, 807 F.2d 857, 864 (9th Cir. 1987), required for the Ninth Circuit's now-rejected contextual "express advocacy" definition? *See* Part V.B. *See also infra* at 15 n.14 (*Furgatch*'s express-advocacy standard).

### I. All Campaign Restrictions Must Be "Unambiguously Campaign Related."

Where is the constitutional line dividing expression subject to disclosure from expression retaining full First Amendment privacy protection? There must be a line, and it must be bright and speech-protective, for we deal with political speech, which is at the core of First Amendment protection. Only one line has been articulated by the Supreme Court in the context of non-politi-

cal-committee, non-candidate compelled disclosure of expenditures related to candidate election campaigns. It is the line where political speech becomes "*unambiguously* related to the *campaign* of a particular federal candidate.*"* *Buckley*, 424 U.S. at 80 (emphasis added). As to electioneering communications, *WRTL II* drew a conceptually identical unambiguous-appeal-to-vote line to separate regulable from non-regulable electioneering communications. But the FEC proclaims that it may go beyond that line to regulate all political speech that seeks to persuade the public. *See infra*. This Court must follow the Supreme Court's line—the First Amendment line.

A.   **The Mandate that "Congress Shall Make No Law" Requires the Government to Demonstrate *Unambiguous* Authority Before Regulating Speech.**

In the quest for the constitutional line at which disclosure may be compelled in this context, we should first note that we deal with highly-protected core "political speech." *WRTL II*, 127 S. Ct. at 2673.[3] So we should follow the example of *WRTL II*, which said that "it is worth recalling the language we are applying" "when it comes to drawing difficult lines in the area of pure political speech." *Id.* at 2674. *WRTL II* recited the First Amendment mandate that "'Congress shall make no law . . . abridging the freedom of speech.'" *Id.* (*quoting* U.S. Const. amend I). *WRTL II* added that "[t]he Framers' actual words put these cases in proper perspective" in this line-drawing endeavor. *Id.* Absent unambiguous constitutional authority to regulate political speech, the First Amendment forbids doing so.

---

[3]As *Buckley* put it, 424 U.S. at 14 (citations omitted):

Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure (the) unfettered interchange of ideas for the bringing about of political and social changes desired by the people." . . . "[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. . . . of course includ(ing) discussions of candidates . . . ." This no more than reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."

**B.** ***Buckley* Drew the Disclosure Line Between Unambiguous *Campaign* Speech and Ordinary Political Speech.**

In searching for the line at which disclosure may be compelled in the candidate election campaign context, the starting point is the seminal *Buckley* decision, which first drew the relevant campaign-finance constitutional lines and to which the Supreme Court continually returns for such first principles. Specifically, we must look at *Buckley*'s Part II, entitled "Reporting and Disclosure Requirements." 424 U.S. at 60. In that analysis, *id.* at 60-84, we must examine the standards of review applied to disclosure and to the relevant application of those standards. Since *McConnell* said that some "electioneering communications" are the "functional equivalent of express advocacy," 540 U.S. at 206, we should look in particular at *Buckley*'s analysis as to the reporting of expenditures for express advocacy communications by non-political-committee, non-candidate entities. *See Buckley*, 424 U.S. at 74-82.

*Buckley*'s Part II.A, set out "General Principles," *id.* at 64, in which it discussed the inherent First Amendment burdens imposed by compelled disclosure, then set out the required standards of review, and then discussed three informational interests in requiring disclosure.[4] *Id.* at 64-68. As to standards of review, there were two, divided by an "*also.*" *Id.* at 64 (emphasis added). The first requirement was "exacting scrutiny," the nature of which is further discussed below, *see* Part II, but which, in and of itself, requires that the government prove some adequate level of interest and that its regulation meets some adequate standard of tailoring to that interest (with "adequate" here determined by the level of scrutiny that "exacting scrutiny" imposes). The Court then said: "We *also* have insisted that there be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Id.* (emphasis added; foot-

---

[4]The applicability of these three interests is addressed below. *See* Part II.E.

**SJ Opposition & Reply**                    4

notes and citations omitted). Since this inquiry is "*also*" required, it is distinct from the interest and tailoring encompassed by "exacting scrutiny."

For present line-drawing purposes, it doesn't matter what *level* of scrutiny "exacting" requires. What matters is what *line* the Court drew in *applying* that "exacting scrutiny." So the analysis will move on to where *Buckley* drew the constitutional line specifically as applied to compelled disclosure of expenditures by non-political-committee, non-candidate entities. This was in *Buckley*'s Part II.C. 424 U.S. at 74. The provision at issue "requir[ed] '(e)very person (other than a political committee or candidate) who makes contributions or expenditures' aggregating over $100 in a calendar year 'other than by contribution to a political committee or candidate' to file a statement with the Commission." *Id.* at 74-75 (citation omitted). *Buckley* noted, which is relevant here, that

> Appellants attack § 434(e) as a direct intrusion on privacy of belief, in violation of *Talley v. California*, 362 U.S. 60 (1960), and as imposing 'very real, practical burdens . . . certain to deter individuals from making expenditures for their independent political speech' analogous to those held to be impermissible in *Thomas v. Collins*, 323 U.S. 516 (1945). [424 U.S. at 75 (emphasis added).]

In the General Principles discussion, the Court had already recognized that disclosure imposes a First Amendment privacy burden, *id.* at 65 ("compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment"), and it had already held that the dissolving-distinction problem identified in *Thomas* (*see* CU Mem. 10, 14) required that the express-advocacy construction be imposed on another expenditure provision, 424 U.S. at 43-44, so the Court did not have to elaborate on those subjects in this context. And the Court had recognized that disclosure would "undoubtedly . . . deter some individuals who otherwise might contribute." *Id.* at 68.

*Buckley* summarized the congressional "goal" and the Court's "task" as follows (to which

SJ Opposition & Reply                              5

the Court will return in its analysis):

> In enacting the legislation under review Congress addressed broadly the problem of political campaign financing. It wished to promote full disclosure of *campaign-oriented* spending to insure both the reality and the appearance of the purity and openness of the federal *election* process. Our *task* is to construe "for the purpose of . . . influencing," incorporated in § 434(e) through the definitions of "contributions" and "expenditures," in a manner that *precisely furthers this goal*. [*Id.* at 78 (emphasis added; footnotes omitted).]

With this congressional "goal" (regulate "*campaign-oriented* spending)  in mind, and mindful of the First Amendment privacy, deterrence, and dissolving-distinction problems it had already addressed, the Court turned to construing "contributions" and "expenditures," which both had the operative language "'for the purpose of . . . influencing' the nomination or election of candidates for federal office." *Id.* at 77 (citation omitted).

Applying its relevant-and-substantial-relation requirement, the Court construed "contribution" narrowly, *id.* at 78, so as to "have a *sufficiently close relationship* to the *goals of the Act*, for they are *connected with a candidate or his campaign*." *Id.* (emphasis added). The broad "goal[] of the Act" had just been identified as being about "disclosure of campaign-oriented spending," *see supra*, and the relevant-and-substantial-relation requirement was employed to assure a "close relationship" between "contribution" and "campaign-oriented spending" so as to meet the privacy, deterrence, and dissolving-distinction constitutional concerns. Note that in this *disclosure* context "sufficiently close relationship" is equated with "connected with a candidate or his campaign." Note also that while the Court did point to vagueness concerns with "'for the purpose . . . of influencing,' the nomination or election of candidates for federal office," *id.* at 76-78 (citation omitted), it resolved it by applying the relevant-and-substantial-relationship requirement to resolve both vagueness and overbreadth by assuring an unambiguous nexus to *elections*.

The court then applied the relevant-and-substantial-relation requirement to "expenditure."

The Court first noted that an "expenditure" by a *political committee* did not have to be subjected to this requirement because a "political committee" was already subject to the requirement, in the form of "the major purpose" test, so that "[e]xpenditures of candidates and of 'political committees' so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, *by definition, campaign related.*" *Id.* at 79 (emphasis added).

The Court then imposed the express-advocacy construction on "expenditure" in the non-political-committee, non-candidate disclosure context. *Id.* at 79-81. Again, the Court cured both vagueness and overbreadth in the phrase "'for the purpose . . . of influencing,' the nomination or election of candidates for federal office" by applying the relevant-and-substantial-relation requirement. That overbreadth was at issue, in addition to vagueness, was clarified by the Court's expressed concern that "the *relation of the information* sought to the *purposes of the Act* may be *too remote.*" *Id.* at 80 (emphasis added). "To insure that the reach of § 434(e) is not *impermissibly broad,*" the Court said, "we construe 'expenditure' for purposes of that section in the same way we construed the terms of § 608(e) to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* (emphasis added; footnote omitted). The Court declared that this narrowing construction avoided overbreadth by meeting the relevant-and-substantial-relation requirement: "This reading is directed precisely to that spending that is *unambiguously related to the campaign* of a particular federal candidate." *Id.* (emphasis added).[5] It noted that this construction avoided the dissolving-distinction problem

_____

[5] *Buckley* said, 424 U.S. at 81 (emphasis added), that

§ 434(e), as construed, imposes independent reporting requirements on individuals and groups that are not candidates or political committees only in the following circumstances: (1) when they make *contributions* earmarked for political purposes or authorized or requested by a candidate or his agent, to some person other than a candidate or political committee, and (2) when they make *expenditures* for communications that expressly advocate the election or defeat of a clearly identified candidate.

because "§ 434(e), as construed, bears a sufficient relationship to a substantial governmental inter-est," *id.*, and "*does not reach all partisan discussion* for it only requires disclosure of those ex-penditures that expressly advocate a particular election result." *Id.*[6] So in this applicable expendi-ture disclosure context, the relevant-and-substantial-relation requirement was clearly restated as the unambiguously-campaign-related requirement. And this "unambiguously campaign related" formulation of the required test, *id.* at 81, echoes the Court's use of similar "campaign related" language in applying the relevant-and-substantial-relation requirement in other contexts.[7] It is fair to say, then, that in the compelled disclosure context, as in the context of all campaign-finance regulation, any regulation must be unambiguously campaign related.

Two things are especially significant here. First, the line that *Buckley* recognized at which disclosure may be imposed in the relevant context is the line between unambiguous "campaign" speech and ordinary political speech, which includes issue advocacy and "partisan discussions." *Id.* at 80. This unambiguously-campaign-related requirement applies regardless of whether one believes that "exacting scrutiny" means strict scrutiny, or intermediate scrutiny, or that the words after the "also," *id.* at 64, define the meaning of "exacting scrutiny" in the disclosure context. *Whatever* the standard of review,[8] in this expenditure disclosure context the unambiguously-campaign-related requirement must be met.

---

[6]Note from this statement that the line at which disclosure may be compelled does not run between "partisan discussion" and non-partisan discussion.

[7]*Buckley* applied this unambiguously-campaign-related requirement to (1) expenditure limi-tations, *id.* at 42-44; (2) PAC status and disclosure, *id.* at 79; (3) non-PAC disclosure of contribu-tions and independent expenditures, *id.* at 79-81; and (4) contributions. *Id.* at 23 n.24, 78.

[8]The unambiguously-campaign-related requirement applies to contributions, *Buckley*, 424 U.S. at 78, the regulation of which requires intermediate scrutiny, *id.* 25, and to expenditures, *id.* at 80, the regulation of which requires strict scrutiny, *id.* at 19, and to political committees, *id.* at 79, the regulation of which requires strict scrutiny. *Austin v. Mich. State Chamber of Com-merce*, 494 U.S. 652, 658 (1990). It applies in all campaign-finance contexts.

Second, the governmental interests that *Buckley* cited with respect to the expenditure disclosure provision were entirely satisfied—to the extent constitutionally permissible—by disclosure limited to speech that meets the unambiguously-campaign-related requirement (i.e., express advocacy in *Buckley*). *Buckley* noted that the disclosure provision "serve[s an] informational interest, and even as construed § 434(e) increases the fund of information concerning those who support the candidates. It goes beyond the general disclosure requirements to shed the light of publicity on spending that is *unambiguously campaign related*." *Id.* at 81 (emphasis added). So there is no cognizable governmental interest here that extends beyond the unambiguously-campaign-related requirement.[9] Neither Congress nor the FEC has any interest in regulating speech, in this candidate election campaign context, that is not "unambiguously related to the campaign of a particular federal candidate." *Id.*

## C.  *WRTL II* Recognized a Line Between "*Campaign* Speech" and "*Political*" Speech."

The next question is whether *WRTL II* applied the unambiguously-campaign-related requirement to electioneering communications, and, more specifically, whether *WRTL II*'s unambiguous appeal-to-vote test, 127 S. Ct. at 2667, is the required form of the unambiguously-campaign-related requirement for the electioneering communication context. Since disclosure is at issue in this case, *Buckley*'s substantial-and-relevant-relation requirement must be met by some line.

*WRTL II* provided a dividing line that is applicable to the present quest for the constitutional line. Since the opinion was very precise and consistent in the terminology used throughout, the specific terms bear close examination. *WRTL II* distinguished fully-protected "political speech," or "issue advocacy," from "campaign speech," *see, e.g.*, *id.* at 2659, also called "electioneering,"

---

[9]This principle applies equally to an interest in "enforcement of . . . contribution and expenditure limitations," which *Buckley* recognized and similarly limited by its construction. *Id.* at 76.

*id.* at 2667-69, 2670 n.8, 2672, which may be regulated. For present line-drawing purposes, what is significant is that "*campaign* speech" and "*election*eering" are about *campaigns* and *elections*.[10] In the context of *WRTL II* and the present case, the relevant campaigns and elections are *candidate* campaigns and elections (not ballot measure campaigns). So *WRTL II* recognized that, in this context, the proper line establishing the permissibility of regulation is between expression related to candidate campaigns and expression not related to candidate campaigns. And, just as *Buckley* had done, *WRTL II* required that a communication could only be deemed to be on the candidate-campaign side of the dividing line if it is unambiguously so. 127 S. Ct. at 2667 ("no other reasonable interpretation than"). This unambiguous requirement means that "campaign speech" is determined by whether a communication contains either the "magic words" of "express advocacy," *id.* at 2667, 2669 n.7, or its "functional equivalent" under *WRTL II*'s unambiguous-appeal-to-vote" test. *Id.* at 2667.

Chief Justice Roberts, the author of *WRTL II*, was of course aware of *Buckley*'s "unambiguously campaign related" requirement, 424 U.S. at 81, and was restricting Congress and the FEC to regulating so-called "*electioneering* communications" to those that unambiguously contained "electioneering," *WRTL II*, 127 S. Ct. at 2667-69, 2670 n.8, 2672, namely, they were truly about candidate campaigns because they were "unambiguously related to the *campaign* of a particular federal *candidate*." *Buckley*, 424 U.S. at 80 (emphasis added). *WRTL II* imposed this same unambiguously-campaign-related requirement by holding that no communication may be deemed the "functional equivalent of express advocacy," *WRTL II*, 127 S. Ct. at 2667, i.e., "campaign speech," *id.* at 2659, unless "the ad is susceptible of *no reasonable interpretation other than* as

---

[10]This requirement of an unambiguous connection to candidate *election campaigns* flows from *Buckley*'s recognition that the sole justification for the Federal *Election Campaign* Act is "[t]he constitutional power of Congress to regulate federal elections." *Buckley*, 424 U.S. at 13.

an *appeal to vote* for or against a specific *candidate.*" *Id.* at 2667 (emphasis added). To reinforce the "unambiguously" part of the requirement, *WRTL II* required that "the benefit of any doubt [goes] to protecting rather than stifling speech." *Id.* at 2667. *See also id.* at 2669 ("Where the First Amendment is implicated, the tie goes to the speaker, not the censor."), 2669 n.7 (same), 2674 (same). So the unambiguously-campaign-related requirement is not met in this context when a communication talks about *candidates*, or even *criticizes* them,[11] but only when the communication unambiguously talks about their *campaign* in a way that involves express advocacy or its functional equivalent under *WRTL II*'s unambiguous-appeal-to-vote test.

In sum, *WRTL II* applied *Buckley*'s unambiguously-campaign-related requirement in the electioneering communication context. Given that this requirement originated in the disclosure context, *Buckley*, 424 U.S. at 80, and applies equally to prohibitions and compelled disclosure, *WRTL II*'s unambiguous-appeal-to-vote test draws the only permissible line for demarcating when "electioneering communications" may be subjected to compelled disclosure.

**D.   The FEC's Proffered Line Is Not Based in the *Candidate Election Campaign* Context.**

The FEC ignores the context of this case (*candidate* election campaigns), the sole source of constitutional authority for the FEC and FECA (authority to regulate candidate *elections*), *Buckley*'s unambiguously-campaign-related requirement, and *WRTL II*'s application of that requirement in the electioneering communication context. It asserts that "the government's interest in providing information to the public extends *beyond speech about candidate election campaigns* to encompass activity that *attempts to sway public opinion or action on the specified issues*." FEC Mem. 22 (emphasis added). So any time a speaker attempts to persuade the public, the FEC says it may regulate that speech. Note that the Federal *Election* Commission expressly says that

---

[11]Criticism does not eliminate the protection for political speech. *See* CU Mem. 16, 42-43.

the interest underpinning its regulation here is not limited to the election context for it "extends beyond speech about candidate election campaigns." *Id.*

The FEC overreaches. Attempted persuasion cannot be the dividing line between regulable and nonregulable speech here in the *candidate election campaign* context. If the FEC's line were correct, it would be the police officer for all "political speech," or "issue advocacy," not just the "*campaign* speech" that is its proper domain. *WRTL II*, 127 S. Ct. at 2659 (emphasis added). Hypothetical[12] information interests that the government might have in other contexts, do not apply to the narrowly-confined candidate election campaign context. The relevant question is not what authority some other agency might have under some other act governing some other subject under some other constitutional authority. The question is how far Congress and the FEC may reach under the authority to regulate *candidate election campaigns*. *Buckley* applied an "unambiguously *campaign* related" requirement. 424 U.S. at 81 (emphasis added). It drew the line based on the "constitutional power of Congress to regulate federal *elections*," 424 U.S. at 13 (emphasis added), and held that disclosure of "'expenditures' . . . 'for the purpose of . . . influencing' the nomination or *election of candidates* for federal office," *id.* at 77 (emphasis added) (citation omitted), must be restricted to "funds used for communications that expressly advocate the *election* or defeat of a clearly identified *candidate*," in order to be "unambiguously related to the *campaign* of a particular federal *candidate*." *Id.* at 80 (emphasis added). *WRTL II* agreed that Congress and the FEC may only regulate speech that is unambiguously "*campaign* speech." 127 S. Ct. at 2659 (emphasis added). And it applied this requirement by holding that an electioneering communication is only "campaign speech" if it "is susceptible of no reasonable interpretation

---

[12]The CLC points to various state grassroots lobbying disclosure laws, CLC Mem. 14-15 & n.8, but Congress has passed no such law.

**SJ Opposition & Reply**                    12

other than as an appeal to vote for or against a specific *candidate*." *Id.* at 2667 (emphasis added). The FEC draws the line in the wrong place.

Moreover, the FEC's "persuasion" line would require that the disclosure requirements not be applied to "electioneering communications" that do not "attempt[] to sway public opinion or action on the specified issues." So an ad that simply mentioned a candidate, but lacked any attempt at persuasion on an issue, would not be subject to disclosure—such as a 10-second ad that simply encouraged the public to go see a movie with "Hillary" in the title. The FEC's line effectively concedes that Citizens' ads may not be subjected to disclosure.[13]

### 1. Ballot-Initiative Campaigns Are Beyond the Relevant Context, But the Unambiguously-Campaign-Related Requirement Also Prevails in That Context.

The FEC next tries to avoid the unambiguously-campaign-related requirement by insisting it is solely about *candidate* campaigns and pointing to ballot-initiative campaigns—which have no candidates and regulate issue advocacy—where an informational interest has been recognized as justifying disclosure. FEC Mem. 20, 22. That argument fails for two reasons.

First, this case is not about a ballot-initiative campaign. Rather, the FEC alleges that Citizens' documentary contains, in *WRTL II*'s words, an unambiguous "appeal to vote for or against a specific *candidate*," *WRTL II*, 127 S. Ct. at 2667 (emphasis added), so that it is subject to the electioneering communication prohibition. FEC Mem. 34 ("is the functional equivalent of express advocacy"). And it clearly believes the Ads are about a candidate. So this is a *candidate*

---

[13]Ads on the environmental issue featuring House Speaker Nancy Pelosi and former House Speaker Newt Gingrich were recently the subject of tardy disclosure reports because they were run in Speaker Pelosi's district during an electioneering communication period. *See* Josh Gerstein, *Group Files Climate Change Ad Disclosure After Delay*, N.Y. Sun, June 16, 2008 (online version). While there was a persuasion attempt, it had nothing to do with an election campaign and reveals both the overbreadth of the current disclosure requirements and the undue complexity of the campaign finance laws (trapping the unwary who would not believe that a pro-environment ad would have anything to do with an election campaign).

SJ Opposition & Reply                    13

*election campaign* context. The standard applicable to *candidate* campaigns must govern. That standard requires that a communication may only be regulated if it is "unambiguously related to the *campaign* of a particular federal *candidate.*" *Buckley*, 424 U.S. at 80 (emphasis added).

Second, even in the ballot-initiative context, the unambiguously-campaign-related requirement prevails as applicable to ballot initiative campaigns. In that context, government may only regulate communications that are unambiguously related to the ballot-initiative campaign. So they must still be "unambiguously *campaign* related," *id.* at 81 (emphasis added), and the absence of a candidate does not change this requirement in that context.

*California Pro-Life Council v. Getman*, 328 F.3d 1088 (9th Cir. 2003) ("*CPLC I*"), illustrates the requirement in the ballot initiative context. *Id.* at 1091. *CPLC I* decided that the state could, as a general principle, "require[] the source and amount of . . . contribution[s] or expenditure[s] to be disclosed for public scrutiny," even though ballot initiatives deal with issues. *Id.* But the relevant part of the analysis is not that the court permitted regulation of "pure issue speech," as the FEC would have it, FEC Mem. 16, but how the definition of a reportable "independent expenditure" was handled. This analysis—about the strength and clarity of the connection between a communication and the campaign—demonstrates the unambiguously-campaign-related requirement at work in the ballot-initiative context.

CPLC had challenged California's "independent expenditure" definition (which triggered "independent expenditure committee" status, with accompanying reporting requirements) as unconstitutionally vague and overbroad. *Id.* California defined "independent expenditure" as

> "an expenditure made by any person in connection with a communication which expressly advocates . . . the qualification, passage or defeat of a clearly identified measure, *or taken as a whole and in context, unambiguously urges a particular result in an election but which is not made to or at the behest of the affected candidate or committee.*" [*Id.* at 1096 (*quoting* Cal. Govt. Code § 82031) (emphasis in original).]

The first part of this definition—requiring that "communication[s] . . . expressly advocate[] . . . passage or defeat of a clearly identified measure"—clearly employs the express-advocacy test as it applies in the ballot-initiative context. CPLC argued that the italicized portion of the definition was unconstitutional for not conforming to the express-advocacy test (an application of the un-ambiguously-campaign-related requirement, *Buckley*, 424 U.S. at 80). In response, the *CPLC I* court first narrowed the overbroad, contextual express-advocacy test that the Ninth Circuit had earlier stated in *Furgatch*, 807 F.2d 857,[14] by declaring that:

> Indeed, *Furgatch* instructs that the communication may be considered "as a whole" when de-termining express advocacy. But a close reading of *Furgatch* indicates that we presumed ex-press advocacy must contain some explicit *words* of advocacy. *See id.* at 864 (noting that "context cannot supply a meaning that is incompatible with, or simply unrelated to, the clear import of the words"). "Context," we emphasized, "remains a consideration, but an ancillary one, peripheral to the words themselves." *Id.* at 863. [*CPLC I*, 328 F.3d at 1098 (emphasis in original).]

(*WRTL II* rejected using context to identify an unambiguous appeal to vote in "electioneering communications," 127 S. Ct. at 2669, so that it is now an improper consideration in determining either express advocacy or its functional equivalent.) Then *CPLC I* decided that it did not have to resolve the vagueness and overbreadth of the California statute because state courts had already cured it (and fulfilled the unambiguously-campaign-related requirement) by imposing the

---

[14]The *Furgatch* "express advocacy" standard, *id.* at 864 (emphasis added), was as follows:

We conclude that speech need not include any of the words listed in *Buckley* to be express ad-vocacy under the Act, but it must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but *as an exhortation to vote for or against a specific candidate.* This standard can be broken into three main components. First, even if it is not presented in the clearest, most explicit language, speech is "express" for pres-ent purposes if its message is unmistakable and *unambiguous*, suggestive of only one plausible meaning. Second, speech may only be termed "advocacy" if it presents a *clear plea for action*, and thus speech that is merely informative is not covered by the Act. Finally, it must be *clear what action is advocated*. Speech cannot be "express advocacy of the election or defeat of a clearly identified candidate" when reasonable minds could differ as to whether it *encourages a vote for or against a candidate* or encourages the reader to take some other kind of action.

**SJ Opposition & Reply**          15

express-advocacy construction:

> We need not decide the difficult question of whether *Furgatch* saves the California statute. In *Governor Gray Davis Committee v. American Taxpayers Alliance,* 102 Cal.App.4th 449, 125 Cal.Rptr.2d 534 (2002), the California Court of Appeal interpreted the PRA definition of "independent expenditure" narrowly "to apply only to those communications that 'contain express *language* of advocacy with an exhortation to elect or defeat a candidate.'" *Id.* at 471, 125 Cal.Rptr.2d 534 (quoting *Iowa Right to Life Comm.,* 187 F.3d at 969-70) (emphasis added). Given this narrowing construction of the statute, we cannot say the PRA's definition of "independent expenditure" overreaches. [*CPLC I,* 328 F.3d at 1098 (emphasis in original).]

So in regulating issue advocacy in the ballot-initiative context government may only regulate communications that expressly advocate for or against the initiative, i.e., they must be unambiguously related to the ballot-initiative campaign.

Other decisions in the ballot-initiative context are not to the contrary. In *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978), the court merely noted in passing that "[i]dentification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected." *Id.* at 792 n.32. The law at issue barred the corporation "from making contributions or expenditures 'for the purpose of . . . influencing or affecting the vote on any question submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation.'" *Id.* at 768. Since *Buckley* had already found "for the purpose of influencing" unconstitutionally vague and given it the express-advocacy construction to implement the unambiguously-campaign-related requirement, 424 U.S. at 77, 81, it is clear in *Bellotti* that the "disclosure" of the "source" of any "expenditure" for a communication was only for one that expressly advocated passage or defeat of a measure.

Similarly, *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981), spoke of "publication of lists of contributors," *id.* at 298, "to *committees* formed to support or oppose ballot measures." *Id.* at 291 (emphasis added). *Buckley* said that a *contribution* "for the purpose of in-

fluencing" was not unconstitutionally vague and overbroad (i.e., because it would violate the un-ambiguously-campaign-related requirement) because it was construed as limited to "[f]unds pro-vided to a candidate or political party or *campaign committee*." 424 U.S. at 23 n.24 (emphasis added). So the unambiguously-campaign-related requirement, as applicable in this context, is met if "contribution" is defined as funds given to a ballot-initiative campaign committee.

### 2. Lobbying Regulations Have Nothing to Do With Elections, But the Lobbying Would Have to Be Unambiguously Related to its Constitutional Authority.

The FEC cites lobbying disclosure requirements in an effort to show that Congress and the FEC have an "interest in informing the public of who is attempting to sway the resolution of pub-lic issues . . . ." FEC Mem. 21. The FEC overreaches. Whatever constitutional authority supports lobbying disclosure is irrelevant in this candidate election campaign context because lobbying has nothing to do with "[t]he constitutional power of Congress to regulate federal *elections*," 424 U.S. at 13 (emphasis added), under the Federal *Election Campaign* Act and the Bipartisan *Cam-paign* Reform Act ("BCRA"). The FEC acknowledges that lobbying "does not involve candidate campaigns," FEC Mem. 21, but fails to grasp the implication of its statement. In the present con-text, Congress may only regulate activity that is "unambiguously related to the campaign of a particular candidate." *Buckley*, 424 U.S. at 80. While lobbying is irrelevant here, any "issue-ori-ented political activity," FEC Mem. 21, regulated in reliance on constitutional authority to regu-late lobbying would have to regulate only activity unambiguously related to that authority.[15]

---

[15]The FEC cites *United States v. Harriss*, 347 U.S. 612 (1954), for support. FEC Mem. 21. But *Harriss* construed a lobbyist disclosure act to avoid constitutional difficulties so that it ap-plies only to persons paid to do lobbying, where the lobbying involves direct contact with Con-gress, and the purpose of the person or a contribution to that person is for the "primary purpose" of such lobbying. *Id.* at 619, 622. It does not apply to "persons having only an 'incidental' pur-pose of influencing legislation." *Id.* at 622. Only a paid person having the primary purpose of influencing elections by direct contact with Congress must report "'the names of any papers, pe-riodicals, magazines, or other publication in which he has caused to be published any articles or

### 3.  *MCFL* Clearly Employed the Unambiguously-Campaign-Related Requirement and Is in the Relevant *Candidate Election Campaign* Context.

The FEC pronounces "nonsensical" Citizens' identification of *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986) ("*MCFL*"), as employing the unambiguously-campaign-related requirement. FEC Mem. 17. Citizens had pointed to *MCFL* as imposing the express-advocacy test and recognizing the major-purpose test, both of which were implementations of the unambiguously-campaign-related requirement. CU Mem. 10-11. Citizens' argument is straightforward. *MCFL* was construing the language of 2 U.S.C. § 441b, which forbids corporate "expenditure[s] . . . in connection with any election." The Supreme Court noted that

> [t]he argument relies on the portion of *Buckley* . . . that upheld the disclosure requirement for expenditures by individuals other than candidates and by groups other than political committees. See 2 U.S.C. § 434(c). There, in order to avoid problems of overbreadth, the Court held that the term "expenditure" encompassed "only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U.S., at 80 (footnote omitted). The rationale for this holding was:
>
>> [T]he distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various issues, but campaigns themselves generate issues of public interest. *Id.,* at 42 (footnote omitted).[16] [479 U.S. at 248-49.]

The portion of *Buckley* that *MCFL* cites is exactly the location where *Buckley* imposed the

editorials.'" *Id.* at 615 n.2 (citation omitted). That is the reporting concerning "artificially stimulated letter campaign[s]" of which *Harriss* approved, *id.* at 620, not the sort of grassroots lobbying at issue in *WRTL II*, 127 S. Ct. 2652. Notably, the "principal purpose" test of *Harriss* in the lobbying context serves to limit regulation to that which is unambiguously lobbying related, much as the "major purpose" test in *Buckley* limits regulation to that which is, "by definition, campaign related," 424 U.S. at 79, i.e., "unambiguously campaign related." *Id.* at 81.

[16]Although *Buckley*, *MCFL*, and *WRTL II* held that this dissolving-distinction problem required a bright-line test to *protect* speech, the FEC argues that it is a reason to *burden* speech. FEC Mem. 22 n.14. And the FEC argues that protected "political speech" under *WRTL II* may yet be regulated because it might "influence an election," FEC Mem. 22 n.14, even though *WRTL II* barred any consideration of intent and effect in as-applied challenges in this candidate election campaign context, 127 S. Ct. at 2665-66, 2668, 2669 n.7, as did *Buckley*. 424 U.S. at 43-44.

SJ Opposition & Reply                    18

bright-line express-advocacy construction on an expenditure definition employing the vague and overbroad phrase "for the purpose of influencing."[17] *MCFL* imposed the identical express-advocacy requirement in a *prohibition* context that *Buckley* imposed in a *disclosure* context, citing *Buckley*'s "unambiguously campaign related" passage as justification. 479 U.S. at 249 ("We agree . . . that this rationale requires a similar construction of the more intrusive provision that directly regulates independent spending."). So it is clearly not "nonsensical," FEC Mem. 17, to say that *MCFL* recognized and applied *Buckley*'s unambiguously-campaign-related requirement.

Ignoring the obvious import of *MCFL*'s identical express-advocacy construction and citation of *Buckley* as requiring it, the FEC argues that *MCFL* "noted the benefits of mandatory disclosure, even when the underlying expenditures to be disclosed were constitutionally exempt from limitation," and concludes that "*MCFL* stands directly contrary to Plaintiff's argument that *WRTL*'s holding regarding EC funding must be extended to the EC disclosure requirement." FEC Mem. 17. The FEC evades the relevant issue, which is not whether disclosure is permitted as to some communications that may not be prohibited. The issue is whether regulation—whether prohibition or disclosure—is restricted to expenditures for communications that are (in this candidate election campaign context) "unambiguously related to the campaign of a particular candi-

---

[17]*Buckley* then pronounced that its saving construction (1) prevented a situation where "the relation of the information sought to the purposes of the Act may be too remote"; (2) insure[d] that the reach of ["expenditure"] [wa]s not impermissibly broad"; (3) precisely targeted only "spending that is unambiguously related to the campaign of a particular federal candidate"; (4) assured that "expenditure" would "bear[] a sufficient relationship to a substantial governmental interest"; (5) assured that "expenditure" would "not reach all partisan discussion for it only requires disclosure of those expenditures that expressly advocate a particular election result"; and (6) would "shed the light of publicity on spending that is unambiguously campaign related." *Buckley*, 424 U.S. at 80-81. *Buckley* did this in an expenditure *disclosure* context, *id.* at 77, and it cited an informational interest as justifying disclosure in this context, *id.* at 81, but *only* after narrowing the scope of permissible disclosure to what was "unambiguously related to the campaign of a particular federal candidate." *Id.* at 80.

**SJ Opposition & Reply**           19

date." *Buckley*, 424 U.S. at 80. *MCFL* clearly embraced the unambiguously-campaign-related

requirement, specifically citing the *Buckley* passage that established it when *MCFL* adopted the

derivative express advocacy test. *See supra*. And all of the disclosure of non-prohibited activity

that *MCFL* referenced fell within the unambiguously-campaign-related requirement. *MCFL* said

that even though it eliminated the independent expenditure prohibition for *MCFL*-corporations,

> an *independent expenditure* of as little as $250 by MCFL will trigger the disclosure provisions
> of § 434(c). As a result, MCFL will be required to identify all *contributors* who annually pro-
> vide in the aggregate $200 in *funds intended to influence elections*, will have to specify all *re-
> cipients of independent spending* amounting to more than $200, and will be bound to identify
> all persons making contributions over $200 who *request that the money be used for independ-
> ent expenditures*. These reporting obligations provide precisely the information necessary to
> monitor MCFL's independent spending activity and its receipt of contributions. The state in-
> terest in disclosure therefore can be met in a manner less restrictive than imposing the full pan-
> oply of regulations that accompany status as a political committee under the Act. [470 U.S. at
> 262 (emphasis added).]

So what did *MCFL* say must be disclosed? First, "independent expenditure[s]," including the

"recipients of independent spending" must be disclosed. *Id.* "Independent expenditures" have

been express-advocacy communications ever since *Buckley* imposed the express-advocacy con-

struction on them, 424 U.S. at 44 & n.52, 80-81, based on the unambiguously-campaign-related

requirement—which *MCFL* confirmed. 479 U.S. at 248-49. Second, "contributors . . . [of] funds

intended to influence elections" must be disclosed. *Id.* at 262. Such contributions meet the unam-

biguously-campaign-related requirement under *Buckley*'s construction, in the disclosure context,

of "'contributions' . . . 'for the purpose of . . . influencing' the nomination or election of candi-

dates for federal office," 424 U.S. at 77, which it construed to be either a donation to a candidate,

political party, or campaign committee or "earmarked for political purposes." *Id.* at 78. There is

absolutely no doubt that *Buckley* applied the unambiguously-campaign-related requirement in

construing the sort of contributions that must be disclosed because it expressly restated the re-

quirement: "So defined, 'contributions' have a sufficiently close relationship to the goals of the Act, for they are connected with a candidate or his campaign." *Id.* This is part of the same analysis in which the Court expressly applied the unambiguously-campaign-related requirement to "political committee" status and expenditure disclosure, *id.* at 79-81, to assure that "the relation of the information sought to the purposes of the Act [would not] be too remote." *Id.* at 80.

As to the applicability of an informational interest, *MCFL* declared that disclosure of the listed unambiguously-campaign-related information was enough: "These reporting obligations provide precisely the information necessary to monitor MCFL's independent spending activity and its receipt of contributions." 479 U.S. at 262. *MCFL* then said that the major-purpose test would take care of any further information to be disclosed by triggering PAC status if MCFL's independent expenditures became its major purpose. *Id.* This major purpose test was established as part of *Buckley*'s analysis applying the unambiguously-campaign-related requirement, 424 U.S. at 76-82, and the Court said that "[e]xpenditures of . . . 'political committees' so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related." *Id.* at 79. In sum, *MCFL* embraced *Buckley*'s analysis that campaign-finance regulation may only extend to contributions, expenditures, and entities that are (in this candidate election campaign context), "unambiguously related to the campaign of a particular candidate." *Buckley*, 424 U.S. at 80.

## II. The Disclosure Requirements Fail the Required Strict Scrutiny.

Within the class of First Amendment activities that may be regulated in the candidate election campaign context because they meet the unambiguously-campaign-related requirement, the First Amendment yet requires that a specific regulation must be appropriately tailored to an appropriately important interest, such as preventing quid pro quo corruption. What is "appropriate"

depends on the nature of the burden. As shall be shown, compelled disclosure in this context im-

poses a per se burden on First Amendment privacy rights that requires a high level of scrutiny.

This was recognized in *Davis v. FEC*, No. 07-320, slip op. (U.S. June 26, 2008), which requires

that this case be decided for Citizens.

**A.  *Davis* Relied on *Buckley*, Not *McConnell*, and Distinguished "Exacting Scrutiny" from the Relevant-and-Substantial-Relation Requirement.**

*Davis* involved a requirement for the reporting of contributions under BCRA's so-called

Millionaire's Amendment. The provision required a candidate who contributed over a certain

level to his own campaign to file contemporaneous reports of his contributions instead of waiting

to file the same information on the scheduled reporting dates (so that his opponent could, based

on a formula, raise more funds under raised contribution limits). *Davis* declared both the early-

disclosure requirement and the raised contribution limits unconstitutional.

The *Davis* disclosure analysis relied on *Buckley*, 424 U.S. 1, not *McConnell*, 540 U.S. 93, so

any argument that *McConnell* lowered *Buckley*'s required standard for scrutinizing disclosure in

this context fails. *See Davis*, No. 07-320, slip op. at 18. The scrutiny burden was on the FEC, not

Davis. *Id.* The Court relied on *Buckley* for the requirement of  two distinct elements to the re-

quired scrutiny: (1) "exacting scrutiny" "*and*" (2) the relevant-and-substantial-relation require-

ment. *Id.* (emphasis added). So the two types of scrutiny are not conflated. And the activity at

issue in *Davis* clearly met the unambiguously-campaign-related requirement because it was about

disclosure of contributions by a candidate to his election campaign.

**B.  *Davis* Required the Interest to Match the Burden, and Burdens on Core Political Speech Require Strict Scrutiny.**

*Davis* reaffirmed that compelled disclosure in this candidate election campaign context is a

per se burden on First Amendment privacy rights. *Id.* So it is now clear that there is no "mere dis-

closure" in this context that is subject to little or no scrutiny. *Davis* applied "exacting scrutiny" without identifying whether that term meant "strict scrutiny," but it did indicate that "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* And the fact that it thought the disclosure at issue was a serious actual burden is evident from the fact that it struck down disclosure that imposed substantially less burden than is present in the current case. *See infra.* This indicates that, whatever one calls "exacting scrutiny," it is a formidable level of scrutiny in this context. While, as *Davis* indicated, the Court has sometimes imposed lesser scrutiny based on lesser burdens, *id.*, as shall be shown, where core political speech is involved the sufficiency of the burden to trigger strict scrutiny is a given.

There are disclaimer and reporting requirements at issue in this case, both of which impose burdens on Citizens' *own speech* (not a contribution that it wants to make). So preliminarily it should be observed that *Buckley* began its analysis of FECA's contribution and expenditure limitations with a General Principles analysis that noted that the highest First Amendment protection applied to expenditures for one's own speech, but that where the speech was indirect, as it said was the case with typical contributions, then it would apply intermediate scrutiny. 424 U.S. at 14-23. So intermediate scrutiny would not be not appropriate here as a result of indirect speech.

As to the disclaimer requirement, any "electioneering communication" that lacks an unambiguous "appeal to vote," *WRTL II*, 127 S. Ct. at 2667, is not supposed to be restricted. But the challenged disclaimer provision, which takes at least 4 seconds to intone, so limits Citizens' 10-second ads that they are effectively restricted. And the disclaimer seriously limits a 30-second ad. So we are talking about on-communication, direct limitations on core political speech, which clearly trigger strict scrutiny as to the disclaimer requirements. *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), made it clear that an on-communication disclaimer requirement

was a serious enough burden to trigger strict scrutiny. *Id.* at 347.

In the analysis of reporting and disclosure requirements, *Davis* reaffirmed *Buckley*'s recognition that, while there was "no ceiling on campaign-related activities, 424 U.S. at 64, "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Id. Buckley* called it a "significant encroachment[] on First Amendment rights." *Id.* So the Court required "exacting scrutiny." *Id. Buckley* called it the "*strict* test." *Id.* at 66. When *Buckley* turned next to consider a reporting requirement for persons making independent expenditures and certain contributions it said that it "must apply the *same strict standard of scrutiny*" as it had just applied to the previous disclosure provision to protect the "right of associational privacy." *Id.* at 75. So the test is clearly a "strict" one.[18] As noted above, *Davis* reaffirms *Buckley*'s recognition that compelled disclosure is an inherent and serious burden, in and of itself, on First Amendment privacy rights.

In *McIntyre*, 514 U.S. 334, the Court clarified that "[w]hen a law burdens *core political speech*, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *Id.* at 347 (emphasis added) (*citing Bellotti*, 435 U.S. at 786). A  core political speech burden is not restricted to the "limitation" context. *McIntyre* was a case, like the present one, about a disclaimer on a communication. As noted, *McIntyre* cited *Bellotti*, which said that "exacting scrutiny" is strict scrutiny," 435 U.S. at 795. *Bellotti* was a prohibition case (corporations forbidden to advocate in ballot measure context), but its analysis was cited and employed in *McIntyre*, which was about disclosure, not prohibition, which indicates

---

[18]*WRTL II* spoke of *Buckley*'s use of "exacting scrutiny," 424 U.S. at 44, as "strict scrutiny." 127 S. Ct. at 2669 n.7. Of course *Buckley* was there speaking of "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression," but the term used to describe the scrutiny is the same, "exacting," i.e., "strict."

that the applicable determining line for strict scrutiny is not between prohibitions and non-prohibitions, but between burdens on core political speech and burdens on other types of expression.

In *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999) ("*Buckley II*"), Justice Thomas provided the valuable service of a concurring opinion detailing at length the Court's use of strict scrutiny and lesser scrutiny in various First Amendment contexts. *Id.* at 206. His whole opinion is an instructive survey of the precedent, but for present purposes the following is decisive here: "When [an] election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny." *Id.* He noted that where core political speech is involved, the Court has "ordinarily applied strict scrutiny without first determining that the State's law severely burdens speech," *id.* at 207, probably, he added, because "it makes little difference whether we determine burden first because restrictions on core political speech so plainly impose a 'severe burden.'" *Id.* at 208 (citation omitted).

*WRTL II* did just what Justice Thomas described, it required strict scrutiny without asking whether the burden was severe because any burden on core political speech is automatically severe. 127 S. Ct. at 2664. *WRTL II* affirmed *McIntyre*, *supra*, by stating that strict scrutiny is applied where there is a *burden*, not a *limitation*, on core political speech: "Because BCRA § 203 burdens political speech, it is subject to strict scrutiny." 127 S. Ct. at 2664. Since *WRTL II* was very careful and precise in its terminology, the fact that it relied on a "burden," not a prohibition, is controlling.[19] As the challenged provisions here burden political speech, strict scrutiny is man

---

[19]Moreover, *WRTL II* cited *McConnell*, 540 U.S. at 205, *Austin,* 494 U.S. at 658, *MCFL,* 479 U.S. at 252 (plurality opinion), *Bellotti*, 435 U.S. at 786; and *Buckley,* 424 U.S. at 44-45, for the proposition that a burden on political speech triggers strict scrutiny. *WRTL II*, 127 S. Ct. at 2664. *WRTL II* interpreted all of these, despite varying contexts, as standing for the proposition that a burden on core political speech mandates strict scrutiny. So debating about the context in which *Buckley* used "exacting scrutiny" is unavailing. At least since *WRTL II*, a burden on political speech requires strict scrutiny. Note especially that *WRTL II* said *McConnell* stood for that propo-

dated. Whatever lesser scrutiny might apply in other First Amendment contexts, where the burden is on core political speech there need be no further question about the scrutiny required.

**C.   If the *Davis* Disclosure Was Unconstitutional, the Present Disclosure Is More So.**

If the degree of scrutiny goes up as the burden goes up, then whatever the degree of scrutiny that was required by "exacting scrutiny" in *Davis*, No. 07-320, slip op. at 18, must be higher in the present case because the disclosure requirements at issue here impose greater burdens. And if the *Davis* disclosure was unconstitutional, the present disclosure must necessarily be more so.

*Davis* involved disclosure by a candidate of contributions that he made to his election campaign. As a candidate, he was already subject to disclosure of all campaign receipts and disbursements, so he was not having to disclose any new contribution information. Rather, he was merely required to disclose the information contemporaneously instead of awaiting the periodic reporting deadline. By contrast, the present case does not involve disclosure that would have to be made in any event, but at a later date. This case involves disclosure of donors who would not have to be disclosed in any event, reports of expenditures that would not otherwise have to be disclosed, and disclaimer burdens that would not be present in any event. If the disclosure in *Davis* was unconstitutional, then *a fortiori* the present disclosure provisions are unconstitutional. And to the extent that *Davis* relied on the fact that the disclosure requirements were unconstitutional because they were designed to implement an unconstitutional scheme, this is a close parallel to Citizens' argument about the unambiguously-campaign-related requirement, i.e., disclosure is unconstitutional if it requires disclosure as to constitutionally impermissible territory.

**D.   The Use of Synonyms Does Not Alter the High Scrutiny Required.**

A word should be said about the use of synonyms in Supreme Court opinions, which use can

---

sition, too. *Id.*

cause confusion or be used in an attempt to evade required strict scrutiny. Writing is often enhanced by the use of synonyms to avoid repetition of the same term, so it is common to find synonyms in legal opinions as a stylistic device. But where, as in Supreme Court legal opinions, advocates may attempt to place heavy reliance on any variant reading, precision is preferred. As noted above, *WRTL II* is a particularly well-written opinion in this respect because it consistently uses "political speech" and "issue advocacy" as distinguished from "campaign speech," "electioneering," and "express advocacy." *See, e.g.*, 127 S. Ct. at 2659.[20] But it must be realized that such precision is not always the case. Confusing synonyms are often used without any intent to change the analysis. And analytical language often changes over time.

For example, *McIntyre* used "overriding," not "compelling," to describe the required strict-scrutiny standard. 514 U.S. at 347. In *Bellotti*, 435 U.S. 765, which *McIntyre* said employed strict scrutiny, 514 U.S. at 347, the Court spoke of "exacting scrutiny" as requiring the State to "show[] a subordinating interest which is compelling," 435 U.S. at 786, and "means 'closely drawn to avoid unnecessary abridgment." *Id.* (*quoting Buckley*, 424 U.S. at 25 (*Buckley*'s contri-

---

[20]This precision lends importance to *WRTL II*'s statement that "BCRA survives strict scrutiny to the extent it *regulates* express advocacy or its functional equivalent," *id.* at 2664 (emphasis added), and the many other uses of "regulate" instead of "restrict." *See* CU Mem. 18 & n.19. Since only a prohibition was at issue, the choice of "regulate" instead of "restrict" cannot be a holding, but it is the instructional judicial dictum often placed in cases to fulfill the Court's duty to "say what the law is." *Marbury v. Madison*, 5 U.S. 1 (1 Cranch) 137, 177 (1803). For example, in *Roe v. Wade*, 410 U.S. 113 (1973), there were standards as to different trimesters that had nothing to do with the particular case about Jane Roe, but lower courts nonetheless followed the instruction as to the law's requirements. *WRTL II*'s instruction may not be brushed aside as mere obiter dictum. The FEC's notion that *WRTL II* said "regulation" in response to the FEC's argument that the corporate electioneering communication prohibition was not really a restriction because of the PAC-option, FEC Mem. 10, is implausible because *WRTL II* specifically called the prohibition a "prohibition." *See, e.g.*, 127 S. Ct. at 2663 ("The only question, then, is whether it is consistent with the First Amendment for BCRA § 203 to *prohibit* WRTL from running these three ads." (emphasis added)). And *WRTL II* expressly rejected the notion that the PAC-option made the "prohibition" not a prohibition. *Id.* at 2671 n.9. So *WRTL II* used "regulation" carefully and intentionally, and it meant "regulation," not "prohibition."

SJ Opposition & Reply                    27

bution-limit analysis using intermediate scrutiny)). *Bellotti* then referred to "exacting scrutiny" as "critical scrutiny," *id.*, and after further analysis held that "[a]ssuming, *arguendo*, that protection of shareholders is a 'compelling' interest . . . , we find 'no substantially relevant correlation between the governmental interest asserted and the State's effort' to prohibit appellants from speaking." *Id.* at 795 (citation omitted).[21] *Bellotti* was using strict scrutiny and the requirement of a "compelling interest" was clear, but the "narrow tailoring" requirement was described with synonyms that might lead one to mistakenly believe that some intermediate standard applied—or even that the Court was speaking of the relevant-and-substantial-relation requirement that it had stated in *Buckley* in the disclosure context.[22]

From these examples (numerous others could be cited), the use of synonyms does not alter a required level of scrutiny. So the fact that *McConnell* spoke of "important state interests" instead of "compelling state interests" in upholding the electioneering communication reporting and disclaimer requirements facially cannot alter *WRTL II*'s subsequent statement of the law, i.e., where political speech is *burdened*, as by disclaimer and reporting requirements, strict scrutiny is re-

---

[21]Citizens argues that *Buckley*'s "exacting scrutiny" test for disclosure is strict scrutiny and that the substantial-and-relevant-relation requirement that *Buckley* "also" required, 424 U.S. at 64, is what the Court later described in an applicable context as the unambiguously-campaign-related requirement. But if the FEC wishes to conflate the two requirements, then it is bound by *Bellotti*'s use of "substantially relevant correlation" language to refer to strict scrutiny.

[22]Another example is *Buckley II*, 525 U.S. 182, where the majority used strict scrutiny to review an after-the-fact reporting requirement for petition circulators in the ballot-measure context. That it was strict scrutiny is clear from a footnote in the majority opinion responding to questions about the standard of review raised by Justice Thomas. The majority said: "Our decision is entirely in keeping with the 'now-settled approach' that state regulations 'impos[ing] 'severe burdens' on speech . . . [must] be narrowly tailored to serve a compelling interest." *Id.* at 192 n.17. Although the Court used strict scrutiny language, it concluded that the challenged provisions were "no more than tenuously related to the substantial interests disclosure serves," so that they "'fail exacting scrutiny.'" *Id.* at 205 (citation omitted). Such use of synonyms prompted Justice Thomas to author an opinion, as noted above, explaining the Court's scrutiny in various First Amendment contexts. *Id.* at 206.

SJ Opposition & Reply                    28

quired. *Id.* at 2664. It is true that many courts have in the past been confused about the standard

of review concerning burdens on political speech. This is evident in *CPLC I*, in which the Ninth

Circuit noted that *Buckley*'s use of "exacting scrutiny" and then "substantial relation" had caused

some confusion, but then held that strict scrutiny was required in the disclosure context on the

following rationale, which is applicable here:

> [W]e subject California's disclosure requirements to strict scrutiny. In doing so, we follow the Court's post-*Buckley* decision of *MCFL*, 479 U.S. 238. There the Court subjected disclosure and reporting provisions of FECA to strict scrutiny because those provisions applied to "organizations whose major purpose is not campaign advocacy, but who occasionally make independent expenditures on behalf of candidates." 479 U.S. at 252-53. The Court recognized that reporting and disclosure requirements are more burdensome for multi-purpose organizations (such as CPLC) than for political action committees whose sole purpose is political advocacy. *See id.* at 255-56. Given that the *MCFL* Court considered FECA's disclosure requirements to be a severe burden on political speech for multi-purpose organizations, we must analyze the California statute under strict scrutiny. Post-*Buckley,* the Court has repeatedly held that any regulation severely burdening political speech must be narrowly tailored to advance a compelling state interest. *See Austin v. Mich. Chamber of Comm.,* 494 U.S. 652, 657 (1990); *see also Buckley v. Am. Constitutional Law Found.,* 525 U.S. 182, 192 n. 12 (1999); *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347 (1995); *Ariz. Right to Life PAC,* 320 F.3d at 1007-1010. [*CPLC I*, at 328 F.3d at 1101 n.16.]

The FEC cites to another Ninth Circuit case and a Fourth Circuit case as saying that "exac-

ting scrutiny" was intermediate scrutiny. FEC Mem. 12. As to the Ninth Circuit case, *Alaska*

*Right to Life Committee v. Miles*, 441 F.3d 773 (9th Cir. 2006), the court actually followed *Amer-*

*ican Civil Liberties Union of Nevada v. Heller*, 378 F.3d 979 (9th Cir. 2004), in applying strict

scrutiny to all the disclosure provisions. *Miles*, 441 F.3d at 788. The Fourth Circuit case, *North*

*Carolina Right to Life Committee Fund for Independent Political Expenditures v. Leake*, 524

F.3d 427 (4th Cir. 2008) ("*NCRL-FIPE*"), dealing with disclosure in the different context of pub-

lic funding, is an example of the confusion over the level of scrutiny because of the frequent fail-

ure to distinguish the strict scrutiny requirement from the unambiguously-campaign-related re-

quirement that *Buckley* "*also*" required. But neither *NCRL-FIPE* nor *Miles* eliminates the latter

SJ Opposition & Reply                    29

requirement because they required disclosure of expenditures for communications that met the unambiguously-campaign-related requirement. *See Jackson v. Leake*, 476 F. Supp. 2d 515, 520 (E.D.N.C. 2006) (same case as *NCRL-FIPE*; plaintiff planned to make "independent expenditures"); *Miles*, 441 F.3d at 780 ("An 'expenditure' does *not* include the transfer of something of value for making 'an issues communication.'"). On the same day as the *Jackson* decision, another Fourth Circuit panel, in *North Carolina Right to Life v. Leake*, 525 F.3d 274 (4th Cir. 2008) (with the author of the *NCRL-FIPE* opinion dissenting), recognized the necessity of including an unambiguously-campaign-related requirement in the constitutional analysis in the candidate election campaign context in a much more detailed and extended analysis, but had no occasion to consider whether "exacting scrutiny" means strict scrutiny. *See* CU Mem. 20-22. In any event, *WRTL II*'s statement that burdens on political speech require strict scrutiny is the latest, and controlling, word on the subject. And regardless of the scrutiny level, the unambiguously-campaign-related requirement controls this case.

    As to the requirements of strict scrutiny, *WRTL II* set those out: "Under strict scrutiny, the *Government* must prove that applying BCRA to WRTL's ads furthers a compelling interest and is narrowly tailored to achieve that interest. *Id.* at 2664 (emphasis in original).[23] So it is the FEC's burden to prove, as to Citizens' Ads, that they are the functional equivalent of express ad-

---

[23]Since *McConnell* facially upheld disclosure, the FEC's burden is easier where "ads" are the "functional equivalent of express advocacy" under *WRTL II*'s unambiguous-appeal-to-vote test:

> The strict scrutiny analysis is, of course, informed by our precedents. This Court has already ruled that BCRA survives strict scrutiny to the extent it regulates express advocacy or its functional equivalent. *McConnell*, [127 S. Ct.] at 206. So to the extent the ads in these cases fit this description, the FEC's burden is not onerous; all it need do is point to *McConnell* and explain why it applies here. If, on the other hand, [the] ads are *not* express advocacy or its equivalent, the Government's task is more formidable. It must then demonstrate that banning [or, in the present case, regulating] such ads during the blackout periods is narrowly tailored to serve a compelling interest. No precedent of this Court has yet reached that conclusion. [127 S. Ct. at 2664 (emphasis in original).]

SJ Opposition & Reply                    30

vocacy (the FEC concedes they are not), or that the disclosure burdens are narrowly tailored to a compelling governmental interest. As to Citizens' documentary movie, the FEC has the burden of proving (1) that it is the functional equivalent of express advocacy under *WRTL II*'s unambiguous-appeal-to-vote test *and* (2) either that it is the functional equivalent of the "ads" at issue in *McConnell* and *WRTL II* or, in the alternative, that the prohibition and disclosure requirements are constitutional as applied to a full-length documentary movie that is not only broadcast but also shown in theaters and sold on DVD.

In sum, strict scrutiny applies and the FEC has the burden of proving narrow tailoring to a compelling interest as to all applications of the disclosure requirements. And in addition (and even if strict scrutiny did not apply), the FEC must "also" prove, *Buckley*, 424 U.S. at 64, that the disclosure requirements reach only communications that are "unambiguously campaign related." *Id.* at 81. This is an insurmountable task because the FEC must prove that communications that *WRTL II* said were *not* "*campaign* speech," 127 S. Ct. at 2659, 2673 (emphasis added), *are* in fact "unambiguously *campaign* related. *Buckley*, 424 U.S. at 81 (emphasis added).[24]

## E.  All Governmental Interests in this Context Are Restricted to Disclosure of "Unambiguously Campaign Related" Expenditures.

*Buckley* discussed three "governmental interests," 424 U.S. at 66, namely (1) "provid[ing] the electorate with information 'as to where political *campaign* money comes from and how it is spent by the candidate," *id.* (emphasis added); (2) "deter[ring] actual *corruption* and avoid[ing] the appearance of corruption by exposing large *contributions* and *expenditures* to the light of

---

[24]The FEC may not shift the burden of proof to Citizens by continuing to insist that Citizens makes an assertion that it does not make, *see* FEC Mem. 11, i.e., that Citizens asserts that it is the sort of disfavored organization that is exempt from *all* disclosure. The FEC's argument is a straw man because Citizens has explained clearly that "Citizens only challenges here disclosure as to communications that are not unambiguously campaign related, not those that are." CU Mem. 25. So the FEC's arguments addressing that straw man must be disregarded. *See* FEC Mem. 25-29.

publicity," *id.* at 67 (emphasis added) and (3) "gathering the data necessary to detect violations of the *contribution* limitations." *Id.* at 68. The Court said that "[t]he disclosure requirements, *as a general matter*, directly serve substantial governmental interests," and that "disclosure require-ments certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption." *Id.* at 68 (emphasis added).

Several things should be noted about this part of the *Buckley* analysis. Preliminarily, "least restrictive means" is a strict-scrutiny requirement. As to the informational interests, the first is restricted to information about "*campaign* money," which must be governed by the "*unambigu-ously* campaign related" requirement later in the same disclosure analysis. *Id.* at 80-81 (emphasis added). The second interest is in preventing quid pro quo corruption, which the FEC concedes is not involved here,[25] and speaks of "contributions" and "expenditures," which are FECA terms of art. *Buckley* gave "contributions" an unambiguously-campaign-related construction, 424 U.S. at 23 n.24, 78, and construed "expenditure" to refer only to express advocacy communications, say-ing that "[t]his reading is directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate." *Id.* at 80. The third interest has to do with circum-vention of contribution limits, which circumvention is not involved here (there is no limit on do-nations to fund what *WRTL II* called protected "political speech") and is based on a quid pro quo corruption interest, which is not involved here. And as noted above, *Buckley* took note of govern-mental interests specifically in the non-political party, non-candidate expenditure disclosure con-text and limited the permissible disclosure with the unambiguously-campaign-related require-

---

[25]The FEC concedes that "*WRTL* held that the anti-corruption interest did not apply to com-munications other than express advocacy or its functional equivalent." FEC Mem. 19 n.12 (*citing WRTL II*, 127 S. Ct. at 2672). So "because Plaintiff's planned ads are not the functional equiva-lent of express advocacy, the Commission is not relying upon an anti-corruption interest to jus-tify disclosure requirements as applied to Plaintiff's *WRTL* ads." *Id.*

SJ Opposition & Reply                    32

ment. So those interests are already met by disclosure that meets that requirement. Consequently, in *Buckley*, the only cognizable informational interest was in the disclosure of express-advocacy independent expenditures, and in the electioneering communication context it must be similarly limited to the functional equivalent of express advocacy under *WRTL II*'s unambiguous-appeal-to-vote test. 127 S. Ct. at 2667.

### III. *McConnell* Neither Precluded As-Applied Challenges Nor Decided This Case.

As Citizens noted in its opening memorandum, the present Court indicated a belief at the preliminary injunction stage that *McConnell* precluded as-applied challenges, based on certain language in *McConnell*. *See* CU Mem. 7, 23. There is no need to repeat the argument made against this position in that memorandum. *See id.* The FEC now "stresses . . . that it is not arguing that *McConnell*'s facial holding precludes as applied challenges to the disclosure provisions," FEC Mem. 18 n.10, but it continues to insist that "the holding does belie Plaintiff's argument that the Court has categorically excluded from disclosure requirements all ECs that are not the functional equivalent of candidate campaign ads." *Id.* The FEC points to the Court's facial upholding of "the disclosure requirements as 'to the entire range of "electioneering communications."'" *Id.* at 18. And it quotes *McConnell* as "discussing inclusion of some 'pure issue ads' within [the] EC definition." *Id.* (*quoting* 540 U.S. at 207). "This necessarily means," says the FEC, "that disclosure is not constitutionally limited to 'unambiguously campaign related' advertising." *Id.*

Ironically, the second *McConnell* passage quoted (540 U.S. at 207) was the summation of *McConnell*'s discussion of facial challenge to the electioneering communication *prohibition*, as to which *WRTL II* did in fact limit the scope of regulated "electioneering communications" to those that are unambiguously campaign related, i.e., "ad[s] . . . susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 127 S. Ct. at 2667.

This required analysis mandates that what *WRTL II* called "political speech," *id.* at 2673-74 (distinguished from "campaign speech," *see, e.g., id.* at 2659), must similarly be protected in the disclosure context. Just as broad facial language in *McConnell* did not preclude *WRTL II*'s limitation of the scope of "electioneering communication" based on the unambiguously-campaign-related requirement, so broad facial language in *McConnell* does not preclude restricting the scope of the same term in the disclosure context, based on the same requirement. *See* CU Mem. Part II.

### IV. Disclosure Imposes Substantial Burdens.

The FEC continues to argue that Citizens should have no exemption to the disclosure requirements because it "presents no evidence that its donors will suffer reprisals." *Id.* at 25 (*citing McConnell*, 540 U.S. at 198-99; *Buckley*, 424 U.S. at 69-74, 82 n.109, *NAACP v. Alabama*, 357 U.S. 449 (1958); *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87 (1982).

There are two answers to this. First, this is a straw-man argument. Citizens has clearly stated that it is not arguing for what *Buckley* called a "blanket exemption," 424 U.S. at 72, so as to be free from *all* disclosure out of concern for reprisals against its members. Citizens raises no objection to disclosure of unambiguously-campaign-related activity, but rather that it believes that it and its donors must be free of any burden for choosing to associate for the purpose of amplified, collective speech that is *not* unambiguously campaign related under *WRTL II*'s appeal-to-vote test. Citizens has made this clear in its opening memorandum, *see* CU Mem. 7, 25-26, and, as the FEC notes, both Citizens and its related entities have provided just such disclosure. The FEC is attempting to argue that the *only* as-applied challenge that may be brought to the disclosure provisions is one seeking *Buckley*'s "blanket exemption" for socially-disfavored organizations. But just as WRTL brought an as-applied challenge to the electioneering-communication prohibition based on constitutional arguments, so Citizens brings an as-applied challenge to the electioneer-

ing-communication disclosure requirements on the basis that the challenged provisions require disclosure beyond the line where compelled disclosure is constitutionally permissible—not based on reprisals against its members as would be required for the blanket exemption based on socially-disfavored status. As a result, Citizens is not required to come forward with evidence of reprisals to obtain the blanket exemption that it does not seek. If the FEC wishes to continue arguing against a challenge that Citizens is not making, it is free to do so, but the irrelevant argument must be disregarded.

Second, as set out in the opening memorandum, CU Mem. Part III, and above, *supra* at Part II, compelled disclosure as to core political speech imposes an *inherent* burden on First Amendment privacy rights that is sufficient to trigger strict scrutiny. The FEC makes no serious effort to refute the fact that requiring, for example, the disclosure of Mrs. McIntyre's checkbook register because she funded a non-"campaign" ad would inherently be a violation of First Amendment privacy. *See McIntyre*, 514 U.S. at 342 ("desire to preserve as much of one's privacy as possible"); *Buckley*, 424 U.S. at 66 (disclosure is "invasion of privacy"); William McGeveran, *Mrs. McIntyre's Checkbook: Privacy Costs of Political Contribution Disclosure*, 6 U. Pa. J. Const. L. 1 (2003). And in light of the reaffirmation by *Davis* that compelled disclosure imposes a per se First Amendment privacy burden, No. 07-320, slip op. at 18, the point is now irrefutable.[26]

---

[26]That there is a First Amendment right of privacy is also clear from cases seeking expungement of disclosed information on First Amendment grounds. *Kansans for Life v. Gaede*, 38 F. Supp. 2d 928 (D. Kan. 1999), held first that the request for expungement prevented a case from becoming moot. *Id.* at 932 ("See *Kerr v. Farrey*, 95 F.3d 472, 476 (7th Cir.1996) (request for expungement of misconduct references from prison records is not made moot by prisoner's parole); *Paton v. LaPrade*, 524 F.2d 862, 868 (3rd Cir.1975) (plaintiff may ask for expungement of information gathered by FBI in violation of plaintiff's First Amendment rights, although file and investigation are closed); *Black v. Warden*, 467 F.2d 202, 204 (10th Cir.1972) (case may not be dismissed as moot until plaintiff's disciplinary records are expunged)"). The district court then ordered the state to expunge an independent expenditure report that had been filed at state insistence, but which the court said could not have been required on First Amendment grounds (be-

The FEC even alleges doubt about whether Citizens is really chilled from exercising its First Amendment rights. FEC Mem. 29. This argument is a red herring because the real question is whether disclosure imposes a *burden* on First Amendment rights, which it does. If disclosure imposed no burdens, *Buckley* would not have done *any* constitutional scrutiny of the FECA disclosure requirements. Similarly, if a disclaimer requirement imposes no burden, FEC Mem. 30-33, then *McIntyre*, 514 U.S. 334, would not have engaged in any constitutional scrutiny. Central to the FEC's argument of no burden is its claim that Citizens has not put in evidence for the "blanket exemption" that Citizens does not claim. *Buckley* recognized the burdens that disclosure imposes, so those burdens exist as a matter of law apart from any "blanket exemption" argument.

But Citizens was chilled from broadcasting its Ads at the most opportune time—at the roll-out of its new movie—because it was unwilling to assume burdens that it believes are unconstitutional. And whether or not it has run its Ads at other times is irrelevant, as *WRTL II* held when the same argument was made and rejected in that case. 127 S. Ct. at 2668 ("WRTL did not resume running its ads after the BCRA blackout period because, as it explains, the debate had changed. . . . WRTL's decision not to continue running its ads after the blackout period does not support an inference that the ads were the functional equivalent of electioneering."). As in *WRTL II*, "the debate has changed" because the roll-out of *Hillary: The Movie* has come and gone. In fact, the marketability of a movie about Senator Clinton has declined with the decline of her po-

---

cause the purported "independent expenditure" lacked express advocacy):

> Maintaining the report on file perpetuates the potentially chilling disclosure which the Court in *Buckley* found can infringe on the privacy of association and belief guaranteed by the First Amendment. 424 U.S. at 64. The court is aware of no government interest which in this instance would justify maintaining the disclosure of information collected in violation of the First Amendment. Accordingly, the court shall direct defendants to ask the Kansas Secretary of State to expunge the report filed by plaintiff from the public records. [*Gaede*, 38 F. Supp. at 936.]

SJ Opposition & Reply                    36

litical fortunes—although it is not a moot question because the situation meets the capable-of-repetition-yet-evading-review standard. At present, the more pressing question is whether Citizens will be able to do an ad blitz in connection with its upcoming documentary movie about a candidate in whom the public now has greater interest, Senator Obama.

The FEC also continues to argue that the disclaimer doesn't mislead anyone because it does not require Citizens to use the word "electioneering" in the communication. FEC Mem. 31. This evades the point. The public is familiar with similar disclaimers—speaking of not being "authorized by any candidate or candidate's committee" and including a stand-by-your-ad statement— as indicating an electioneering ad. Similar disclaimers are required for candidate ads, and the same disclaimer is required for express-advocacy ads. *See* 11 C.F.R. § 110.11. Putting the same disclaimer on an ad that *WRTL II* said is not the functional equivalent of express advocacy as one would put on an ad that is functionally equivalent to express advocacy tells the public that this is really the functional equivalent of express advocacy, i.e., a campaign ad, an electioneering ad. That misleads the public. The government may not compel misleading speech.

The FEC cites *Meese v. Keene*, 481 U.S. 465 (1987), for the proposition that Citizens is free to explain that its communications are not really electioneering. That might work for a movie, but it clearly has no application to an ad (especially of the 10- and 30-second varieties). Moreover, *Meese* relied on the fact that people had a long history with the term "political propaganda" and knew that it had a neutral meaning: "We should presume that the people who have a sufficient understanding of the law to know that the term 'political propaganda' is used to describe the regulated category also know that the definition is a broad, neutral one rather than a pejorative one." *Id.* at 483. As discussed above, what the public knows about a disclaimer of the sort here imposed on Citizens' Ads is that it means "campaign speech," not protected "political speech."

**SJ Opposition & Reply**                              37

As to the movie and Ads, since this case is "about political speech," *WRTL II*, 127 S. Ct. at 2673, a higher standard applies than would be applied to labeling imported movies, as *Meese* discusses, or to "securities disclosures," "tobacco labeling," " reporting of releases of toxic substances," and the like. FEC Mem. 32-33 (*quoting National Electric Mfrs. Ass'n v. Sorrell*, 262 F.3d 104, 116 (2nd Cir. 2001)). In fact, the very quotation that the FEC lifts from *Sorrell* acknowledges that the court was dealing with "product and other commercial information" and was not applying "searching scrutiny." *See* FEC Mem. 33. The fact that the government may require, e.g., "nutritional labeling" in no way justifies burdens on core political speech. *See id.*

**V. The Disclosure Requirements and Prohibition Are Unconstitutional as Applied.**

**A. The Ads Are Not Unambiguously Campaign Related.**

In this candidate election campaign context, Citizens' Ads are not "unambiguously related to the campaign of a particular candidate," *Buckley*, 424 U.S. at 80, because, employing the equivalent test under *WRTL II*, they "may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate." 127 S. Ct. at 2670. The FEC acknowledges that the Ads contain no unambiguous "appeal to vote," but claims that this line is meaningless as applied to disclosure. As addressed at length above, *supra* Part I, there must be a bright constitutional line beyond which Congress and the FEC may not require disclosure. The FEC argues for a broad informational interest bounded only by an attempt-to-sway-public-opinion line that is not anchored to the sole constitutional authority, in this candidate election campaign context, which is to regulate elections. But the FEC may not replace the Supreme Court's constitutional line with an unconstitutional one. Under *Buckley*'s unambiguously-campaign-related requirement (from the disclosure context) as applied in the electioneering communication context with the unambiguous-appeal-to-vote requirement, Citizens' Ads may not be subjected to the disclosure

requirements. Because *WRTL II* held that such ads are not "*campaign* speech," 127 S. Ct. at 2659 (emphasis added) ("We conclude that the speech at issue in this as-applied challenge is not the 'functional equivalent' of express campaign speech."), the FEC cannot demonstrate that Citizens' Ads are "unambiguously *campaign* related." *Buckley*, 424 U.S. at 81 (emphasis added).

**B. *Hillary* Is Not Unambiguously Campaign Related.**

In its opening Memorandum, Citizens argued that its documentary movie is neither the functional equivalent of express advocacy nor the functional equivalent of the ads at issue in *McConnell*, so that it may not be subjected to the electioneering communication prohibition, and therefore it is not unambiguously campaign related, so that it is not subjected to the disclosure requirements. The Court is respectfully referred to that analysis, which is not fully repeated here. *See* CU Mem. Part IV.B. The analysis as to the prohibition really comes down to the answers to the two questions set out in the Argument introduction that relate to the movie. *Supra* at 2.

The first key question is whether a full-length documentary movie (that has a compendium book, is sold on DVD, and is shown in theaters) is the same as the "ads" that provided the evidentiary basis for, and to which the trial and Supreme Court limited their analysis in, *McConnell*, 540 U.S. at 126 ("[s]o-called issue ads"), or different in kind and more like a fully-protected book that one must select in order to see its content?

Citizens argued that full-length documentary movies were not at issue in *McConnell*, that a documentary movie is not like the ads at issue in *McConnell*, but more like a book (which has enjoyed full protection from such disclosure requirements), and that the FEC had the burden to show (regardless of the level of scrutiny) that the movies posed the same problems as the brief ads at issue in the *McConnell* evidence. *See* CU Mem. Part IV.B.

In a minimal response, the FEC first isolates the statement about the movie also being shown

in theaters, sold on DVD, and having a compendium book and says that these distribution meth-ods are not prohibited by electioneering communication prohibition. FEC Mem. 44. That goes without saying, but the clear point of the description was that these characteristics further distin-guish the movie from the ads and show that the documentary is not just a long ad but actually a bona fide movie that is different in kind from ads.

The FEC's further answer is that the electioneering communication definition "draws no dis-tinction between ad[s] and movies," *id.*, which begs the question of whether the First Amend-ment mandates that it do so. The FEC then tries to show that the *McConnell* Court took full-length movies into account because of the thirty-minute infomercials discussed by the district court. *Id.* The FEC makes no answer to Citizens' argument that the district court was pointing out that those infomercials had *not* been taken into account in the studies on which both courts relied. CU Mem. 40. In any event, full-length bona-fide movies are also sufficiently different in kind from abbreviated  infomercials (not also shown in theaters, or sold on DVD, or having a compen-dium book) that they would be entitled to constitutional protection even if the infomercials were not (which remains an undecided, as-applied question). The FEC was unable to show that *McConnell* anywhere discussed anything other than ads, but it concludes that the Court was aware of longer electioneering communications when it decided *McConnell*. FEC Mem. 44. That begs the as-applied question and is the same as saying that *McConnell* was aware of genuine is-sue ads so that they lacked constitutional protection from the prohibition—an argument that *WRTL II* rejected. *See* 127 S. Ct. at 2670 n.8. Since the FEC has failed to show that Citizens' movie is at all like the ads at issue in *McConnell*, it may not take advantage of the argument-by-analogy option. *See*, *e.g.*, *WRTL II*, 127 S. Ct. at 2664 ("point to *McConnell* and explain why it applies here"). Instead, the FEC had the burden to do what was done in *McConnell*, namely to

SJ Opposition & Reply                    40

show that *movies* were an "electioneering" problem like certain "ads" were. The FEC offers no evidence, and it had the burden here—which is clearly a strict scrutiny burden since a prohibition is at issue. *Id.* at 2664. Where First Amendment rights are involved, the government "must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 664 (1994) (internal quotation marks and citation omitted).

Of course there are distinct differences between ads and movies that readily come to mind, such as the fact that ads are imposed unawares on a captive audience that has chosen to watch or listen to some program on a different topic, whereas Citizens' movie would have to be selected by a willing viewer. *McConnell* and the studies it cited spoke of myriad ads run prior to elections. 127 S. Ct. at 127 n.2 ("In the 1996 election cycle, $135 to $150 million was spent on multiple broadcasts of about 100 ads.  In the next cycle (1997-1998), 77 organizations aired 423 ads at a total cost between $270 and $340 million.  By the 2000 election, 130 groups spent over an estimated $500 million on more than 1,100 different ads."). But there was, and is, no evidence of any such problem with movies. The FEC bore the strict-scrutiny burden of showing that ads are like movies in such respects, but it failed. It could not, of course, because they are not alike. So movies, like books, retain their historic First Amendment protection against government regulation. The movie may not be prohibited for this reason alone.

The second key question as to the movie was whether, when *WRTL II* limited "the functional equivalent of express advocacy" to communications that could only be unambiguously "interpreted as an appeal to vote for or against a specific candidate," 127 S. Ct. at 2667, it intended that "appeal to vote" require some "exhortation to vote," i.e., a "clear plea for action" that "encour-

ages a vote," as *Furgatch*, 807 F.2d 857, required for the Ninth Circuit's now-rejected contextual "express advocacy" definition? *See supra* at 15 n.14 (*Furgatch* test). Citizens addressed this at length. CU Mem. 33-39. The FEC's response is fourfold.

First, it leans heavily on the "*as*" in *WRTL II*'s test for the functional equivalent of express advocacy. FEC Mem. 41 (emphasis in FEC Mem.). But that *as* has no meaning absent the words that follow it. The communication must be subject to only one interpretation: "as an appeal to vote for or against a specific candidate," *WRTL II*, 127 S. Ct. at 2667. The words are carefully chosen. It is helpful to note what is *not* said. The communication is not to be interpreted *as* "for or against a specific candidate," or *as* "promoting," "attacking," "supporting," or "opposing" ("PASO") the candidate. The question is not whether the communication may only be interpreted *as* "focusing" on a candidate or *as* "criticizing" a candidate. And the question is not whether the communication may be interpreted *as* "the functional equivalent of express advocacy" because *WRTL II* was narrowing the broad *McConnell* language with careful specificity. Rather, the communication must be interpreted, first, "as an *appeal*." But it is not an appeal to consider a candidate's merits or demerits, or the candidate's positions on issues, or anything else about the candidate. Rather, the required appeal must be "*to vote* for or against a specific candidate." And it is impossible to interpret a communication— with all doubts and ties resolved in favor of free speech and no forbidden considerations of intent and effect—as an *appeal* unless there is some verb calling for some action, and under *WRTL II*'s standards, the call to action must be clear and the action called for must clearly be for a vote for or against a specific candidate. Therein lies the relevance of *Furgatch* because its test, too, contained an *as*, 807 F.2d at 864 ("no other reasonable interpretation but *as an exhortation to vote for or against a specific candidate*" (emphasis added)), yet that court still thought that a "clear plea for action" that "encourages a vote" was

required. *Id.* And *Furgatch* is the one case that suggests what a communication might look like that goes beyond "magic words" but still might be the functional equivalent of express advocacy under the unambiguous-appeal-to-vote test. *WRTL II* in narrowing the "functional equivalent of express advocacy" could not have intended to go beyond the limits of *Furgatch*, which had been the outer limit of courts' interpretation of the express advocacy test, to create some abstract test that said "appeal to vote" but really didn't mean it. The FEC's dismissal of *Furgatch* as "irrelevant," FEC Mem. 41 n.21, apparently seeks to avoid an analysis that it has difficulty refuting.[27]

Second, the FEC then tries to recast *WRTL II*'s test by importing details of the application of that test to grassroots lobbying into the test itself. FEC Mem. 41. What the FEC would like to do is to skip over the actual words of the unambiguous-appeal-to-vote test, substitute words from the *application* of the test to specific grassroots-lobbying ads for the test itself and then say that there is some general appeal that can be discerned from things like "focusing" on a candidate. But the actual words of the test require that the ad may only be interpreted by whether there is "an appeal to vote for or against a specific candidate."

Third, the FEC recasts Citizens' explanation of *WRTL II*'s test as being about "the presence or absence of specific words." *Id.* The FEC creates a straw man again. Citizens has demonstrated, with the *Furgatch* illustration, how an ad might avoid the "magic words" but still be subject only to an interpretation "as an appeal to vote for or against a specific candidate" based on a clear plea

---

[27]This seems especially so when the FEC insists that *Furgatch* is irrelevant because it was about express advocacy, which (according to the FEC) in turn was only about vagueness, which is absent in the electioneering communication definition. This response ignores the voluminous briefing above and in Citizens' opening brief about how the "express advocacy" construction was imposed on "expenditure" to prevent a situation where "the relation of the information sought to the purposes of the Act may be too remote," to "insure that the reach of ["expenditure"] [wa]s not impermissibly broad," and to confine "expenditure" to disbursements that were "unambiguously related to the campaign of a particular candidate." *Buckley*, 424 U.S. at 79-80. Those statements all indicate an overbreadth analysis.

for action that clearly constitutes voting.

Fourth, the FEC tries to make the movie unprotected unless it fits the FEC's notion of "issue advocacy," instead of *WRTL II*'s idea of protected "political speech." The FEC's notion of issue advocacy is erroneous. It should first be noted that speech fitting the "electioneering communication" definition but lacking an unambiguous "appeal to vote," *id.* at 2667, is "*political* speech." *Id.* at 2659-60, 2664-66, 2669 n.7, 2672-74 (emphasis added). So the fact that the speech may speak of *political* matters does not mean that it may be regulated. The relevant line as to what communications may be prohibited is not drawn at whether they address political issues. Such political speech is also known as "issue advocacy," *id.* at 2659, but issue advocacy is not defined as being about some particular legislative issue, as the FEC tries to require. *See*, *e.g.*, FEC Mem. 4 (movie "does not focus on legislative issues"). Rather, issue advocacy is merely speech that "conveys information and educates," *WRTL II*, 127 S. Ct. at 2667, on any subject, including political topics. Because *WRTL II* dealt with grassroots lobbying, the ads at issue there did deal with a pending legislative issue, which fact *WRTL II* noted in the *application* of its unambiguous-appeal-to-vote test. *Id.* But that application did not *define* issue advocacy. *WRTL II* defined it in the paragraph following the test and following the application of the test in that unique context. The definition, already noted above, was simple: "Issue advocacy conveys information and educates." *Id.* The Court added the following explanatory note, which indicates that such issue advocacy is not sufficiently unambiguous in its relation to a candidate election to warrant regulation: "An issue ad's impact on an election, if it exists at all, will come only after the voters hear the information and choose—uninvited by the ad—to factor it into their voting decisions." *Id.* The definition of issue advocacy ("political speech") contained no requirement that there be a legislative issue, nor that it be about *any* public issue.

Issue advocacy, i.e., political speech, is defined by the absence of *campaign* speech, not the presence of some particular public issue. Political speech may discuss candidates without including some public issue and still be issue advocacy. So asking "What is the issue?" misses the proper analysis. For example, just as a candidate biography is about that person, not some public issue (although it might address issues in discussing the person), and yet enjoys full First Amendment protection, so a documentary movie about the candidate would also be expected to be about the person, not some public issue, and would be fully protected by the First Amendment. The fact that the information conveyed might be political in nature is unremarkable because "[t]hese cases are about political speech." *Id.* at 2673. In fact, *WRTL II* reaffirmed "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message,'" *id.* at 2671 n.7 (citation omitted), so a communication may not be regulated merely for discussing political matters or not discussing legislative issues. Thus, *WRTL II*'s unambiguous-appeal-to-vote test disregards the presence or absence of political speech or a legislative issue (instead looking for some call to action constituting an appeal to vote), so whether or not the speech speaks of political matters or of issues is irrelevant to the test.

In sum, the FEC failed to prove that the movie contains any clear call to action, with that action clearly being to vote for or against a candidate. Absent that, the prohibition may not be applied. Absent that, the disclosure requirements are unconstitutional as applied to the movie.

## Conclusion

Summary judgment should be granted to Citizens and denied to the FEC.

Respectfully submitted,

/s/ James Bopp, Jr.
James Bopp, Jr., D.C. Bar #CO0041
Richard E. Coleson*
Jeffrey P. Gallant*
Clayton J. Callen*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/235-3685 facsimile
  * pro hac vice motion granted

June 27, 2008                    *Counsel for Plaintiff*

**United States District Court**
**District of Columbia**

| | |
|---|---|
| **Citizens United**,<br><br>          ***Plaintiff***,<br><br> *v.*<br><br>**Federal Election Commission**,<br><br>          ***Defendant***. | **Civ. No. 07-2240** (ARR, RCL, RWR) |

**Plaintiff's Statement of Material Issues and**
**Objections to Defendant's Statement of Undisputed Facts**

Citizens United ("Citizens") submits the following statement of material issues in opposition

the Federal Election Commission's ("Commission") statement of undisputed material facts.

LCvR 7(h), 56.1. The following numbered paragraphs correspond with the Commission's num-

bered paragraphs.

1-3. No response.

4. Citizens objects that the movie speaks for itself. Citizens objects to the Commission's

conclusory statement that *Hillary: The Movie* "focuses on the ongoing presidential election, spe-

cifically Senator Hillary Clinton's candidacy for President of the United States." On the contrary,

*Hillary* is a feature length documentary film on a prominent American political figure. Amended

Verified Complaint ¶ 14 (Doc. 22) ("AVC"). It discusses Senator Clinton's record as First Lady

and United States Senator, as well as her presidential bid. Plaintiff's Statement of Undisputed

Material Facts ¶ 23 ("Pl. Facts").

5. Citizens objects that the movie speaks for itself. Citizens objects to the Commission's

conclusory statement that *Hillary* is "devoted to . . . arguing that [Senator Clinton] lacks the qual-

ifications for, and is not fit to become, President of the United States." While some interviewees

in *Hillary: The Movie* do express opinions on whether Senator Clinton would make a good president, Pl. Facts ¶ 23, and the film does criticize her, AVC Exh. 2, *Hillary* is not devoted to discrediting her qualifications for the presidency.

6. Citizens objects to the Commission's vague and ambiguous use of the word "issue," and the Commission's conclusory statement that "[l]egislative issues are mentioned only in context of critiquing Senator Clinton's character and fitness for the presidency." The film speaks for itself. AVC Exh. 2.

7-9. No response.

10. Citizens objects to the Commission's selective description of "Elections '08" as irrelevant. Nothing in the electioneering communications definition, 11 C.F.R. § 100.29, or the Commission's relevant regulation, 11 C.F.R. § 114.15, considers the nature of the channel on which a communication is broadcast. And even if this consideration were relevant, one of the primary goals of "Elections '08" is to permit "[p]ublic interest groups, associations, unions, and other organizations to communicate their respective views and position on important issues." Defendant's Statement of Material Facts Exh. 8 (filed under seal). Moreover, what is stated at this website is irrelevant to interpreting the message of the movie itself and may not be used. *See FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652, 2668-69 (2007) ("*WRTL II*").

11. Citizens' intention was to broadcast the film within the states and time periods enumerated in ¶ 17 of the Amended Complaint as it believed public interest in the film would be heightened during these times. AVC ¶ 20. However, Citizens did not receive timely judicial relief permitting it to do so and has recognized that the "time-bound details" of those plans are no longer possible. Affidavit of David N. Bossie ¶ 8. If the situation warrants doing so, and if Citizens timely receives the judicial relief requested in its Motion for Summary Judgment, Doc. 52, Citi-

SJ Opposition & Reply                    2

zens may in fact broadcast *Hillary: The Movie* during the 30 day electioneering communication blackout period leading up to the Democratic National Convention (July 29-Aug. 28) and the 60 day period leading up to the November general election. Similarly, upon the completion of its documentary about Senator Barack Obama, Citizens may broadcast this Obama film on cable television during these times if they receive an offer to do so, and the situation warrants doing so.

12-13. No response.

14. Citizens planned to broadcast its Ads in conjunction with the release of *Hillary: The Movie* in order to maximize box office and DVD sales of the film. AVC ¶¶ 19-20. However, Citizens did not receive timely judicial relief permitting it to do so and this opportunity has been irreparably lost. Citizens intends to broadcast materially similar advertisements to promote the release of its upcoming documentary film on Senator Barack Obama. Pl. Facts ¶¶ 15-16. And, to the extent feasible, Citizens still intends to broadcast its Ads for *Hillary: The Movie* at future times. Pl. Facts ¶ 15.

15. No response.

16. Citizens objects to the Commission's unfounded speculation that "the use of a segregated account would likely increase Plaintiff's reporting obligations." *See* 11 C.F.R. § 104.20(c)(7) (requiring disclosure of the name and address of donors giving an aggregate of $1,000 or more to that account); 11 C.F.R. § 104.20(c)(9) (requiring disclosure of "the name and address of each person who made a donation aggregating $1,000 or more to the corporation . . . which was made for the purpose of furthering electioneering communications."). The Commission points to no fact in the record to support this assertion. Furthermore, Citizens has stated it will not run its Ads absent the requested judicial relief, AVC ¶ 26, so any electioneering communications paid for by Citizens will not be subject to any reporting obligations, regardless of their

source.

17. No response.

18. The timing of Citizens' production of its film on Senator Obama is not relevant to any issue in this case.

19-26. Citizens objects to these paragraphs as irrelevant. The Supreme Court has mandated that compelled disclosure is a burden as a matter of law, *Buckley v. Valeo*, 424 U.S. 1, 64 (1976), and the Commission's proposed facts are not relevant to any claim made by Citizens. Furthermore, Citizens is the party in this case and information regarding separate organizations (and their donors) is not relevant to Citizens' claims. *See California Medical Association v. FEC*, 453 U.S. 182, 196 (1981) ("[The] claim that [a PAC] is merely the mouthpiece of [the sponsoring organization] is untenable. [The PAC] instead is a separate legal entity that receives funds from multiple sources and that engages in independent political advocacy.").

27. Citizens objects to this paragraph as containing a legal conclusion not properly included as a statement of fact under LCvR 7(h).

28. Citizens objects to the Commission's vague, ambiguous and irrelevant statement that "[f]ar from suffering reprisals, Plaintiff holds itself out as a well connected, mainstream organization." This statement is a legal conclusion not properly included as a statement of fact under LCvR 7(h). Furthermore, responding to the defamatory characterization of being a "fringe militia" group and noting its "open association" with prominent persons in no way suggests that Citizens does not have prominent political *opponents* in influential positions.

29. No response.

Respectfully submitted,


/s/ James Bopp, Jr.
James Bopp, Jr., D.C. Bar #CO0041
Richard E. Coleson*
Jeffrey P. Gallant*
Clayton J. Callen*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/235-3685 facsimile
 * pro hac vice motion granted
June 27, 2008                *Counsel for Plaintiff*

**United States District Court**
**District of Columbia**

| | |
|---|---|
| **Citizens United**, | |
| *Plaintiff*, | **Civ. No. 07-2240** (ARR, RCL, RWR) |
| *v.* | |
| **Federal Election Commission**, | |
| *Defendant.* | |

**[Proposed] Order**

Defendant's Motion for Summary Judgment (Doc. 55) is DENIED.


SO ORDERED this _____ day of _____2008.


_____
United States Circuit Judge


_____
United States District Judge


_____
United States District Judge